IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ALABAMA,
NORTHEASTERN DIVISION

| | |
|---|---|
| THE ALABAMA DEMOCRATIC CONFERENCE, an Alabama political action committee, DR. EDDIE GREENE, JAMES GRIFFIN, BOB HARRISON, EMMITT E. JIMMAR, and JIMMIE PAYNE, <br><br> Plaintiffs, <br><br> v. <br><br> LUTHER STRANGE in his official capacity as the Attorney General of Alabama; ROBERT L. BROUSSARD, in his official capacity as District Attorney for the 23rd Judicial Circuit; BRYCE U. GRAHAM, JR., in his official capacity as District Attorney for the 31st Judicial Circuit, <br><br> Defendants. | CIVIL ACTION NO. |

## Complaint

1. This action arises under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973; and the First and Fourteenth Amendments to the United States Constitution. This court has jurisdiction to hear this action under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1973*l*.

1

2. This action seeks relief against Alabama Act 2010-765, the Congressman Mike Rogers/Jeff McLaughlin Campaign Finance Transparency Act ("Act 2010-765").

## Parties

3. Plaintiff Alabama Democratic Conference (ADC) is registered with the Alabama Secretary of State as a political action committee.

4. Plaintiff Bob Harrison is an African-American citizen of the United States and a registered voter in Madison County. He has been a candidate for county commission, elected to that office twice, and expects to run for office again. ADC has endorsed him and made GOTV efforts on his behalf. For approximately 20 years he has been a member of the ADC.

5. Plaintiff Emmitt E. Jimmar is an African-American citizen of the United States and a registered voter in Colbert County. He has been a candidate for county commission, elected to that office several times, and expects to run for office again. ADC has endorsed him and made GOTV efforts on his behalf. For approximately 46 years he has been a member of the ADC and has held office as Chairman and Coordinator of the 5th Congressional Distinct and Chairman of the Colbert County ADC.

6. Plaintiff James Griffin is an African-American citizen of the United States and a registered voter in Madison County. For approximately 10 years he has been a member of the ADC.

7. Plaintiff Jimmie Payne is an African-American citizen of the United States and a registered voter in Madison County. For approximately 15 years he has been a member of the ADC and has held office as vice-chair in the Madison County branch of ADC.

8. Plaintiff Dr. Eddie Greene is an African-American citizen of the United States and a registered voter in Madison County. He has been a member of the ADC for approximately 15 years.

9. Defendant Luther Strange is the Attorney General of Alabama and is being sued in his official capacity.

10. Defendant Robert L. Broussard is the District Attorney for the 23rd Judicial Circuit (containing Madison County) and is being sued in his official capacity.

11. Defendant Bryce U. Graham, Jr., is the District Attorney for the 31st Judicial Circuit (containing Colbert County) and is being sued in his official capacity.

## Facts: the ADC

12. The Alabama Democratic Conference (the Black Political Caucus of Alabama) was founded in 1960 when Arthur Shores, Dr. C. G. Gomillion, and other black citizens associated for the advancement of their beliefs and ideas, specifically in an effort to communicate with black voters and influence them to support the Democratic presidential ticket of John F. Kennedy and Lyndon B. Johnson. From its beginnings ADC has expanded its communications activity and has grown to become the state's largest and most effective grassroots political

organization. Today ADC's advocacy extends into most of the counties in the state, through its county units.

  13. Since 1960 ADC's basis mission has been to communicate with, educate, organize, and unify black voters in order to give greater strength to their petitions to state and local government for the redress of grievances, to have the black community respected by candidates and elected officials, and to work toward associating with white individuals of goodwill and progressive organizations in biracial coalitions.  In 1970 the ADC began formally to screen and endorse candidates for public office.  At that time white candidates were reluctant to associate publicly with black political organizations for fear that their opponents would use the association in overt racial appeals to white voters.  In order to gain respect and equal treatment for black citizens and to associate more freely with white candidates, voters and organizations in biracial coalitions, the ADC adopted a rule that year requiring Democratic candidates to come before an ADC screening committee in person before they could be endorsed.  The ADC endorsements were publicized by ADC in a number of ways, including through the now well-known ADC yellow sample ballot distributed to voters at polling places and other locations across the state.

  14. In addition to its endorsement of candidates and related speech,  ADC has  been active in conducting regular voter registration drives and get-out-the-vote ("GOTV") drives; maintaining and communicating with knowledgeable political units in counties and

congressional districts; associating with white candidates and predominantly white organizations in election campaigns and other advocacy; getting more blacks and white candidates of goodwill elected to public office; monitoring the voting, employment, and appointments records of elected officials and communicating that information to voters; securing legislation for the benefit of black and white citizens of Alabama; and sponsoring litigation to create more opportunities for black citizens to vote and otherwise to participate in the political process and to achieve fair and equitable representation at all levels of government.

15. ADC has made expenditures, as that term is defined by the Alabama's Fair Campaign Practices Act (FCPA,) during past elections in GOTV and other communications efforts in support of candidates it has endorsed. ADC intends to continue to run such GOTV programs and to continue its voter education, biracial-coalition building, and other activities.

16. Because, like all other organizations with significant political involvement, ADC routinely spends more than $1,000 in each primary or general election, it has been required to register as a PAC with the Alabama Secretary of State.

17. The average family income of black citizens of Alabama is substantially less than that of white citizens. Census data demonstrate that households occupied by black citizens are more likely than whites to lack access to vehicles, that black individuals and households have

lower income than white household, that black persons are more likely than white persons to be hourly wage-earners, and that accordingly black voters have a greater need than white persons for organizational support in getting rides to polls. In order to fund its GOTV drives, to print and distribute sample ballots, and to build biracial coalitions, the ADC has associated itself with other political groups which provide funding to the ADC.

18.   Alabama has a long history of discrimination in voting at polling places, and this history has lingering effects in terms of the need for poll watchers, voter assistance and other voter protection support on election day.

19.   Black voters in Alabama have a higher need for assistance in voting and a greater dependence on organizational sample ballots as a result of past discrimination in education.

20.   ADC has received contributions (as that term is defined by the FCPA) during past elections from the Alabama Democratic Party, the Alabama Education Association (AEA), A-VOTE (a political action committee affiliated with the AEA), other political action committees, and candidates. ADC will continue to solicit and expects to continue to receive such contributions to support its election communication activities, if they are legal.

## Facts: Act 2010-765

21.   Alabama's Fair Campaign Practices Act has been in effect since 1988 and has been amended several times since then.

22. The Legislature adopted Act 2010-765 in a Special Session in December 2010, and the bill was signed by the Governor on 20 December 2010. A copy of the Act, showing the changes from the previous law, is attached as Exhibit A. Act 2010-765 became effective upon its approval by the Governor.

23. Act 2010-765 amends the FCPA, Ala. Code § 17-5-15 to add the following new provisions:[1]

> (b) [1] It shall be unlawful for any political action committee, 527 organization, or private foundation, including a principal campaign committee, to make a contribution, expenditure, or any other transfer of funds to any other political action committee, 527 organization, or private foundation.
>
> [2] It shall be unlawful for any principal campaign committee to make a contribution, expenditure, or any other transfer of funds to any other principal campaign committee, except where the contribution, expenditure, or any other transfer of funds is made from a principal campaign committee to another principal campaign committee on behalf of the same person.
>
> [3] Notwithstanding the foregoing, a political action committee that is not a principal campaign committee may make contributions, expenditures, or other transfers of funds to a principal campaign committee and a separate segregated fund established by a corporation under federal law if the fund does not receive any contributions from within this state other than contributions from its employees and directors is not restricted by this subsection in the amount it may

---

[1] For ease in reading and reference, the three sentences of the subsection are presented separately and numbered.

> transfer to a political action committee established under the provisions of Section 10A-21-1.01 by the same or an affiliated corporation.

24. "Political action committee" and "principal campaign committee" are defined by Ala. Code 17-5-2 as follows:

> (10) POLITICAL ACTION COMMITTEE. Any political action committee, club, association, political party, or other group of one or more persons which receives or anticipates receiving contributions or makes or anticipates making expenditures to or on behalf of any elected official, proposition, candidate, principal campaign committee or other political action committee. For the purposes of this chapter, an individual who makes a personal political contribution shall not be considered a political action committee.

> (11) PRINCIPAL CAMPAIGN COMMITTEE. The principal campaign committee designated by a candidate under Section 17-5-4. A political action committee established primarily to benefit an individual candidate or an individual elected official shall be considered a principal campaign committee for purposes of this chapter.

25. Neither Act 2010-765 nor the FCPA defines the term "527 organization." It is not clear if the Act adopts by implication the following definition found in the Internal Revenue Code, 26 U.S.C. § 527(e):

> (1) Political organization

> The term "political organization" means a party, committee, association, fund, or other organization (whether or not incorporated) organized and operated primarily for the purpose of directly or indirectly

8

accepting contributions or making expenditures, or both, for an exempt function.

(2) Exempt function

The term "exempt function" means the function of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office or office in a political organization, or the election of Presidential or Vice-Presidential electors, whether or not such individual or electors are selected, nominated, elected, or appointed. Such term includes the making of expenditures relating to an office described in the preceding sentence which, if incurred by the individual, would be allowable as a deduction under section 162(a).

26. Act 2010-765 prohibits transfers to or from PACs, 527 organizations, private foundations, principal campaign committees of candidates, and political parties, with the exception of the following:

  a. Any political entity may contribute to a principal campaign committee of a state candidate (except for a limitation of $1,000 on transfers from a federal principal campaign committee to a principal campaign committee of the same individual running for a state office) [contained in Section 3 of the Act].

  b. "[A] principal campaign committee, during a term of office commencing on the day after the election for the seat or office the candidate seeks and ending on the day of the next general election for that seat or office, may pay qualifying fees to a political party and may expend up to a cumulative total of five thousand dollars ($5,000) of campaign contributions, and any proceeds from investing the

9

contributions, for the following purposes: (1) Tickets for political party dinners or functions[;] (2) State or local political party dues or similar expenses incurred by independent or write-in candidates" [added to § 17-5-7(d)].

      c.  "[A] separate segregated fund established by a corporation under federal law if the fund does not receive any contributions from within this state other than contributions from its employees and directors is not restricted by this subsection in the amount it may transfer to a political action committee established … by the same or an affiliated corporation" [added to § 17-5-15(b)]. This provision is inconsistent with federal law which allows a corporation to solicit contributions to its separate segregated fund from "its stockholders and their families and its executive or administrative personnel and their families." 11 C.F.R. § 114.5(g)(1). Federal law also allows "[a] labor organization, or a separate segregated fund established by a labor organization [to solicit] contributions to such a fund from … its members and executive or administrative personnel, and their families." 11 C.F.R. § 114.5(g)(2).

      27.  Violation of Ala. Code § 17-5-15 is a Class A misdemeanor punishable to twelve months imprisonment and a fine of two thousand dollars. Ala. Code §§ 13A-5-7 and -12 and 17-17-35.

      28.  Violation of the new provision added by Section 3 is a Class C felony punishable by imprisonment of not less than a year and a day and not more than ten years. Ala. Code § 13A-5-6(a)(3).

## Count One: Violation of the First Amendment

29. All paragraphs above are realleged as if set out fully herein.

30. Act No. 2020-765 interferes with the rights and benefits of association of the ADC, its members, and those who wish to assist in its mission.

31. Under Act 2010-765, it is illegal for the ADC to receive contributions from political action committees such as the Alabama Democratic Party, the AEA, and A-VOTE. Ala. Code § 17-5-15(b), sentence [1].

32. Under Act 2010-765 it is illegal for the ADC to associate with like-minded PACs, including the Democratic Party and others, and expend or receive funds so that the associated groups can more effectively petition the government for the redress of their grievances, and associate to persuade and encourage voters to cast ballots for candidates of their choice.

33. Under Act 2010-765, it is illegal for the ADC to receive contributions from principal campaign committee of candidates wishing to associate with the ADC and to communicate with and encourage participation by black voters. Ala. Code § 17-5-15(b), sentence [2].

34. The Attorney General of Alabama and the respective district attorneys may prosecute violations of Title 17, Chapter 5. Ala. Code § 17-17-35(d), (e).

35. The U.S. Court of Appeals for the D.C. Circuit recently summarized the Supreme Court case law on campaign contribution limits in *SpeechNow.org v. Federal Election Com'n,* 599 F.3d 686, 692 (D.C. Cir. 2010) (citations omitted):

> When the government attempts to regulate the financing of political campaigns and express advocacy through contribution limits, therefore, it must have a countervailing interest that outweighs the limit's burden on the exercise of First Amendment rights. Thus a "contribution limit involving significant interference with associational rights must be closely drawn to serve a sufficiently important interest." The Supreme Court has recognized only one interest sufficiently important to outweigh the First Amendment interests implicated by contributions for political speech: preventing corruption or the appearance of corruption.

36. The only type of "corruption" that may be used as a basis of a restriction on campaign contributions or expenditures is quid pro quo corruption involving contributions to candidates for office.

37. The only interest stated by legislators in favor of Act 2010-765 was that expressed in its title – transparency, that is, the right of the public to know who was making contributions to candidates.

38. The source of campaign contributions by PACs in the State of Alabama already is disclosed to the public. The Alabama Secretary of State maintains on her official web site a searchable database of all contributions to and by PACs that meet the legal threshold for reporting. As stated by then-candidate Bradley Byrne to the *Montgomery Advertiser* when that paper asked him at an October 2009

news conference whether there was a way to be certain he was not receiving any money indirectly from the Alabama Education Association (AEA):

> Yeah, y'all know how to read the financial reports. You can follow a PAC contribution, even if they wash it through this PAC-to-PAC thing. If you see A-vote money or one of the other PACs that (AEA) have given to this PAC, giving to that PAC and it ends up in my campaign or somebody else's campaign, it's going to tell you.
>
> And we're going to be watching that very carefully. We're going to make it very clear to anybody that's trying to send us money ... if you're going to make a PAC contribution, don't put it in a PAC that has any AEA money in it because we don't want it.

*Montgomery Advertiser,* March 16, 2010.

  39. In the 2011 Regular Session, the Legislature adopted two Acts which provide actual transparency in campaign finance by means other than the restrictions on the ADC in Act 201-765:

    a. Act No. 2011-687 (SB136) requires monthly campaign finance reports beginning 12 months before a primary, special, or general election, weekly reports during the month before an election, and daily reports during the last eight days before an election. This Act becomes effective on 1 September 2011, but has not yet been submitted for preclearance pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. 1973c.

    b. Act No. 2011-697 (SB284) provides, with certain exceptions, that electioneering communications and political

advertisements paid for by an organization or entity shall disclose the names of the source of the funding of the organization or entity. This Act becomes effective on 1 July 2011, but has not yet been submitted for Section 5 preclearance.

 40. Act 2010-765 was not adopted to prevent *quid pro quo* corruption or the appearance of such corruption in organizations such as the ADC.

 41. Act 2010-765 is not closely drawn to achieve the legitimate interest in preventing *quid pro quo* corruption or the appearance of such corruption.

  a. The Act prohibits transfers of funds that will be used for independent expenditures, for GOTV activities, for voter protection activities, and for other communication expenditures, as well as transfers of funds which will ultimately be given to candidates' principal campaign committees.

  b. Since ADC's receipt of contributions from candidates, the Alabama Democratic Party, or other PACs does not involve a contribution *to* a candidate, there is no danger of *quid pro quo* corruption. Since the ADC's expenditures for GOTV drives, voter protection, and other communication expenditures do not involve a contribution *to* a candidate, there is no danger of *quid pro quo* corruption.

  c. The ADC has established procedures to isolate donations from individuals and businesses and to ensure that no funds

from other PACs, 527 organizations, or private foundations will be contributed to candidates. To the extent that the prevention of *quid pro quo* corruption or the appearance of such corruption is a valid basis of Act 2010-765, this isolation of donations will prevent both corruption and the appearance of corruption.

42. The State of Alabama has no legitimate interest in preventing or interfering with the efforts of the ADC to encourage black citizens to register and vote by providing rides to the polls, protection against harassment, or communication of election-related information to voters.

## Prayer for Relief (Count One)

43. WHEREFORE, the plaintiffs respectfully pray that this Court will grant it the following relief:

   a. Enjoin the defendants, their successors, and those acting in concert with them or at their direction from enforcing the amendment to Ala. Code § 17-5-15(b) made by Act 2010-765 against any organization making transfers or contributions to the plaintiff ADC or against ADC for receiving such transfers or contributions;

   b. Enjoin the defendants, their successors, and those acting in concert with them or at their direction from enforcing the amendment to Ala. Code § 17-5-15(b) made by Act 2010-765 against ADC for making contributions to candidates if the funds for such contributions were received directly from individuals or businesses.

   c.  Grant such other and further equitable relief as may be necessary.

   d.  Award plaintiffs their costs incurred in prosecuting this action, including an award of attorneys' fees and expenses, pursuant to 42 U.S.C. § 1988.

## Count Two: Violation of § 2 of the Voting Rights Act's Results Standard

 44.  All paragraphs above are realleged as if set out fully herein.

 45.  This Count is a claim to enjoin violations of Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. Pursuant to 42 U.S.C. §§ 1973j, 1973l, 1983, and 1988, this Court has jurisdiction to afford plaintiffs the judicial relief they seek for violation of their rights protected by the aforesaid statutory and constitutional provisions.

 46.  This Count is brought by all plaintiffs against all defendants.

 47.  Act 2010-765 will have a disparate impact on African Americans because of the needs of African-American voters as set forth above.

 48.  Act 2010-765 contains standards, practices, and procedures that result in the abridgement or dilution of the right to vote or to participate in the political process on account of the voters' race or color in violation of § 2 of the Voting Rights Act, 42 U.S.C. § 1973. As noted

above, African-American voters in Alabama disproportionately have a need for GOTV programs. ADC has fulfilled that task for several decades. Act 2010-765 will prohibit and interfere with ADC's fundraising for an effective GOTV program.

49. As result of Act No. 2010-765 and its interference with GOTV efforts of ADC, a number of black voters will be unable to get to the polls to vote, and thus will be effectively barred from access to the franchise. Black citizens will be disproportionately disadvantaged by such interference.

50. As a result of Act No. 2010-765 and its interference with voter protection efforts of ADC, a number of black voters will suffer discriminatory treatment at the polls so as to deny their ability to cast an independent and informed ballot, and so as to chill their future participation. Black citizens will be disproportionately disadvantaged by such interference.

51. Act No. 2010-765 disproportionately reduces and forecloses the access of minority candidates to amassing the resources necessary to run an effective campaign against their majority-race opponents. Accordingly, as a result of Act No. 2010-765 "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section." 42 U.S.C. § 1973(b).

52. Under the totality of circumstances test, Act No. 2010-765 has a discriminatory effect on the ability of black voters in Alabama to

17

participate in the political process and elect candidates of their choice to public office.

## Prayer for Relief (Count Two)

53.  WHEREFORE, the plaintiffs respectfully pray that this Court will grant it the following relief:

   a.  Enter a declaratory judgment that Act 2010-765 violates the rights of plaintiffs and the class they seek to represent protected by § 2 of the Voting Rights Act, 42 U.S.C. § 1973.

   b.  Enjoin the defendants, their successors, and those acting in concert with them or at their direction from enforcing the amendment to Ala. Code § 17-5-15(b) made by Act 2010-765 against any organization making transfers or contributions to the plaintiff ADC for use in GOTV efforts;

   c.  Enjoin the defendants, their successors, and those acting in concert with them or at their direction from enforcing the amendment to Ala. Code § 17-5-15(b) made by Act 2010-765 against the plaintiff ADC for receipt of any transfer from any organization made for use in GOTV efforts;

   d.  Grant such other and further equitable relief as may be necessary.

   e.  Award plaintiffs their costs incurred in prosecuting this action, including an award of attorneys' fees and expenses, pursuant to 42 U.S.C. §§ 1973*l* and 1988.

                          Submitted by,

                          /s/ Edward Still

| | |
|---|---|
| Osaygefo Grubbs | Edward Still |
| Joe M. Reed & Associates, LLC |   Ala. Bar No. ASB-4786-I47W |
| 524 S. Union Street | 130 Wildwood Parkway |
| Montgomery, AL 36104 | STE 108 PMB 304 |
| Phone: 334-834-2000 | Birmingham AL 35209 |
| Fax: 334-834-2088 | Phone & fax: 205-320-2882 |
| email: ogrubbs@bellsouth.net | email: still@votelaw.com |

John K. Tanner
3743 Military Rd, NW
Washington DC 20015
Phone: 202-503-7696
Email:
john.k.tanner@gmail.com
(Motion for *pro hac vice*
admission pending)