FILED
2011 Aug-01  PM 11:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| THE ALABAMA DEMOCRATIC CONFERENCE, an Alabama political action committee, *et al.*, | ) ) ) ) | |
| *Plaintiffs,* | ) ) | Civil Action No. |
| v. | ) | 5:11-cv-02449-JEO |
| LUTHER STRANGE, in his official capacity as Attorney General of Alabama, *et al.*, | ) ) ) ) | |
| *Defendants.* | ) ) | |

## MOTION TO DISMISS

The defendants—Attorney General Luther Strange and District Attorneys Robert L. Broussard and Bryce U. Graham Jr. (collectively, the "State" or "State Defendants")—move the Court to dismiss the complaint for its failure to state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6).[1]

## INTRODUCTION

For years before passage of Ala. Act No. 2010-765 (*see* Ex. A), Alabama law allowed political operatives free reign to shift campaign money

---

[1] In support of their motion, the State Defendants submit certain materials not included in the complaint. The State relies on these materials strictly to establish facts of which the Court may take judicial notice—i.e., facts "not subject to reasonable dispute" because they are "generally known" within the Court's territorial jurisdiction or "capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned." FED. R. EVID. 201(b). Eleventh Circuit precedent suggests that as a result, the Court need not treat the State's motion as one for summary judgment. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir.1999); *cf.* FED. R. CIV. P. 12(d).

indiscriminately among political action committees, or "PACs." The result, as many scores of editorials and news articles have noted, has been the emasculation of the State's campaign finance disclosure laws and an entrenched perception that politicians' votes or other official action was up for sale. *See generally* Ex. B, Selected News Articles, 1993-2011. Indeed, given the federal indictment alleging that at least one Alabama state senator received bribes under cover of these "PAC-to-PAC transfers," *see* Ex. C, Indictment, *United States v. McGregor*, No. 2:10-cr-00186-MHT (M.D. Ala. Oct. 1, 2010) (hereinafter "Bingo Indictment"), at ¶¶ 133-155, that perception was accurate.

This case requires the Court to decide whether the First Amendment or Section 2 of the Voting Rights Act of 1965, 42 U.S.C. §1973, prevents Alabama from ending this regrettable situation by banning PAC-to-PAC transfers. But as we explain below, neither provision does: Given the ban's negligible interference with activities protected by the First Amendment, it is easily justified by Alabama's countervailing interests in (1) promoting transparency in campaign finances and (2) preventing corruption. Likewise, the ban cannot plausibly be viewed as a "standard, practice, or procedure" resulting in the "denial or abridgement" of black Alabamians' right to vote "on account of race or color." 42 U.S.C. §1973(a). Consequently, the complaint is due to be dismissed.

## BACKGROUND

### A.   The Alabama Fair Campaign Practices Act

Alabama historically has taken a "minimalist approach" to regulating political campaigns.  Edward A. Hosp, *Alabama Campaign Finance Law*, 68 ALA. LAW. 379, 379 (2007).  Under the State's "Fair Campaign Practices Act," *see* ALA. CODE §§17-5-1 *et seq.*, the main unit of regulation is a PAC, which is broadly defined to include "[a]ny . . . group of one or more persons" that plans to receive or spend money for the purpose of influencing a state election.  *Id.* §17-5-2(10); *see also id.* §17-5-2(2) & (4).  A candidate's principal campaign committee is a type of PAC, *see id.* §17-5-2(11), but the definition of PAC specifically excludes an "individual who makes a personal political contribution."  *Id.* §17-5-2(10).  PACs must register, *see id.* §17-5-5; appoint certain officers, *see id.* §17-5-3(a); maintain a separate bank account, *see id.* §17-5-3(b); keep records of their contributions and expenditures, *see id.* §17-5-3(c) & (d); and publicly disclose certain information about those contributions and expenditures, *see id.* §17-5-8.

There are a few other notable regulations; for example, candidates may not raise funds while the Legislature is in session, *see id.* §17-5-7(b)(2), and certain political ads and campaign literature must identify the person or entity responsible for their broadcast or distribution, *see id.* §§17-5-12 & -13.  But in general, this organization-and-disclosure scheme represents the primary way in which Alabama

regulates campaign activity.  Significantly, there are no limits on the amount of

money individuals may give to a PAC (including candidates' principal campaign

committees); and there are only nominal limits on how much money corporations

may so give.[2]  Until recently, there also was no limit on the amount of money

PACs could transfer to candidates or other PACs.

### B.     The Ban on PAC-to-PAC Transfers & Other Recent Legislative Activity

The ability to transfer money freely among PACs led to the circumvention

of the State's disclosure rules and effective anonymity for high-dollar political

contributors.  As one editorial put it, the system worked like this:

> [A] contribution from an individual or an interest group
> [could] be made to one PAC, which [could] then make a
> contribution to another PAC, which [could] then make a
> contribution to another PAC, and on and on until some
> PAC eventually gets the money to the candidate. By then,
> the link between the original contributor and the recipient
> the contributor intended to get the money all along
> [would be] effectively erased.

Editorial, *PAC Bill Step Toward Reform*, MONTGOMERY ADVERTISER, April 23,

2004, at A7 (Ex. B at 50).  PAC-to-PAC transfers, in other words, were "the

---

[2]  The Alabama Code purports to limit corporations' political contributions to $500 per election.  *See* ALA. CODE §§10-2A-70.1 & -70.2.  For a discussion of how corporations may in fact give many times this amount, see HOSP, *supra*, at 381-82.  One main way to do this is through PAC proliferation.  Because there is no limit on the number of PACs to which a corporation may give, a determined corporate donor may spread its money around various PACs, earmarking the funds for their intended recipients.

4

closest thing yet to legalized money laundering." Editorial, *Campaign Finance Reform: The Devil Is In The Loopholes*, MOBILE PRESS-REGISTER, Nov. 27, 2010, at A8 (Ex. B at 125).

This system, in turn, created opportunities for corrupt deal-making between influence-seekers and public officials. Without effective public disclosure, donors were free to extract promises of official action as a condition for their contributions—and candidates were free to oblige them. Or at least there was a general perception to that effect. *See, e.g.*, Ex. B, Selected News Articles, 1993-2011, at 13, 51-52, 62-63, 93, 104. A federal indictment filed in October 2010, which alleged that at least one Alabama state senator took bribes with the help of PAC-to-PAC transfers, *see* Ex. C, Bingo Indictment at ¶¶ 133-155, reinforced these suspicions. *See also, e.g.*, Glen Browder, Op-Ed, *PAC-to-PAC Transfers Breed Corruption*, MOBILE PRESS-REGISTER, Oct. 17, 2010, at A17 (Ex. B at 117-18).

Soon after the 2010 election, the newly elected Alabama Legislature acted to address this problem. It passed Act 2010-765, the "Congressman Mike Rogers/Jeff McLaughlin Campaign Finance Transparency Act." At its heart is the provision banning PAC-to-PAC transfers at issue in this case:

> It shall be unlawful for any political action committee, 527 organization, or private foundation, including a principal campaign committee, to make a contribution, expenditure, or any other transfer of funds to any other

> political action committee, 527 organization, or private foundation.

ALA. ACT NO. 2010-765, §2 (amending ALA. CODE §17-5-15) (Ex. A at 6).  There are three primary exceptions:  First, a PAC that is not a candidate's principal campaign committee may give money to candidates' principal campaign committees.  *See id.* (Ex. A at 7).  Second, if a corporation maintains a "segregated fund established . . . under federal law" (for participation in federal elections), that fund may freely transfer funds to the corporation's affiliated PAC established under ALA. CODE §10A-21-1.01 (for participation in state elections).  *See id.* (Ex. A at 7).  And third, there is a limited exception (for one class of candidates' principal campaign committees) for party qualifying fees, party dues, and tickets to political party dinners or functions.  *See id.* §2 (amending ALA. CODE §17-5-7) (Ex. A at 5).

As part of its efforts to reform campaign practices in Alabama, the Legislature also recently enacted two other pieces of legislation.  One act increases the frequency of PACs' required financial disclosure reports.  *See* ALA. ACT NO. 2011-687 (amending ALA. CODE §17-5-8).  Another requires more detailed disclosure about funding sources for "electioneering communications" and paid political advertisements.  *See* ALA. ACT NO. 2011-697 (amending ALA. CODE §§17-5-2, -8, & -12).  To the extent necessary, the Attorney General's Office has

submitted these changes to the United States Department of Justice for

preclearance under Section 5 of the Voting Rights Act.

### C.    The Plaintiffs and Their Claims

This challenge to the PAC transfer ban is brought by the Alabama

Democratic Conference ("ADC") and five of its members. *See* doc. 1, ¶¶ 3-8. The

ADC is a registered political action committee, *id.* ¶ 16, whose mission is to

"communicate with, educate, organize, and unify black voters." *Id.* ¶ 13. To do

this, the ADC "endorse[s] candidates for public office," *id.*, conducts "regular

voter registration drives and get-out-the-vote ('GOTV') drives," *id.* ¶ 14, and

engages in a host of other political activity, *id.* ¶¶ 13-14. It receives funding from

"the Alabama Democratic Party, the Alabama Education Association (AEA), A-

VOTE (a political action committee affiliated with the AEA), other political action

committees, and candidates." *Id.* ¶ 20.

The complaint purports to state two causes of action. First, it alleges that the

PAC transfer ban violates the First Amendment by preventing the ADC from

receiving contributions from other PACs, including candidates' principal campaign

committees. *Id.* ¶¶ 31, 33. (It also appears to claim a First Amendment violation

on the ground that ADC may no longer "expend . . . funds" in further  of

"associat[ing] with like-minded PACs." *Id.* ¶ 32.)   On this basis, it asks the Court

to enjoin the State from enforcing the PAC transfer ban against: (1) any

organization that transfers money to the ADC in violation of the ban, *id.* ¶ 43.a, and (2) the ADC, either for accepting such transfers, *id.*, or for giving money to candidates "if the funds for such contributions were received directly from individuals or businesses," *id.* ¶ 43.b.

The complaint also purports to state a claim under section 2 of the Voting Rights Act of 1965, 42 U.S.C. §1973. This claim is premised on allegations that black voters have: (1) "a greater need than white persons for organizational support in getting rides to polls," *id.* ¶ 17; (2) a "need for poll watchers, voter assistance and other voter protection," *id.* ¶ 18; and (3) "a greater dependence on organizational sample ballots," *id.* ¶ 19. According to the complaint, the PAC transfer ban thus results in a "discriminatory effect on the ability of black voters in Alabama to participate in the political process and elect candidates of their choice to public office." *Id.* ¶ 52. This claim, too, seeks to enjoin the State from enforcing the ban against any organization transferring money to the ADC, or against the ADC for accepting such transfers—at least insofar as the transfers relate to the ADC's get-out-the-vote efforts. *Id.* ¶¶ 53.a-53.b.

## MOTION TO DISMISS STANDARD

The Court should dismiss the complaint unless it "'state[s] a claim to relief that is plausible on its face.'" *American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S.

8

544, 570 (2007)).  Although the complaint's factual allegations must be accepted

as true at this stage, they must "raise a right to relief above the speculative level."

*Id.* (quoting *Twombly*, 550 U.S. at 555).  Critically,  "the tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions."  *Id.* at 1290 (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949

(2009)).

**ARGUMENT**

## I.    The PAC transfer ban does not violate the First Amendment.

The First Amendment, which prohibits States from passing any law

"abridging the freedom of speech," U.S. CONST. amend. I,[3] "has its fullest and most

urgent application to speech uttered during a campaign for political office.'"

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806,

2817 (2011) (quoting *Eu v. San Francisco County Democratic Cent. Comm.*, 489

U.S. 214, 223 (1989) (internal quotation marks omitted)).  In that spirit, the

Supreme Court has subjected laws that substantially burden political speech to

"strict scrutiny," under which the State must prove that the restriction is narrowly

tailored to further a compelling governmental interest.  *Id.* (citing *Citizens United

v. FEC*, 130 S. Ct. 876, 898 (2010)).

---

[3] The First Amendment applies to the States by operation of the Fourteenth Amendment.
*See New York Times Co. v. Sullivan*, 376 U.S. 254, 276-77 (1964).

This does not mean, however, that States are powerless to regulate the political process. They may pass campaign restrictions that can withstand strict scrutiny. Or, they may pass restrictions that pose a lesser burden on First Amendment interests. The Supreme Court has subjected such "less onerous" restrictions on campaign-related speech "to a lower level of scrutiny and upheld [them]." *Id.*; *see also Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 452 (2008) (explaining that "[i]f a statute imposes only modest burdens" on associational rights, strict scrutiny does not apply). Under this lower level of scrutiny, the provision at issue need only bear a "substantial relation" to, *see, e.g.*, *Citizens United*, 130 S. Ct. at 914, or be "closely drawn" in furtherance of, *see, e.g.*, *Arizona Free Enterprise*, 131 S. Ct. at 2817, a state interest that is "sufficiently important," *see, e.g.*, *id.*

For the reasons that follow, Alabama's ban on PAC-to-PAC transfers falls squarely into this second category of "less onerous" restrictions subject to lower-level scrutiny. But even if the ban is subject to strict scrutiny, it would survive because it is narrowly tailored to serve a compelling state interest. Not only does it promote transparency as to the sources of campaign funding, it also will play a vital role in preventing actual or perceived corruption. Either way, the ban does not violate the First Amendment.

## A. The ban imposes only a marginal burden on activities protected by the First Amendment.

"[S]trict scrutiny is appropriate only if the burden [on First Amendment interests] is severe," *Clingman v. Beaver*, 544 U.S. 581, 592 (2005), but the ban on PAC-to-PAC transfers does not present such a burden.  It does not limit any candidate or group's ability to speak.  Nor does it limit, on its face, any candidate or group's ability to raise funds.  (To the extent it may limit fundraising in practice, it is only because some current donors will not want their contributions to face publicity.)  All it does is prevent the *transfer* of funds among groups once those funds have been given in the first instance.

In this respect, the transfer ban bears little resemblance to any of the other campaign regulations the Supreme Court has subjected to strict scrutiny.  It does not ban particular messages or forms of speech.  *Cf. Citizens United*, 130 S. Ct. at 897 (describing the ban on corporate electioneering communications as "an outright ban" on speech); *Eu*, 489 U.S. at 223-25 (prohibition on state political parties endorsing candidates in party primaries); *see also First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 786 (1978) (strict scrutiny is appropriate "[e]specially where . . . a prohibition is directed at speech itself").  Nor does it limit spending for political purposes. *Cf. Colorado Republican Federal Campaign Comm. v. FEC*, 518 U.S. 604, 608 (1996) (limits on uncoordinated political party expenditures); *FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986)

(restraints on independent expenditures applied to express advocacy groups);
*Buckley v. Valeo*, 424 U.S. 1, 52-54 (1976) (per curiam) (restrictions on campaign
expenditures).  Nor does it impose a "penalty" on the exercise of one's First
Amendment rights.  *Cf. Arizona Free Enterprise*, 131 S. Ct. at 2818; *Davis v. FEC*,
554 U.S. 724, 739-40 (2008). Finally, it does not discriminate based on the content
of any message.  *Cf. United States v. Playboy Entertainment Group, Inc.*, 529 U.S.
803, 811 (2000) (regulation targeting "sexually explicit adult programming").

    Nor does the PAC transfer ban impose any serious burden on the plaintiffs'
associational rights.  It may be true that "[t]he right to join together for the
advancement of beliefs and ideas . . . is diluted if it does not include the right to
pool money through contributions, for funds are often essential if 'advocacy' is to
be truly or optimally 'effective.'" *Buckley*, 424 U.S. at 65-66 (quoting *NAACP v.
Alabama*, 357 U.S. 449, 460 (1958)).  But the PAC transfer ban leaves individuals
free to pool their money with other individuals without limit.  It even leaves a PAC
free to coordinate expenditures and activities with another PAC without limit—so
long as money does not change hands between the two PACs.  Again, it is only the
*transfer* of those pooled funds to another group that may not occur.  That limited
prohibition leaves plenty of room for associational activities to occur.

    If anything, given its purpose and operation, the PAC transfer ban looks
most like a disclosure requirement under which candidates or groups must identify

12

their contributors. Because disclosure requirements "do not prevent anyone from speaking," *Citizens United*, 130 S. Ct. at 914 (quoting *McConnell*, 540 U.S. at 201), and "impose no ceiling on campaign-related activities," *Buckley*, 424 U.S. at 64, they have long been upheld under a less demanding standard of review. *See id.* at 64, 66 (analyzing disclosure requirements to ensure there is a "substantial relation" between the challenged provision and a "sufficiently important" government interest). The Supreme Court's descriptions of disclosure rules apply with equal force to the PAC transfer ban and thus require application of the corresponding, lower-level scrutiny that Court used to uphold such measures. The transfer ban should be upheld if its bears a substantial relation to a sufficiently important government interest.

### B.     The ban furthers the State's interests in promoting transparency and preventing corruption.

1.     *Preventing Circumvention of Disclosure Rules*: Under the Supreme Court's "lower-level" scrutiny, the ban survives at a minimum because it prevents the circumvention of the State's disclosure requirements—which are themselves unquestionably constitutional under the First Amendment, *see e.g.*, *Citizens United*, 130 S. Ct. at 913-16 (upholding disclosure requirements by vote of eight of the nine Justices). With unfettered PAC-to-PAC transfers, campaign funds were commingled with other funds and shuffled around until it was impossible for

13

members of the public to determine who gave the money in the first place.  *See, e.g.*, Ex. B at 3, 15-16, 28, 43, 49, 71, 98.[4]  By ending this practice, the PAC transfer ban thus serves the disclosure rules' function of "provid[ing] the electorate with information" about the sources of political campaign funds, *Buckley*, 424 U.S. at 66, and helping citizens "'make informed choices in the political marketplace.'" *Citizens United*, 130 S. Ct. at 914 (citation omitted); *see also United States v. Harriss*, 347 U.S. 612, 625 (1954) (lobbying disclosure rules provide a "modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose").  Because the disclosure rules are valid under the First Amendment, preventing circumvention of them is itself a valid interest. *See, e.g.,  FEC v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 456 (2001) ("all Members of the Court agree that circumvention [of contribution limits] is a valid theory of corruption"); *Buckley*, 424 U.S. at 67-68 (apart from other justifications, disclosure rules can be justified because they are essential to detecting violations of contribution limits).

In this regard, the PAC transfer ban is similar to several other types of campaign regulations that have been upheld on an anti-circumvention theory.  One example is statutes such as ALA. CODE §17-5-15, which make it unlawful for

---

[4] Campaign finance reports of PACs (including candidates' principal campaign committees) are available online.  *See* http://arc-sos.state.al.us/CGI/ELCNAME.MBR/INPUT. Interested readers may peruse reports from before December 20, 2010 (the date Act 2010-765 was signed into law) to test for themselves the extent to which PAC-to-PAC transfers undercut the State's disclosure rules.

individuals to make political contributions in the name of another person. *See Mariani v. United States*, 212 F.3d 761, 775 (3rd Cir. 2000) ("Proscription of conduit contributions (with the concomitant requirement that the true source of contributions be disclosed) would seem to be at the very core of the [*Buckley*] Court's analysis" upholding disclosure requirements); *State v. Moyer*, 230 P.3d 7, 17 (Or. 2010) (en banc) ("A law that forbids making a contribution using another person's name is not . . . more burdensome than a law . . . requiring disclosure of the identity of the contributor in the first instance."), *cert. denied*, 131 S. Ct. 326 (2010). Another example is a nearly indistinguishable Minnesota statute banning transfers among *candidate* campaign committees. *See Minnesota Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106, 1112-13 (8th Cir. 2005) (upholding a transfer ban in part "to prevent circumventing the contribution/ spending limits").

Ultimately, the State's transparency interest also suffices to carry the PAC transfer ban in a strict-scrutiny analysis as well. This is because promoting transparency and preventing corruption—itself a compelling interest, *e.g.*, *Citizens United*, 130 S. Ct. at 909–are inextricably intertwined: Transparency measures such as disclosure requirements "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Buckley*, 424 U.S. at 67. And "[a] public armed with information about

15

a candidate's most generous supporters is better able to detect any post-election

special favors that may be given in return." *Id.* As Justice Brandeis famously put

it, "[s]unlight is said to be the best of disinfectants; electric light the most efficient

policeman." *Id.* (quoting L. BRANDEIS, OTHER PEOPLE'S MONEY 62 (National

Home Library Foundation ed. 1933)).

2. *Preventing Actual and Perceived Corruption:* In any event, the PAC

transfer ban also withstands strict scrutiny because it directly furthers the State's

interest in preventing corruption and the appearance of corruption. Although the

Supreme Court has at times suggested that a State bears only a minimal evidentiary

burden to substantiate such a claim,[5] there is no shortage of editorials and news

coverage over the past 18 years proving, at a minimum, that the appearance of

corruption resulting from PAC-to-PAC transfers is firmly entrenched within

Alabama:

> ■ The problems associated with PAC-to-PAC transfers have been public
> knowledge since at least 1993, when coverage of the issue seems to
> have begun. The issue has been covered extensively[6] in every area of
> the State, including all of the State's most populous areas such as
> Anniston, Birmingham, Decatur, Dothan, Huntsville, Mobile,

---

[5] *See Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 391 (2000) ("The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."); *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 210 (1982) (the Court will not "second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared").

[6] A search in WestLaw's Alabama News database for "(("PAC" "political action committee") /p transfer)" returns over 2,000 articles.

Montgomery, and Tuscaloosa.  *See generally* Ex. B, Selected News Articles, 1993-2011.

- From the beginning of the coverage, PAC-to-PAC transfers have been understood to raise problems of transparency in campaign finances. "Political action committees already make it hard enough for citizens to know who paid for candidates to seek office," one news article declared. "The added difficulty of unraveling maze-like PAC-to-PAC transfers compounds that."  Joe Nabbefeld, *Transfer Maze Blurs Who Gets PAC Cash*, BIRMINGHAM NEWS, Sept. 25, 1994, at 26 (Ex. B at 8).

- Even before the recent federal Bingo Indictment, there were suggestions that PAC-to-PAC transfers created an opportunity for corrupt deal-making.  One statewide elected official likened the practice to "slipping hundred dollar bills under the table."  Editorial, *Put Money On the Table*, MOBILE PRESS-REGISTER, July 19, 2009, at A18 (Ex. B at 94).  And as one editorial board put it, "Alabamians may not understand the ins and outs of PAC-to-PAC transfers but they know corruption when they smell it."  Editorial, *Alabama Is A Great Place for Corruption*, MOBILE PRESS-REGISTER, Oct. 22, 2007, at A8 (Ex. B at 82).  *See also, e.g.*, Ex. B at 13, 51-52, 62-63, 93, 104.

- The recent Bingo Indictment and related prosecution revealed these suggestions to be well-founded.  The indictment itself that alleged that two of the defendants (including an Alabama state senator) discussed how to conceal a bribe "by running it through various PACs."  Ex. C, Bingo Indictment, at ¶ 147.  And one lobbyist testified under oath that he had conveyed a bribe using this method.  Brendan Kirby & Kim Chandler, *Lawyers Tee Off On Massey's Reputation, Phone Call On 200k To Smith*, BIRMINGHAM NEWS, July 13, 2011 (Ex. B at 135).

In short, no one can seriously dispute that the "harms" associated with PAC-to-PAC transfers are "real, not merely conjectural."  *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994).  PAC-to-PAC transfers have led to real quid pro quo corruption in Alabama, or at least the appearance of it.

Preventing quid pro quo corruption—not only the actual corruption at issue here, but even the mere *appearance* of it—has long been recognized as an interest so compelling as to justify burdens on First Amendment-protected activities such as limiting individuals' contributions to candidates. *E.g.*, *Citizens United*, 130 S. Ct. at 909; *FEC v. Nat'l Conservative Political Action Comm.*, 460 U.S. 480, 496-97 (1985); *Buckley*, 424 U.S. at 26-27; *SpeechNow.org*, 599 F.3d 686, 692 (D.C. Cir. 2010). Indeed, the appearance of corruption is "[o]f almost equal concern" as the danger of actual quid pro quo arrangements given the potential for erosion of public confidence in government due to "public awareness of the opportunities for abuse." *Buckley*, 424 U.S. at 27 (quotation marks omitted). Large, direct contributions to candidates, as are possible under Alabama's scheme of minimal regulation, pose a special possibility of quid-pro-quo corruption, *see Citizens United*, 130 S. Ct. at 908 (citing *Buckley*, 424 U.S. at 26), and thus would justify "preventative" measures even if it was difficult to ascertain the true extent of any actual corruption. *Id.* (citing *Massachusetts Comm. For Life*, 479 U.S. at 260).

## C.   The ban is narrowly tailored to further these interests.

Having established that the PAC transfer ban furthers Alabama's compelling government interests, all that remains is to show that the ban is sufficiently tailored. If the Court "strictly scrutinizes" the transfer ban, it must be "narrowly tailored" in that there can be no less restrictive alternative available for

18

accomplishing the State's objectives. *Arizona Free Enterprise*, 131 S. Ct. at 2817. Otherwise, the transfer ban need only be "closely drawn" to meet the State's ends or bear a "substantial relation" to those ends. *Id.* Although this tailoring analysis can only fully be completed in response to the plaintiffs' proposed alternatives, several points bear noting at this juncture.

First, because the transfer ban prevents the *appearance* of corruption, the news coverage cited in the previous section is relevant to the tailoring analysis as well. For almost 18 years, in all areas of the State, Alabama voters have been exposed to a drumbeat of commentary documenting that PAC-to-PAC transfers create an opportunity for the exchange of official action for campaign contributions. And more recently, concrete evidence came to light in the form of the federal bingo trial that these fears were well-founded. That being the case, there is no other means of preventing the appearance of corruption from PAC-to-PAC transfers than by simply ending them.

Nor does the First Amendment require the State to impose direct limits on contributions to candidates like those found in federal system. It is true that direct-contribution limits have been "an *accepted* means to prevent quid pro quo corruption." *Citizens United*, 130 S. Ct. at 909 (citing *McConnell*, 540 U.S. at 136-38 & n.40 (emphasis added)). But it does not follow that limiting such contributions to candidates is the *only* permissible way to prevent quid-pro-quo

19

corruption.  Indeed, the Supreme Court has recognized that imposing a meaningful disclosure system (of which the PAC transfer ban is a vital part) is a less restrictive means of pursuing that interest.  *See Citizens United*, 130 S. Ct. at 915 ("disclosure is a less restrictive alternative to more comprehensive regulation of speech" (citing *Massachusetts Citizens for Life*, 479 U.S. at 262)).  "The First Amendment does not require the government to curtail as much speech as may conceivably serve its goals."  *Blount v. SEC*, 61 F.3d 938, 946 (D.C. Cir. 1995).

Finally, if the Plaintiffs are suggesting that any concerns justifying the PAC transfer ban could be met by more stringent disclosure requirements (or even current ones), *see* doc. 1, Complaint, ¶¶ 38-39, they are wrong.  The very problem with PAC-to-PAC transfers is that they inherently weaken disclosure rules, and that would be true however more frequently the reports are filed or more detailed the disclosed information becomes.  The same practical objection could be raised to any proposal for a *limit* on PAC-to-PAC transfers, as opposed to a ban. Limiting the number or value of transfers any one PAC could make would simply result in the proliferation of more PACs as savvy operatives continue to find ways to obscure their financial dealings.  In the end, if Alabama wishes to revive its interests in transparency and honest government from the harm done by PAC-to-PAC transfers, it has only one option: to end PAC-to-PAC transfers.  That is what

the State has done, and there is no valid reason the First Amendment should stand in its way.

### D.    The ban may constitutionally be applied to the ADC.

For the same reasons the PAC transfer ban is valid as a general matter, it is valid as applied to the ADC.  The complaint implies that the ban would be invalid as applied to the ADC because that organization's *receipt* of contributions from other PACs does not involve a contribution to a candidate and thus cannot give rise to quid pro quo corruption.  *See* doc. 1, ¶ 41.b.  But this argument is fatally undermined by the complaint's other allegations that the ADC "has made expenditures, as that term is defined by the Alabama Fair Campaign Practices Act . . .  during past elections," *id.* ¶ 15, and that it plans to adopt measures to isolate future contributions to candidates, *id.* ¶ 41.c.  The appearance of corruption will still be possible if the ADC is exempted from the PAC transfer ban.

In any event, the transfer ban's goal of promoting transparency in campaign finances would also be impermissibly thwarted by exempting the ADC. Disclosure rules are valid even against groups who intend to make no contributions to candidates.  *See SpeechNow.org*, 599 F.3d at 692-96.  There is no reason the Legislature cannot provide some "modicum of information" to voters about the ADC's funding sources.  *Harriss*, 347 U.S. at 625.

**II.    The PAC transfer ban does not violate Section 2 of the Voting Rights Act.**

To make a successful Section 2 claim, Plaintiffs must prove either that (i) the PAC-to-PAC ban was intended by the Legislature to be discriminatory, or (ii) "the exclusion of the minority group from meaningful access to the political process due to the interaction of racial bias in the community with the challenged voting scheme." *Nipper v. Smith*, 39 F.3d 1494, 1524 (11th Cir. 1994).[7]  Plaintiffs do not claim discriminatory intent, but instead claim that the PAC-to-PAC ban "contains standards, practices, and procedures that result in the abridgement or

---

[7] Section 2 provides in its entirety as follows:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

dilution of the right to vote or to participate in the political process on account of the voters' race or color."  (Doc. 1, ¶ 48).

How, exactly, does a ban on laundering political contributions have a discriminatory impact?  For the Court to reach that conclusion, even assuming the truth of the factual averments in the Complaint, would require unreasonable inferences that require dismissal.  The Court would have to believe that even though the Act received unanimous support in the Legislature – including by ADC-endorsed minority legislators – that minorities can vote effectively only with affirmative assistance from others, that only ADC can provide that assistance, and that ADC can provide that assistance only with a particular type of fundraising. Even the liberal requirements of Rule 12 do not demand that suspension of logic and common sense.

Because of this implausibility of Plaintiffs' Section 2 claim, and because the PAC-to-PAC ban does not have the necessary link to voting to trigger the Voting Rights Act, that claim is due to be dismissed.

### A.    The PAC-to-PAC Ban is not a "Voting Qualification, Prerequisite to Voting or Standard, Practice, or Procedure" With Respect to Voting

Not every rule with an arguable impact on voting falls under the Voting Rights Act's application.  *Pressley v. Etowah County Commission*, 502 U.S. 491 (1992).  In *Pressley*, the plaintiffs claimed that rule changes applicable to two

23

Alabama county commissions were subject to Section 5 of the Voting Rights Act

and were therefore unenforceable unless precleared.  Those rules lowered the

amount of spending power that Commission members held after taking office.

The Supreme Court held that the changes fit none of the previously-

recognized categories of rules requiring preclearance:  (1) changes in the manner of

voting; (2) changes in candidacy requirements and qualifications; (3) changes in

the composition of the electorate that may vote for candidates for a given office;

and (4) changes affecting the creation or abolition of an elective office. 502 U.S. at

502-03.

The Court did not hold that these categories were exclusive.  *Id.*   The

important factor was that each of the categories "has a direct relation to voting," *id.*

at 503, and the Commission rule changes at issue in *Pressley* did not.

Of course, *Pressley* was a Section 5 case, not a Section 2 case.  And because

most Section 2 cases involve practices with an obvious link to voting (such as the

difference between single-district and multi-district elections), we are not aware of

a Section 2 case such as this one involving a rule so far removed from the voting

process.  Defendants therefore are not aware of a decision setting the boundaries of

Section 2's scope, in the way that *Pressley* did for Section 5.  Nonetheless, the

limiting doctrine fits neatly in the Section 2 context, and the law is clear that

"[d]espite its broad language, Section 2 does not prohibit all voting restrictions that

24

may have a racially disproportionate effect." *Johnson v. Florida*, 405 F.3d 1214, 1228 (11th Cir. 2005) (finding that felon disenfranchisement was not subject to Section 2 review).

There is a strong textual connection between Section 5 and Section 2, because both apply only to a "voting qualification or prerequisite to voting or standard, practice, or procedure" with respect to voting. *Compare* 42 U.S.C. § 1973(a), 42 U.S.C. §1973c. Moreover, a plurality of the Supreme Court has held that all matters falling within the scope of Section 2 "must also be subject to Section 5." *Morse v. Republican Party of Virginia*, 517 U.S. 186, 209 (1996) (Per Stevens, J., with one Justice concurring and three Justices concurring in the judgment). If all Section 2 matters fall within Section 5, then a matter (such as this one) that lies outside the scope of Section 5 must also fall outside the scope of Section 2.

For these reasons, the rule in *Pressley* is instructive as the Court considers whether a ban on laundering campaign donations is the type of rule that triggers Section 2. It is not.

The challenged statute does not cap what any person or organization can spend or contribute. It does not stop any individual or corporation from donating to ADC. It does not prevent any person from voting, change the manner of voting,

25

change any candidacy requirement or qualification, change the composition of the electorate, or create or abolish an elective office.

The ban does not prohibit any group from sponsoring a get-out-the-vote campaign, nor does it cap what can be spent on such efforts.  ADC remains free to spend whatever funds it wishes on get-out-the-vote activities, and to accept contributions that will be spent thereon.  All it cannot do is transfer monies to other PACs or receive money from other PACs.  And to the extent it claims it cannot engage in those activities unless it gets money laundered from the AEA and political parties, or from accepting fees from candidates who wish to buy ADCs endorsement, the Court should not be persuaded.  AEA and political parties can pay for get-out-the-vote activities, or there surely are means whereby groups can split a bill without transferring funds from one PAC's account to another's.  Consequently, the ban has no direct impact on voting and is outside the scope of Section 2.

As further indication that the PAC-to-PAC ban is not a "standard, practice, or procedure" with respect to voting, the State has not submitted the Act for Section 5 preclearance.  Dr. Joe Reed, chairman of ADC, tried his best to convince the Department of Justice that the Act is indeed subject to Section 5 and that it is "retrogressive" (*i.e.*, that it has a negative effect on minority voting).  *See* Undated Letters of Joe L. Reed to United States Department of Justice, Ex. D.  However,

DOJ has not challenged the State's view that the Act is not subject to Section 5. Falling outside the parameters of Section 5, the Act likewise falls outside the parameters of Section 2.

None of this is to say that a PAC-to-PAC ban is not subject to other legal provisions, such as the Equal Protection Clause (although Plaintiffs certainly could not prevail in an Equal Protection claim where there is no evidence of a discriminatory intent). But the Voting Rights Act, in short, is about *voting*. For a rule to bear scrutiny under Section 2 of the Voting Rights Act, it "must bear a direct relation to voting itself." *Pressley*, 502 U.S. at 510. The PAC-to-PAC ban does not. For that reason alone, this Court should dismiss the Section 2 claim.

## B.    The PAC-to-PAC Ban Does Not Deny Minority Voters "Meaningful Access to the Political Process"

Even when a challenged law relates to "voting," a "violation of Section 2 is established only if, based on the totality of the circumstances, minority plaintiffs can prove that they have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Osburne v. Cox*, 369 F.3d 1283, 1289 (11th Cir. 2004). Pleading a valid Section 2 claim requires sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable," or "more than a sheer

possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Even assuming that the PAC-to-PAC ban is a standard, practice, or procedure with respect to voting, Plaintiffs' Section 2 claim is due to be dismissed because it is not plausible, on the facts alleged by the Plaintiffs, that Plaintiffs are the victim of a Section 2 violation (that Plaintiffs are denied meaningful access to the electoral process as a result of their race and the ban on PAC-to-PAC transfers).

### 1.    Plaintiffs' Claim is Implausible

Plaintiffs' implausibly contend that African-American voters are incapable of deciding who to vote for unless the ADC tells them which candidate it prefers. Section 2 deals with the opportunity of minority voters to elect the candidates of their choice, not the candidates of ADC's choice.  Voters can make up their own minds about who to support.

That said, the State of course concedes that the Court must assume the truth of the factual averments of the complaint, even if the Court thinks it unlikely that the plaintiffs will be able to *prove* that the fact is true.  However, Plaintiffs' claim remains implausible, even assuming the truth of the facts alleged.  To get from the factual averment that Black voters have a higher need for assistance to a right to relief, the Court must assume other facts that are not at all plausible, such as that

28

ADC is indispensible to such assistance, and that ADC cannot offer such assistance *unless* it receives transfers from other PACs. The Court is not at all required to give Plaintiffs the benefit of the doubt there. As the Court said in *Iqbal*, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the *reasonable inference* that the defendant is liable." 115 S.Ct. at 1949 (emphasis added). The inferences sought by the Plaintiffs are not reasonable.

One inference the Court must draw to find for the Plaintiffs is that even if ADC is unable to operate get-out-the-vote campaigns, that no other person or entity will do so. It is not reasonable to assume that only ADC can effectively operate get-out-the-vote campaigns. If for some reason ADC ceases to do so, it is not plausible to believe that candidates or other PACs are not already engaged in such efforts, or that they will fail to step in to protect their own self interests. ADC says it gets much of its money from the Alabama Education Association ("AEA"); because Dr. Joe Reed, the leader of ADC, is also the Associate Executive Secretary of the Alabama Education Association,[8] it is implausible to assume that AEA will not continue to be involved in get-out-the-vote programs.

Another inference the Court must draw to find for the Plaintiffs is that the PAC-to-PAC ban will prevent ADC from fulfilling its historical function. The challenged statute does not prohibit individuals from donating to ADC and puts no

---

[8] *See* http://www.myaea.org/Departments/Administration.html; http://www.joelreed.net/

29

limitation on ADC's fundraising that is different from that applicable to every other PAC.  Nor does the statute prevent PACs from organizing a get-out-the-vote campaign together and splitting the bill.  The claim that minority voters cannot vote effectively unless ADC receives money laundered through other PACs is simply implausible.

### 2.    The PAC-to-PAC puts up no barriers to voting

Even if the Act will stop all get-out-the-vote campaigns (which would be an unreasonable inference), Plaintiffs' Section 2 claim still fails.  The Act still would not in any way prevent any voter's "meaningful access to the political process." Plaintiffs allege only that the Act will impede a program that provides affirmative assistance in voting, not that it is a *barrier* to voting.

Moreover, at most, the Plaintiffs are alleging that the Act arguably would make voting less *convenient* for some voters.  And mere "inconvenience does not result in a denial of 'meaningful access to the political process.'" *Jacksonville Coalition for Voter Protection v. Hood*, 351 F.Supp.2d 1326, 1335 (M.D.Fla. 2004) (holding that alleged disparity in number of early voting sites in districts with larger number of minority voters does not rise to a Section 2 violation).  *See also, Coalition for Sensible and Humane Solutions v. Wamser*, 771 F.2d 395 (8th Cir. 1985) (policy of fewer voting or registration sites, while less convenient, was not a constitutional violation); *Paralyzed Veterans of Am. v. McPherson*, 2008 WL

4183981 *23 (N.D. Cal. 2008) (unreported) ("The failure to provide the most convenient method of voting does not in itself severely burden the right to vote.")

Having to go to the polling place has never been considered a substantial burden on the right to vote. *See Crawford v. Marion County Election Board*, 553 U.S. 181, 198 (2008) ("For most voters who need them, the inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting."). If Plaintiffs' Section 2 claim is valid – if minorities can vote effectively only with the assistance of a get-out-the-vote program (and an *ADC sponsored* program, at that) – then what is to prevent a claim that there must be a polling place on every block? Or that every voter must be given a ride to the polls? Or that the ballots must be taken to the voters?

Going to the poll, even in the absence of any affirmative encouragement, is not a burden on voting. Section 2 is concerned with *obstacles* to the electoral process, not with a claim that a private group's *encouragement* program is more or less effective.

If this bill had a discriminatory affect on voting, then one would assume that minority members of the Legislature would have vigorously opposed the bill. However, the PAC-to-PAC ban received *unanimous* support from minority

31

members of the Legislature (including those endorsed by ADC).  One news report

noted as follows:

> Alabama's black lawmakers supported and helped pass a
> new law that is now being challenged in court by a black
> political organization.
>
> The lawsuit by the Alabama Democratic Conference, the
> black wing of the state Democratic Party, targets
> legislation that bans the transfer of campaign
> contributions between political action committees.
>
> The lawsuit filed earlier this month in federal court in
> Birmingham says the ban on PAC-to-PAC transfers
> violates the ADC's free speech rights and hurts its efforts
> to get black voters to the polls.
>
> ADC chairman Joe Reed says the ban restricts the
> Democratic Party's ability to transfer money to the ADC.
>
> But black legislators have historically supported efforts
> to ban PAC-to-PAC transfers and without dissent backed
> the bill by Republican Rep. Mac McCutcheon of
> Capshaw.

Bob Johnson, *Black Lawmakers Voted For Law Challenged by ADC*, Associated

Press, July 16, 2011 (see Ex. B at 136).[9]  The fact that ADC-endorsed legislators

unanimously helped pass the bill flies in the face of Plaintiffs' claim that the rule is

discriminatory.  *See Solomon v. Liberty County Commissioners*, 221 F.3d 1218,

1234 (11th Cir. 2000) ("[O]bviously, the fact that black *and* white voters in Liberty

County voted overwhelmingly against single-member districts, tends to undercut

---

[9] *Available at* http://www.abc3340.com/story/15092828/black-lawmakers-voted-for-law-challenged-by-adc?clienttype=printable (last visited Aug. 1, 2011)

any suggestion that the continued policy of maintaining at-large elections is somehow discriminatory or otherwise tenuous.")

Plaintiffs talk much of *past* discrimination in Alabama.  They do not allege any *present* discrimination has led to an infringement in the right to vote.  This matters, because, as the Eleventh Circuit said in *Nipper*, a successful Section 2 plaintiff must show that he is denied "meaningful access to the political process due to the interaction of racial bias in the community with the challenged voting scheme." 39 F.3d at 1524.  We agree with Judges Tjoflat and Prior that this means that, while Section 2 requires less than a showing of actual discriminatory intent, it requires more than a simple showing of discriminatory impact.  *Johnson v. Florida*, 405 F.3d 1214, 1235 (2005) (Tjoflat, J., concurring).  There must be proof (or at this stage, at least an allegation) that "racial bias in the relevant community *caused*" the alleged Section 2 violation.  *Id.* at 1238.  Plaintiffs do not even allege such here, but instead allege only *past* discrimination and present disperate effect.  That will not do, and provides an alternative ground for dismissal.

In any event, evidence of past discrimination "cannot, in the manner of original sin, condemn governmental action that is not in itself unlawful." *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980).  Alabama has a strong interest in preserving the integrity of elections and ensuring that citizens know who is funding

campaigns.[10]  And if it is true, as ADC alleges, that Black voters require more assistance than other voters, then they especially should be protected by the Act and receive clear information about who is funding the messages they receive.  The PAC-to-PAC ban serves that end.  It does not, it *cannot*, have a discriminatory impact on access to the political process because it has *no* such impact in a way that matters to Section 2.[11]

## CONCLUSION

Because Act 2010-765 does violates neither the First Amendment nor Section 2 of the Voting Rights Act, the complaint is due to be dismissed.

## AFFIRMATIVE DEFENSES

1.  Defendants plead the defense of unclean hands.

---

[10] *See Common Cause v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009) ("A State indisputably has a compelling interest in preserving the integrity of its election process."), quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

[11] Defendants also note that "[a]s part of any prima facie case under Section Two, a plaintiff must demonstrate the existence of a proper remedy."  *Davis v. Chiles*, 139 F.3d 1414, 1419 (11th Cir. 1998).  *See also*, *Nipper v. Smith*, 39 F.3d 1494, 1533 (11th Cir. 1994) ("The absence of an available remedy is not only relevant at the remedial stage of the litigation, but also precludes, under the totality of the circumstances inquiry, a finding of liability.")  Here, Plaintiffs seek an injunction preventing enforcement of the Act against ADC and against any PAC that transfers money to ADC.  But what about other PACs that sponsor get-out-the-vote programs?  Must the State permit contribution-laundering by all such PACs, or only those whose membership is predominantly African-American?  Or is it only get-out-the-vote programs by a particular party?  The difficulty of crafting a remedy that does not itself present Equal Protection problems counsels against recognizing Plaintiffs' novel claim.

2.  Plaintiffs have failed to state a claim against the District Attorney defendants on which relief can be granted.

3.  To the extent the District Attorney defendants are not proper parties, venue is not proper in this District.

4.  Some or all of the Plaintiffs lack standing to assert some or all of the claims against the Defendants.

Respectfully submitted,

LUTHER STRANGE (ASB-0036-G42L)
*Attorney General*

s/ William G. Parker, Jr.
Winfield J. Sinclair (ASB-1750-S81W)
James W. Davis (ASB-4063-I58J)
William G. Parker, Jr. (ASB-5142-I72P)
*Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
(334) 353-8440 (fax)
wsinclair@ago.state.al.us
jimdavis@ago.state.al.us
wparker@ago.state.al.us

**Attorneys for Attorney General Strange,
District Attorney Broussard, and District
Attorney Graham**

## CERTIFICATE OF SERVICE

I certify that on August 1, 2011, I electronically filed the foregoing document using the Court's CM/ECF system which will send notification of such filing to the following persons:

Edward Still
130 Wildwood Parkway
Suite 108 - PMP 304
Birmingham, AL 35209
(205) 320-2882
still@votelaw.com

John K. Tanner
JOHN TANNER LAW OFFICE
3743 Military Road NW
Washington, DC 20015
(202) 503-7696
john.k.tanner@gmail.com

Norman O Grubbs
JOE M. REED & ASSOCIATES LLC
524 South Court Street
Montgomery, AL 36104
(334) 834-2000
ogrubbs@bellsouth.net


s/ William G. Parker, Jr.
Attorney for the State Defendants