RECEIVED

2010 OCT -1 P 3:39

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

# UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Crim. No.  2:10 cr 186 - MHT |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | [18 U.S.C. §§ 371, 666(a)(1)(B), 666(a)(2), |
| | ) | 1341, 1343, 1346, 1951, 1956(a)(1)(B)(i), |
| MILTON E. MCGREGOR, | ) | 1001(a)(2), 1512(c)(2), and 2] |
| RONALD E. GILLEY, | ) | |
| THOMAS E. COKER, | ) | |
| ROBERT B. GEDDIE JR., | ) | |
| JARROD D. MASSEY, | ) | |
| LARRY P. MEANS, | ) | |
| JAMES E. PREUITT, | ) | |
| QUINTON T. ROSS JR., | ) | |
| HARRI ANNE H. SMITH, | ) | |
| JARRELL W. WALKER JR., | ) | |
| and | ) | |
| JOSEPH R. CROSBY, | ) | |
| | ) | __INDICTMENT__ |
| Defendants. | ) | |
| | ) | |

The Grand Jury charges that:

## Introduction

At all times relevant to this Indictment, unless otherwise stated:

### The Alabama Legislature

1.      The Alabama Legislature (the "Legislature") was a political subdivision within the State of Alabama.

2.      In fiscal years 2009 and 2010, the State of Alabama received more than $10,000 per year in funds from the United States Government in the form of grants, contracts, subsidies, loans,

1

guarantees, insurance, and other forms of federal assistance.

3.     The Legislature was composed of two chambers:  the House of Representatives, comprising 105 members, and the Senate, comprising 35 members.  The legislative session generally took place between January and May.  Members of the House of Representatives and the Senate were agents of the State of Alabama.

### Relevant Individuals

### Gambling Facility Operators and Employees

4.     MILTON E. MCGREGOR owned a controlling interest in Macon County Greyhound Park, Inc., also known as Victoryland, in Macon County, Alabama, and Jefferson County Racing Association, in Jefferson County, Alabama, as well as ownership interests in other entertainment and gaming facilities in Alabama, which offered or sought to offer "electronic bingo" gambling machines to the public.

5.     RONALD E. GILLEY owned a controlling interest in the Country Crossing real estate, entertainment, and gambling development in Houston County, Alabama, which sought to offer "electronic bingo" gambling machines to the public. MCGREGOR provided financial backing to GILLEY for the construction and operation of Country Crossing, in exchange for a percentage of the business's gross receipts.

6.     JARRELL W. WALKER JR. was an employee and spokesman for GILLEY and GILLEY's Country Crossing enterprise.

### Lobbyists

7.     THOMAS E. COKER was a registered lobbyist operating a lobbying and consulting business in Montgomery, Alabama.  MCGREGOR was one of COKER's largest clients.

2

8.    ROBERT B. GEDDIE JR. was a registered lobbyist and a partner in a lobbying and consulting business in Montgomery, Alabama.  During the 2009 and 2010 legislative sessions, GEDDIE worked as a lobbyist for MCGREGOR.

9.    JARROD D. MASSEY was a registered lobbyist operating a lobbying and consulting business in Montgomery, Alabama.  MASSEY's largest client was GILLEY.

10.    Lobbyist A was a registered lobbyist who worked for MASSEY.

### Alabama Legislators and Staff

11.    Senator LARRY P. MEANS was serving his third term in the Alabama Senate, representing the 10th District, which included Cherokee and Etowah Counties.  MEANS was a candidate for reelection in the 2010 Senate election cycle.

12.    Senator JAMES E. PREUITT was serving his fifth term in the Alabama Senate, representing the 11th District.  PREUITT also owned an automobile and truck dealership in Talladega, Alabama.  PREUITT was a candidate for reelection in the 2010 Senate election cycle.

13.    Senator QUINTON T. ROSS JR. was serving his second term in the Alabama Senate, representing the 26th District, which includes Montgomery, Alabama.  ROSS was a candidate for reelection in the 2010 Senate election cycle.

14.    Senator HARRI ANNE H. SMITH was serving her third term in the Alabama Senate, representing the 29th District, which includes part of Houston County, in which GILLEY's Country Crossing was located.  SMITH was a candidate for reelection in the 2010 Senate election cycle.

15.    Legislator 1 was a member of the Alabama House of Representatives and a candidate for reelection in the 2010 election cycle.

16.     Legislator 2 was a member of the Alabama Senate and a candidate for reelection in the 2010 election cycle.

17.     Legislator 3 was a member of the Alabama House of Representatives and a candidate for reelection in the 2010 election cycle.

18.     JOSEPH R. CROSBY was a legislative analyst with the Legislative Reference Service. The Legislative Reference Service was a division of the Legislature and served as a non-partisan drafting and legal research office that provided assistance to both chambers of the Legislature. As an employee of the State of Alabama, CROSBY was paid an annual salary of approximately $160,000 by the State of Alabama. At all relevant times, CROSBY was an agent of the State of Alabama. In his role as a team leader within the Legislative Reference Service, CROSBY was a subject-matter expert on all gambling-related legislation and took an active role in drafting such legislation.

<u>The Gambling Legislation</u>

19.     In or about 2009, MCGREGOR and GILLEY, together with others who supported gambling in the State of Alabama, formed the "Sweet Home Alabama Coalition" to promote the passage of pro-gambling legislation that would be favorable to the business interests of individuals operating electronic bingo facilities, including MCGREGOR and GILLEY.

20.     On or about March 5, 2009, ROSS introduced a bill in the Alabama Senate, Senate Bill 471 ("SB471"), which proposed amendments to the Alabama Constitution authorizing the operation of electronic bingo at only specified locations in Alabama, including Macon County, home of Victoryland, and Houston County, home of Country Crossing, which was then under construction. A virtually identical bill, House Bill 676, was introduced on the same day in the House of

4

Representatives. These bills, which individually and collectively were known as the "Sweet Home Alabama" legislation and which were supported by MCGREGOR and GILLEY's "Sweet Home Alabama Coalition," ultimately, for lack of support, were never put to a vote in either chamber of the Legislature in 2009.

21.     In January 2010, at the commencement of the 2010 Alabama legislative session, various members of the Legislature introduced several pieces of legislation that, if enacted, would be favorable to the business interests of the operators of gambling enterprises, including MCGREGOR and GILLEY. This legislation primarily distilled to two measures: (1) proposed amendments to the Constitution of Alabama that would authorize the operation of electronic bingo gambling machines in Alabama, and (2) proposed general legislation that would preclude law enforcement officials from interfering with the operations of electronic bingo gambling establishments until a public referendum was held on the Constitutional Amendment.

22.     Senate Bill 380 ("SB380"), which was introduced in the Alabama Senate on or about February 4, 2010, like the "Sweet Home Alabama" legislation in 2009, proposed an amendment to the Alabama Constitution permitting the operation and taxation of electronic bingo in Alabama. MCGREGOR, GILLEY, and other operators of similar gambling enterprises supported SB380.

23.     On or about March 3, 2010, a procedural vote, known as a budget isolation resolution ("BIR"), which would have permitted a substantive vote on SB380, failed for lack of the necessary 21 votes.

24.     Subsequently, on or about March 30, 2010, a revised SB380 passed in the Alabama Senate, receiving 21 votes, the minimum required to pass a constitutional amendment.

25.     The House of Representatives did not vote on SB380.  In addition, the Legislature did not vote on any general bills involving pro-gambling legislation during the 2010 legislative session, which concluded on or about April 22, 2010.

26.     According to fiscal estimates prepared by employees of the Legislature, SB380 would have generated over $5,000 in annual state and local tax proceeds.

## COUNT ONE
(Conspiracy, 18 U.S.C. § 371)

27.     The allegations contained in Paragraphs 1 through 26 of this Indictment are realleged as though fully set forth herein.

28.     From in or about February 2009 through in or about August 2010, in the Middle District of Alabama and elsewhere, defendants

MILTON E. MCGREGOR,
RONALD E. GILLEY,
THOMAS E. COKER,
ROBERT B. GEDDIE JR.,
JARROD D. MASSEY,
LARRY P. MEANS,
JAMES E. PREUITT,
QUINTON T. ROSS JR.,
HARRI ANNE H. SMITH,
JARRELL W. WALKER JR.
and
JOSEPH R. CROSBY,

along with co-conspirator Lobbyist A, and other persons known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other and with other persons known and unknown to the Grand Jury to commit federal programs bribery, in that:

A.     the defendants and others known and unknown to the Grand Jury corruptly gave, offered, and agreed to give money and other things of value to Alabama State legislators and

6

legislative staff, as agents of the State of Alabama, with intent to influence and reward them in connection with pro-gambling legislation, which was any business, transaction, and series of transactions of Alabama involving anything of value of $5,000 or more, in violation of Title 18, United States Code, Section 666(a)(2); and

B. Alabama State legislators and legislative staff, as agents of the State of Alabama, corruptly solicited, demanded, accepted and agreed to accept money and things of value from defendants and others, intending to be influenced and rewarded in connection with pro-gambling legislation, which was any business, transaction, and series of transactions of Alabama involving anything of value of $5,000 or more, in violation of Title 18, United States Code, Section 666(a)(1)(B).

<u>Purposes of the Conspiracy</u>

29. It was a purpose of the conspiracy for MCGREGOR and GILLEY to corruptly provide and offer to provide payments and campaign contributions, among other things of value, to members and staff of the Alabama Legislature, including MEANS, PREUITT, ROSS, SMITH, Legislator 1, Legislator 2, Legislator 3, and CROSBY, with the intent to influence and reward them for official acts taken to effect the passage of pro-gambling legislation that was favorable to the business interests of MCGREGOR and GILLEY.

30. It was further a purpose of the conspiracy for members and staff of the Alabama Legislature, including MEANS, PREUITT, ROSS, SMITH, and CROSBY, to enrich themselves by corruptly accepting payments, campaign contributions, and offers of payments and campaign contributions with the intent of being influenced and rewarded for supporting the business interests of MCGREGOR and GILLEY, in connection with pro-gambling legislation.

7

31.     It was further a purpose of the conspiracy for lobbyists, including COKER, GEDDIE, MASSEY, and Lobbyist A, along with SMITH, to assist MCGREGOR and GILLEY by corruptly providing and offering to provide payments and campaign contributions, among other things of value, to members of the Alabama Legislature, including MEANS, PREUITT, ROSS, SMITH, Legislator 1, Legislator 2, and Legislator 3, in a manner that would conceal the true nature, source, and control of the money and the fact that it was being provided by MCGREGOR and GILLEY, with the assistance of lobbyists and SMITH, to the legislators in return for their favorable votes on and support of pro-gambling legislation.

<u>Manner and Means of the Conspiracy</u>

32.     It was part of the conspiracy that MCGREGOR and GILLEY, individually and through direction provided to lobbyists and other individuals, including COKER, GEDDIE, MASSEY, WALKER, and Lobbyist A, would provide and offer to provide campaign contributions, campaign appearances by country music celebrities, political polls, media buys, fundraising assistance, offers to pay money to opposition candidates in return for their withdrawal from races, and other things of value, to incumbent legislators and candidates for election to the Legislature, including ROSS, MEANS, PREUITT, SMITH, Legislator 1, Legislator 2, and Legislator 3, in return for supporting the business interests of MCGREGOR and GILLEY by promising to vote for, and voting for, pro-gambling legislation.

33.     It was a further part of the conspiracy that MCGREGOR and GILLEY would and did pay thousands of dollars, in violation of Alabama law, to public officials and employees of the Legislature, including CROSBY, in return for their assistance in drafting and passing pro-gambling

8

legislation and promoting MCGREGOR's and GILLEY's business interests, including their interest in minimizing the tax rate applicable to gambling revenue.

34.     It was a further part of the conspiracy that MCGREGOR and GILLEY would and did hire lobbyists, political consultants, and other individuals, including WALKER, GEDDIE, COKER, MASSEY, and Lobbyist A, who would, among other things, meet with members of the Legislature to offer things of value and negotiate the terms of benefits provided by MCGREGOR and GILLEY to legislators and candidates for election to the Legislature in return for supporting the business interests of MCGREGOR and GILLEY by promising to vote for, and voting for, pro-gambling legislation.

35.     It was a further part of the conspiracy that ROSS, MEANS, SMITH, and PREUITT would and did solicit and demand payments and campaign contributions from MCGREGOR and GILLEY and the lobbyists and other individuals working for them, including GEDDIE, COKER, MASSEY, WALKER, and Lobbyist A, in return for their votes and support for pro-gambling legislation.

36.     It was a further part of the conspiracy that MCGREGOR, GILLEY, and lobbyists and other individuals working for them, including GEDDIE, COKER, MASSEY, WALKER, and Lobbyist A, would and did disguise payments made to legislators from whom they sought support by concealing illicit payments through political action committees ("PACs") and using conduit contributors.

37.     It was a further part of the conspiracy that MCGREGOR, GILLEY, lobbyists and other individuals working for them, including GEDDIE, COKER, MASSEY, WALKER, and Lobbyist A, and legislators, including SMITH, ROSS, MEANS, and PREUITT, did attempt to

9

conceal the planning and execution of these corrupt transactions by, among other things, using telephones obtained in the names of others, conducting conversations in private face-to-face meetings, falsifying business records, providing falsified documents in response to grand jury subpoenas, and making false statements to law enforcement officials.

Overt Acts

38.     In furtherance of the conspiracy and to effect the objects thereof, the defendants and others committed the following overt acts, among others, in the Middle District of Alabama and elsewhere:

Legislator 1

39.     On or about February 18, 2009, MASSEY told Legislator 1, a member of the Alabama House of Representatives, whose district contains GILLEY's Country Crossing, that he (MASSEY) needed to know Legislator 1's position on the issue of electronic bingo, so that MASSEY could decide whether to put pressure on Legislator 1 to support the issue.

40.     On or about March 4, 2009, one day before a possible vote on the "Sweet Home Alabama" pro-gambling legislation, SMITH invited Legislator 1 and Legislator 2, a member of the Alabama Senate, to dinner that night with MASSEY, GILLEY, and others to discuss the bill.

41.     On or about March 4, 2009, over dinner at a restaurant in Montgomery, Alabama, GILLEY sought to persuade Legislator 1 to support the "Sweet Home Alabama" legislation by offering to raise hundreds of thousands of dollars for Legislator 1's reelection campaign. At the same dinner, SMITH attempted to persuade Legislator 1 that she and Legislator 1 would need GILLEY's campaign support to win reelection and that Legislator 1 should work with GILLEY to support pro-gambling legislation.

10

42.     On or about March 24, 2009, SMITH, in a telephone conversation with Legislator 1, stated that she believed that GILLEY, in fact, would honor his word and provide to Legislator 1 the hundreds of thousands of dollars GILLEY offered Legislator 1 during the dinner on or about March 4, 2009.

43.     On or about March 26, 2009, GILLEY, in a telephone conversation with Legislator 1, reaffirmed his willingness, and the willingness of others, to provide campaign support and contributions to Legislator 1 "until the damn cows come home" in exchange for Legislator 1's support of the "Sweet Home Alabama" bill.

44.     On or about January 13, 2010, after the 2009 legislative session ended without a vote on the "Sweet Home Alabama" legislation in either chamber of the Legislature, in a telephone conversation, GILLEY renewed his efforts to influence Legislator 1's vote on pro-gambling legislation, warning Legislator 1 that, if Legislator 1 did not vote in favor of legislation favorable to GILLEY, "we'll do everything we can to take your ass out."

### Legislator 2

45.     On or about March 4, 2009, Legislator 2, a member of the Alabama Senate, attended the same dinner at a restaurant in Montgomery, Alabama, with Legislator 1, SMITH, GILLEY, and MASSEY, among others. During the dinner, SMITH discussed with Legislator 2 the campaign support GILLEY could provide if Legislator 2 committed to favoring pro-gambling legislation.

46.     During the 2009 legislative session, MASSEY contacted Legislator 2 and inquired whether Legislator 2 had decided to support pro-gambling legislation.

47.     On or about February 9, 2010, after SB380 had been introduced in the Alabama

11

Senate, GILLEY had a telephone conversation with Legislator 2 about the pro-gambling legislation. During the conversation, Legislator 2 mentioned SMITH's earlier indication, during the dinner on or about March 4, 2009, of possible campaign support for Legislator 2 from GILLEY, as well as a discussion Legislator 2 had with MASSEY about the possibility of Legislator 2 working as a political consultant. In response, GILLEY promised to "get all those bases covered to where it's, to where it's fluid for you, and, and it's comfortable for you." As the call ended, GILLEY told Legislator 2 that the cellular phone GILLEY was using was "a very, very safe line . . . . I change the phone out every three days."

48. On or about February 16, 2010, MASSEY, during an unannounced visit to Legislator 2's legislative office, stated that MCGREGOR and GILLEY "put money into races." MASSEY attempted to mask his corrupt intent, claiming that "there's no quid pro quos." However, during the same conversation, MASSEY went on to warn Legislator 2 that, if Legislator 2 did not commit to voting in favor of the pro-gambling legislation supported by MCGREGOR and GILLEY, Legislator 2 "might miss an opportunity to really cut yourself a good deal," and noted that "there's some money at play that could be had that, you know, could only be made available to certain candidates." During the visit, MASSEY also instructed Legislator 2 not to discuss these issues over the telephone.

49. On or about February 17, 2010, a lobbyist employed by MCGREGOR explained to Legislator 2 that he (the lobbyist) could use MCGREGOR's resources to help Legislator 2 move up in the leadership of Legislator 2's party without "having to really get dirty," adding, "I think you're in a position to name your price."

50. On or about February 18, 2010, Legislator 2 met with MASSEY, MCGREGOR, and GILLEY at MASSEY's office in Montgomery, Alabama. During the meeting, MCGREGOR and

12

GILLEY expressed concern that, unless the pro-gambling legislation passed in Alabama, their commercial futures were in jeopardy. MCGREGOR then went on to stress the need for Legislator 2's favorable vote on the pro-gambling legislation, stating, "Here's where we are. We need, we need your help. We need your vote and support on the people having the right to vote on this issue." In response to Legislator 2's suggestion that it could cost up to $500,000 to run for state-wide office, MCGREGOR stated that Legislator 2 "need[ed] some new friends" and that he and GILLEY "got a bad habit of supporting our friends." Later in the conversation, MASSEY focused the discussion on the type of support MCGREGOR and GILLEY could provide Legislator 2:

> You need resources. You need a commitment, um and obviously we've got a very important issue. I'm not going to tell you there's a quid pro quo, but, that being said, um, these guys can talk about what we can do, what we can't do. That's for y'all to decide and determine.

When Legislator 2 suggested that "maybe they need to think about it," MCGREGOR stated, "I don't need to think about it. We done talked. . . . We done thought about it." GILLEY added, "I don't need to think about anything."

51.    During the meeting at MASSEY's office on or about February 18, 2010, the parties discussed the possibility of Legislator 2 receiving income through a professional arrangement. When Legislator 2 stated that "[MASSEY] and I talked about doing some PR [i.e., public relations] stuff, some consulting work that you'd mentioned before," GILLEY responded, promising that "we can tie you into our, uh, uh, our entertainment and PR firm, which is the biggest in the country." Agreeing with GILLEY's offer, MASSEY told Legislator 2, "Let me visit with them [MCGREGOR and GILLEY] and get a little bit deeper in the weeds. And you and I can come up with a kind of template of sorts." As the conversation ended, MCGREGOR assured Legislator 2: "Let me say it another way, it would be absolutely, to me, unthinkable for us not to work together. It is the perfect

13

scenario."

52.     On or about February 19, 2010, MASSEY met with Legislator 2 to discuss the details of a plan to compensate Legislator 2 for his vote in favor of the pro-gambling legislation by funneling $1 million per year—to be used at Legislator 2's discretion—through a public relations job set up in connection with a public relations firm employed by GILLEY in order to conceal the fact that it was MCGREGOR and GILLEY who were going to pay Legislator 2. MASSEY summarized the offer, saying, "I would suggest that that look something like—and, again, it is up to you for what you would want to use it for—but basically there is a million dollars of business that is going to come through that PR entity, one way or the another, you know, annually." Later in the meeting, MASSEY detailed the need to disguise the arrangement:

> There are some oddities to how we would want to do it because, you, as you know on the ethics reporting, if there's any tie to an organization that is lobbying a legislature, technically they have to announce that there is a business connection. And when they do then obviously everyone's gonna look at it whether it's totally legit or whatever.
>
> So you got to find a backdoor way, which is basically you have, then, an entity that is not related per se to [GILLEY's business] whatever that may be. Um, it's some subsidiary that is disconnected and isn't required to be registered as a lobbyist, and you meet all those thresholds. Um, we get all that worked out, that's not a big deal. But, in effect, that PR entity does two things. One, it gives you ability to do some other things, um, have that structure. But then also you got that revenue that's, I mean, use it for campaigns. You can use it individually or whatever.

At the end of the conversation, MASSEY told Legislator 2, "I'm telling ya, it's a good deal . . . I mean, you in the catbird seat."

53.     On or about February 22, 2010, MASSEY called Legislator 2 to schedule an in person meeting to "fine tune" the corrupt deal, noting that "obviously we don't need to talk about that on the phone." MASSEY also noted that Legislator 2 would be "very, very pleased" with the proposal.

14

54.     On or about February 23, 2010, MASSEY and GILLEY met with Legislator 2 at a retail store in Prattville, Alabama, to finalize the deal.  During the meeting, GILLEY affirmed his commitment to Legislator 2: "I'm excited about the opportunities.  I'm excited about the, uh, PR, my PR firm is excited. . . . It'll be great for all of us."  GILLEY also confirmed that, even if the pro-gambling legislation did not pass in the House of Representatives, "I'm with ya," as long as Legislator 2 supported the bill.

55.     On or about March 2, 2010, MASSEY told GILLEY that Legislator 2 "ain't with us" on the pro-gambling legislation.

56.     That same day, on or about March 2, 2010, MCGREGOR, speaking with the sponsor of SB380, said that Legislator 2 was "solid as a rock" in his support for the bill.

57.     Later that same day, on or about March 2, 2010, MCGREGOR said Legislator 2 "flat hadn't told the truth to some people," when an employee of the Alabama legislature told MCGREGOR that Legislator 2 may vote against the bill.

58.     Toward the end of the day on or about March 2, 2010, the sponsor of SB380 asked MCGREGOR for permission to retaliate against Legislator 2 and other legislators who did not support the bill.  During the conversation, the legislator stated, "I . . . want your authority . . . I mean the collective authority . . . to say, if you fuckers fuck us on this [legislation] . . . there will be no peace. . . . We're coming after your ass."  MCGREGOR responded, "Big man, let me tell you, I don't even have to think about it.  You've got mine . . . ."  The sponsor continued, reiterating, "I want the authority to say this is your vote, you vote yes or no and this is what we're going to judge you by."  Again, MCGREGOR affirmed that he was "110% on board with that."

59.     On or about March 13, 2010, in a telephone call between MCGREGOR and GILLEY,

MCGREGOR suggested that GILLEY approach Legislator 2 again, to which GILLEY replied that any offer to Legislator 2 would not be "what I had agreed to before." In response, MCGREGOR said, "I understand."

60. Later that same day, on or about March 13, 2010, MCGREGOR cautioned GILLEY to hold off on talking to Legislator 2, saying, "Let's wait and see if we even need him. . . . I'd rather that motherfucker come to you anyway." GILLEY replied, "Yeah, especially after the way he did us last time, and uh, the deal, what I had worked out with him ain't gonna fly now."

61. On or about March 14, 2010, MCGREGOR told an employee of the Alabama Senate to give Legislator 2 a "gut check," because although MCGREGOR claimed that Legislator 2 "hadn't made any commitments to me, . . . I promise you one thing, . . . [Legislator 2] flat did to others."

62. On or about March 22, 2010, in a telephone call between GILLEY and MASSEY, MASSEY suggested that GILLEY direct SMITH to warn Legislator 2 that GILLEY and MASSEY were "going to make [Legislator 2's] life a holy hell" unless Legislator 2 changed Legislator 2's decision to oppose the pro-gambling legislation.

63. On or about March 18, 2010, speaking with MCGREGOR, GEDDIE said his lobbying partner "had a pretty good conversation with [Legislator 2], but, you know, we've been down that road before." Later in the conversation, MCGREGOR told GEDDIE that "[Legislator 2] damn sure wasn't committed to me with it, [but] I'm told point blank that [Legislator 2] was flat committed" to voting for the pro-gambling legislation.

64. On or about March 23, 2010, GILLEY complained to MCGREGOR about the amount of time he had spent with Legislator 2, stating, "[to] end up doing me the way he did me was wrong. . . . Under normal circumstances, I would beat his ass."

16

65.     On or about March 24, 2010, MASSEY, recounting a conversation he had just had with Legislator 2 regarding Legislator 2's decision to vote against the BIR on or about March 3, 2010, told GILLEY: "In case I was being recorded, I said, [Legislator 2] I don't recall anything we talked about previously. . . you can tell me that you support [the legislation] or don't and we can have another conversation at my office . . . ." MASSEY continued, "I just made sure I was covering my ass, but he basically knew, hey, that the deal's off."

66.     On or about March 31, 2010, GILLEY, after the existence of the instant criminal investigation became public, told MCGREGOR that he was "real disturbed" with Legislator 2 and questioned "what that motherfucker was up to when we were meeting with him," referring to their meetings in February 2010, during which MCGREGOR, GILLEY, and MASSEY discussed with Legislator 2 the things of value they could provide Legislator 2 in exchange for his vote on the pro-gambling legislation.

<u>Legislator 3</u>

67.     On or about February 14, 2010, MCGREGOR left a voicemail for Legislator 3, a member of the Alabama House of Representatives, who had not spoken to MCGREGOR in approximately two years. At the time of the call, Legislator 3 believed that MCGREGOR had financially supported Legislator 3's opponent in a prior election.

68.     On or about February 15, 2010, after Legislator 3 called him back, MCGREGOR and Legislator 3 discussed whether Legislator 3 would support pro-gambling legislation, with MCGREGOR offering significant campaign contributions to Legislator 3 in return for a favorable vote on the pro-gambling legislation. In light of MCGREGOR's affiliation with gambling interests, MCGREGOR stated, "Yeah and I can get you support from people, uh, I, I would, I wouldn't think

17

that you would want support directly from me." Later during the call, MCGREGOR told Legislator 3, "I can get you significant help in your campaign not from me, from people that I have a great working relationship with, business type people. That some of them that you could never get by yourself." When Legislator 3 inquired whether the amount of any contributions would be "500 or a couple of thousand," MCGREGOR responded, "Oh no, I, I said significant help. . . . I can and will get you significant help from people that fall in this category. That's the commitment I'll make to you right now and it's as good as, as, as, as any commitment you will ever get. I will do it, and I will prove it to you." After Legislator 3 mentioned he had a fundraiser that evening, MCGREGOR reiterated that the "commitment I made to you is as good as gold."

69.     Later that same day, on or about February 15, 2010, following MCGREGOR's conversation with Legislator 3, MCGREGOR called GEDDIE and told him about Legislator 3's fundraiser.

70.     Later on or about February 15, 2010, GEDDIE and an employee of his lobbying firm delivered two checks, each in the amount of $2,500, drawn from GEDDIE-controlled PACs, to Legislator 3 at the fundraiser for Legislator 3 at a Tallassee, Alabama, restaurant.

71.     On or about February 16, 2010, MCGREGOR apologized to Legislator 3 for missing the fundraiser; however, MCGREGOR said that he "got Bob [GEDDIE] and [one of GEDDIE's employees] to go over to your function last night and they were impressed." When Legislator 3 expressed uncertainty about whether GEDDIE and his employee were there on MCGREGOR's behalf, MCGREGOR stated, "Oh yeah. Yeah. . . . I called Bob [GEDDIE] right at well, about thirty minutes after I talked with you to see if he could go and represent, represent me and, and he said he'd be glad to and, uh, so anyway we talked about what, what I wanted him to do and, uh, and he did it."

18

72.     Sometime after on or about February 16, 2010, GEDDIE instructed an employee to record the two checks he delivered to Legislator 3 as attributable to MCGREGOR in a contribution ledger maintained by GEDDIE's lobbying business.  Then, at a later date, GEDDIE told the same employee that the contributions to Legislator 3, in fact, should not be attributed to MCGREGOR. GEDDIE further instructed the employee to alter the contribution ledger to reflect that two other clients were the source of the contributions to Legislator 3, when in fact GEDDIE knew that the contributions were made on behalf of and at the direction of MCGREGOR and that the other two clients had no knowledge of and did not authorize such contributions.

73.     Between in or about May 2010 and in or about August 2010, in response to grand jury subpoenas, GEDDIE caused to be produced to law enforcement officials the altered contribution ledgers.

### LARRY P. MEANS

74.     On or about February 5, 2010, the day after SB380 was introduced in the Alabama Senate, MEANS received five $5,000 contributions, totaling $25,000, attributed to MCGREGOR and drawn on funds from GEDDIE-controlled PACs.

75.     On or about March 22, 2010, in a telephone call with MCGREGOR, MEANS referred to the pending pro-gambling legislation and said that there was "nothing I want to do more than help you."  MEANS noted he was facing a reelection challenge and said, "I'm going to probably need a bunch of help now."  MCGREGOR responded, "Well, you got me . . . and whatever it takes for Larry MEANS to come back, that's what we gonna do.  That's the bottom line."  Later in the conversation, MEANS told MCGREGOR: "I still been talking to Jim [PREUITT]. . . . He and I are trying to stay together on this thing."

19

76.     On or about March 24, 2010, MEANS told Lobbyist A to ask MASSEY and GILLEY if they would contribute $100,000 to MEANS's campaign, and Lobbyist A relayed MEANS's request to MASSEY. In response, MASSEY told Lobbyist A that he had told GILLEY that MEANS was demanding $100,000.

77.     On or about March 24, 2010, MASSEY told GILLEY that "I need to get your okay on something . . . we're getting a shakedown going on us up here to some degree . . . with regards to MEANS. . . . He's asking for $100,000 if he votes for this bill." In response, GILLEY stated, "Let me, let me call you from another phone, please."

78.     One minute later, on or about March 24, 2010, when GILLEY called MASSEY from a different phone, MASSEY stated, "Hey, sorry, I forgot." Returning to the subject of MEANS's request for $100,000, GILLEY told MASSEY that "he can one-hundred percent count on our support." GILLEY continued, "We're gonna support who supports democracy. And the motherfucker who doesn't support democracy get ready to get their fucking ass busted."

79.     Later that same day, on or about March 24, 2010, Lobbyist A, on instructions from MASSEY, told MEANS that MASSEY and GILLEY would make the $100,000 contribution. Referring to his earlier request, MEANS asked if they were talking about the same thing. Lobbyist A confirmed that they were.

80.     That same day, on or about March 24, 2010, MASSEY told a public official from Houston County, Alabama: "I'm sitting up here right now cutting a deal with, cutting a deal with MEANS in just a minute."

81.     In the morning of the day of the vote on SB380, on or about March 30, 2010, MASSEY told a fellow lobbyist: "COKER went to Talladega [PREUITT's hometown] and Gadsden

[MEANS's hometown] yesterday and fine tuned all that, you know, make sure everything was committed . . . confirm everything we promised and everybody."

82.     On or about March 30, 2010, MEANS voted for SB380, which MCGREGOR and GILLEY supported, having abstained in the BIR vote on an earlier version of SB380 just weeks earlier, on or about March 3, 2010, and having promised people that he would not vote for the bill without a local provision related to gambling in Etowah County, a county in MEANS's district. The final version of SB380 contained no such provision relating to Etowah County.

## JAMES E. PREUITT

83.     In or about early March 2010, PREUITT told Lobbyist A that if a vote were held the next day, he would vote no on the pro-gambling bill, SB380.

84.     Thereafter, in or about early March 2010, when Lobbyist A informed MASSEY that PREUITT would vote against the pro-gambling legislation, MASSEY told Lobbyist A to offer PREUITT $2 million in campaign contributions.

85.     Shortly thereafter, in or about early March 2010, Lobbyist A, following MASSEY's instructions, met with PREUITT in PREUITT's legislative office and told PREUITT that MASSEY and GILLEY would provide PREUITT with $2 million for his 2010 reelection campaign if PREUITT voted in favor of SB380.

86.     On or about March 2, 2010, GILLEY and MASSEY discussed whether PREUITT's vote was "squared away." During the conversation, in a reference to PREUITT's car dealership, MASSEY mentioned GILLEY's "transportation needs" at Country Crossing.

87.     Later the same day, on or about March 2, 2010, MASSEY told GILLEY to call MASSEY back on the "other phone." When GILLEY called back, MASSEY and GILLEY

21

discussed securing PREUITT's vote by purchasing a "good bit" of vehicles from PREUITT's dealership. During the call, MASSEY told GILLEY to meet with PREUITT in person and "assume that you are being recorded" when speaking to PREUITT over the phone.

88.    On or about March 3, 2010, MASSEY told WALKER that he was going to "feel around the edges" with PREUITT to determine what it would take to secure PREUITT's support for SB380.

89.    Later that same day, on or about March 3, 2010, PREUITT voted no on a BIR that would have permitted a substantive vote on SB380 to proceed.

90.    On or about March 20, 2010, MCGREGOR, in a conversation with another gambling facility operator, named PREUITT, along with four other senators, including Legislator 2, as "in play," after noting that he told PREUITT he "can't survive" without PREUITT's support for the pro-gambling legislation.

91.    Later that same day, on or about March 20, 2010, Lobbyist A told GILLEY that PREUITT had not yet agreed to vote for the gambling bill and that GILLEY needed to meet with PREUITT in person to let PREUITT know that GILLEY, MASSEY, and Lobbyist A would run PREUITT's reelection campaign and provide country music celebrities as a means of support.

92.    On or about March 21, 2010, GILLEY told WALKER to promise PREUITT that "we'll have our celebrities come in here and support you and we'll blow the competition away. We will, we'll wax their ass, but you [PREUITT] got to vote for us on this." GILLEY also told WALKER, "[Y]ou can buy a damn fleet [of vehicles] from him [PREUITT] if you have to while you're there."

93.    On or about March 22, 2010, GILLEY, in response to Lobbyist A's suggestion that

22

GILLEY visit PREUITT, noted that he needed to buy some trucks from PREUITT's dealership.

94.     On or about March 22, 2010, PREUITT left GILLEY a message, returning an earlier call from GILLEY. When GILLEY heard PREUITT's message, he stated that PREUITT was a "no vote; we're about to turn him into a yes vote."

95.     Later the same day, on or about March 22, 2010, MCGREGOR, after revealing to COKER that they had received a commitment on one more vote, declared that "if [PREUITT] goes with us, then we're there."

96.     On or about March 23, 2010, WALKER told GILLEY that he offered to run a poll on PREUITT's behalf. In response, GILLEY told WALKER that he would bring a famous country music star to PREUITT's dealership to "buy trucks."

97.     On or about March 23, 2010, MCGREGOR told COKER: "Your major assignment today ought to be trying to close the deal with PREUITT." Later in the same telephone call, MCGREGOR reiterated: "We need to zero in on PREUITT like a, like a laser beam."

98.     On or about March 23, 2010, COKER told MCGREGOR about a lunch conversation he had with PREUITT and MEANS, stating, "I think, uh, uh, GILLEY's call and conversation with him [PREUITT], uh, helps him a great deal . . . that little added layer of, of what they offered in terms of, uh, entertainers and things like that during his campaign I think that meant a lot to him cause I'd already told him what we would do. . . . If, uh, GILLEY calls, give them credit for putting a little icing on the cake for it."

99.     On or about March 23, 2010, MCGREGOR told a fellow gambling operator, in reference to SB380, "PREUITT's there."

100.    On or about March 23, 2010, MCGREGOR told GILLEY: "COKER told me to tell

23

you that, what you, you did, a good job in talking to PREUITT. . . . PREUITT was bragging on y'all

today." GILLEY replied: "Oh, we gon' stay on him like white on rice, now, we, we, uh, got some

things lined up for him." MCGREGOR continued, "Good.  Well he was very appreciative,

PREUITT is."

101.    On or about March 23, 2010, MCGREGOR told a member of the Senate leadership:

"PREUITT is, is there. . . . COKER called me tonight."

102.    On or about March 24, 2010, PREUITT approached Lobbyist A at the Alabama

Senate and asked Lobbyist A if MASSEY and GILLEY would honor their commitments to

PREUITT if SB380 did not pass in the House of Representatives.  Lobbyist A, after checking with

MASSEY, assured PREUITT that MASSEY and GILLEY would keep their promises.

103.    On or about March 24, 2010, WALKER told MASSEY that he offered his support

to PREUITT in exchange for PREUITT's vote on the pro-gambling bill.  During the conversation,

WALKER also stated that he knew PREUITT had spoken to Lobbyist A about whether MASSEY

would honor his commitments if the bill did not pass in the House of Representatives.

104.    On that same day, on or about March 24, 2010, MASSEY, after discussing whether

he should spend $20,000 of GILLEY's money to pay for a poll for PREUITT, told Lobbyist A:

"'Course at this point the way we're spending money, I don't, I, I say just go ahead and do it, and

if he damn don't vote for us, we'll kill his ass, we'll, we'll, or we'll fuck up the results in the poll

and put him out to press."

105.    Later that same day, on or about March 24, 2010, MASSEY told GILLEY that he did

not think that PREUITT had "committed to anything," to which GILLEY replied, "whatever we have

to do, do it."

106. Later that same day, on or about March 24, 2010, MASSEY recounted to GILLEY a conversation he had with PREUITT. According to MASSEY, he told PREUITT:

> "I'm going tell you right now, the only way I know, the most definitive way—aside from what you already been talked to about as far as the support you'll have and the commitments we've got from Jay [WALKER] and our artists—is, you will financially be able to match anything they put in your race. 'Cause we want to get you re-elected . . . ."

> We didn't talk any specifics, he [PREUITT] didn't want to talk any specifics. I just said, "Look, you, you ante up with us," I said, "We raised over a quarter of million dollars for Harri Anne SMITH in one night with what I would tell you is not necessarily the, you know, most current artistry. Uh, if I bring in a [contemporary country music star] or somebody like that in your area, no telling what I can raise. "But," I said, "Senator that was in one night." I said, "That gives you just a little example of the type of stuff we're committed to do for our friends . . . ."

When GILLEY asked how PREUITT responded to MASSEY's assurances, MASSEY continued:

> He told me point blank, he said, "Well, as you know, I've gone, come a long way," and you gotta know PREUITT to understand all this code. "I've come a long way." And, he's winking at me. . . . I told him, I said, "Look, I know you rock solid with Larry [MEANS]." I said, "I know you're covering him." I said, "Y'all got, y'all got this thing locked up right now and it's whatever y'all want." And I said, "So, that's, you know, hey, that's great. That's the way this process works."

Later in the conversation, MASSEY told GILLEY, "I mean, he's, he's [PREUITT] there. He all but told me, 'Hey, when Larry [MEANS] is fine,' I mean, 'I'm not going to leave Larry [MEANS] hanging.'"

107. On or about March 26, 2010, MASSEY recounted for GILLEY a conversation MASSEY had with COKER:

> You know, we're squared away on PREUITT, uh, basically, though, and PREUITT's funny, you know, he doesn't want to get in to certain things, but we talked in, in various detail the other day. But here's what we're doing. Tom [COKER] called me, he said, "Look, PREUITT's fine, but he's basically wanting to verify what 'significant way' means and all this," which I kinda told him the other day, you know. He [COKER] said campaign contributions, uh, you know, the artists. So we walked through it and . . . what Tom

25

[COKER] said is "I'm trying to find you, that's what he's [PREUITT] asked me to do." And he [COKER] said, "I didn't want to just call Ronnie [GILLEY]."

GILLEY said he would call COKER and tell COKER "exactly" what he told PREUITT.

108.    On or about March 26, 2010, in a telephone conversation with WALKER, GILLEY, referring to PREUITT and his campaign personnel, instructed WALKER to "give 'em whatever they want right now, we've gotta have that damn vote come Tuesday."

109.    On or about March 26, 2010, COKER told MASSEY that PREUITT wanted to find out the precise details behind MASSEY and GILLEY's promises to be "heavily involved," above and beyond campaign contributions, in PREUITT's upcoming campaign for reelection. MASSEY recommended that COKER speak directly to GILLEY about the promises that GILLEY made to PREUITT.

110.    Shortly thereafter, on or about March 26, 2010, MASSEY told WALKER that "we are fine tuning everything through COKER this morning for PREUITT. Everything is good to go, but, um, Ronnie's [GILLEY] gonna have a conversation with COKER just to verify all our commitments and make sure he's clear on 'em, so we can finalize everything."

111.    In or about the end of March 2010, MASSEY told Lobbyist A that COKER had asked him what commitments GILLEY had made to PREUITT.

112.    On or about March 30, 2010, the day of the Senate vote on SB380, PREUITT told Lobbyist A that he was going to support the bill.

113.    On or about the same day, March 30, 2010, MASSEY told a fellow lobbyist that "COKER went to Talladega [PREUITT's hometown] and Gadsden [MEANS's hometown] yesterday

26

and fine tuned all that . . . make sure everything was committed . . . confirm everything we promised and everybody else."

114.    On or about March 30, 2010, twenty-seven days after he voted against a BIR on an earlier version of the bill, PREUITT voted in favor of SB380.

115.    On or about March 31, 2010, during a telephone conversation between GILLEY and SMITH, SMITH asked GILLEY, "You wanna tell Jim PREUITT thank you [for voting in favor of SB380]? He's sitting in my office." When PREUITT got on the line, GILLEY thanked PREUITT for his support. PREUITT interjected to remind GILLEY about commitments that were made to PREUITT: "Well, I think, uh, you probably knew we had a couple, or come from a decent conversation prior . . . with Jay [WALKER] and, uh, then I get back with COKER." GILLEY responded, assuring PREUITT that "we are rock solid and we're ready, we're ready to, uh, again, we believe in supporting people who, who support democracy, as I told you before, and we are, we are gung ho and ready to get started . . . we're rock solid and one-hundred percent behind you." The conversation continued with PREUITT asking GILLEY to help "taper off" PREUITT's opposition and GILLEY promising that PREUITT would be prepared to fight that "battle" if the need arose. As the conversation ended, PREUITT told GILLEY, "Call me if you need me."

116.    On or about April 1, 2010, in an interview with law enforcement officers, PREUITT claimed that he was never offered anything of value in exchange for his vote to pass pro-gambling legislation, and that he was unaware of private individuals, lobbyists, or legislators being involved in the offer or acceptance of things of value in exchange for votes to pass pro-gambling legislation.

117.    On or about May 25, 2010, PREUITT refunded $500 and $1,500 contributions he received from MASSEY and a MASSEY-controlled PAC, respectively, in December 2009.

27

### QUINTON T. ROSS JR.

118.    On or about March 3, April 20, and September 17, 2009, MCGREGOR caused to be issued from a personal account three checks, each in the amount of $50,000, totaling $150,000, to a PAC controlled by GEDDIE.  On or about December 23, 2009, MCGREGOR caused to be issued two corporate checks totaling $37,000 to the same GEDDIE-controlled PAC.  On or about December 29, 2009, and March 1, 2010, ROSS received $2,500 campaign contributions from the same GEDDIE-controlled PAC.

119.    In or about late December 2009 or early January 2010, ROSS called Lobbyist A. During the call, ROSS told Lobbyist A that he wanted a campaign contribution from MASSEY and GILLEY.  ROSS demanded approximately $5,000 or $10,000.  ROSS stated that he believed that he deserved the campaign contribution because he had sponsored the pro-gambling legislation in the 2009 legislative session, and that he was no longer "feeling the love."

120.    On or about December 27, 2009, MASSEY caused to be issued to ROSS a $5,000 campaign contribution.

121.    On or about December 30, 2009, MCGREGOR caused to be issued corporate checks totaling nearly $2 million, which were deposited into dozens of PACs.  Over the next several months, working closely with COKER, GEDDIE, and others, MCGREGOR doled out this money, as campaign contributions, to legislators, including ROSS, whose votes on the pro-gambling legislation MCGREGOR sought to influence.

122.    On or about January 7, 2010, and March 1, 2010, ROSS received two additional campaign contributions, totaling $4,500, from GEDDIE-controlled PACs.

123.    Between in or about February 2010 and in or about April 2010, ROSS received

28

$32,500 from other PACs to which MCGREGOR contributed.

124.    On or about March 9, 2010, ROSS introduced in the Senate a competing pro-gambling bill.

125.    In or about the middle of March 2010, one or two weeks prior to the vote on SB380, ROSS called MASSEY to ask for an additional $25,000 in campaign contributions.

126.    In or about March 2010, COKER told Lobbyist A that ROSS had asked him for more money after COKER had already given ROSS $15,000 in campaign contributions.

127.    On or about March 14, 2010, MASSEY told GILLEY that ROSS was seeking $20,000 in campaign contributions. MASSEY claimed that "we done gave his butt fifteen thousand dollars, you know, prior to the [legislative] session," and "apparently [ROSS's] doing the same thing to everybody 'cause COKER was bitching about it." According to MASSEY, COKER said he had already given $25,000 to ROSS.

128.    On or about March 29, 2010, the day before the anticipated vote on the pro-gambling bill, SB380, ROSS called MCGREGOR and asked, "You feel like you got the twenty-one [votes] in the Senate?" MCGREGOR responded that he was "cautiously optimistic." Later in the call, ROSS thanked MCGREGOR for recent campaign contributions and said, "I'm actually, uh, calling to see if I can get some more help." In response, MCGREGOR claimed: "I don't even know where we are. I've, I've been so wrapped up and, uh, GEDDIE . . . he's been keeping up with everything." After ROSS continued to press the issue, claiming that campaign support "would help [ROSS] out tremendously," MCGREGOR stated, "I did my thing in December and GEDDIE's been doing his thing and other people since."

29

129.     The day of the vote, on or about March 30, 2010, MCGREGOR called ROSS and told ROSS that he could "call on some folks" that he had "relationships with to help" ROSS. MCGREGOR stated further that "money is tight." After MCGREGOR told ROSS he would work with GEDDIE to secure additional contributions for ROSS, ROSS stated, "I definitely appreciate it, um, you know, whatever, whatever you can do, and I, I definitely appreciate, you know, what you've already done, um, we're just getting down to the wire, and so I've, you know, um, you know, you don't know until you ask, and so, so, you know, you just make your calls." ROSS continued, "We, we know the window is closing on us fast and so I'm just trying to do everything I can to, uh, make sure I can raise [funds] . . . ." In response, MCGREGOR promised to help however he could.

130.     On or about March 30, 2010, ROSS voted in favor of SB380.

131.     On or about March 31, 2010, following the successful vote on SB380, COKER and MCGREGOR discussed additional campaign contributions for ROSS. During the conversation, MCGREGOR stated, "If you can say anything to any other clients about helping Quinton [ROSS], I'll tell ya about that when I see ya . . . ." COKER responded, "Yeah, I've got, uh, I'm, I'm gonna give him a, a good, uh, check from the, uh, medical association and from the soft drink folks." Shortly thereafter, MCGREGOR acknowledged his prior conversations with ROSS on or about March 29, 2010, and March 30, 2010, noting, "I talked to him [ROSS] about talking to you and, and . . . GEDDIE yesterday . . . actually, yesterday and day before yesterday, I'll tell you about that when I see you."

132.     At all relevant times, ROSS ran unopposed in his reelection bid.

HARRI ANNE H. SMITH

30

133.    On or about April 3, 2008, SMITH introduced an anti-gambling bill, Senate Bill 572, that would have restricted the operation of bingo in Houston County, the location of Country Crossing, to charitable organizations, while prohibiting all previously authorized private bingo operations.  SMITH's bill, if enacted, effectively would have barred GILLEY and Country Crossing from conducting bingo-related business in Houston County.

134.    During the following legislative session, on or about March 24, 2009, SMITH, in a telephone conversation with Legislator 1, stated that she believed that GILLEY, in fact, would honor his word and provide to Legislator 1 the hundreds of thousands of dollars GILLEY offered Legislator 1 during the dinner at a restaurant in Montgomery, Alabama, on or about March 4, 2009.  SMITH also claimed that she was "not gonna take a dime" from GILLEY.

135.    On or about December 8, 2009, GILLEY caused to be issued thirty-nine corporate checks, totaling $19,500, which were deposited in SMITH's campaign account.

136.    In or about late December 2009, SMITH accepted over $160,000 in additional campaign contributions from GILLEY's business associates.

137.    In or about December 2009, GILLEY made an approximately $217,000 in-kind contribution to SMITH's campaign for a country music concert and fundraiser.

138.    Between in or about December 2009 and in or about March 2010, SMITH accepted a total of $13,000 in contributions from PACs that received money from MASSEY's business and from other PACs into which MCGREGOR had deposited funds.

139.    Between in or about December 2009 and in or about March 2010, SMITH accepted a total of $20,000 from GEDDIE-controlled PACs, $10,000 of which GEDDIE attributed to MCGREGOR in company records.

140. On or about January 11, 2010, SMITH received a $30,000 PAC campaign contribution. On or about the next day, January 12, 2010, GILLEY wrote two $15,000 personal checks to two other PACs controlled by the same individual who ran the PAC from which SMITH received the $30,000 contribution.

141. On or about March 10, 2010, SMITH received a total of $15,000 in campaign contributions from three PACs into which MCGREGOR deposited money from his corporate enterprises in or about December 2009.

142. On or about March 11, 2010, SMITH arranged with GILLEY to funnel $400,000 into her reelection campaign, using a PAC, thereby hiding GILLEY as the source of the funds.

143. On or about March 12, 2010, after noting that we "just gotta get another vote . . . another couple of votes," GEDDIE told MCGREGOR that he made campaign contributions to House and Senate members, including SMITH.

144. On or about March 16, 2010, GILLEY arranged with a political consultant to buy $400,000 worth of campaign advertisements for SMITH, with the money coming from "some individuals, um, as well as corporations."

145. On or about March 22, 2010, GILLEY asked SMITH to convince as many legislators as she could to vote for the pro-gambling legislation. SMITH indicated that she would carry out GILLEY's request.

146. On or about March 24, 2010, SMITH asked GILLEY about his promised campaign contributions, and GILLEY assured her that he would "get those checks busted up, the way they need to be." As the conversation ended, GILLEY instructed SMITH to put pressure on other legislators to vote in favor of the pro-gambling bill: "Stay tough on 'em now. . . . We gotta have 'em right now

32

. . . . Lean on everyone of 'em you can." SMITH reassured GILLEY: "I will."

147. Later that same day, on or about March 24, 2010, SMITH and GILLEY continued their discussion of how GILLEY'S contribution to SMITH would be concealed by running it through various PACs. When GILLEY asked SMITH if she was comfortable using a PAC with a name associated with a different political party than SMITH's, SMITH consented, explaining, "'Cause what we're gonna do is put it through another. . . . Like, what we'll do, it will go to that one, and then we're gonna move it to a different one."

148. On or about March 24, 2010, GILLEY issued four checks, each in the amount of $50,000, to four separate PACs, including PACS referenced in an earlier conversation between GILLEY and SMITH. The total amount, $200,000, was intended for SMITH, in partial satisfaction of GILLEY's promised $400,000 in support. SMITH, in turn, failed to report this contribution, the disposition of which she controlled, on campaign disclosure reports, in violation of Alabama law.

149. On or about March 29, 2010, GILLEY offered to do a "big gala event" for SMITH's and another legislator's campaigns. During the conversation, SMITH asked, "Are we sure that PREUITT and them are OK?" In response, GILLEY claimed, "I think we're gonna be alright, but you just don't [know]."

150. On or about March 30, 2010, SMITH voted in favor of the pro-gambling legislation, SB380, which was wholly contrary to the prior anti-gambling bill SMITH introduced two years earlier.

151. Later that same day, on or about March 30, 2010, after the pro-gambling bill passed in the Senate, GILLEY called SMITH to congratulate her and to thank her for her help. In the same conversation, GILLEY stated that, if Legislator 1 and another member of the House of

33

Representatives did not vote in favor of the legislation favored by MCGREGOR and GILLEY, "we're gonna get 'em or they gonna wish they woulda. . . . We will make an example out of 'em, if they don't." SMITH replied, "I agree."

152.    On or about March 31, 2010, GILLEY and SMITH discussed GILLEY's need for additional legislation that would protect Country Crossing until a public referendum were held in November on the constitutional amendment authorized by SB380. During the conversation, GILLEY claimed that Country Crossing did not "have the same protection that everybody else has," and he instructed SMITH that she was "gonna have to lead the charge if we do it [propose additional legislation]."

153.    On or about March 31, 2010, MASSEY and WALKER discussed campaign funds going to SMITH. Before elaborating on plans to fund SMITH's campaign, MASSEY mentioned the possibility that law enforcement was monitoring the conversation:

> Let me qualify this in case any of my friends are listening. Uh, bottom line is apparently Ronnie [GILLEY] had indicated he wanted to be, uh, more supportive of [SMITH's] campaign and, uh, had indicated some funds were gonna be moving to her campaign for her support for her various philosophies and whatnot. Uh, seems like to me there was some discussion about $200,000 or something.

MASSEY cautioned, however, that "quite honestly, I don't want to be talking to her right now based on all this shit that's going on and having any discussion about that."

154.    On or about April 3, 2010, WALKER told MASSEY that SMITH "needs to step up to the damn plate" and support additional general legislation beneficial to Country Crossing to reciprocate for all the support SMITH had received from them.

155.    Between in or about December 2009 and in or about March 2010, SMITH received approximately ninety percent of the campaign contributions deposited into her campaign account

34

from GILLEY, GILLEY's business associates, GEDDIE-controlled PACs, and PACS to which MCGREGOR had contributed.

## JOSEPH R. CROSBY

156.    Between in or about May 2008 and in or about April 2010, MCGREGOR caused to be issued monthly checks in the amount of $3,000, totaling $72,000, made payable to CROSBY. CROSBY, who was prohibited from receiving income in addition to his State of Alabama salary for his official assistance, failed to report any of the payments on his State of Alabama financial disclosure forms until in or about July 2010, after the Legislative Reference Service received a grand jury subpoena in connection with the instant investigation.

157.    On or about February 27, 2009, CROSBY received an email from a lawyer working for MCGREGOR, instructing CROSBY to make certain changes to the draft "Sweet Home Alabama" pro-gambling legislation.

158.    On or about January 6, 2010, MCGREGOR caused to be issued a check in the amount of $3,000 made payable to CROSBY.

159.    On or about January 11 and on or about January 18 through 20, 2010, CROSBY directed an employee of the Legislative Reference Service to transmit to MCGREGOR drafts of a pro-gambling bill sponsored by a member of the Alabama House of Representatives.

160.    On or about January 11, 2010, Legislator 2 made a request to the Legislative Reference Service for a draft bill that would amend the Alabama Constitution to prohibit all forms of gambling. Although the request initially was assigned to a different legislative analyst, CROSBY, as a team leader, handled the drafting of the bill. Shortly thereafter, CROSBY provided Legislator 2 with a draft bill that did not prohibit all forms of gambling, as Legislator 2 had requested, but

35

instead, in part, protected the interests of gambling operators, such as MCGREGOR and GILLEY. When Legislator 2 told CROSBY that the bill CROSBY drafted did not satisfy Legislator 2's request, CROSBY redrafted the proposed legislation.

161.    On or about January 18, 2010, CROSBY received instructions from MCGREGOR, through his lawyer, to make changes to a draft constitutional amendment designed to protect MCGREGOR's business interests.

162.    On or about January 20 and 21, 2010, CROSBY directed an employee of the Legislative Reference Service to transmit to MCGREGOR early drafts of SB380, which had not yet been introduced.

163.    On or about February 3, 2010, MCGREGOR caused to be issued a check in the amount of $3,000 made payable to CROSBY.

164.    On or about the morning of February 4, 2010, the day SB380 was introduced, CROSBY directed an employee of the Legislative Reference Service to transmit to MCGREGOR an updated draft of SB380. Later, CROSBY directed the employee to forward to MCGREGOR edits CROSBY had received from MCGREGOR's lawyer.

165.    On or about February 22, 2010, CROSBY directed an employee of the Legislative Reference Service to transmit to GEDDIE a proposed amendment to SB380.

166.    On or about March 2, 2010, and March 3, 2010, CROSBY directed an employee of the Legislative Reference Service to transmit updated drafts of SB380 to MCGREGOR.

167.    On or about March 3, 2010, MCGREGOR caused to be issued a check in the amount of $3,000 made payable to CROSBY.

168. On or about March 4, 2010, MCGREGOR, through his lawyer, gave specific instructions for CROSBY to make changes to SB380.

169. On or about March 7, 2010, CROSBY told MCGREGOR his work on SB380 had been "pretty exhausting." In response, MCGREGOR stated, "I wanted to thank you for staying on top of everything and, and, uh, responding to working with us."

170. On or about March 8, 9, and 10, 2010, CROSBY directed an employee of the Legislative Reference Service to transmit updated drafts of SB380 to MCGREGOR.

171. On or about March 10, 2010, CROSBY promised MCGREGOR that he would make changes to SB380 and get the agreement of the bill's Senate sponsor. During the conversation, MCGREGOR told CROSBY, "I appreciate your efforts, big man," before asking him to "jog [his] memory" regarding proposed changes to the bill.

172. On or about March 11, 2010, MCGREGOR told COKER that CROSBY, along with MCGREGOR's lawyer and the sponsor of the legislation, "fixed" some language in SB380 that would affect MCGREGOR's tax liability.

173. On March 11, 2010, MCGREGOR asked SB380's sponsor to talk to MCGREGOR's lawyer, who "knows more about my finances than I do," in an effort to amend the bill in a way that would reduce MCGREGOR's tax liability under the legislation.

174. On or about March 11, 2010, and March 12, 2010, CROSBY directed an employee of the Legislative Reference Service to transmit updated drafts of SB380 to MCGREGOR.

175. On or about March 12, 2010, in a telephone call with CROSBY, MCGREGOR provided specific provisions that were to be included in a revised SB380 and urged CROSBY to speed up the drafting process so that his legislation would advance before bills proposed by other

37

legislators.

176.    Later that same day, on or about March 12, 2010, referencing a proposed tax provision in SB380, MCGREGOR assured COKER that "we ain't gonna pay no higher tax."

177.    On or about March 14, 2010, MASSEY told GILLEY that any proposed pro-gambling legislation would go through CROSBY, and that CROSBY could be expected to report any such legislative developments to MCGREGOR.

178.    On or about March 22, 2010, CROSBY directed an employee of the Legislative Reference Service to transmit an updated draft of SB380 to MCGREGOR.

179.    On or about April 7, 2010, MCGREGOR caused to be issued a check in the amount of $3,000 made payable to CROSBY.

180.    On or about April 8, 2010, CROSBY directed an employee of the Legislative Reference Service to transmit the final version of SB380 to MCGREGOR.

181.    On or about April 12, 2010, CROSBY directed an employee of the Legislative Reference Service to transmit the final version of SB380 to GEDDIE.

<u>Additional Overt Acts in Furtherance of the Conspiracy</u>

182.    On or about March 11, 2010, in a conversation with MCGREGOR, COKER mentioned one legislator's suggestion that the legislation include a provision prohibiting campaign contributions from gambling operators, claiming that such a provision "would lose us nineteen" votes, in return for the two that would be gained.

183.    On or about March 12, 2010, in a telephone call between MCGREGOR and GILLEY, MCGREGOR asked GILLEY, "Do you want to talk on your, this phone here?" GILLEY responded that "I ain't got my other one with me right this minute. We good on it?" When MCGREGOR

38

consented, GILLEY continued, "They listen to you anyways. They done tracked your phone, that phone down, you had it so long. You defeated the purpose about four months ago." MCGREGOR responded, "I don't really care."

184.    On or about March 15, 2010, GILLEY ordered a telephone in another person's name to hide his identity as the true user of the telephone.

185.    On or about March 17, 2010, during a brief telephone exchange, MCGREGOR asked GILLEY, "You want to call me back on the other phone or talk on this one?" GILLEY responded that he would "call [MCGREGOR] right back." MCGREGOR confirmed: "Call me right back on this same number."

186.    Three days later, on or about March 20, 2010, in another attempt to evade possible monitoring, MCGREGOR again asked GILLEY, "You want to call me back on that other line you got?" GILLEY responded, "Uh, yeah, I'll call you right back."

187.    On or about March 23, 2010, during a conversation regarding the upcoming vote on SB380, MCGREGOR asked GEDDIE, "Confidentially, you, you on a safe phone?" to which GEDDIE responded, "I hope so. If I'm not, I'm in trouble." Satisfied with GEDDIE's assurance, MCGREGOR told GEDDIE, in a reference to the twenty-one votes necessary to pass SB380, "I feel like we're there." GEDDIE agreed, stating, "Yeah, I do, too. Based on what I've been told."

188.    On or about March 26, 2010, GILLEY ordered a telephone in another person's name to hide his identity as the true user of the telephone.

189.    On or about March 18, 2010, MCGREGOR, speaking with GEDDIE, said, "I need to get with you to find out exactly where we are, on, on our, on our friends and also to establish a

39

game plan on where we're going," after which GEDDIE noted "we still got some movin' around to do, but we've moved a lot."

190.    On or about March 30, 2010, the day of the vote on SB380, GILLEY called a campaign consultant to discuss a member of the Alabama Senate, who supported the bill but was unlikely to take part in the vote due to illness. During the call, GILLEY told the consultant, who was planning to see the ailing legislator that morning, that, if the legislator participated in the vote, GILLEY would secure the help of prominent country music stars to run the legislator's campaign. GILLEY told the consultant to assure the legislator that GILLEY was going "to participate in his campaign and uh, in a big, big, big way" and that the legislator was "number twenty-one for us." Later, GILLEY stated that "in excess of $500,000 is what's already committed" if the legislator showed up and voted in favor of SB380. The consultant assured GILLEY that he would forward GILLEY's promise to the legislator. Later that day, the legislator voted in favor of SB380.

All in violation of Title 18, United States Code, Section 371.

### COUNT TWO
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(2) & 2)

191.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

192.    On or about March 4, 2009, in the Middle District of Alabama and elsewhere, defendants

RONALD E. GILLEY,
JARROD D. MASSEY,
and
HARRI ANNE H. SMITH,

40

aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly and corruptly give, offer and agree to give something of value to an agent of a state government with the intent to influence and reward the agent in connection with the business, transaction, and series of transactions of such state government involving something of value of $5,000 or more, namely, GILLEY, MASSEY, and SMITH did offer over $200,000 in campaign contributions to Legislator 1, a member of the Alabama House of Representatives, being an agent of the State of Alabama, which received benefits in excess of $10,000 in the one-year period from March 1, 2009, to February 28, 2010, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance and other forms of federal assistance, to influence and reward Legislator 1 in connection with an upcoming vote on pro-gambling legislation.

All in violation of Title 18, United States Code, Sections 2 and 666(a)(2).

### COUNT THREE
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(2) & 2)

193.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

194.    On or about February 15, 2010, in the Middle District of Alabama and elsewhere, defendants

MILTON E. MCGREGOR,
and
ROBERT B. GEDDIE JR.,

aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly and corruptly give, offer and agree to give something of value to an agent of a state government with the intent to influence and reward the agent in connection with the business, transaction, and series

41

of transactions of such state government involving something of value of $5,000 or more, namely, GEDDIE, at the direction of MCGREGOR, did give $5,000 to Legislator 3, a member of the Alabama House of Representatives, being an agent of the State of Alabama, which received benefits in excess of $10,000 in the one-year period from May 1, 2009, to April 30, 2010, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance and other forms of federal assistance, to influence and reward Legislator 3 in connection with an upcoming vote on pro-gambling legislation.

All in violation of Title 18, United States Code, Sections 2 and 666(a)(2).

## COUNT FOUR
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(2) & 2)

195.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

196.    From on or about February 18, 2010, through on or about February 23, 2010, in the Middle District of Alabama and elsewhere, defendants

MILTON E. MCGREGOR,
RONALD E. GILLEY,
and
JARROD D. MASSEY,

aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly and corruptly give, offer and agree to give something of value to an agent of a state government with the intent to influence and reward the agent in connection with the business, transaction, and series of transactions of such state government involving something of value of $5,000 or more, namely, MCGREGOR, GILLEY, and MASSEY did promise $1 million to Legislator 2, for use at Legislator

42

2's discretion, which money would be provided to Legislator 2 as income from, or an equity interest

in, a public relations entity, to influence and reward Legislator 2, a member of the Alabama Senate,

being an agent of the State of Alabama, which received benefits in excess of $10,000 in the one-year

period from May 1, 2009, to April 30, 2010, from federal programs involving a grant, contract,

subsidy, loan, guarantee, insurance and other forms of federal assistance, in connection with an

upcoming vote on pro-gambling legislation.

All in violation of Title 18, United States Code, Sections 2 and 666(a)(2).

## COUNT FIVE
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(2) & 2)

197.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this

Indictment are realleged and incorporated as though fully set forth herein.

198.    On or about March 22, 2010, and March 24, 2010, in the Middle District of Alabama

and elsewhere, defendants

RONALD E. GILLEY,
MILTON E. MCGREGOR,
and
JARROD D. MASSEY,

along with Lobbyist A, aided and abetted by each other and others known and unknown to the Grand

Jury, did knowingly and corruptly give, offer and agree to give something of value to an agent of a

state government with the intent to influence and reward the agent in connection with the business,

transaction, and series of transactions of such state government involving something of value of

$5,000 or more, namely, GILLEY, MASSEY, MCGREGOR, and Lobbyist A promised to give

campaign contributions, including promises of $100,000 and other unspecified amounts, to MEANS,

43

a member of the Alabama Senate, being an agent of the State of Alabama, which received benefits in excess of $10,000 in the one-year period from May 1, 2009, to April 30, 2010, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance and other forms of federal assistance, to influence and reward MEANS in connection with an upcoming vote on pro-gambling legislation.

All in violation of Title 18, United States Code, Sections 2 and 666(a)(2).

### COUNT SIX
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(1)(B) & 2)

199.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

200.    From on or about March 23, 2010, through on or about March 25, 2010, in the Middle District of Alabama and elsewhere, defendant

### LARRY P. MEANS,

aided and abetted by others known and unknown to the Grand Jury, while a member of the Alabama Senate, being an agent of the State of Alabama, which received benefits in excess of $10,000 in the one-year period from May 1, 2009, to April 30, 2010, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other forms of federal assistance, did corruptly solicit, demand, accept, and agree to accept something of value intending to be influenced and rewarded in connection with the business, transaction, and series of transactions of such state government involving something of value of $5,000 or more, namely, MEANS agreed to accept approximately $100,000 in campaign contributions from GILLEY, MASSEY, and Lobbyist A, intending to be influenced and rewarded in connection with an upcoming vote on pro-gambling

Ex. C, Indictment, United States v. McGregor, et al.

legislation.

All in violation of Title 18, United States Code, Sections 2 and 666(a)(1)(B).

## COUNT SEVEN
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(1)(B) & 2)

201.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

202.    On or about March 22, 2010, in the Middle District of Alabama and elsewhere, defendant

LARRY P. MEANS,

aided and abetted by others known and unknown to the Grand Jury, while a member of the Alabama Senate, being an agent of the State of Alabama, which received benefits in excess of $10,000 in the one-year period from May 1, 2009, to April 30, 2010, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other forms of federal assistance, did corruptly solicit, demand, accept, and agree to accept something of value intending to be influenced and rewarded in connection with the business, transaction, and series of transactions of such state government involving something of value of $5,000 or more, namely, MEANS agreed to accept an unspecified amount of campaign contributions from MCGREGOR, intending to be influenced and rewarded in connection with an upcoming vote on pro-gambling legislation.

All in violation of Title 18, United States Code, Sections 2 and 666(a)(1)(B).

## COUNT EIGHT
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(2) & 2)

203.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this

45

Indictment are realleged and incorporated as though fully set forth herein.

204.    In or about March 2010, in the Middle District of Alabama and elsewhere, defendants

RONALD E. GILLEY,
JARROD D. MASSEY,
MILTON E. MCGREGOR,
JARRELL W. WALKER JR.,
and
THOMAS E. COKER,

along with Lobbyist A, aided and abetted by each other and others known and unknown to the Grand

Jury, did knowingly and corruptly give, offer and agree to give something of value to an agent of a

state government with the intent to influence and reward the agent in connection with the business,

transaction, and series of transactions of such state government involving something of value of

$5,000 or more, namely, GILLEY, MASSEY, MCGREGOR, COKER, WALKER, and Lobbyist A

promised to provide at least $2,000,000 in campaign support and the services of prominent country

music stars for campaign purposes, among other things of value, to PREUITT, a member of the

Alabama Senate, being an agent of the State of Alabama, which received benefits in excess of

$10,000 in the one-year period from May 1, 2009, to April 30, 2010, from federal programs

involving a grant, contract, subsidy, loan, guarantee, insurance and other forms of federal assistance,

to influence and reward PREUITT in connection with an upcoming vote on pro-gambling legislation.

All in violation of Title 18, United States Code, Sections 2 and Section 666(a)(2).

## COUNT NINE
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(1)(B) & 2)

205.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this

Indictment are realleged and incorporated as though fully set forth herein.

46

206.    In or about March 2010, in the Middle District of Alabama and elsewhere, defendant

JAMES E. PREUITT,

aided and abetted by others known and unknown to the Grand Jury, while a member of the Alabama Senate, being an agent of the State of Alabama, which received benefits in excess of $10,000 in the one-year period from May 1, 2009, to April 30, 2010, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other forms of federal assistance, did corruptly solicit, demand, accept, and agree to accept something of value, intending to be influenced and rewarded in connection with the business, transaction, and series of transactions of such state government involving something of value of $5,000 or more, namely, PREUITT agreed to accept at least $2,000,000 in campaign support and the services of prominent country music stars for campaign purposes, among other things of value, from GILLEY, MASSEY, MCGREGOR, COKER, WALKER, and Lobbyist A, intending to be influenced and rewarded in connection with an upcoming vote on pro-gambling legislation.

All in violation of Title 18, United States Code, Sections 2 and 666(a)(1)(B).

## COUNT TEN
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(2) & 2)

207.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

208.    From in or about January 2010 through in or about March 2010, in the Middle District of Alabama and elsewhere, defendants

RONALD E. GILLEY,
JARROD D. MASSEY,
MILTON E. MCGREGOR,

47

and
THOMAS E. COKER,

along with Lobbyist A, aided and abetted by each other and others known and unknown to the Grand

Jury, did knowingly and corruptly give, offer and agree to give something of value to an agent of a

state government with the intent to influence and reward the agent in connection with the business,

transaction, and series of transactions of such state government involving something of value of

$5,000 or more, namely, GILLEY, MASSEY, MCGREGOR, COKER, and Lobbyist A promised

to give campaign contributions, including promises of $25,000 and other unspecified amounts, to

ROSS, a member of the Alabama Senate, being an agent of the State of Alabama, which received

benefits in excess of $10,000 in the one-year period from May 1, 2009, to April 30, 2010, from

federal programs involving a grant, contract, subsidy, loan, guarantee, insurance and other forms of

federal assistance, to influence and reward ROSS in connection with an upcoming vote on pro-

gambling legislation.

All in violation of Title 18, United States Code, Sections 2 and Section 666(a)(2).

### COUNT ELEVEN
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(1)(B) & 2)

209.   The allegations contained in paragraphs 1 through 26 and 39 through 190 of this

Indictment are realleged and incorporated as though fully set forth herein.

210.   From in or about December 2009 through in or about March 2010, in the Middle

District of Alabama and elsewhere, defendant

QUINTON T. ROSS JR.,

aided and abetted by others known and unknown to the Grand Jury, while a member of the Alabama

48

Senate, being an agent of the State of Alabama, which received benefits in excess of $10,000 in the one-year period from May 1, 2009, to April 30, 2010, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other forms of federal assistance, did corruptly solicit, demand, accept, and agree to accept something of value, intending to be influenced and rewarded in connection with the business, transaction, and series of transactions of such state government involving something of value of $5,000 or more, namely, ROSS agreed to accept campaign contributions of at least $20,000 from GILLEY, MASSEY, and Lobbyist A, intending to be influenced and rewarded in connection with an upcoming vote on pro-gambling legislation.

All in violation of Title 18, United States Code, Sections 2 and 666(a)(1)(B).

## COUNT TWELVE
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(1)(B) & 2)

211.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

212.    In or about March 2010 in the Middle District of Alabama and elsewhere, defendant

QUINTON T. ROSS JR.,

aided and abetted by others known and unknown to the Grand Jury, while a member of the Alabama Senate, being an agent of the State of Alabama, which received benefits in excess of $10,000 in the one-year period from May 1, 2009, to April 30, 2010, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other forms of federal assistance, did corruptly solicit, demand, accept, and agree to accept something of value, intending to be influenced and rewarded in connection with the business, transaction, and series of transactions of such state government involving something of value of $5,000 or more, namely, ROSS agreed to accept an

49

unspecified amount of campaign contributions from MCGREGOR and COKER, intending to be influenced and rewarded in connection with an upcoming vote on pro-gambling legislation.

All in violation of Title 18, United States Code, Sections 2 and 666(a)(1)(B).

## COUNT THIRTEEN
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(2) & 2)

213.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

214.    From in or about December 2009 through in or about March 2010, in the Middle District of Alabama and elsewhere, defendant

### RONALD E. GILLEY

aided and abetted by others known and unknown to the Grand Jury, did knowingly and corruptly give, offer and agree to give something of value to an agent of a state government with the intent to influence and reward the agent in connection with the business, transaction, and series of transactions of such state government involving something of value of $5,000 or more, namely, GILLEY promised to give at least $400,000 in campaign funds to SMITH, a member of the Alabama Senate, being an agent of the State of Alabama, which received benefits in excess of $10,000 in the one-year period from May 1, 2009, to April 30, 2010, from federal programs involving a grant, contract, subsidy, loan, guarantee, insurance and other forms of federal assistance, to influence and reward SMITH in connection with an upcoming vote on pro-gambling legislation.

All in violation of Title 18, United States Code, Sections 2 and 666(a)(2).

## COUNT FOURTEEN
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(1)(B) & 2)

215.     The allegations contained in paragraphs 1 through 26 and 39 through 190 of this
Indictment are realleged and incorporated as though fully set forth herein.

216.     From in or about December 2009 through in or about March 2010, in the Middle
District of Alabama and elsewhere, defendant

HARRI ANNE H. SMITH,

aided and abetted by others known and unknown to the Grand Jury, while a member of the Alabama
Senate, being an agent of the State of Alabama, which received benefits in excess of $10,000 in the
one-year period from May 1, 2009, to April 30, 2010, from federal programs involving a grant,
contract, subsidy, loan, guarantee, insurance, and other forms of federal assistance, did corruptly
solicit, demand, accept, and agree to accept something of value, intending to be influenced and
rewarded in connection with the business, transaction, and series of transactions of such state
government involving something of value of $5,000 or more, namely, SMITH solicited and agreed
to accept at least $400,000 for her campaign from GILLEY, intending to be influenced and rewarded
in connection with an upcoming vote on pro-gambling legislation.

All in violation of Title 18, United States Code, Sections 2 and 666(a)(1)(B).

**COUNT FIFTEEN**
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(2) & 2)

217.     The allegations contained in paragraphs 1 through 26 and 39 through 190 of this
Indictment are realleged and incorporated as though fully set forth herein.

218.     From in or about February 2009 through in or about March 2010, in the Middle
District of Alabama and elsewhere, defendant

51

MILTON E. MCGREGOR,

aided and abetted by others known and unknown to the Grand Jury, did knowingly and corruptly

give, offer and agree to give something of value to an agent of a state government with the intent to

influence and reward the agent in connection with the business, transaction, and series of transactions

of such state government involving something of value of $5,000 or more, namely, MCGREGOR

gave $42,000, in monthly payments of $3,000, to CROSBY, a legislative analyst with the Alabama

Legislative Reference Service, being an agent of the State of Alabama, which received benefits in

excess of $10,000 in the one-year period from May 1, 2009, to April 30, 2010, from federal

programs involving a grant, contract, subsidy, loan, guarantee, insurance and other forms of federal

assistance, to influence and reward CROSBY in connection with his official acts as they pertained

to drafting gambling legislation, including SB380.

    All in violation of Title 18, United States Code, Sections 2 and 666(a)(2).

## COUNT SIXTEEN
(Federal Programs Bribery and Aiding and Abetting, 18 U.S.C. §§ 666(a)(1)(B) & 2)

    219.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this

Indictment are realleged and incorporated as though fully set forth herein.

    220.    From in or about February 2009 through in or about March 2010, in the Middle

District of Alabama and elsewhere, defendant

JOSEPH R. CROSBY,

aided and abetted by others known and unknown to the Grand Jury, while a legislative analyst with

the Alabama Legislative Reference Service, being an agent of the State of Alabama, which received

benefits in excess of $10,000 in the one-year period from May 1, 2009, to April 30, 2010, from

Ex. C, Indictment, United States v. McGregor, et al.

federal programs involving a grant, contract, subsidy, loan, guarantee, insurance, and other forms

of federal assistance, did corruptly solicit, demand, accept, and agree to accept something of value

intending to be influenced and rewarded in connection with the business, transaction, and series of

transactions of such state government involving something of value of $5,000 or more, namely,

CROSBY agreed to accept and accepted $42,000, in monthly payments of $3,000, from

MCGREGOR, intending to be influenced and rewarded in connection with his official acts as they

pertained to drafting gambling legislation, including SB380.

All in violation of Title 18, United States Code, Sections 2 and 666(a)(1)(B).

## COUNT SEVENTEEN
(Extortion and Aiding and Abetting, 18 U.S.C. §§ 1951 & 2)

221. The allegations contained in paragraphs 1 through 26 and 39 through 190 of this

Indictment are realleged and incorporated as though fully set forth herein.

222. In or about March 2010 in the Middle District of Alabama and elsewhere, defendant

QUINTON T. ROSS JR.,

aided and abetted by others known and unknown to the Grand Jury, did knowingly attempt to

obstruct, delay, and affect commerce and the movement of articles and commodities in commerce

by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is, ROSS,

while serving as a member of the Alabama Senate, engaged in a course of conduct, whereby ROSS

solicited and, directly and through others, pressured MCGREGOR and COKER, under the color of

official right, to consent to provide an unspecified amount of campaign contributions for the benefit

of ROSS, which money was not due to ROSS.

All in violation of Title 18, United States Code, Sections 2 and 1951.

## COUNT EIGHTEEN
(Extortion and Aiding and Abetting, 18 U.S.C. §§ 1951 & 2)

223.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

224.    From in or about December 2009 through in or about March 2010, in the Middle District of Alabama and elsewhere, defendant

QUINTON T. ROSS JR.,

aided and abetted by others known and unknown to the Grand Jury, did knowingly attempt to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is, ROSS, while serving as a member of the Alabama Senate, engaged in a course of conduct, whereby ROSS solicited and, directly and through others, pressured GILLEY, MASSEY, and Lobbyist A, under the color of official right, to consent to provide approximately $25,000 in campaign contributions for the benefit of ROSS, which money was not due to ROSS.

All in violation of Title 18, United States Code, Sections 2 and 1951.

## COUNT NINETEEN
(Extortion and Aiding and Abetting, 18 U.S.C. §§ 1951 & 2)

225.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

226.    On or about March 22, 2010, in the Middle District of Alabama and elsewhere, defendant

LARRY P. MEANS,

54

aided and abetted by others known and unknown to the Grand Jury, did knowingly attempt to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is, MEANS, while serving as a member of the Alabama Senate, engaged in a course of conduct, whereby MEANS solicited and, directly and through others, pressured MCGREGOR, under the color of official right, to consent to provide an unspecified amount of campaign contributions for the benefit of MEANS, which money was not due to MEANS.

All in violation of Title 18, United States Code, Sections 2 and 1951.

### COUNT TWENTY
(Extortion and Aiding and Abetting, 18 U.S.C. §§ 1951 & 2)

227. The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

228. From on or about March 23, 2010, through on or about March 25, 2010, in the Middle District of Alabama and elsewhere, defendant

### LARRY P. MEANS,

aided and abetted by others known and unknown to the Grand Jury, did knowingly attempt to obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is, MEANS, while serving as a member of the Alabama Senate, engaged in a course of conduct, whereby MEANS solicited and, directly and through others, pressured GILLEY, MASSEY, and

55

Lobbyist A, under the color of official right, to consent to provide approximately $100,000 in campaign contributions for the benefit of MEANS, which money was not due to MEANS.

All in violation of Title 18, United States Code, Sections 2 and 1951.

## COUNT TWENTY-ONE
(Extortion and Aiding and Abetting, 18 U.S.C. §§ 1951 & 2)

229. The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

230. From in or about December 2009 through in or about March 2010, in the Middle District of Alabama and elsewhere, defendant

### HARRI ANNE H. SMITH,

aided and abetted by others known and unknown to the Grand Jury, did knowingly obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is, SMITH, while serving as a member of the Alabama Senate, engaged in a course of conduct, whereby SMITH solicited and, directly and through others, pressured GILLEY, under the color of official right, to consent to provide at least $400,000 in campaign contributions for the benefit of SMITH, which money was not due to SMITH.

All in violation of Title 18, United States Code, Sections 2 and 1951.

## COUNT TWENTY-TWO
(Extortion and Aiding and Abetting, 18 U.S.C. §§ 1951 & 2)

231. The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

56

232.     In or about March 2010, in the Middle District of Alabama and elsewhere, defendant

JAMES E. PREUITT,

aided and abetted by others known and unknown to the Grand Jury, did knowingly attempt to

obstruct, delay, and affect commerce and the movement of articles and commodities in commerce

by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is,

PREUITT, under color of official right, while serving as a member of the Alabama Senate, agreed

to accept at least $2,000,000 in campaign support and the services of prominent country music stars

for campaign purposes, among other things of value, from GILLEY, MASSEY, MCGREGOR,

COKER, WALKER, and Lobbyist A, which things of value were not due to PREUITT.

All in violation of Title 18, United States Code, Sections 2 and 1951.

## COUNTS TWENTY-THREE THROUGH THIRTY-THREE
(Honest Services Fraud and Aiding and Abetting, 18 U.S.C. §§ 1341, 1343, 1346 & 2)

### The Scheme

233.     The allegations contained in paragraphs 1 through 26 and 29 through 190 of this

Indictment are realleged and incorporated as though fully set forth herein.

234.     From in or about February 2009 through in or about August 2010, in the Middle

District of Alabama and elsewhere, defendants

MILTON E. MCGREGOR,
RONALD E. GILLEY,
THOMAS E. COKER,
ROBERT B. GEDDIE JR.,
JARROD D. MASSEY,
LARRY P. MEANS,
JAMES E. PREUITT,
QUINTON T. ROSS JR.,
HARRI ANNE H. SMITH,

57

JARRELL W. WALKER JR.,
and
JOSEPH R. CROSBY,

along with Lobbyist A, aided and abetted by each other, and by others known and unknown to the

Grand Jury, knowingly devised and intended to devise a scheme and artifice to defraud and deprive

the State of Alabama, the Legislature, the Legislative Reference Service, and the citizens of Alabama

of their right to the honest services of elected members and employees of the Legislature through

bribery and concealment of material information.

### Execution of the Scheme

235.    On or about the date of each Count listed below, in the Middle District of Alabama

and elsewhere, defendants MCGREGOR, GILLEY, COKER, GEDDIE, MASSEY, MEANS,

PREUITT, ROSS, SMITH, WALKER, and CROSBY, along with Lobbyist A, aided and abetted by

each other, and by others known and unknown to the Grand Jury, for the purpose of executing and

attempting to execute the above-described scheme and artifice to defraud and deprive, placed and

caused to be placed in a post office and an authorized depository for mail, to be sent and delivered

by the United States Postal Service and by a private and commercial interstate carrier, the following

matters and things:

| COUNT | Date | Description |
|-------|------|-------------|
| 23 | 1/6/2010 | Check #15939, drawn on the account of Macon County Greyhound Park, Inc., in Shorter, Alabama, in the amount of $3,000, made payable and mailed to CROSBY at his home in Montgomery, Alabama |

58

| 24 | 2/3/2010 | Check #16053, drawn on the account of Macon County Greyhound Park, Inc., in Shorter, Alabama, in the amount of $3,000, made payable and mailed to CROSBY at his home in Montgomery, Alabama |
| 25 | 3/3/2010 | Check #16164, drawn on the account of Macon County Greyhound Park, Inc., in Shorter, Alabama, in the amount of $3,000, made payable and mailed to CROSBY at his home in Montgomery, Alabama |
| 26 | 3/24/2010 | Four checks, each in the amount of $50,000, caused to be mailed from Houston County, Alabama, to four separate PACs in Huntsville, Alabama |
| 27 | 4/7/2010 | Check #16287, drawn on the account of Macon County Greyhound Park, Inc., in Shorter, Alabama, in the amount of $3,000, made payable and mailed to CROSBY at his home in Montgomery, Alabama |

All in violation of Title 18, United States Code, Sections 2, 1341, and 1346.

236. On or about the date of each Count listed below, in the Middle District of Alabama and elsewhere, defendants MCGREGOR, GILLEY, COKER, GEDDIE, MASSEY, MEANS, PREUITT, ROSS, SMITH, WALKER, and CROSBY, along with Lobbyist A, aided and abetted by each other, and by others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of wire communication in interstate commerce, the following writings, signals and sounds:

| **COUNT** | **Date** | **Description** |
|---|---|---|
| 28 | 3/16/2010 | Telephone call between MCGREGOR in Nevada and another gambling facility operator in Alabama concerning the pro-gambling legislation |

59

| 29 | 3/16/2010 | Telephone call between MCGREGOR in Nevada and COKER in Alabama concerning the pro-gambling legislation and PREUITT's vote |
| 30 | 3/16/2010 | Telephone call between MCGREGOR in Nevada and the head of the Alabama Education Association in Alabama concerning the pro-gambling legislation and PREUITT's vote |
| 31 | 3/17/2010 | Telephone call between MCGREGOR in Nevada and COKER in Alabama concerning the pro-gambling legislation and PREUITT's vote |
| 32 | 3/17/2010 | Telephone call between MCGREGOR in Nevada and the sponsor of SB380 concerning the need to gather votes in support of the bill |
| 33 | 3/22/2010 | Telephone call between GILLEY in Tennessee and SMITH in Alabama concerning the need to gather votes in support of the bill |

All in violation of Title 18, United States Code, Sections 2, 1343, and 1346.

## COUNTS THIRTY-FOUR THROUGH THIRTY-SEVEN
(Money Laundering and Aiding and Abetting, 18 U.S.C. §§ 1956(a)(1)(B)(i) & 2)

237.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this

Indictment are realleged and incorporated as though fully set forth herein.

238.    On or about the dates specified and in the approximate amounts identified as to each

count below, defendants

RONALD E. GILLEY
and
HARRI ANNE H. SMITH,

aided and abetted by each other, and by others known and unknown to the Grand Jury, knowingly

conducted and attempted to conduct financial transactions, affecting interstate and foreign

commerce, which transactions involved the proceeds of specified unlawful activity, that is: (1)

60

GILLEY and others gave, offered, and agreed to give money and other things of value to Alabama State legislators, including SMITH, as agents of the State of Alabama, with intent to influence and reward the Alabama State legislators in connection with pro-gambling legislation, which was any business, transaction, and series of transactions of Alabama involving anything of value of $5,000 or more; and (2) SMITH and other Alabama State legislators, as agents of the State of Alabama, corruptly solicited, demanded, accepted and agreed to accept money and things of value from GILLEY and others, intending to be influenced and rewarded in connection with pro-gambling legislation, which was any business, transaction, and series of transactions of Alabama involving anything of value of $5,000 or more, knowing the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity and that while conducting and attempting to conduct such transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

| COUNT | Date | Type of Transaction |
|-------|------|---------------------|
| 34 | 3/24/2010 | Check in the amount of $50,000 mailed from Enterprise, Alabama, to Huntsville, Alabama and deposited in account #xxxxxx2015 at Servis1st Bank |
| 35 | 3/24/2010 | Check in the amount of $50,000 mailed from Enterprise, Alabama, to Huntsville, Alabama and deposited in account #xxxxxx1991 at Servis1st Bank |
| 36 | 3/24/2010 | Check in the amount of $50,000 mailed from Enterprise, Alabama, to Huntsville, Alabama and deposited in account #xxxxxx2023 at Servis1st Bank |
| 37 | 3/24/2010 | Check in the amount of $50,000 mailed from Enterprise, Alabama, to Huntsville, Alabama and deposited in account #xxxxxx1967 at Servis1st Bank |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

## COUNT THIRTY-EIGHT
(False Statement, 18 U.S.C. § 1001(a)(2))

239.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

240.    On or about April 1, 2010, in the Middle District of Alabama, in a matter within the jurisdiction of the executive branch of the Government of the United States, defendant

### JAMES E. PREUITT

did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, in that during the course of an interview by FBI agents conducting an official investigation PREUITT stated that, during the 2010 Alabama legislative session, he was never offered anything of value in exchange for his vote to pass pro-gambling legislation, and that he was unaware of private individuals, lobbyists, or legislators being involved in the offer or acceptance of things of value in exchange for votes to pass pro-gambling legislation, when, in truth and in fact, as PREUITT well knew, these statements were false.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT THIRTY-NINE
(Obstruction of Justice and Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2) & 2)

241.    The allegations contained in paragraphs 1 through 26 and 39 through 190 of this Indictment are realleged and incorporated as though fully set forth herein.

242.    From on or about February 16, 2010, through in or about August 2010, in the Middle District of Alabama and elsewhere, defendant

62

ROBERT B. GEDDIE JR.,

aided and abetted by others known and unknown to the Grand Jury, corruptly obstructed, influenced, and impeded, and attempted to corruptly obstruct, influence, and impede an official proceeding, to wit: defendant GEDDIE instructed an employee to alter a contribution ledger to reflect that two contributions, totaling $5,000, made by GEDDIE and another employee to Legislator 3 were not made on behalf of MCGREGOR as GEDDIE initially had indicated, but instead were made on behalf of two other clients, when in fact GEDDIE knew that the contributions were made on behalf of and at the direction of MCGREGOR and that the other two clients had no knowledge of and did not authorize such contributions; and defendant GEDDIE caused to be produced to law enforcement officials, in response to multiple grand jury subpoenas, originals as well as copies of the altered contribution ledgers.

All in violation of Title 18, United States Code, Sections 2 and 1512(c)(2).

## NOTICE OF FORFEITURE

243.    The allegations contained in paragraphs 1 through 26, 39 through 190, 216, 220, and 238 of this Indictment are realleged and incorporated as though fully set forth herein.

244.    Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), upon conviction of an offense in violation of Title 18, United States Code, Section 666(a)(1)(B), as set forth in Count Fourteen of this Indictment, defendant

HARRI ANNE H. SMITH

shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to the offense, including, but not limited to, a sum of money equal to $200,000 in United States currency.

63

245. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), upon conviction of an offense in violation of Title 18, United States Code, Section 1951, as set forth in Count Twenty-One, defendant

HARRI ANNE H. SMITH

shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to the offense, including, but not limited to, a sum of money equal to $200,000 in United States currency.

246. Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), as set forth in Counts Thirty-Four through Thirty-Seven of this Indictment, defendants

RONALD E. GILLEY
and
HARRI ANNE H. SMITH

shall forfeit to the United States of America any property, real or personal, involved in such offense, and any property traceable to such property. The property to be forfeited includes, but is not limited to, a sum of money equal to $200,000 in United States currency.

247. If any of the property subject to forfeiture in paragraphs 244 through 246, as a result of any act or omission of the defendants:

        (a)    cannot be located upon the exercise of due diligence;

        (b)    has been transferred or sold to, or deposited with, a third party;

        (c)    has been placed beyond the jurisdiction of the Court;

        (d)    has been substantially diminished in value; or

64

     (e)    has been commingled with other property which cannot be divided

without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title

21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section

982(b)(1), and Title 28, United States Code, Section 2461(c).

    All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), and Title

28, United States Code, Section 2461(c).


A TRUE BILL


Dated: OCT 1, 2010 _____

                                  Foreperson


Jack Smith
Chief, Public Integrity Section

_____

Peter J. Ainsworth
Senior Deputy Chief
Public Integrity Section
U.S. Department of Justice
1400 New York Ave.
Washington, DC 20005
202-514-1412