

# Alabama Democratic Conference

P.O. Box 6233

MONTGOMERY, ALABAMA 36106

JOE L. REED
CHAIRMAN

The Honorable Thomas E. Perez
Assistant Attorney General for Civil Rights
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue N.W., Ste. 5643
Washington, DC 20530

The Honorable T. Christian Herren
Chief, Voting Section
Civil Rights Division
U.S. Department of Justice
1800 G Street N.W., Room 7254
Washington, DC 20006

Gentlemen:

     This is in reference to submission no. 2011-0068 of the State of
Alabama (Alabama Act. No. 2010-761, and to identify a contemporaneous
voting change enacted by the Alabama Legislature which has not been
submitted, and which we are advised the State of Alabama does not intend to
submit for review under Section 5. We believe that not only is the second
change subject to the preclearance requirements of Section 5, but also that the
changes are interrelated, and that your Department should review these
changes in tandem and assess their purpose and effect as a unified whole.

     Act No. 2010-761, of course, limits the opportunity for certain citizens
to participate in the political process by eliminating the long-standing option
that public employees have enjoyed affirmatively to request an automatic
salary deduction to their employment-related political action committee, or
PAC. The purpose and effect of the change is to block and interfere with the
funding of two specific PACs that have been key vehicles for minority
political participation in Alabama. SB 2 also restricts the opportunity of
additional classes of state employees to participate in the political process

The State of Alabama also has submitted for Section 5 review one small portion of Act 2010-765, which was enacted concurrently with Act 761, in the same special session. Act No, 2010-765 deals with expenditures by and to political action committees, or PACs. These are defined by state law broadly to encompass virtually all political activities other than those undertaken by individuals as individuals or by corporations:

> Any political action committee, club, association, political party which receives or anticipates receiving contributions or makes or anticipates making expenditures to or on behalf of any elected official, proposition, candidate, principal campaign committee or political action committee.

Ala. Code 17-5-2(a)(10). The state previously has acknowledged the need for Section 5 review of changes in contributions and expenditures by such organizations in numerous previous submissions. See, e.g., Attachments D through G to the state's submission.

The state has again submitted for section 5 review such a change in expenditures by and contributions to PACs by submitting that part of Act 2010-765 allowing a candidate's principal campaign committee, "to pay a candidate's filing fee and to purchase tickets to political party dinners or functions."

The state thus acknowledges the clear need to submit for Section 5 review changes in the expenditures and receipts by political committees, but has failed to submit other, far more sweeping changes enacted by the same statute.

Act No. 2010-765 in fact bans all transfer of funds not only between PACs, but also among PACs, 527 organizations, and private foundations (other than the submitted transfers for filing fees and party tickets). The Act would, for example, prohibit a political party, a labor union or other 527 organization, or a candidate from providing funds to a minority political organization to encourage or facilitate minority voter turnout.

The ban would have a direct and devastating effect on the opportunity of minority voters to participate in the political process and elect candidates of their choice. As you are aware, minority citizens of Alabama long have relied

on political organizations such as the Alabama Democratic Conference (ADC) and other groups in order, among many, many other activities, to

1. Obtain rides to the polls so that they can vote;
2. Obtain sample ballots to assist them in marking all federal, state and local offices and propositions on the often lengthy ballot, and to assist in electing candidates of their choice;
3. Obtain assistance in marking their ballots from a person whom they trust;
4. Obtain protection against harassment at the polls from poll workers and poll watchers.

These activities cost money and, as a practical matter, the ADC like other minority groups involved in the political process must organize as PACs in order to comply with state and federal law. It also is essential that the ADC and other minority PACs be able to receive contributions from allied PACs – those that support minority participation in the political process -- in order to undertake these activities.

Accordingly, we urge the Attorney General formally to advise the State of Alabama that the ban on voter participation by Act No. 2010-765 is subject to the preclearance requirements of Section 5, and to request that the State submit the changes for preclearance either to your Department or to the District of Columbia Court.

We further request that the Department of Justice the changes in Act Nos. 2010-761 and 2010-765 as a unified whole, much as the Department reviews all unprecleared annexations at once so that the cumulative effect of the addition of small groups of voters can reveal electorally significant vote dilution or a pattern of racially selective annexations. While each of the proposed changes would have a retrogressive effect on minority political participation, the truly devastating effect of the changes can best be seen by viewing them in tandem.

We also note that Congress and the Federal Election Commission have enacted a complex and comprehensive system of campaign finance regulation, including specifically regulation of contributions by, to and among PACs. See, e.g., 11 C.F.R. 110. Federal law expressly preempts the field of campaign finance regulation as it touches on candidates for federal office. 2 U.S.C. 453. The Alabama ban on PAC to PAC transfers extends to and

directly interferes with the federal system. The political activities of the ADC and other minority PACs in elections for state and federal office are inextricably intertwined. State and federal elections are held on the same day in the same location, groups "get out the vote" for both state and federal offices, sample ballots endorse both state and federal candidates on the same sheet, and so on. This recrudescence of official interference with federal law by the State of Alabama makes it all the more necessary and appropriate for the Department of Justice to use all means available to block enforcement of the ban.

We will provide a detailed formal comment concerning submission no. 2011-0068 in the near future, and will provide detailed information on Act No. 2010-765 when it is submitted for Section 5 review. This also is to supplement more formally the telephonic request on behalf of Alabama Legislative Black Caucus leaders and other minority political leaders in Alabama for a meeting with Assistant Attorney General for Civil Rights, Thomas E. Perez and other personnel concerning these changes. We renew and we reaffirm our previous request for a meeting anytime on February 24 or for the morning on February 25, 2011.

We appreciate your assistance with this important matter.

Sincerely,

Joe L. Reed
Chairman


cc:     Honorable Luther Strange
        Attorney General State of Alabama

        Honorable Winfield J. Sinclair
        Assistant Attorney General State of Alabama



# Alabama Democratic Conference

P.O. BOX 6233

MONTGOMERY, ALABAMA 36106

JOE L. REED
CHAIRMAN

The Honorable Thomas E. Perez
Assistant Attorney General
Civil Rights Division
Department of Justice
950 Pennsylvania Avenue, NW, Ste. 5643
Washington, DC 20530

The Honorable T. Christopher Herren
Chief, Voting Section
Civil Rights Division
Department of Justice
Room 7254-NWB
1800 G Street, NW
Washington DC 20006

Re:  COMMENT ON SUBMISSION Nos. 2011-0068 and 2011-0278
     Alabama Act Nos. 2010-761 and 2010-765

Dear Gentlemen:

This is to provide additional background on the above-captioned proposed changes affecting voting. We note at the outset that the failure of the State of Alabama to prove a prima facie case that the proposed Acts meet the Section 5 burden. Indeed, the State has not even identified all of the interrelated changes it has made. As set forth in our previous correspondence, both statutes are so vague that citizens of Alabama cannot with confidence conform their behavior to the law. This is especially disturbing given the criminal penalties involved. See Ala. Code §17-17-5.

This letter seeks to bring some order out of this legislative chaos to assist the Department of Justice in analyzing the statutes in the particular context of the, history, laws and political structures of the State of Alabama. Both statues, to the limited extent that they have sufficient clarity to allow analysis, would impose unprecedented limits on political participation. They impose restrictions that are unique among the 50 states, and that are uniquely destructive to the particular black political institutions in the State of Alabama.

At bottom, the Alabama statutes were adopted with the purpose and will have the effect of eroding black citizens' opportunity to participate effectively in the political process by choking off necessary resources to black voters, black political organizations, and biracial coalitions black voters have been and may be able to form.

## THE VOTING CHANGES AT ISSUE

### Act No 2010-765

The state has submitted only the part of Act No. 2010-765 that allows certain candidates' principal campaign committee to use campaign funds to pay filing fees and party dues, and to purchase tickets to party dinners. It appears, however, that such expenditures actually already were permitted through the transfer of funds to the political party's PAC. The state's submission fails to make clear that the real change is that this opportunity is restricted to incumbent elected officials. The transfers may only take place during a term of office commencing on the day after the election for the seat or office the candidate seeks.

Act No. 2010-765. The funds thus can only be distributed after the election is over and before the next election. The state thus fails to correctly identify the change effected by the statute, and also fails to offer any reason for the distinction between incumbents and challengers, or of the effect of the distinction. We, frankly, can identify no rationale for this provision on our own and note the obvious conflict with the 14th Amendment to the United States Constitution.

Act No. 2010-765 also, contains additional and much more substantive changes affecting voting. The Act also prohibits any contribution from one political action committee (PAC), 527 organization, or private foundation to another PAC, 527 organization, or private foundation, and thus would affect a sweeping change in the conduct of elections.[1] According to the National Conference of State Legislators, Alabama would be unique among the states in placing a total prohibition on such transfers.
The state explains its refusal to submit these changes by arguing that changes affecting political campaign expenditures fall outside the scope of Section 5. That is, the state claims, contrary to all logic and experience, that changes affecting the funding of political activity have no effect upon voting. The Supreme Court repeatedly has made clear money is intimately involved in that "the right or ability of persons to participate in political campaigns," 28 C.F.R. §51.13(k). See, e.g., *Buckley v. Valeo*, 424 U.S. 1 (1976); *Federal Election Commission v. Wisconsin Right to Life*, 127 S. Ct. 2652 (2007); *Citizens United v. FEC*, 130 S.Ct. 876 (2010).

The state argues in detail that a PAC is not a voter, candidate or political party, but rather an organization that (with circular logic) falls outside of Section 5... because it falls outside of Section 5.[2] This argument is directly contradicted by the Alabama Code itself. Under Alabama law, a PAC may in fact be an individual voter, Ala. Code §17-5-2 (a)(10) ("POLITICAL ACTION COMMITTEE....one or more persons"), and a political party unquestionably is and must be a PAC. Id. ("POLITICAL ACTION COMMITTEE...[a] political party").

---

[1] Act No. 2010-765 also contains a sentence in new Ala. Code §17-17-5(b)(3d sentence), that makes no sense, but the fact that it appears to conflict with federal law and the fact that the state bothered to enact it, indicate that it involves some sort of change affecting voting. The state needs to clarify this provision before it can be reviewed by the Attorney General and before citizens can determine how to comply.

[2] The state also suggests that the ability of individuals to make, and candidates to receive some types of contributions means that there is no change. Restricting the ability to make contributions and to allow others was, however, the point of the statute: the state intended to have an effect upon voting.

Indeed, by the state's reasoning, a principal campaign committee, an organization respecting which the state has submitted (but misidentified) changes, is defined in the very same code section as PACs. Ala. Code §17-5-2 (a)(11). The Alabama Code itself makes clear that the state's position rests on a distinction without a difference.

Looking past the code into the reality of minority access to the franchise, there is no question that the limitations imposed by the statute constitute "change[s] affecting the right or ability of persons to participate in political campaigns," 28 C.F.R. §51.13(k). Ask any political scientist or successful politician how people participate in political campaigns, and the answer will include voting, volunteering, attending rallies, and making contributions. Jesse Unruh, Speaker of the California House in the 1960s, put it more succinctly: "Money is the mother's milk of politics."

Money for voting activity also is highly regulated. The State of Alabama has constructed a complex system of laws regulating the reporting and use of money for political purposes. See generally, Ala. Code Title17, Chapter 5. A group that gathers or expends as little as $1,000 in a calendar year in support of a candidate or ballot proposition is a PAC or other regulated organization falls within that system. A major change in the system, such as the sweeping new limitations to be imposed by Act No. 2010-765, clearly can have an effect on voting within the meaning of Section 5.

Such changes also have the potential for racial discrimination. In 2010, a white candidate for a state senate seat spent over $1 million, including $150,000 of his own money on his campaign (and ultimately won a state senate seat previously held by a black senator). Black persons in Alabama are much less likely to be able to make such unregulated individual expenditures than white persons.[3] The gap between black and white accumulated wealth is even greater than the substantial gap in annual income. As a practical matter, given the web of laws created by the state, effective black participation in the political process in Alabama requires cooperative group activity, and thus to coordinating PACs.

As the Supreme Court held in *Allen v. State Board of Elections*, 393 U.S. 544, 565 (1969), the Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." Alabama, having erected a complex system of election regulation over every viable and most non-viable candidates and associations of citizens of the state cannot reasonably argue that those state-created regulations insulate the state from federal oversight. *Smith v. Allwright,* 321 U.S. 649 (1944).

Section 5 was enacted because "Congress had reason to suppose that these States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself." *South Carolina v. Katzenbach,* 383 U. S. 301, 335(1966). The Alabama legislature has done just that.

### Act No. 2010-761

---

[3] Candidates are, of course, allowed to spend unlimited funds on their own elections, *Davis v. FEC,* 554 U.S. ___ (2008).

The state has submitted Act No. 2010-761, as a "change affecting the right or ability of persons to participate in political campaigns," and specifically bars for all time any employee payroll deduction for a PAC or for any organization that is engages even once in political activity. The Act was aimed squarely at the Alabama Education Association, or AEA, which is viewed as a pro-black organization, and is a major source of support for black candidates and biracial coalitions.

Act No. 2010-761fails to provide any clear guidance as to the scope of the activities it restricts. It lists seven factors involved in the restriction on "political" activities, but those factors simply repeat the ban on "political" activities without making clear any boundaries on the term. The Merriam Webster online dictionary defines "political" as

> 1 a: of or relating to government, a government, or the conduct of government
>
> b: of, relating to, or concerned with the making as distinguished from the administration of governmental policy.

The definition potentially covers all activities of an organization of government employees. The legislators who supported the bill often claim that government has crept into every corner of American life, and the hints offered in the legislative language suggest their intent to have the state creep into every corner of Alabama life to limit political activity. It is all but impossible to avoid triggering the law. Contracting with an organization that communicates so much as the name of a candidate (organizations cannot subscribe to newspapers) or even engaging in a communication that mentions the name of a candidate (no one in the organization can breathe the name of any elected official) will be illegal under the Act.

The interpretation and enforcement of the stature have already begun, although without notice to your Department. In a February 10, 2011, communication, reiterated and expanded on February 14, the State of Alabama, through legal counsel for the Department of Postsecondary Education, Lynne Thrower, officially advised that 2-year college presidents that it was illegal for employees of the AEA, a private organization, to assist AEA members preparing bank-draft agreements for AEA dues while on Postsecondary campuses. The state relied on a pre-existing law that bars the use of state office supplies and vehicles by the state employees who control and are responsible for that property for the benefit of a candidate for office:

> It shall be unlawful for any officer or employee of the State of Alabama to use or to permit to be used any state-owned property of any character or description, including stationery, stamps, office equipment, office supplies, automobiles or any other property used by him, in his custody or under his control for the promotion or advancement of the interest of any candidate for the nomination or election to any public office of the State of Alabama.

Ala. Code §36-12-61. The AEA recruiters were not state employees and had no control over any state property. The only connection of the AEA employees to state property at the time was that they were present on a college campus. At the time the state blocked the AEA activity,

moreover, there were no candidates for office in the state, as "candidate" is defined by state law;[4] nor was it clear that the AEA would endorse candidates in the future in the face of the strictures of Act No. 2010-761.

As interpreted by the State of Alabama, therefore, in light of the proposed statute Alabama law prohibits any person from undertaking any activity on any state property that may in the future benefit an as-yet unidentified person who may become a candidate. This unquestionably is a change affecting voting within the meaning of Section 5.

It is indisputable that since well before November 1, 1964, candidates and citizens have openly and freely campaigned on public property. Citizens have exercised their right to speak from courthouse steps and on college campuses, to hold candidate debates in school gymnasiums, and to pass the bucket for funds on courthouse lawns. Under this new interpretation of Ala. Code § 36-12-61, it would be a criminal violation to pass out campaign literature on a school parking lot even outside the previous limit of 30 feet from the door to a polling place, Ala. Code §17-9-50, or to act as a poll watcher, Ala. Code § 17-8-7, in a courthouse polling place. As discussed below, both of these activities are central to black political participation in the state: distributing sample ballots outside the polls and protecting voter from racial discrimination inside the polls.

The breadth of the changes, as elaborated by the Lynne Thrower communications, invites unequal and racially discriminatory enforcement.[5] The state cannot seriously argue that it uniformly enforced this newly discovered ban on such tangentially political activity on state property on November 1, 1964, or indeed that they could or would enforce it uniformly in the future.

These inter-tangled voting changes are subject to the preclearance requirements of Section 5.

**BACKGROUND**

As we have noted previously, these bills were passed in a special legislative session called in the immediate aftermath of a sweeping election defeat of candidates supported by the black voters of Alabama. The statutes were crafted and designed to minimize and cancel out black voting strength and to fortify the political process against a future resurgence of black voters and their allies.

This first assault on black political power – and other measures are waiting in the wings – involved an assault on the mother's milk of politics, the financial resources that are essential to facilitating the effective participation of black voters in Alabama elections.

---

[4]  In Alabama an individual only becomes a candidate when she files for office with the appropriate official, or has started accepting funds for a particular office. Ala. Code §17-5-2. And a candidate may not accept or solicit contributions until 12 months before the primary or election at which she is a candidate, Ala. Code §17-5-7(b)(2).

[5]  This danger is particularly acute in Alabama, as illustrated by the hopeless vagaries of application of the state constitutional disenfranchisement of persons convicted of felonies involving moral turpitude. *Gooden v. Worley*, CV-2005-5778-RSV (Jefferson County Cir. Ct., August 23, 2006) , rev'd on other grounds, *Chapman v Gooden*, 974 So. 2d 972 (Ala. 2007).

Black voters in Alabama suffer from a history of discrimination in the voting process; indeed, the state constitution was adopted with the stated purpose to "establish white supremacy in this state." *Hunter v. Underwood,* 471 U.S. 222, 229 (1985). That history, written in blood, continues to affect the willingness of black voters to register and vote at polling places often dominated by hostile white poll workers and hostile white poll watchers. The mistreatment of black voters in Conecuh County, marked as it was by racial slurs and gross disparate treatment of black voters, provided a striking part of the legislative history of the reenactment of the special provisions of the Voting Rights Act.[6] The evidence in *Harris v. Graddick,* 593 F.Supp. 128, 138 (M.D. Ala. 1984), established that such mistreatment pervaded the state.

That history, moreover, is all too alive today. As black voters went to the polls in a recent municipal election in Evergreen, Alabama, the county seat of Conecuh County, they were "greeted" by white men in pick-up trucks stationed at each polling place. The white men ostentatiously aimed cameras at the black voters and recorded their faces. Seeing those white men shooting their pictures had a special meaning and effect for the black voters of Evergreen. The photos might be shown to employers, landlords, or creditors. A car might follow them home in the night. That is their heritage as black citizens of Alabama.

This history creates specific needs for many black voters as they seek an equal opportunity to participate in the political process. The record of discrimination in the state educational system places an additional burden on black voters. All too many black citizens of Alabama suffer from limited literacy as a result of the segregated school systems that continued long after the 1954 decision in *Brown* and the 1970 order in *Lee v. Macon County.* Even in those jurisdictions that today have unitary school systems, the state has done nothing to educate the tens of thousands of Alabama voters who went to those segregated schools and today cannot cast a ballot without assistance.

Additional burdens complicate access to the polls for black voters. Black citizens of Alabama are substantially more likely than their white counterparts to lack access to a car or truck. Polling places often are miles from their homes. They must rely on others to get to the polls.[7] Finally, in the context of racially polarized voting by the white majority in Alabama, black voters have had to coordinate their own votes. This results in special communications needs.

Black citizens of Alabama have faced these obstacles by forming political organizations, of which the Alabama Democratic Conference (ADC) is the most prominent. These groups attempt to overcome the barriers imposed by the state's record official discrimination by helping black citizens to:

1. Obtain rides to the polls so that they can vote;

---

[6] *Voting Rights Act: Section 6, 7 and 8 – The Federal Examiner and Observer Program: Hearing Before the Subcomm. on the Constitution of the H. Comm. on the Judiciary,* 109th Cong. (2005) (statement of Barry H. Weinberg, former Deputy Chief and Acting Chief, Voting Section, Civil Rights Div., U.S. Dep't of Justice).

[7] Although the Alabama VAP was only 23.9% black in 2000, 45.4% of households with no access to an automobile were black. Alabama restricts absentee voting to only a limited number of citizens, Alabama Code 17-11-7, and does not have an early voting program that would allow voters a longer period in which to cast a ballot in the normal course of their activities, in combination with another trip.

2. Obtain sample ballots to assist them in marking all federal, state and local offices and propositions on the often lengthy ballot, and to assist in electing candidates of their choice;
3. Obtain assistance in marking their ballots from a person whom they trust;
4. Obtain protection against harassment at the polls from poll workers and poll watchers.

Gasoline for rides to the polls costs money. So do all the other activities undertaken by black political organizations working to overcome the barriers facing black voters. And the costs keep rising. In 2010, a white candidate for the state senate spent over $1 million, including $150,000 of his own money, and ultimately won a state senate seat previously held by a black senator.[8] White candidates, of course, have access to far greater individual resources than black candidates. This is especially true of candidates hostile to the aspirations of the black community, who often have access to the resources of for-profit corporations as well as well as those of wealthy individuals.

The cost of campaigns has risen far beyond the level of resources that can be raised within the black community. The programs to get black voters registered, to get them to the polls, and to protect them at the polls require resources from other groups in and outside Alabama. The primary purpose of these statutes is to cut off those outside assets and thus cripple black political activity. And the state legislature took aim at the organizations that provide the foundation for black access to the election process in Alabama.

A description of these foundation organizations and their activities helps understand the impact of the statutes and the context in which they were adopted.

**The Alabama Democratic Conference**

The Alabama Democratic Conference (the Black Political Caucus of Alabama) was founded in 1960 by Arthur Shores, Dr. C. G. Gomillion, and other black citizens in an effort to influence black voters to support the Democratic presidential ticket of John F. Kennedy and Lyndon B. Johnson. From its beginnings ADC has grown to become the state's largest and most effective grassroots political organization. Today ADC's influence extends into most of the counties in the state, through its county units.

Since 1960 ADC's basis mission has been to organize and unify the black vote and to have it respected by candidates and elected officials alike. Initially the organization moved its mission through a network of committed volunteers who traveled across the state establishing local chapters, holding district meetings, and educating voters. It took at least one decade for ADC to consolidate the black vote, build credibility, and create political clout in the state.

Throughout its history ADC has focused on doing a few things as well, such as conducting regular voter registration drives and get-out-the-vote ("GOTV") drives; maintaining knowledgeable political units in counties and congressional districts; getting more blacks and

---

[8] Of course, your Department is well aware of the mistreatment of black voters within that district when federal observers are not present; federal observers were assigned to monitor polling places in that district to protect the 15th Amendment rights of black voters in the 2010 election.

white candidates of goodwill elected to public office; monitoring the voting, employment, and appointments records of elected officials; and securing legislation or litigation that has created more opportunities for blacks to participate and achieve fair and equitable representation at all levels of government. As a result of ADC's effective political presence, Alabama now has a larger percentage of black elected officials than any other state in the nation.

In 1970 the ADC began formally to screen and endorse candidates for public office. At that time white candidates were reluctant to associate publicly with black political organizations for fear that they would be the target of overt racial appeals. In order to gain respect and equal treatment for black citizens and to associate with white voters in biracial coalitions, the ADC adopted a rule that year requiring Democratic candidates to come before an ADC screening committee in person before they could be endorsed.

The screening process, like other ADC functions, not only serves the practical political function of identifying the best candidates, but also the larger ADC goal of encouraging biracial activities and alliances as a means of eroding the legacy of racial segregation that pervades political, business and social relations in Alabama.

Since 1970, thousands of candidates have been screened and endorsed by ADC. Candidates that enjoy this endorsement are included on the well-known ADC yellow sample ballot that is distributed to thousands of Alabama voters as they go to the polls. The sample ballot is especially vital to the many black citizens of Alabama who attended racially segregated schools and who were denied the right to read and write well enough to vote without such assistance.

## ADC as a PAC

The ADC is a Political Action Committee, or PAC. As a practical matter, this is the only type of political organization open to black citizens of Alabama consistent with state and federal law. Black citizens of Alabama are in a position of severe disadvantage in terms of access to wealth, and simply lack the resources to establish and maintain other types of organizations ranging from 527s to for-profit corporations, that federal law allows to engage in virtually all of the activities undertaken by the ADC.

The struggle for resources in the face of rising campaign costs combines with the ADC mission to build biracial coalitions to make alliances among political actors an essential element of black political participation in the state. In any given election, a number of PACs organizations provide funds to the ADC in order to encourage black voters to get out and vote, and to vote consistent with ADC endorsements. The ADC patches these funds together to pay for sample ballots and other voter information, phone banks, transportation for voters on election day, poll watchers, and similar activities.

The black community in Alabama is not monolithic, and many other organizations operate on a similar basis. The most prominent of these is the Alabama New South Coalition (ANSC), long led by Sen. Hank Sanders of Selma. The ANSC and other groups participate in the same core activities and funding systems as the ADC.

## The Alabama Education Association

The Alabama Education Association is the product of a merger in 1969 between the formerly all-white AEA and the all-black Alabama State Teachers Association. Through its membership (nearly all teachers in Alabama public schools) and its political action committee (A-VOTE), the AEA has become a potent political force in Alabama. When AEA and ASTA merged, the combined organization made a conscious effort to have a biracial leadership. Since the merger, Dr. Paul Hubbert (white) has been Executive Secretary and Dr. Joe L. Reed (black) has been Associate Executive Secretary.

AEA has approximately one hundred five thousand (105,000) active, retired, and student members. Its active members are employees of the State of Alabama, the Department of Postsecondary Education (DPE), postsecondary institutions under the DPE, and local boards of education. Each AEA member must execute a voluntary request before AEA can be deducted from their paychecks, and a separate voluntary request must be executed for contributions to A-VOTE to be deducted.

A-VOTE has been a major source of campaign contributions for black candidates. Since 1970 (when the first black members of the Alabama Legislature were elected in the Twentieth Century), a larger percentage of black legislators than white legislators have been active or retired educators. Currently, the active membership of AEA (that is, excluding retired and student members) is 28% black, significantly higher than the 23.9% of the state's voting age population that is black. Significantly, the black teacher-members of AEA are in far better financial health that the average black Alabamian and thus better able to make PAC contributions than the general black population. Attached as Exhibit A is the latest minimum salary schedule for the State of Alabama. Attached as Exhibit B is a table showing the distribution of per capita income by race in Alabama.

The role of black teachers is also magnified by the history of racial discrimination by the State of Alabama. From Reconstruction through the 1950s, the State of Alabama did everything possible to restrict educational opportunities to blacks. *See Knight v. Alabama,* 787 F.Supp. 1030, 1066-1109 (N.D. Ala. 1991), *aff'd in relevant part,* 14 F.3d 1534 (11th Cir. 1994). The state kept gradually increasing the level of education that could be obtained by blacks at state schools solely to keep "uppity" northern teachers from coming South and to satisfy growing federal mandates to provide native black Alabamians capable of teaching first elementary, then high school, then postsecondary courses. E.g., see 787 F.Supp. at 1095. Alabama A&M University and Alabama State University were founded as normal schools (teacher colleges) because of this policy by the State. As a result, teachers comprised the main part of the black educated, middle class. It was black teachers who helped form the local black political organizations around the state, who organized the 1955 Montgomery bus boycott, the 1962 sit-ins, and similar efforts.

When the all-black Alabama State Teachers' Association (ASTA) merged with AEA in 1969, it "was viewed as a liberal, pro-black lobby." *Knight v. Alabama,* 458 F.Supp. 2d 1273, 1295 (N.D. Ala. 2004). As Dr. Reed has testified in federal court on several occasions, his role as Chair of ASTA gave him the initial financial independence and freedom to mobilize the Alabama Democratic Conference into a powerful vehicle for effective participation by black citizens in Alabama elections. His continuing role as Associate Executive Director of AEA has

helped build and maintain black participation. AEA has influence in the white community and among white politicians, but AEA is absolutely indispensable for effective black electoral participation. The decision to end the AEA and A-VOTE payroll deductions strikes at the heart of black political participation.

## PURPOSE

Under Section 5, the State of Alabama bears the burden of proof that the proposed changes were adopted free of any racially discriminatory purpose. Alabama has done nothing to bear that burden. We have provided them with copies of each of our comments on the proposed changes and we have made specific, credible allegations of intentional discrimination. To the best of our knowledge, the state has provided and we have been made aware of no response to the evidence we have presented, no refutation of our arguments. Indeed, they have failed even to offer any explanation for the adoption of the changes, or even accurately to identify the changes.

The Supreme Court identified useful indicia of a racially discriminatory purpose in *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266-268 (1977). These criteria appear to have been written with these voting changes in mind.

As described in detail above, in light of the lingering effects of past discrimination, including the racial disparities in income and wealth in Alabama and the consequent need for concerted action, the impact of the proposed restrictions will bear far more heavily on black voters than their white counterparts.

The historical background of the proposed changes involves a long train of actions by the State of Alabama to deny black citizens of the state equal access to the franchise, and a long struggle by black voters and their allies to organize and use the targeted devices to build a remarkable level of electoral success and political influence. The proposed changes follow the pattern of many of the earlier abuses by leaving enforcement to the unfettered discretion of state and local officials rather than offering clear neutral standards for compliance.

The specific sequence of events leading up to adoption of the statutes is consistent with a discriminatory purpose. The changes were adopted in a special session by political opponents of black voters and their allies in biracial coalition. The proponents openly decried the electoral influence and success of the AEA and black PACs such as ADC and ANSC and made no secret that they were particular targets of the changes

Also telling is the legislative history, which shows substantive departures from considerations normally considered important by the state. The legislature rejected alternative proposals that would have better served their stated purpose (in Act No. 2010-765) of enhancing disclosure. Numerous disclosure systems had been heavily publicized in the wake of *Citizens United v. FEC*, 130 S.Ct. 876 (2010) and a model code prepared by the Campaign Disclosure Project also was at hand. The legislature failed to pass HB 6, for example, which would have required disclosure every month, rather than only twice before each election. The state also has failed to adopt the most effective disclosure device, electronic filing of reports and creation of a timely, searchable database of contributors and expenditures. As it is, reports must be scanned and copied so that there are serious limits on searching for contributors other than PACs.

Electronic filing would have saved the state considerable expense and allowed real disclosure. Instead of serving these legitimate interests and recognizing the Supreme Court's skepticism of limitations on First Amendment rights in the electoral context, the state chose the dubious course of blocking campaign activity, and in a way that specially interferes with black political activity.

Similarly, as to Act No. 2010-761, the Legislature supposedly sought to remove state resources entirely from the political arena, but amended the original bill to allow payroll dues deductions for local government dues to organizations that regularly become deeply involved in political issues.

The state has not provided a detailed legislative history, including debate transcripts. Under Section 5, such failure must be read against them. This is especially true in light of the refusal of the state to explain the purpose of either Act, even though it bears the burden of establishing the absence of a racially discriminatory purpose infecting the changes.

Perhaps there is no more striking signal of the racially discriminatory purpose and effect of the change are the 20 individuals whom the state offers as familiar with the racial impact of the voting changes in Act No. 2010-761, and the 52 individuals familiar with the racial impact of the voting changes in Act No. 2010-765. Each and every one of these individuals is white. All who had opponents faced unified opposition from black voters. The state has put the voting rights of black citizens in the hands of their opponents.

## CONCLUSION

These circumstances establish that the submitted statutes were adopted with a racially discriminatory purpose and that they will have a racially discriminatory effect. At minimum, they establish a clear need for a detailed explanation, supported by corroborated facts, that explain exactly what these Delphic statutes mean, why they were adopted, and what their effect will be. And the preclearance process demands a reasonable opportunity for black citizens of Alabama to respond, to test the State's "facts" and arguments, and to refute them. Only in this way will the Department have a firm basis on which to make a determination. If Section 5 preclearance can be obtained based on the vacuum offered by the state, the law is a dead letter.

Sincerely,

Joe L. Reed
Chairman