3/5/07 Press-Register (Mobile, AL) A1
2007 WLNR 4653224

Press-Register (Mobile, AL)
Copyright ©2007 Press-Register. All Rights Reserved. Used by NewsBank with Permission.

March 5, 2007

Section: A

PAC-to- PAC ban sought

BOB JOHNSON

Associated Press Writer

ALABAMA LEGISLATURE

PAC-to- PAC ban sought

Most Alabama lawmakers support legislation against such transfers, according to AP survey

By BOB JOHNSON

Associated Press Writer

MONTGOMERY - Speaker Seth Hammett says he expects legislation to ban the transfer of campaign contributions from one political action committee to another to be among the first bills considered by the House after the regular session begins Tuesday.

A ban became a hot issue in the 2006 elections, drawing support from Gov. Bob Riley and both the Democratic and Republican caucuses in the Legislature.

In an Associated Press survey of legislators, 82 percent of House members responding and 78 percent of senators said they favor banning the transfer of campaign contributions between PACs. Ban proponents say the PAC transfers make it difficult for voters to figure out who is giving money to a candidate.

"I can' t imagine why anyone won' t want to pass this," said Hammett, D-Andalusia. " It may well be the very first bill we take up."

The sponsor of the measure since he was first elected to the Legislature seven years ago has been Rep. Jeff McLaughlin, D-Guntersville. McLaughlin is an outspoken advocate of election and constitutional revisions and has refused to take contributions in his election campaigns.

McLaughlin said he' s encouraged by the speaker' s plan to put the PAC-to-PAC transfer ban at the top of his list and by the support of most political groups at the State House. " But if that will translate into getting the bill passed, I don' t know."

McLaughlin has reasons to be skeptical.

It has passed in the House by near unanimous margins for six years in a row, but it has died each time in the Senate without coming up for a vote. For several years the bill died in Senate committees. The past two years it was approved by

committees, but then never came up for a vote in the full Senate.

Riley is optimistic the 2007 session will not end the same way.

"I did not hear a person campaigning for office last year say they did not support it. If you get it on the House and Senate floor, I think it will pass," the governor said.

Here's how a PAC-to-PAC transfer works: A candidate's campaign finance report filed with the secretary of state's office shows he or she received a large donation from a PAC, usually with a name filled with initials that mean nothing to most voters. A check of the PAC's finance report finds a large donation from another PAC.

Leadership changes in the Senate may make it easier to get the bill up for a vote in the Senate. New Senate President Pro Tem Hinton Mitchem, D-Union Grove, has said senators may be more interested in taking up the bill while the cost of running last year's campaigns is fresh on their minds.

Senate Majority Leader Sen. Zeb Little, D-Cullman, said he supports the ban, but wants to link it to a bill that would require nonprofit groups to disclose the source of money used to influence the outcome of referendum votes on issues like taxes and gambling. That measure has generated heated debate and has died in past sessions, sometimes after tying up both the House and the Senate for days.

McLaughlin said linking the two bills could result in his bill dying again.

"Linking this bill to anything else will make it much more difficult to pass. This is the most egregious problem we have, and there is a very straightforward fix for it," he said.
PAC-to-PAC transfers became an issue in the race for chief justice last fall. Campaign finance reports show prominent plaintiff lawyers, including the Beasley Allen firm in Montgomery and the Cunningham Bounds firm in Mobile, gave $317,000 to PACs operated by Jeff Martin of Montgomery and Mike Echols of Tuscaloosa. Those PACs gave to other PACs, which eventually transferred $449, 850 to Franklin PAC, operated by Montgomery lobbyist Johnny Crawford. Then Franklin PAC gave Chief Justice Sue Bell Cobb her largest campaign contribution: $500, 000.

The timing of the transactions and the amount of money in the PACs indicated significant contributions from plaintiff lawyers found their way to Cobb's campaign chest, but the mixing and mingling with other campaign funds - including some from dog tracks - made it impossible to tell how much.

The transfers were tracked by Alabama Voters Against Lawsuit Abuse, whose executive director, Skip Tucker, cited them as an example of how plaintiff lawyers seek to hide their donations through PAC-to-PAC transfers.

He noted that the contribution was made so late in the campaign that Cobb didn't have to report it until two months after she defeated incumbent Drayton Nabers.

Cobb said she was not directly involved in her fundraising and did not know the details of the contribution.

CUTLINES

Seth Hammett

"I can't imagine why anyone won't want to pass this. It may well be the very first bill we take up."

QUOTE

"I did not hear a person campaigning for office last year say they did not support it. If you get it on the House and Senate floor, I think it will pass." - Gov. Bob Riley on PAC-to-PAC transfer ban

---- **Index References** ----

Company: PAC

News Subject: (Local Government (1LO75); Legal (1LE33); Government (1GO80); Economics & Trade (1EC26))

Tuscaloosanews.com

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears above any article. Order a reprint of this article now.

# PAC-to-PAC transfers are risky business for Capitol

*Published: Tuesday, March 6, 2007 at 3:30 a.m.*



Sherrill Realty has the following positions available.

Construction Help
Maintenance Technician
Lawn Care Crew

To see qualifications and how to apply click here!

According to an Associated Press survey, an overwhelming majority of the Alabama Legislature, which goes into session today, favors banning the transfer of campaign contributions between political action committees.

The proposed legislation won the backing of 82 percent of the House members and 78 percent of the Senate. Speaker of the House Seth Hammett says he can't imagine why anyone wouldn't want to ban PAC-to-PAC transfers.

We can't either. But the fact is that Hammett's House has passed bills banning those transfers for six years in a row. And for six years in a row, those bills have died in the Senate.

Although it would be disappointing, it wouldn't be surprising if the same thing happened this year.

That's because when push comes to shove, there's not really much enthusiasm for the ban. Unless it remains in the legislative spotlight, it almost certainly will die. And there are many issues and causes demanding the attention of lawmakers this session.

PAC-to-PAC transfers are little more than money laundering. With a wink and a nod, a contributor who wants to secretly fund a candidate's campaign gives money to a PAC, which transfers it to another PAC, which bundles it with other donations and shifts it to a third PAC, which channels the money from the original contributor to the favored candidate.

The trail is almost impossible to follow, offering deniability to candidates and contributors alike.

Obviously, it's an unhealthy practice. But it's also obvious that some lawmakers are unsettled by the prospect of giving voters a clear picture of who gave money to what candidate. Not wanting to risk an up-or-down vote on a PAC-to-PAC ban, however, they're likely to do what they've done for the past six years and find an excuse to let the reform die.

There will be plenty of opportunities for the bill to fall between the cracks this year. The weeks ahead will be full of controversies and battles over other issues.

Already, legislative leaders are sparring over the size of a proposed school construction bond. Some are proposing $750 million, but others say they'd like to deepen the indebtedness to $800 million or even $1 billion.

What percentage of the bond issue will go to K-12 schools and what to higher education is another bone of contention.

So, is the Alabama Education Association's call for a 7 percent raise for teachers and other public school employees? Some lawmakers feel the size of the proposed raise is too high and one Republican lawmaker is insisting on tying increases to performance.

Gov. Bob Riley has his own agenda, including a plan to cut income taxes on families that make less than $100,000 a year.

**Ex. B, Selected News Articles, 1993-2011**

On top of everything else, a partisan battle is brewing over rules that could bottleneck much of the business in the Senate -- including the PAC-to-PAC transfer ban.

It's nice that such a healthy percentage of lawmakers say they support the ban. But when it comes to its passage, an old Southern axiom is worth remembering: Handsome is as handsome does.

It's nice that such a healthy percentage of lawmakers say they support the ban. But when it comes to its passage, an old Southern axiom is worth remembering: Handsome is as handsome does. % -->

Copyright © 2011 TuscaloosaNews.com — All rights reserved. Restricted use only.

5/7/10 Montgomery Advert. (Ala.) (Pg. Unavail. Online)
2010 WLNR 9520846

Montgomery Advertiser (AL)
Copyright ©2010 Montgomery Advertiser, Ala.

May 7, 2010

EDITORIAL: Corruption thrives in state politics

May 7--For the second time since the state s current crop of legislators took office four years ago, Alabama lawmakers are the focus of a widespread criminal probe. That is not a good legacy for legislators to take before the voters in the June primary and November general elections.

Dozens of legislators and lobbyists have marched to the federal courthouse in Montgomery this week to appear before a federal grand jury looking into the circumstances surrounding legislation to expand electronic gambling in the state and the huge sums of campaign money spent on the issue.

Grand jury proceedings are secret, so no one really knows what will come of the probe or when it will come to fruition, if at all. But simply the fact that it is ongoing has to send chills up the spines of many legislators.

Some of them have to feel like they have been through this before. It was only a few years ago that federal authorities were looking at many legislators and their dealing with the state' s two-year college system. That earlier probe pulled resulted in the indictments and convictions of several legislators.

Now the focus is on the Legislature again.

But it hasn' t just been the Legislature that has been targeted by prosecutors. Two of the past four men who were elected as governor of the state have been convicted of corruption involving their time in office. The late Guy Hunt was removed from office after his conviction in 1993, and Don Siegelman is currently appealing his conviction for bribery and conspiracy for actions while he was governor.

And yet, despite this recent history of widespread political corruption, the Alabama Legislature repeatedly has refused in recent years to strengthen the state s ethics and campaign disclosure laws.

The state s ethics laws are so weak that lawmakers can take up to $249.99 per day in gifts and other things of value from a lobbyist or other special interests without even reporting it. There is no actual limit on how much they can take, including trips and meals and almost anything else.

Because the Legislature has refused to close the loopholes created by PAC-to-PAC transfers, campaign disclosure laws have become a joke. Political action committees and political parties routinely intermingle funds from special interests to hide the real source of the funding. Without disclosure, the corrupting effects of big contributions are magnified.

Alabamians should welcome federal criminal probes of the political process in the state, because without the fear such probes produce among some politicians things might be even worse.

Maybe, just maybe, this latest probe will embarrass legislators into cleaning up the process by adopting true ethics and campaign reforms. But that will happen only if the state s voters make it clear that they will not tolerate lawmakers who do not actively pursue reforms, not just give them lip service.

---- **Index References** ----

Company: PAC

Ex. B, Selected News Articles, 1993-2011 449

10/22/07 Press-Register (Mobile, AL) A8
2007 WLNR 21287567

Press-Register (Mobile, AL)
Copyright ©2007 Press-Register. All Rights Reserved. Used by NewsBank with Permission.

October 22, 2007

Section: A

Alabama is a great place for corruption

Alabama is a great place for corruption

ANOTHER NATIONAL survey brings embarrassing news for Alabama: The state is a great place to live if you're a crooked politician.

Alabamians are well aware that the state usually ranks near the bottom in surveys of education and public health. But many state residents probably don't realize that Alabama also brings up the rear on a key measure of political health.

The state's campaign finance disclosure laws are among the weakest in the nation, according to a study funded by the Pew Charitable Trusts. That means it's easy for politicians here to hide the sources of their campaign money from the public.

Big-money campaign donors don't buy favors from politicians out in the open, where everyone can watch the unethical deals going down. Corruption needs darkness to grow and flourish.

Alabama has created a nearly ideal environment for influence-peddlers. Darkness shrouds the campaign finance scene, making it nearly impossible for the public to heed the famous advice of Watergate's Deep Throat: Follow the money.

The national campaign finance study gave Alabama straight F's for disclosure. Only Wyoming fared worse in the study.

It's hard to believe that any state could hide the money better than Alabama. Consider, for instance, that it's perfectly legal for a lobbyist in Alabama to spend up to $250 a day lavishing legislators with free meals, free liquor and other gifts without reporting any of it to the public.

Lobbying is a legitimate form of political advocacy, but let's face it: Lobbyists who spend as much as $250 a day trying to influence lawmakers are not promoting First Amendment rights. The public needs to know if a legislator is the equivalent of a lobbyist's "kept" man or woman.

The authors of the campaign finance study pointed to several loopholes in Alabama law that allow campaign cash to change hands without the public knowing about it.

Thirty-six states require candidates to publicly report last-minute campaign contributions. But not Alabama. Here, donors can frustrate public accountability by waiting until the last five days before an election to drop a bundle on a candidate.

Why do candidates prefer to hide their connections to certain interest groups? Figuratively speaking, they don't want voters to be able to turn on the lights and see the cockroaches scurrying across the floor.

Candidates in Alabama can hide a lot of creepy, crawly things with the sleight of hand of PAC-to-PAC transfers.

The process of routing a campaign donation through a maze of political action committees is complicated - that's why it works to conceal the real identity of donors.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

Many legislators and even some influential campaign donors think PAC-to-PAC transfers degrade politics in Alabama. Even so, reformers like Gov. Bob Riley have been repeatedly frustrated in their efforts to ban PAC-to-PAC transfers.

Obviously, some powerful legislators in Alabama - most of them in the state Senate - are determined to keep the money hidden.

Senate Majority Leader Zeb Little, a Democrat from Cullman, has endorsed a ban on *PAC-to-PAC transfers*, but he dismisses the idea that's it a big issue for Alabamians. " Nobody is clamoring for PAC-to-PAC except editorial boards, " he said recently.

That view strikes the Press-Register editorial board as a bit too cynical. Polls have shown overwhelming public support for new campaign ethics laws. Alabamians may not understand all the ins and outs of PAC-to-PAC transfers, but they know corruption when they smell it.

In any event, it shouldn't take a public clamor for our lawmakers to do the right thing. Politicians with any sense of pride in their calling wouldn't continue to submit to the shameful demands of Alabama's hide-the-money system.

---- Index References ----

Company: PAC

News Subject: (Government (1GO80); Public Affairs (1PU31))

Region: (USA (1US73); Americas (1AM92); Alabama (1AL90); North America (1NO39))

Language: EN

Other Indexing: (GOV; PAC; PEW CHARITABLE TRUSTS; SENATE MAJORITY LEADER ZEB; WATERGATE; WYOMING) (Alabama; Alabamians; Bob Riley; Figuratively; Lobbying; Thirty)

Keywords: EDITORIAL

Edition: 05

Word Count: 748

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

3/6/08 Decatur Daily (KRTBN) (Pg. Unavail. Online)
2008 WLNR 4438649

Decatur Daily
Copyright ©2008 The Decatur Daily, Ala.

March 6, 2008

### EDITORIAL: PAC transfers need to be transparent

Mar. 6--Here s one reason why the state Senate should stop its stalling on reforming transfers between political action committees: $436,950.

That s nearly a half million dollars that PACs transferred to other PACs before it reached Larry Langford s successful campaign for mayor of Birmingham.

The money began its circuitous route as $50,000 in Tuscaloosa developer Stan Pate s PAC. The mayor announced last week that Mr. Pate would be a partner in a $90 million revitalization plan for Five Points West and at Fair Park.

Finding the origin of the money took much digging, more than the average Alabamian would do or could do. It took a newspaper reporter to make the connection, which is why the Senate doesn t want to improve the laws governing political giving.

Senators like hiding political contributions.

---- **Index References** ----

Company: PAC

News Subject: (Government (1GO80))

Region: (USA (1US73); Americas (1AM92); Alabama (1AL90); North America (1NO39))

Language: EN

Other Indexing: (PAC; SENATE) (EDITORIAL; Finding; Larry Langford; Pate; Senators; Stan Pate; West)

Word Count: 162

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

3/18/08 Birmingham News (AL) 6
2008 WLNR 5338560

Birmingham News (AL)
Copyright ©2008 Birmingham News. All Rights Reserved.

March 18, 2008

Volume 121
Section: EDITORIAL

Of cokeheads and campaigns

THE ISSUE The Legislature is looking for compromise on a bill that is supposed to ban money transfers between political action committees.

State Rep. John Rogers, no stranger to provocative quotes, offered up a pair in Sunday' s story in The News that suggest it' s not very likely the Legislature this session will fix a corrupt campaign finance system.

'' A cokehead has to have their fix to survive and most politicians have to have money to run and win, but there is a difference between them,' ' the Birmingham Democrat said. ° The cokehead doesn' t care a flip about where his drugs come from, but the politician does.' '

And this: ° The system the way it is is too good to change, especially if you' re in the Senate where the big money is. They' re not going to vote to kill the golden goose.' '

Rogers' quotes say it all. Because politicians care where their money comes from, they want to leave alone the loophole in the current law that allows political action committees to transfer money among themselves to hide from the public the source of a campaign contribution. That way, corporations, unions, other special-interest groups and individuals with deep pockets, especially those that are controversial, can funnel money through PACs to the candidates of their choice, and the public rarely finds out.

And because the current system favors incumbents and allows them to raise big bucks through PACs, there aren' t very many lawmakers intent on killing the goose that lays all that gold in their campaign coffers.

That hasn' t stopped state Rep. Jeff McLaughlin, D-Guntersville, from trying for years. For what seems like the 20th year in a row, McLaughlin is sponsoring a bill that would ban PAC-to-PAC money transfers. Once again, the House passed the bill unanimously. This year, instead of the Senate killing McLaughlin' s bill outright, as per usual, senators passed a version of a PAC ban that does little more than foster another lucrative loophole through which to launder campaign contributions.

The Senate bill carved out exemptions from the transfer ban for political parties and legislative caucuses. Critics believe the bill would lead to an explosion of caucuses through which to pass money, as well as year-round fundraising, since the general prohibition against fundraising during the legislative session does not apply to caucuses.

If there is such a thing as less than worthless, the Senate bill is it. The bill ° bans' ' PAC-to-PAC transfers at the same time it encourages another way for donors to hide the source of their contributions.

Earlier this month, the House voted 102-0 to reject the Senate bill and send the House-passed bill to a conference committee to work out a compromise. But there should be no compromise other than the committee agreeing to McLaughlin' s bill, which, although it is light years better than the Senate bill, isn' t perfect.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

The House bill would ban PACs from giving money to political parties, legislative caucuses and other PACs. But the bill would allow PACs to give to a candidate's political committee, which could mix that money with other contributions to obscure the identity of the donor before distributing it to another candidate.

Why does any of this matter? Why should the public care who is funding a candidate's campaign? Because money really is the mother's milk of politics, as teacher superlobbyist Paul Hubbert reminded us Sunday. Finding out who is suckling whose campaign is key to understanding who wields influence and power over elected officials in Montgomery.
Sort of the way coke is to the cokehead.

---- **Index References** ----

Company: PAC

News Subject: (Government (1GO80); Political Parties (1PO73); Public Affairs (1PU31))

Language: EN

Other Indexing: (PAC; SENATE; STATE REP) (Critics; Jeff McLaughlin; John Rogers; McLaughlin; Paul Hubbert; Rogers; Sort)

Word Count: 714

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

2/10/09 Press-Register (Mobile, AL) A6
2009 WLNR 3020671

Press-Register (Mobile, AL)
Copyright ©2009 Press-Register. All Rights Reserved. Used by NewsBank with Permission.

February 10, 2009

Section: A

This could be the year

This could be the year

MAYBE THIS year, Alabama legislators, embarrassed by their state's growing reputation for political corruption, finally will pass major ethics reform bills such as a ban on laundering campaign contributions.

Or maybe not. When it comes to scandal and corruption, many Alabama lawmakers appear incapable of feeling embarrassment or shame. Witness the subdued response in Montgomery to the ongoing federal investigations that have resulted in felony charges against former legislators and one sitting lawmaker. Three of those cases have ended with guilty pleas or convictions.

But even with the shadow of corruption falling on the Capitol itself, powerful legislators have continued to block all efforts to bring greater openness and honesty to campaign fund-raising, lobbyists' activities and lawmakers' business connections.

Reformers in the Legislature have tried for more than a decade to end the shady practice of concealing the source of campaign donations by passing them through a maze of political action committees. Rep. Jeff McLaughlin, a Democrat from Guntersville, is trying again this year. Last week a House committee approved a bill he proposed that would ban PAC-to-PAC transfers.

If history is any guide, Rep. McLaughlin's bill will make it through the House before it's quietly killed by key Democrats in the Senate. But there's still a chance - a long-shot chance, to be sure - that senators will decide to take action to rehabilitate the reputation of the Senate and, indeed, of the entire state.

In his State of the State address, Gov. Bob Riley observed that all the high-profile scandals in Alabama make it more difficult to recruit major industries to the state. The connection is clear: Business executives are taking a major risk if they invest millions in a corrupt state. That's why corrupt Third World countries rarely attract foreign investment.

Alabama is in danger of becoming a national punch line to jokes about political corruption. Maybe this year, lawmakers will do something to stifle the cynical laughter.

---- Index References ----

News Subject: (Government (1GO80); Public Affairs (1PU31))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (ALABAMA; LEGISLATURE; SENATE) (Bob Riley; Jeff McLaughlin; McLaughlin)

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

4/20/09 Anniston Star (Ala.) (Pg. Unavail. Online)
2009 WLNR 7334111

Anniston Star, The (AL)
Copyright ©2009 The Anniston Star, Ala.

April 20, 2009

EDITORIAL: Slow death of PAC-to-PAC transfers

Apr. 20--In the 2000 legislative session the Alabama House of Representatives passed a bill that would outlaw the transfer of money from Political Action Committees to other Political Action Committees in order to hide the original source of the funds.

The ban would have ended the practice of politicians laundering money so voters would not know who was financially supporting whom or what.

That was as far as it got.

And in the seven legislative sessions that followed, the Alabama House passed legislation outlawing PAC-to-PAC transfers.

Those bills never became law.

This year, with Gov. Bob Riley pushing ethics reform and transparency in government, it was hoped that both houses of the legislature would agree to outlaw PAC-to-PAC transfers.

Things started well.

On Feb. 12, four days into the session, the House passed the bill and sent it to the Alabama Senate, where it was put in the in-basket.

It sat there until last Thursday, when it was assigned to the Senate Constitutions and Election Committee.

Who let it sit there?

It is the responsibility of Senate President Pro Tem Rodger Smitherman, D-Birmingham, to assign bills to committees.

In the past, this has taken anywhere from a few hours to a few days, but not this time.

When asked why it took two months to move the bill, Sen. Smitherman said that he had trouble deciding which committee should review it.

What???

There are only 24 standing committees in the Senate.

Nearly half of these are obviously not the place to assign this legislation, so you have 14-16 from which to choose.

Surely the president pro tem knows his committees well enough to make a decision sooner.

And if he doesn' t, why didn' the just assign the bill to the same committee that reviewed it eight times in the past.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

But he didn't act, and now, unless by some miracle the Senate gets moving on the PAC-to-PAC ban, the matter is dead for another year.

"It was an honest delay," Smitherman said.

"I'm in full support of PAC-to-PAC transfer limitations," he added.

Well, if this is " full support' we sure would hate to see what he would do to a bill he opposed.

So for another year, the shell game continues.

---- **Index References** ----

News Subject: (Economics & Trade (1EC26); Government (1GO80))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (ALABAMA HOUSE; ALABAMA SENATE; ELECTION COMMITTEE; HOUSE; POLITICAL ACTION COMMITTEES; SENATE; SENATE CONSTITUTIONS) (Bob Riley; Pro Tem; Rodger Smitherman; Smitherman; Things)

Word Count: 426

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# **News**Room

4/22/09 Anniston Star (Ala.) (Pg. Unavail. Online)
2009 WLNR 7471473

Anniston Star, The (AL)
Copyright © 2009 The Anniston Star, Ala.

April 22, 2009

EDITORIAL: Seeking ethics in Alabama: A bill worth passing

Apr. 22--A few things are becoming clear during this session of the Alabama Legislature.

First, more than a few legislators don't want voters to know where their campaign contributions originate. The sad state of the PAC-to-PAC transfer ban makes that undeniable.

Although blame can be placed on the president pro tem of the state Senate for holding the bill up, the truth is that there has not been much pressure on him to move it along -- either from fellow senators or from members of the state House. Although the House passed the PAC-to-PAC ban with ruffles and flourishes, many members are hoping the Senate saves them from ever having to abide by its restrictions.

And now, with less than seven working days left in the session, it looks like Gov. Bob Riley's much-touted ethics bill may be headed for the same inglorious death.

We have said it before and we say it again: Alabama's ethics code is a joke.

The best the Center for Public Integrity could give the state was a "C" for financial disclosure by public officials. But when it came to disclosure by lobbyists, the state merited a big, fat "F."

Why?

One example will suffice.

A lobbyist can spend up to $250 a day entertaining an elected official -- $91,000 a year -- and not report a dime of it. Agreed, there are not many people sent to Goat Hill who are worth that kind of money, but still ...

And there are a host of other perks that lobbyists can legally give public officials in this state.

Calling it a system that "encourages corruption, Riley proposed a new Alabama Code of Public Ethics that would limit what lobbyists can spend in their lobbying to $25 a day. It also would require lobbyists (including those who lobby the executive branch) to disclose to the Alabama Ethics Commission any and all "items of value" provided to public officials -- called "public servants" in his proposal. What's more, these lobbyists would have to disclose financial transactions between themselves and public servants and/or family members.

Meanwhile, public servants would have to disclose all jobs and consulting contracts they have with any entity that receives public funds.

Ex. B, Selected News Articles, 1993-2011

And -- a very big and -- the Alabama Ethics Commission would have subpoena power so it could require individuals and organizations under investigation to produce files and documents needed to make a decision. Today, Alabama has the only state-level ethics commission without subpoena power. No wonder the state ranks so low.

This much-needed piece of legislation was introduced on Feb. 24 and was immediately assigned to the House Judiciary Committee. It has sat there ever since.

Committee Chairman Marcel Black, D-Tuscumbia, says he is not holding up the bill. He claims the legislation is complex and the committee needs time to study it. Well, it had the month of March, which included a nice spring break. If being a legislator is really a full-time job, as many claim, then they should have been studying instead of doing whatever they did.

Complexity is no excuse. This matter was not dropped on them out of the blue.

As for Black's assurance that the committee will vote on the bill before the session ends, let's hope it will. The committee will vote just in time for the issue to get to the floor and die, as good bills often do when the Alabama Legislature is working its magic.

---- Index References ----

News Subject: (Government (1GO80); Local Government (1LO75))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (ALABAMA; ALABAMA ETHICS COMMISSION; ALABAMA LEGISLATURE; COMMITTEE; GOV; HOUSE; HOUSE JUDICIARY COMMITTEE; SENATE; STATE HOUSE) (Agreed; Black; Bob Riley; Marcel Black; Riley)

Word Count: 663

End of Document         © 2011 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

Ex. B, Selected News Articles, 1993-2011

5/8/09 Press-Register (Mobile, AL) A10
2009 WLNR 9448454

Press-Register (Mobile, AL)
Copyright ©2009 Press-Register. All Rights Reserved. Used by NewsBank with Permission.

May 8, 2009

Section: A

Legislature too busy to mess with ethics

Legislature too busy to mess with ethics

ONCE AGAIN, the Alabama Legislature didn' t get around to ethics.

With the session winding down, two key ethics reform bills have failed to advance, despite Gov. Bob Riley' s high-profile lobbying efforts and the state' s growing reputation for corruption. The Senate, as usual, buried a proposal to ban the odorous practice of hiding the sources of campaign donations by passing them through a maze of so-called political action committees. And both the House and the Senate failed to act on the sweeping reforms proposed by the governor and included in bills sponsored by Rep. Mac Gipson, R-Prattville, and Sen. Ben Brooks, R-Mobile.

Year after year, the House passes a ban on PAC-to-PAC transfers, the money-laundering scheme that enables powerful interests to disguise their identity with a political action committee label, then funnel money to legislators who presumably are willing to do their bidding. But Senate leaders just can' t seem to move any legislation that seriously restricts the shell game.

Now, mind you, the Senate leaders say they abhor the shady PAC-to-PAC business and mean to put a stop to it. They say that every year. Senate Pro Tem Rodger Smitherman, D-Birmingham, said it this year. " I m in full support of PAC-to-PAC transfer limitations," he declared.

And yet Sen. Smitherman didn' t get around to assigning the House bill banning PAC-to-PAC transfers to a committee until nearly the end of the session.

The sponsor of the bill, Rep. Jeff McLaughlin, D-Guntersville, noted that the House sent the bill to the Senate back in February, on the fourth day of the session. Sen. Smitherman explained that he couldn' t decide which committee to send it to.

If anyone in Alabama believes that, well, you' re getting the representation you deserve. It' s clear that powerful Democrats - and maybe some in the Republican minority, too - don' t want the public to know who is really funding campaigns in Alabama.

Both the House and the Senate failed to do the right thing on the ethics reform package pushed by governor. Perhaps that' s because a lot - maybe even most - lawmakers like the idea of being wined and dined by lobbyists and not having the public know anything about the expensive " entertainment."

Astonishingly, Alabama law allows lobbyists to spend up to $250 a day entertaining a public official without filing a public report detailing the expense. The ethics package would have put meaningful limits on lobbyists' spending on public officials and required the influence-peddlers to file spending reports.

But legislators were too busy with other matters to deal with trifles like the perception that they welcome the corrupting influence of lobbyists who can spend up to $90,000 a year on a public official and keep the public in the dark about it.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

**Legislature too busy to mess with ethics, 2009 WLNR 9448454**

Yes, the Legislature was just too busy to raise Alabama's dismally low ethical standards. State residents shouldn't be surprised if the next national survey of public corruption reveals that Alabama is even more corrupt than famously corrupt Louisiana. After all, lawmakers in the Bayou State finally did get around to passing a sweeping ethics reform measure.

---- Index References ----

Company: PAC

News Subject: (Government (1GO80); Legislation (1LE97); Local Government (1LO75))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (BAYOU STATE; HOUSE; HOUSE PASSES; PAC; SENATE; SENATE PRO TEM RODGER SMITHERMAN; SMITHERMAN) (Ben Brooks; Bob Riley; Jeff McLaughlin; Legislature; Mac Gipson)

Keywords: EDITORIAL

Edition: 01

Word Count: 633

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

6/15/09 Montgomery Advert. (Ala.) (Pg. Unavail. Online)
2009 WLNR 11439452

Montgomery Advertiser (AL)
Copyright ©2009 Montgomery Advertiser, Ala.

June 15, 2009

EDITORIAL: Disclosure remains key component

Jun. 15--Alabamians who thought they saw a glimmer of hope for our state's money-tarnished judicial elections in a recent U.S. Supreme Court decision are in for a disappointment. That decision won't mean much in Alabama.

For the first time, the court addressed the issue of whether a large campaign contribution from a party with a case before a judge should cause that judge to recuse himself or herself from the case. In Caperton v. Massey, the court held that it should.

The case involved a West Virginia Supreme Court justice whose election was largely funded by a coal company executive who spent $3 million on his campaign -- three times what the justice's own campaign committee spent. The coal company had appealed a huge judgment against it, and the justice ruled in its favor -- twice.

One need not be a scholar of judicial ethics to see the problem here. The perception of impartiality that is crucial to maintaining confidence in the courts was obliterated.

Alabamians have seen plenty of big-bucks judicial races. Since 1993, interests and individuals have spent more than $60 million on races for the state Supreme Court, more than in any other state.

So shouldn't this West Virginia case offer some hope for an end to these costly, often highly negative campaigns in Alabama that are harmful to the judiciary's image? Sadly, no.

There is a critical distinction between the states. In West Virginia, this scandal was widely known because the state's election laws require much clearer disclosure of campaign contributions, whether made directly to a candidate or expended by a person or group on the candidate's behalf.

In Alabama, however, contributions can easily be masked by shuffling the money around through multiple political action committees -- the practice of "PAC-to-PAC transfers" that is roundly criticized in each session of the Legislature even as lawmakers decline to do anything about it. In addition, third-party groups don't have to disclose their donors. That means that lots of money can be poured into an Alabama Supreme Court campaign without it ever becoming clear whose money it is or whether a conflict calling for recusal would result from it later.

Ironically, Alabama actually has a law restricting the amount of campaign money a judge can accept before recusal is required in cases involving the contributors -- $4,000 for an appellate judge and $2,000 for a trial judge. However, without a way to know who gave to whom and how much, if s useless.

"It s a pretty good statute," Thomas Wells, the Alabama lawyer who is the current president of the American Bar Association, told the Birmingham News. " The problem is Alabama has no transparent way to track campaign contributions to judges, so that statute can't be used."

Absent that transparency, Alabama will always be vulnerable to scandals such as the West Virginia case, in which judges clearly ought to step aside from a trial or an appeal. We simply might not know it when such a travesty occurs.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

7/19/09 Press-Register (Mobile, AL) A18
2009 WLNR 14409445

Press-Register (Mobile, AL)
Copyright ©2009 Press-Register. All Rights Reserved. Used by NewsBank with Permission.

July 19, 2009

Section: A

Put money on the table

Put money on the table

IT S NO surprise that gubernatorial candidates in Alabama aren t willing to unilaterally disarm in the campaign finance wars.

The Associated Press interviewed the seven declared candidates in the 2010 governor s race and found they all plan to take money from political action committees. Yet all of them say they oppose - and want to ban - PAC-to-PAC transfers that conceal the source of campaign money.

Some may see this as evidence of rank hypocrisy. If you re a real campaign finance reformer, don t take the money if you aren t sure it came from groups respectable politicians would want to be seen with in public.

There are two problems with this line of thinking. First of all, a candidate has to raise a lot of money to mount a credible campaign for governor. A candidate who passes up PAC money while his or her opponents rake it in probably won t be elected governor and go on to lead a crusade against campaign money laundering.

Second, there s nothing inherently wrong with PAC money. The First Amendment guarantees that individuals and groups can participate in the political process and make their voices heard. A group can amplify its members' voices by raising money and giving it to candidates aligned with the group s views.

The reason Alabama s campaign finance system is a disgrace is that it allows PACs to hide the money - to keep the public from knowing who s really funding campaigns. State Treasurer Kay Ivey, a GOP candidate for governor, compared it to " slipping hundred dollar bills under the table."

Alabama should require candidates and their supporters to put all the campaign money on the table. Then voters can follow the money and make up their own minds about the influence of various special interests.

Here s what we d like to see the gubernatorial candidates do about PAC-to-PAC transfers: Promise they will expose the lawmakers who say they support PAC reform but who keep strangling reform bills. And vow to hit the stump and use the governor s bully pulpit to defeat these liars and hypocrites when they come up for re-election.

---- Index References ----

Company: PAC

News Subject: (Government (1GO80); Public Affairs (1PU31))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

1/19/10 Huntsville Times (Huntsville, AL) 7A
2010 WLNR 1758981

Huntsville Times (Huntsville, AL)
Copyright ©2010 The Huntsville Times. All Rights Reserved.

January 19, 2010

Section: Editorial

PACs: a shadow government

JOHN PECK

In a strange way, media-bashers can rightfully blame the press for Alabama' s failure to pass meaningful campaign finance reform.

Many legislators don' t want the media to report where they get the bulk of their campaign money. So they routinely kill tougher campaign disclosure laws.

Thus, election season after election season, a multimillion-dollar money-laundering scheme gets carried out in Alabama campaigns. Democrats blame Republicans and Republicans blame Democrats. Funny that they always seem in favor of reforms.

Special-interest groups benefit the most from these shameful money transfers among political action committees (PACs). The public is the ultimate loser.

A Birmingham News story Sunday likened perennial efforts by state Rep. Jeff McLaughlin to ban PAC transfers to the "Groundhog Day" movie in which the protagonist (played by actor Bill Murray) is forced to live the same day again and again.

McLaughlin, D-Guntersville, has been pushing the PAC bill unsuccessfully for about a decade. Before him, former state representative-turned-congressman Mike Rogers, R-Anniston, led the crusade.

"I m going to keep fighting," McLaughlin told The News, noting that while the economy and jobs are the most pressing issues facing Alabama, election reform is" fundamental to us making real progress."

Just maybe, McLaughlin allowed, Alabama will one day" get to Feb. 3," the day following Groundhog Day.

This shell game evolved soon after lawmakers - pressured by newspapers and other groups - passed tough campaign disclosure laws in 1988 requiring them to reveal all their contributions. Former Alabama Secretary of State Jim Bennett said PACs grew like newborn rabbits soon after the disclosure law was passed. Bennett, a former newspaper reporter in Birmingham before entering politics, helped push the Fair Campaign Practices Act while serving in the Legislature.

Lobbyists who control PACs found that by transferring contributions multiple times, voters couldn' t detect how much influence they or their clients may wield over a particular officeholder.

And to put perfume on a pig, so to speak, many of the PACs took on do-gooder names such as Alabama Citizens for Common Sense, or Children s PAC, or Citizens for Good Government, or some other mom-and-apple-pie moniker.

Look more closely at many of these PACs, though, and the dark secrets slowly emerge. PAC contributors are often other

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

PACs, which get cash from still other PACs, which may get wads of money from special-interest groups and individuals with specific agendas. The transfers are usually cleverly disguised. Deposits are spread on different dates to escape detection from reporters and other snoops who could expose it.

Everyone in politics seems pleased with this arrangement. The secret interest group exerts its influence. The politician ducks revealing an unpopular giver. The lobbyists controlling the PAC gets their fees.

We wish McLaughlin success in banning PAC transfers. It s inexcusable to allow this charade to continue. We say it s time to root out the shadow of this evil power in government called PACs.

By John Peck for the editorial board: E-mail: john.peck@htimes.com

---- Index References ----

Company: PAC

News Subject: (Government (1GO80); Public Affairs (1PU31); Political Parties (1PO73); Legislation (1LE97))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (ALABAMA; FAIR CAMPAIGN PRACTICES; PAC) (Alabama; Bennett; Bill Murray; Democrats; Funny; Jeff McLaughlin; Jim Bennett; John Peck; McLaughlin; Mike Rogers; PACs; Republicans)

Keywords: EDIT; ALABAMA LEGISLATURE

Edition: 2

Word Count: 631

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

1/21/10 Decatur Daily (KRTBN) (Pg. Unavail. Online)
2010 WLNR 1278600

Decatur Daily
Copyright ©2010 The Decatur Daily, Ala.

January 21, 2010

EDITORIAL: Senators should pass PAC reform

Jan. 21--State Sen. Zeb Little, D-Cullman, dismissed questions about ethics and political action committees during a recent editorial board meeting at The Daily.

People he talked with around their kitchen tables were more interested in feeding families than they were about good government, he indicated.

He was here to talk about the Democratic legislative plan to spend $1 billion from the Alabama Trust Fund on roads and bridges to help struggling families. Ethics legislation was not on his agenda and that s too bad, because corrupt government is less likely to serve the downtrodden. Hidden campaign money goes to support special interest groups' causes.

The state House of Representatives this week passed a reform bill that would ban candidates from transferring campaign donations from one political action committee to another. The House passes this legislation year after year, but Little s Senate colleagues always kill it.

Senators like the transfers because the public can t trace the source of their money. For example, an electronic bingo PAC could give money to another PAC with the intent of the money going to senators who will vote to make electronic bingo legal. The public is seldom aware of these payments, because the PACs do an expert job of laundering the money.

This bill would stop that laundering.

The public cares about good government. One way to assure honest government is for campaign funding to be transparent.

Kitchen table talk might be about meat and potatoes, but Little can be certain his constituents would like to know the sources of his campaign funds.

---- **Index References** ----

Company: PAC

Region: (North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (ALABAMA TRUST FUND; HOUSE; PAC; STATE HOUSE) (Hidden; Jan; Zeb)

Word Count: 318

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

2/23/10 Birmingham News (AL) 4
2010 WLNR 3888924

Birmingham News (AL)
Copyright ©2010 Birmingham News. All Rights Reserved.

February 23, 2010

Volume 122
Section: EDITORIAL

That's some bucket

THE ISSUE Gambling interests at the end of 2009 gave PACs a 'drop in the bucket' compared to what is spent during a major election cycle, and compared to what they'll end up giving this election cycle.

Not to worry. The $2.2 million Alabama gambling interests gave to political action committees the last three days of 2009 is but " a drop in the bucket' compared to the campaign contributions made in a major election cycle.

So says lawyer John M. Bolton III, who downplayed the contributions detailed in a Sunday story in The News. Bolton works for dog track and casino owner Milton McGregor, who not surprisingly gave the most. McGregor and his two tracks gave nearly $1.6 million, almost all of it in the final three days of the year, to more than 30 PACs run by lobbyists and political consultants, according to campaign finance records.

We suspect the $2.2 million total is also but " a drop in the bucket' compared to what gambling interests will spend during this year's major election cycle. What we won't know until April 19, the deadline for filing 50/45-day reports on campaign spending for the June 1 primaries, is just how much they gave from Jan. 1 until Jan. 12. This year's legislative session began Jan. 12. Gambling interests and every other campaign contributor are barred by law from giving while the Legislature meets. [See Clarification]

The apparent thinking behind the law, passed in 1993, was to limit special-interest influence on legislative races while lawmakers meet to debate the merits of bills that would affect those special interests.

How quaint.

Whatever influence can be bought by campaign contributions is bought long before lawmakers debate the first bill in a new legislative session. If gambling interests can buy influence with their millions, they did it before Jan. 12.

It matters not that the money went to PACs rather than directly to lawmakers. The donor and the candidate know exactly where the money came from. Otherwise, what's the point of giving millions? Good government, the alleged purpose for many PACs? Good government wouldn't give the electronic-bingo legislation as written - to favor big givers like McGregor - the time of day.

But it does matter that the public has such a hard time finding out where all those millions go because Alabama's campaign-finance law allows legal money laundering. The law lets contributors funnel money through PACs, which get money from other sources including PACs, and in turn donate to candidates. The PAC wash cycle rinses away the direct link from contributor to candidate, making it almost impossible for the public to know for sure who is funding whose campaign.

The News' review of campaign records included 86 PACs that often handle contributions from casinos and their owners. How is anyone going to make sense of those records to know exactly how much candidates received from gambling interests?

That s how many lawmakers want it, and the reason a bill banning PAC-to-PAC money transfers fails every year in the Legislature. While the House passes the bill each session, the Senate kills it, keeping in place the favored system of hide-and-seek-more-untraceable-contributions. It s not just gambling interests fueling that system, but every interest group and candidate who may not want voters to know the source of a campaign contribution.

All those drops in the bucket add up. What you end up with is a pail full of public distrust in elected officials to do what s best for the people of Alabama, rather than what s best for the money men of Montgomery.

CLARIFICATION: 02/24/2010; This editorial said state law prevents lawmakers from accepting campaign contributions during a legislative session. Actually, the law bars state candidates from raising money while the Legislature is in session, unless that session is within 120 days of an election.

This year, candidates could raise money from Jan. 1 until Jan. 12, the day the session started, but were barred from fundraising from Jan. 12 through Jan. 31 because those days fell outside the 120 days before the June 1 primaries. Starting Feb. 1, lawmakers and other candidates again were able to raise money.

---- Index References ----

Company: PAC

News Subject: (Government (1GO80); Public Affairs (1PU31); Legislation (1LE97); Local Government (1LO75))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (LEGISLATURE; PAC; SENATE) (Bolton; Good; John M. Bolton; McGregor; Milton McGregor)

Word Count: 831

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

3/15/10 Birmingham News (AL) 4
2010 WLNR 5476950

Birmingham News (AL)
Copyright ©2010 Birmingham News. All Rights Reserved.

March 15, 2010

Volume 123
Section: EDITORIAL

'Pretty straightforward?'

THE ISSUE There s no way to know whether Attorney General Troy King received money from gambling interests, which is how contributors and candidates running for office like it.

Luther Strange, who hopes to beat incumbent Attorney General Troy King in the June Republican primary, last week accused King of taking more than $190,000 in campaign contributions from gambling interests.

'' It s pretty straightforward,' ' Strange said. '' He made a commitment if he knew money was from gambling interests he would return the money. I want him to honor his pledge.' '

But things are not as straightforward as they appear to Strange, or as straightforward as they should be.

King, who is perceived by some to be soft on enforcing state and local laws on electronic bingo, has kept his pledge, according to campaign spokesman Jonathan Gray. Strange used records filed with the secretary of state s office by political action committees that show gambling interests giving money to the PACs and those PACs writing checks to King, Gray said. But most of those checks don t show up in King s campaign finance report because he refused the contributions, according to Gray.

This much appears to be true. Many of the checks to King reported by PACs were not listed in King s report, and two checks from PACs linked to gambling interests, from JDC PAC and Talladega PAC, were refunded in December.

But King s report also lists thousands of dollars from other PACs that have taken money from gambling interests or from other PACs that have received contributions from gambling interests, such as Vend PAC, ENVIRO PAC and GREEN PAC.

It s easy enough to go to the secretary of state s Web site and see in King s report, for example, that he received at least $66,000 from Vend PAC, which got $6,000 from Ronnie Gilley Entertainment. Vend PAC also got $25,000 from Home Care PAC, which received $6,000 from Gilley Entertainment, according to Vend PAC s report. Does that mean King got $12,000 from Gilley, the developer of Country Crossing in Houston County? Or nothing? Gray said nothing, that Gilley s money went to a north Alabama Senate race.

Not to cast any doubt on what Gray says, but the public ought not have to rely on anyone s word to know the source of a contribution.

What s crystal clear at this point is there would be no doubt about whether King got bingo bucks if Alabama prevented PACs from washing away any public trace of where the money originated. That, of course, is the dark beauty of legal money laundering through PACs.

King is in no way is alone in this shell game. Millions of dollars are scrubbed this way every election cycle. Virtually all candidates running for statewide and even local offices accept money from PACs, which keeps the public from really

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

knowing who is funding their campaigns. One notable exception has been state Rep. Jeff McLaughlin, D-Guntersville, who never has accepted contributions from PACs (or anyone, for that matter).

Every year since 2002, McLaughlin has sponsored a bill that would clean up PAC money laundering. The reason he is still trying nine years later to get the Legislature to rewrite the law to ban money transfers is that candidates love having well-funded campaigns, and they also love the plausible deniability those transfers allow.

This year, the House, as it has for several years running, approved a ban on PAC-to-PAC money transfers. The Senate is dawdling, purposefully. Even as senators debate gambling legislation, the majority of them don' t want to restrict gambling or any other dollars from making their way through PACs to their campaigns.
At least that much is pretty straightforward.

---- Index References ----

Company: JDC; JINDUICHENG MOLYBDENUM CO LTD; JDC CORP

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (COUNTRY CROSSING; GILLEY; GILLEY ENTERTAINMENT; JDC; RONNIE GILLEY ENTERTAINMENT; SENATE) (Gray; GREEN PAC; Home Care PAC; Jeff McLaughlin; Jonathan Gray; King; Luther Strange; McLaughlin; Millions; PAC; Strange; Troy King; Vend PAC; Virtually)

Word Count: 611

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

4/4/10 Birmingham News (AL) 13
2010 WLNR 7121013

Birmingham News (AL)
Copyright ©2010 Birmingham News. All Rights Reserved.

April 4, 2010

Volume 123
Section: LOCAL NEWS

State bingo industry not gambling with votes

John Archibald

Why are the feds curious about the role of money in the Alabama Legislature?

Because they have a pulse.

Because anybody with sense enough to run screaming from Goat Hill is more than a little curious about the influence of money on Alabama politics.

It's hard to find a better example than last week's seemingly landmark Senate vote on bingo.

Of 21 senators who voted in favor of the bill, at least 17 got campaign money directly or indirectly from bingo baron Ronnie Gilley or his lobbyist Jarrod Massey, state campaign finance records show. Massey's lawyers acknowledged Friday he had been singled out for questioning by federal agents, and was pressured to cooperate soon after the Senate voted 21-13 to pass the bingo bill.

None of the 13 senators who voted against the bill got money from Gilley, as far as I can tell. None got money from Massey's dozen PACs, or those fed by them.

Quid pro quo? That's one of the things the feds want to know.

It is, if nothing else, what happens when the unregulated, untaxed and unbridled bingo express runs headlong into our uncontrolled, unaccountable system of campaign finance.

Bingo, baby. You may already be a winner.

The scary part is that an untrained eye could look at all those contributions and see nothing but roses.

So what if Sen. Linda Coleman got $1,000 from Hospice PAC, or if Sen. Wendell Mitchell took $4,500 from the Reading Initiative PAC? Who cares if Sen. Hank Sanders got $1,500 from the Public Golf PAC? It looks and sounds like money spent well, on spiffy causes.

If you don't know Alabama politics.

Because Massey runs all those PACs, and funds them almost entirely with cash from his Mantra Government PAC. He also runs PACs with swell-sounding names like Auto, Economy, Quality One, Seniors, Tech, Thin Line, Tourism and Youth Educate PACs. Most of them get their money from Mantra, too. And that's as far as state records trace it back.

But Massey works for Gilley, who operates the Country Crossing bingo casino in Houston County.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

Gilley and Massey give to some candidates directly, but the stable of PACs also gives to larger PACs, like ABC Merit PAC. That PAC got $46,000 from Gilley and Massey, then turned around and gave $14,000 to six senators who voted for the bingo bill.

In all, Gilley, Massey, and the PACs they run or support gave yes-voting senators more than $329,000. And that's just the reportable stuff.

The biggest winner was Sen. Harri Anne Smith, who represents Houston County. She got at least $16,000 in contributions from the PACs, and in-kind gifts of $217,817 from Gilley himself. It went for ads, food and rentals for a heckuva New Year's Eve bash.

Why are the feds interested in the role of money in Alabama politics?

You can bet on it. It's a good place to start.

------------------------

John Archibald's column appears Sundays, Wednesdays and Fridays. Write him at jarchibald@bhamnews.com.

---- Index References ----

Company: PAC

Region: (Texas (1TE14); Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (ABC MERIT; PAC; SENATE) (Fridays; Gilley; Hank Sanders; Harri Anne Smith; Jarrod Massey; John Archibald; Linda Coleman; Massey; PACs; Quality; Quid; Ronnie Gilley; Wendell Mitchell; Write; Youth Educate PACs)

Word Count: 574

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

4/7/10 Birmingham News (AL) 1
2010 WLNR 7270142

Birmingham News (AL)
Copyright ©2010 Birmingham News. All Rights Reserved.

April 7, 2010

Volume 123
Section: LOCAL NEWS

With PAC money, lawmakers unite

*John Archibald*

You can't throw a rock in the Alabama State House without hitting someone who took campaign money from Jarrod Massey.

More than four out of 10 lawmakers - 41 percent of all senators and representatives - last year took money from one of the political action committees run or funded by Massey, who was questioned by federal

agents in a probe of improper influence in the state legislature.

More than a third of Republicans took that money. Almost half the Democrats bit.

Shoot. Massey and his money had the closest thing to bipartisan support this legislature has seen since, well - was there a resolution honoring God? Or football?

Massey and his pro-bingo gaggle of PACs - the most notable being Mantra Governmental - gave directly to lawmakers 81 times last year, for a total of $142,000, according to reports filed with the Secretary of State.

Factor in the trickle down - from the headwaters at bingo boss Ronnie Gilley all the way through Massey's core PACs and those funded by them - and you find 57 separate lawmakers who took in at least $438,567 in cash and services. Eight out of every 10 of those dollars went to legislators in December 2009, the last chance before the current legislative session.

It s not just the senators and representatives, either. You have to go through a few degrees of PAC-to-PAC separation, trailing Massey's PACs through ABC Merit PAC, past HomeCare PAC and Vend PAC, but you end up with thousands of dollars in Attorney General Troy King's war chest, too.

It s a lot like tracking footprints on a busy beach, though, so the exact amount - it s more than $30,000 and less than $158,000 - is hard to follow.

And that s a real big part of the problem.

If there is good news - other than the fact it s easy to hit a lawmaker with a rock these days - it s that Alabama has long needed a full-blown federal flushing to cleanse its campaign finance system.

But don't for a minute think Washington has come South only to look at campaign finance. We have a long and winding road to ruin. It s about campaign finance, but also about bingo jackpots a la La La - former Birmingham Mayor Larry Langford. It s about payoffs in all their ugly forms.

And if state Sen. Paul Sanford of Huntsville is telling the truth, and Massey offered him $250,000 to take the pro-bingo position, that makes those campaign contributions seem penny ante.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

It s remarkable that many Alabamians still want to believe the investigation is a political crusade, that Gov. Bob Riley - a lameduck Republican - convinced a Democratic Justice Department to do his bidding.

They really, really miss the point.

This is not about bingo. This probe is not about politics, and did not materialize as if by magic in the midst of a legislative bingo vote. It has been a long time coming.

It s about a state so corrupt on so many levels that it reached out and grabbed the attention of the federal government, as if by the scruff of the neck.

That s sort of the irony, I guess. The state is polarized over the potentially corrosive effects of gambling, but we don t see the seediest of the elements among us.

Our greasy-palmed government.

------------------------

John Archibald s column appears Sundays, Wednesdays and Fridays. Write him at jarchibald@ bhamnews.com.

---- Index References ----

Company: PAC

News Subject: (Government (1GO80); Legislation (1LE97); Local Government (1LO75))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (ABC MERIT PAC; ALABAMA STATE HOUSE; DEMOCRATIC JUSTICE DEPARTMENT; HOMECARE PAC; MANTRA GOVERNMENTAL; PAC; VEND PAC) (Bob Riley; Factor; Fridays; John Archibald; La La; Larry Langford; Paul Sanford; Republicans; Ronnie Gilley; Troy King; Write)

Word Count: 648

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

4/9/10 Birmingham News (AL) 1
2010 WLNR 7457073

Birmingham News (AL)
Copyright ©2010 Birmingham News. All Rights Reserved.

April 9, 2010

Volume 123
Section: LOCAL NEWS

PAC maze keeps Alabama in confusion

John Archibald

It s hardly an accident that Mantra Governmental LLC s Web site is illustrated by a picture of a maze.

No, no, no. Not because Mantra is some kind of cosmic tour guide through the labyrinth of Montgomery politics.

Mantra - and its president, Jarrod Massey - are more like the master maze builders.

Which way did he go? Which way did he go?

Massey, of course, has been questioned by federal agents in the influence-brokering probe of the Alabama Legislature. Money from his political action committees has filtered to lawmakers across the state, with backing by gambling powers such as Ronnie Gilley.

This week, some of Massey s campaign finance compadres started to rethink their, um, relationship.

'' We were misled,'' said Jay Reed, president of Associated Builders & Contractors of Alabama, Inc., which runs ABC Merit PAC to lobby for the construction industry.

ABC Merit PAC received money from five of Massey s PACs, but on Thursday Reed said he took steps to return $46,000 to those PACs and to a Gilley company.

Why? Because ABC did not want to be associated with gambling money, and felt bamboozled in the first place, Reed said.

Massey s PACs, Reed said, are simply not what they seemed.

He said Massey misrepresented Auto PAC as a group that supported automated industry, that Economy PAC represented economic development and Senior PAC looked after interests of senior citizens. Reed said Tech PAC was supposed to push for software and technological advances, and Thin Line PAC was sold as an advocate for police.

But it was gambling money, Reed said.

It was a maze.

Massey s lawyer, however, claims Reed was not misled. Brett Bloomston said Massey s PACs are merely pro-business PACs funded by much more than gambling.

But Tom Dart, president of the Automobile Dealers Association of Alabama, was also discomfited by one of Massey s PACs this week. Massey s Auto PAC was created - and green-lighted by the Secretary of State - under the same name Dart s PAC

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

has used since the mid1980s.

Which is annoying for Dart. It might be worse, I guess, for lawmakers such as Sen. Rodger Smitherman and Rep. Cam Ward. They took contributions from Dart' s Auto PAC and were stained by the brush of Massey' s.

As if PAC-to-PAC transfers weren' t labyrinthine enough.

The system is a lie.

And that' s the real tragedy. Rarely, in Alabama, have we seen a clearer example of why the shell game of PAC-to-PAC transfers really hurts this state.

This misdirection is, as Reed called it, the ° poster child ' for our ruin.

And in the midst of it all, one thing sits dead and forgotten in the Alabama House of Representatives:

That bill to ban PAC-toPAC transfers.

We need it now more than ever. But it is still lost.

Still stuck in the maze.

------------------------

John Archibald' s column appears Sundays, Wednesdays and Fridays. Write him at jarchibald@bhamnews.com.

---- Index References ----

Company: ADVANTA BANK CORP; ARAB BANKING CORPORATION B S C; ABC TAIWAN ELECTRONICS CORP; ABC INDÚSTRIA E COMÉRCIO SA; @ABC PLC; ABC GRUPI AS; ABC INC; ABC COMMUNICATIONS (HOLDINGS) LTD; ALTENLOH BRINCK AND CO GMBH AND CO KG; PAC

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (ABC; ABC MERIT PAC; ALABAMA HOUSE; AUTO PAC; AUTOMOBILE DEALERS ASSOCIATION; ECONOMY PAC; MANTRA; MANTRA GOVERNMENTAL LLC; MONTGOMERY; PAC; RONNIE; TECH PAC; THIN LINE PAC) (Brett Bloomston; Cam Ward; Dart; Fridays; Jarrod Massey; Jay Reed; John Archibald; Massey; Rarely; Reed; Rodger Smitherman; Tom Dart; Write)

Word Count: 566

**End of Document**    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

5/5/10 Press-Register (Mobile, AL) A10
2010 WLNR 10266991

Press-Register (Mobile, AL)
Copyright ©2010 Press-Register. All Rights Reserved. Used by NewsBank with Permission.

May 5, 2010

Section: A

Alabama may be No. 1 in corruption

EDITORIALS

Alabama may be No. 1 in corruption

ONCE AGAIN, a federal grand jury is meeting in Alabama to consider whether lobbyists and lawmakers have conspired to violate the public trust.

And once again, the Legislature failed to take any action that would raise ethical standards in state government and discourage corruption related to lobbying and campaign contributions.

The latest investigation reportedly centers on whether campaign donations were offered in exchange for "yes" votes on an electronic bingo bill.

The bill passed the Senate but failed in the House after FBI agents, federal prosecutors and state law enforcement officials informed key legislators that a probe was under way of possible corruption linked to the push to approve gambling.

That probe may not yield any indictments, much less convictions. But if it does unfold in a manner similar to the investigation of the two-year college system, Alabama could be poised to rise to the top of the national rankings in public corruption.

Recent national surveys have put Alabama in the top five for convictions related to public corruption. But if Bama hits No. 1 in this dubious category, don't expect state residents to yell, "Roll, crooks, roll!"

This is not the sort of thing that makes citizens' hearts swell with pride. Big corruption investigations usually result in a lot of politicians losing their jobs.

A major turnover in the Legislature may be what it takes to finally get meaningful ethics legislation passed.

For at least the past eight years, reformers have proposed bills to clean up the political landscape in Montgomery.

In every case, the bills have been blocked - usually by powerful Democrats in the Senate.

The centerpiece of government reform is a proposal to ban the routing of campaign contributions through a maze of political action committees. These PAC-to-PAC transfers hide the real identity of campaign donors.

Rep. Jeff McLaughlin, D-Guntersville, has repeatedly introduced bills to ban this sleazy practice, only to see his proposals quietly smothered in the Senate.

A number of other ethics proposals should be adopted by the Legislature, including a measure that would require lobbyists to

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

fully disclose how much money they spend wining and dining lawmakers.

But you can be sure nothing will happen unless the people sweep away some of the opponents of reform in November. Voters should carefully follow the issues related to corruption and reform, and keep a close eye on Alabama's standing in the crooked pol surveys.

---- **Index References** ----

Company: FBI SA; BAMA GRUPPEN AS; FRANCHISE BANCORP INC

News Subject: (Government (1GO80); Public Affairs (1PU31); Legislation (1LE97); Local Government (1LO75); Regulatory Affairs (1RE51))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (ALABAMA; BAMA; DEMOCRATS; EDITORIALS; FBI; LEGISLATURE; SENATE) (Alabama; Big; Jeff McLaughlin; Recent; Voters)

Edition: 02

Word Count: 410

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

7/6/10 Montgomery Advert. (Ala.) (Pg. Unavail. Online)
2010 WLNR 13496406

Montgomery Advertiser (AL)
Copyright ©2010 Montgomery Advertiser, Ala.

July 6, 2010

EDITORIAL: Gambling funds flow in campaign

July 06--" We have the best government money can buy," Mark Twain joked.

Political satirist Twain died 100 years ago, so he couldn' t have had Alabama' s current state elected officials and political candidates in mind when he wrote those words. But his words still fit today nonetheless.

Anyone who doubts the corrupting role of big money on the political process should consider this: Even with an ongoing public corruption probe of gambling and donations to legislators, gambling interests already have spent more than $4 million to support candidates for public office in the 2010 election cycle.

And the election is not even half over, with a primary runoff election and the general election still ahead.

The Birmingham News has reported that gambling interests have used at least 104 different political action committees to funnel campaign funds to candidates in dozens of political races, including candidates running for governor, the Legislature, the Alabama Supreme Court, and even the Jefferson County Commission.

With that much money flowing into the political process, it is no surprise that most of the legislation given serious consideration to greatly expand casino-style gambling in the state would have been a sweetheart deal for gambling interests if it had been passed by the state Legislature.

But it didn' t pass, so the state' s citizenry can expect the donation spigot to remain wide open through the remainder of the election cycle.

Just as troubling as the sheer amount of money is the number of political action committees involved. The only reason to use so many PACs -- one lobbyists controlled 47 of them -- is to try to hide the donations, or at least to make it difficult to link a particular gambling interest to a particular candidate.

But that is the purpose of campaign disclosure laws -- to allow the voters to know where specific candidates are getting their money.

However, it' s not just the number of PACs that is a problem. The lobbyists who control the PACs often intermingle the contributions with other funds and then shift those funds from one PAC to another to try to break the paper trail for the money.

William Stewart, a retired University of Alabama political science professor, told the News: " It hides the ultimate source. That helps candidates who don' t want to be seen as sympathetic with gambling."

Alabama desperately needs a stronger campaign disclosure law that limits the numbers of PACs and bans PAC-to-PAC transfers of campaign donations. But until that happens, the state' s voters should ask themselves if they want to support candidates who are more beholden to big contributors than to the average voter.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

10/5/10 Dothan Eagle (Ala.) (Pg. Unavail. Online)
2010 WLNR 19754346

Dothan Eagle (AL)
Copyright ©2010 Dothan Eagle, Ala.

October 5, 2010

Highlights from indictment of Gilley, Sen. Smith

Oct. 05--Highlights of the allegations included in the 65-page indictment of Ronnie Gilley, Sen. Harri Anne Smith, Milton McGregor, Thomas Coker, Robert Geddie Jr., Jarrod Massey, Larry Means, James Preuitt, Quinton Ross Jr., Jarrell Walker Jr., and Joseph Crosby.

-- Gilley and McGregor conspired to " provide campaign contributions, campaign appearances by country music celebrities, political polls, media buys, fundraising assistance, offers to pay money to opposition candidates in return for their withdrawal from races, and other things of value, to incumbent legislators and candidates for election to the Legislature... in return for supporting business interests of McGregor and Gilley by promising to vote for, and voting for, pro-gambling legislation."

-- McGregor and Gilley paid thousands of dollars to public officials and employees of the Legislature, including a legislative analyst for the Legislative Reference Service, in return for their assistance in drafting and passing pro-gambling legislation.

-- Smith and other legislators demanded payments and campaign contributions from McGregor and Gilley and lobbyists working for them in return for their votes and support of pro-gambling legislation.

-- Those involved attempted to conceal what was going on by using telephones obtained in the names of others, having face-to-face meetings, falsifying business records, providing falsified documents in response to grand jury subpoenas, and making false statements to law enforcement.

-- Jarrod Massey, a lobbyist employed by Gilley, met with an unnamed legislator to discuss a plan to funnel $1 million per year, to be used at that legislator' s discretion, through a public relations job set up in connection with a public relations firm employed by Gilley in order to conceal that McGregor and Gilley were going to pay that legislator.

-- The sponsor of SB380, which dealt with electronic gaming, asked McGregor for permission to retaliate against an unnamed legislator for not supporting the bill and saying, in part... " there will be no peace... We' re coming after your ass."

-- Gilley complained to McGregor about the amount of time he had spent with the unnamed legislator and stated, " to end up doing me the way he did me was wrong... Under normal circumstances, I would beat his ass."

-- On March 24, Massey and Gilley were discussing Sen. Larry Means, who allegedly asked for $100,000 if he voted for the bill. Gilley told Massey " he can 100 percent count on our support. We' re gonna support who supports democracy. And the (expletive) who doesn' t support democracy get ready to get their (expletive) ass busted."

-- On March 21, Gilley told Walker to promise Preuitt that " we' ll have celebrities come in here and support you and we' ll blow the competition away. We will, we' ll wax their ass, but you (Preuitt) got to vote for us on this.. Gilley also told Walker " You can buy a damn fleet (of vehicles) from him (Preuitt) if you have to while you' re there." Preuitt owns an automobile dealership in Talladega

-- On March 23, Gilley told Walker he would bring a famous country music star to Preuitt' s dealership to " buy trucks."

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

-- On March 24 Massey, after discussing whether he should spent $20,000 of Gilley's money to pay for a poll for Preuitt, told an unnamed lobbyist, " Course at this point the way we're spending money, I don' t, I, I say just go ahead and do it, and if he damn don' t vote for us, we' ll kill his ass, we' ll, we' ll, or we' ll (expletive) up the results in the poll and put him out to press."

-- After introducing a bill on April 3, 2008, which would have barred Gilley and Country Crossing from conducting bingo-related business in Houston County, Smith accepted 39 corporate checks totaling $19,500 from Gilley, which were deposited into her campaign account. She later accepted $160,000 in additional campaign contributions from Gilley's business associates. Gilley also made a $217,000 in-kind contribution to Smith's campaign for a country music concert and fundraiser. Smith also received other money between December and March from PACS associated with gambling interests.

-- March 22, Gilley asked Smith to convince other legislators to support pro-gambling legislation and Smith agreed. Gilley and Smith discussed concealing Gilley's contribution by running it through a PAC.

-- On March 24, Gilley wrote checks totaling $200,000, to four separate PACS, with the money intended to go to Smith. Smith failed to report this contribution on campaign disclosure forms, in violation of Alabama law.

-- Around April 3, Walker told Massey that Smith " needs to step up to the damn plate" and support additional general legislation beneficial to Country Crossing to reciprocate for all the support Smith had received from them.

-- March 15 and 26, Gilley ordered phones in another person' s name to hide his identity as the true user of the telephone.

-- March 30, Gilley committed $500,000 to a particular legislator, who was likely to miss the vote on SB380 due to illness. That legislator showed up and voted in favor of SB380.

-- Smith solicited and agreed to accept $400,000 for her campaign from Gilley, intending to be influenced and rewarded in connection with an upcoming vote on pro-gambling legislation.

-- Along with the allegations made in the indictment, the government is seeking, upon conviction, forfeiture of property from Harri Anne Smith and from Ronnie Gilley equal to $200,000.

---- Index References ----

Company: PAN ARAB CONTINENCE SOCIETY; PAC

News Subject: (Government (1GO80); Legislation (1LE97); Lobby & Pressure Groups (1LO18); Local Government (1LO75))

Region: (North America (1NO39); Americas (1AM92); USA (1US73))

Language: EN

Other Indexing: (GILLEY; LEGISLATIVE REFERENCE SERVICE; LEGISLATURE; MCGREGOR; PAC; PACS; RONNIE GILLEY) (Anne Smith; Country Crossing; Harri; Harri Anne Smith; Highlights; James Preuitt; Jarrell Walker Jr.; Jarrod Massey; Joseph Crosby; Larry; Massey; Preuitt; Quinton Ross; Robert Geddie; Smith; Thomas Coker; Walker)

Ticker Symbol: NYSE:MEE

Word Count: 853

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

10/6/10 Huntsville Times (Huntsville, AL) 11A
2010 WLNR 19963125

Huntsville Times (Huntsville, AL)
Copyright ©2010 The Huntsville Times. All Rights Reserved.

October 6, 2010

Section: Local News

Montgomery's sordid tales

Mike Hollis

One of the startling passages in federal indictments alleging vote-buying in the Legislature reports a conversation between indicted casino owner Milton McGregor and a lawmaker shepherding McGregor's Sweet Home Alabama bingo bill in the Legislature.

In the discussion, the lawmaker asks McGregor for permission to strong-arm another legislator to support the bill:

"Toward the end of the day on or about March 2, 2010, the sponsor of SB380 asked McGregor for permission to retaliate against Legislator 2 and other legislators who did not support the bill. During the conversation, the legislator stated, " I ... want your authority ... I mean the collective authority ... to say, if you (expletives) us on this [legislation] ... there will be no peace. ... We' re coming after your (expletive)." McGregor responded, " Big man, let me tell you, I don' t even have to think about it. You' ve got mine. ..."

Somehow, the relationship between a lawmaker and someone he is trying to help has been turned upside down. No criminal wrong-doing seems to be attached to this conversation, but it is another example of why people grow cynical and disgusted about politics.

None of the indictments against 11 people arrested Monday in the investigation are convictions. The defendants remain innocent unless a jury decides otherwise.

Nonetheless, another of the more surprising accusations is that the scheme extended beyond vote-buying into the Legislative Reference Service, which helps lawmakers write bills. There, an employee, Joseph R. Crosby, allegedly received $3,000 a month for an unspecified time to make changes to gambling legislation to help McGregor keep his Victoryland casino open. The Legislative Reference Service is a clearinghouse for bills to ensure they meet legal muster.

Another allegation is that then-Republican Sen. Harri Anne Smith (now an Independent) of Slocomb in 2009 offered a House member hundreds of thousands of dollars in campaign donations to vote for a pro-gambling bill. When was the last time you heard that a lawmaker, instead of being accused of taking a bribe, had been charged with trying to buy a colleague' s vote?

Did you ever wonder how much it might cost to buy a lawmaker' s vote? According to the indictments, that could be as little as $5,000 to an offer of as much as $2 million in campaign support and the use of country music stars in a re-election campaign. One lawmaker was allegedly offered $1 million that would have been funneled through a public relations job. That way the recipient wouldn' t have to spend the money on campaign expenses.

Even if the accused are not convicted, the investigation has produced the most sordid allegations against the Legislature in many decades, if not its history.

In their next session, one of the first things lawmakers must address are the loopholes that allow special interests to launder their political contributions through political action committees.

The public deserves to know the origin of every dollar that goes into every campaign. This way we may at least have a clue who is calling the shots.

By Mike Hollis, for the editorial board. E-mail: mike.hollis@htimes.com

---- **Index References** ----

News Subject: (Government (1GO80); Legislation (1LE97); Local Government (1LO75); Regulatory Affairs (1RE51))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73); U.S. Southeast Region (1SO88))

Language: EN

Other Indexing: (LEGISLATIVE REFERENCE; LEGISLATIVE REFERENCE SERVICE; SWEET HOME ALABAMA; VICTORYLAND) (Harri Anne Smith; Joseph R. Crosby; McGregor; Mike Hollis; Milton McGregor; Montgomery; Nonetheless)

Keywords: EDIT; INDICTMENT; GAMBLING; ALABAMA LEGISLATURE

Edition: 2

Word Count: 510

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

10/10/10 Huntsville Times (Huntsville, AL) 16A
2010 WLNR 20493649

Huntsville Times (Huntsville, AL)
Copyright ©2010 The Huntsville Times. All Rights Reserved.

October 10, 2010

Section: Editorial

An evil shadow government

JOHN PECK

State Rep. Jeff McLaughlin is Alabama' s version of" Linus in the pumpkin patch."

Year in and year out, the Guntersville Democrat has watched forlornly as his bill to outlaw the funneling of campaign donations through political action committees passes the Alabama House but never sees the light of day in the Senate.

Like Linus waiting for the Great Pumpkin, McLaughlin retains hope his campaign reform bill will rise past the wicked spirits in the Statehouse.

McLaughlin is a pariah of sorts in the Alabama Legislature. Since his election in 2000, he has steadfastly refused to accept campaign money from PACs and any other group or individual.

He' s also been the chief sponsor of bills that would end what is essentially a legal money laundering scheme in Montgomery. Special interest groups use PACs to funnel millions of dollars into the campaigns of politicians who don' t want voters to know who is backing them.

PAC transfers are at the crux of the federal gambling probe that netted nearly a dozen indictments last week of legislators, lobbyists and casino owners. Prosecutors allege millions of dollars in campaign contributions, a $1 million a year job offer and other election-year assistance were offered in exchange for critical" yes' votes on controversial gambling legislation.

The campaign cash would be funneled to lawmakers through multiple transfers between PACs, making it virtually impossible to trace to the original donor.

Until the Legislature passes tougher ethics and campaign disclosure laws, voters can expect more of these kinds of shenanigans.

McLaughlin, an attorney, arrived in Montgomery the way many freshmen lawmakers do: with high expectations he could make a difference. He bucked the status quo by refusing all political donations and leading the charge to reform the state' s lax campaign disclosure laws.

Now in his fourth campaign, he still refuses political donations, relying instead on an $11,000 budget from his own pocket and help from an army of volunteers to spread his message.

That Alabama could have more lawmakers like McLaughlin who refuse political contributions or at least disclose specifically the interest that gave it.

The PAC shell game evolved soon after lawmakers - pressured by newspapers and other groups - passed campaign disclosure laws in 1988 requiring them to reveal their contributions.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

Former Alabama Secretary of State Jim Bennett said PACs grew like newborn rabbits soon after the Fair Campaign Practices Act he helped author passed.

Lobbyists who control the PACS found that by creating numerous PACS and transferring and co-mingling contributions multiple times, voters couldn't detect how much influence they or their clients may wield over a particular officeholder. And to deceive the public even more, many of the PACs took on meaningless names like Alabama Citizens for Common Sense PAC, Children's PAC, or Citizens for Good Government PAC.

"We never envisioned all this PAC-to-PAC transfer business going on," Bennett told The Times in a previous interview. " I can't very well defend a practice that is just outright laundering of money for the sole purpose of keeping" voters from knowing its source. " You have PAC A gives to PAC B and PAC B to PAC C and C to D. The candidate has D's money, but in fact it came from A. That's a smoke-and-mirrors game."
This newspaper has long been on record against campaign disclosure loopholes that gave birth to runaway PAC transfers. We again implore lawmakers to end this legal bribery system.

Voters can only hope that the recent gambling probe may finally provide the momentum to do so.

By John Peck for the editorial board. E-mail: john.peck@htimes.com

---- **Index References** ----

Company: PAN ARAB CONTINENCE SOCIETY; PAC

News Subject: (Government (1GO80); Legislation (1LE97); Lobby & Pressure Groups (1LO18))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73); U.S. Southeast Region (1SO88))

Language: EN

Other Indexing: (ALABAMA; ALABAMA HOUSE; ALABAMA LEGISLATURE; COMMON SENSE PAC; FAIR CAMPAIGN PRACTICES; GOOD GOVERNMENT PAC; GREAT PUMPKIN; GUNTERSVILLE DEMOCRAT; LEGISLATURE; LINUS; PAC; PACS; SENATE; STATE REP) (Bennett; Children; Jeff McLaughlin; Jim Bennett; John Peck; McLaughlin)

Keywords: EDIT; ALABAMA LEGISLATURE; CAMPAIGN CONTRIBUTIONS

Edition: 2

Word Count: 599

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

10/17/10 Press-Register (Mobile, AL) A17
2010 WLNR 21170277

Press-Register (Mobile, AL)
Copyright ©2010 Press-Register. All Rights Reserved. Used by NewsBank with Permission.

October 17, 2010

Section: A

PAC-to-PAC transfers breed corruption

GLEN BROWDER

Special to the Press-Register

*PAC-to-PAC transfers breed corruption*

Alabamians can end the 'sale' of democracy once and for all

By GLEN BROWDER

Special to the Press-Register

" We re gonna support who supports democracy. And the (expletive deleted) who doesn t support democracy [should] get ready to get their (expletive deleted) (expletive deleted) busted."

Please pardon the coarse language conveyed on the pages of a family newspaper. Or, more accurately, pardon the wiretapped gutter-talk of one of the indicted gambling bosses who, allegedly, almost passed their crooked legislation on Goat Hill in Montgomery.

Ironically, their conversations - electronically taped by the U.S. Justice Department - indicate that powerful gambling interests came pretty close to "buying democracy" with a secret, illegal conspiracy for getting a public vote on the electronic bingo issue.

I shudder to think how far they might have gone to sway that election if the FBI had not intervened.

Of course, everyone is innocent until proven guilty; and in fact, many people sincerely view this whole deal as a partisan attack to affect next month s elections.

But those wiretapped transcripts, if accurate, tell an outrageous tale about the sad state of politics in Alabama.

I ll skip the details, other than noting for the record that the Justice Department indictment charges 11 individuals - legislators, lobbyists, businessmen and their associates - with conspiracy, bribery, extortion, money laundering, fraud, obstruction of justice and making false statements.

Instead, I want to focus attention on the practice of PAC-to-PAC transfers that encourage, facilitate and enhance such corrupt actions.

Rich, powerful special interests commonly shuffle money from one political action committee to another, and on to another, and on to another, allowing them to exercise vast influence in campaigns and the lawmaking process without the public

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

having a clue about their nefarious politicking.

In a way, it's humorous reading what the conspirators apparently said on the tapes about "supporting democracy" while hiding their bribery through multiple PACs; but it's not funny when you realize that this scam almost succeeded.

PAC-to-PAC abuse may or may not be illegal, but it surely encourages bad politics in Montgomery.

The high cost of campaigning and sorry rules-of-the-game pressure politicians and lobbyists to play along; and even honest, decent people get tangled in the web of public deception.

There currently are 859 PACs registered in Alabama; and the whole system is ripe for corruption as charged in the federal indictment.

But democracy in Alabama does not have to work this way. We can never eliminate the possibility of corruption, but we can make it harder on corrupt politicians, lobbyists and special interests by correcting the PAC-to-PAC problem.

I was secretary of state in 1987, when we passed the Alabama Fair Practices Act, and I can speak for myself and both sponsors - Rep. Jim Campbell and Sen. Jim Bennett - in attesting that we did not intend to allow such shenanigans as PAC-to-PAC transfers to subvert the democratic process.

But attorney general opinions in 1989 and 1991 opened the door to this practice, and mass political malfeasance has tainted legitimate politicking ever since. Now, to repeat a comment Bennett made recently, "I cannot very well defend a practice that is just outright laundering of money."
There are several ways whereby we might put an end to this buying of democracy in Alabama. They include:

*A court challenge - The Alabama Fair Campaign Practices Act was designed to prohibit corrupt money-laundering; and I strongly believe that those attorney general opinions of 1989 and 1991 are simply weak interpretations of the act's intent and wording, and have no solid legal authority.

A federal judge decreed just last year on another issue that the Alabama Constitution and the Code of Alabama are the law: "These governing laws do not authorize the attorney general of the state of Alabama to legalize otherwise-illegal activity, or to declare any particular activity to be legal."

Furthermore, he ruled, "Even written opinions of the attorney general in accordance with Alabama Code are not binding statements of law, but merely advisory, and do not have the effect of law."

Some civic-minded citizen needs to seek court clarification and guidance about PAC-to-PAC transfers in light of this logic and current corrupt practices.

*A new legal opinion - A simpler option is getting the Alabama attorney general to re-examine the issue of PAC-to-PAC transfers.

It is acceptable practice for state officials to ask for updated interpretations of previous opinions; and this issue certainly merits reconsideration.

Fortunately, Democrat James Anderson and Republican Luther Strange are now running for the position as Alabama's top legal counsel, and I imagine they'd be responsive to our pleas in light of the recent indictments and as Election Day approaches.

*Legislative action - Of course, the most obvious solution to the current problem is for the Legislature to pass a new law specifying that PAC-to-PAC transfers are illegal.

State Rep. Jeff McLaughlin has waged a valiant struggle for this cause over the years, but this fight will not be won until the leadership of both the House and Senate take responsibility for pushing through PAC reform.

Fortunately, again, Democrat Jim Folsom and Republican Kay Ivey are heatedly competing for lieutenant governor, and all legislative candidates are on next month's ballot. So this would be a good time to secure their commitments to do more than lip service.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

*Executive pressure - Barring other options, the governor of Alabama is the single critical figure in changing this shell game. Previous chief executives have voiced general support, but it is going to take determined leadership to force PAC reform through the Legislature.

Republican Robert Bentley and Democrat Ron Sparks have both staked out positions on corruption and reform. Now, let s get them to pledge publicly - before the election - that they ll not sign any other bills into law until a PAC-to-PAC ban is delivered to the governor s office.

The current tale of crooked politicians, lobbyists and special interests " buying democracy" in Montgomery is as sad as it is outrageous. We can never fully cleanse politics, but we have several options for correcting the money-laundering game that encourages corruption.

We need to challenge the prevailing legal opinion in court, and we need to press the candidates for governor, lieutenant governor, attorney general and the Legislature to skip the rhetoric and stop PAC-to-PAC transfers.

Glen Browder, Ph.D., is emeritus professor of American democracy at Jacksonville State University. He is a former U.S. congressman, Alabama secretary of state and state legislator, and he is considered the father of the Alabama Fair Campaign Practices Act. His e-mail address is browder@jsu.edu.
CUTLINES:

AP photo

Customers play the machines at VictoryLand in Shorter, Ala., earlier this year. Milton McGregor, owner of VictoryLand and a financial backer of Country Crossing casino in Dothan, was indicted along with 10 others earlier this month for his alleged role in PAC-funded schemes to buy and sell votes in the Alabama Legislature to pass Senate Bill 380. The proposal would have let voters decide whether to allow a limited number of bingo casinos to operate across the state.

QUOTE

Rich, powerful special interests commonly shuffle money from one political action committee to another, allowing them to exercise vast influence in campaigns and the lawmaking process without the public having a clue.

---- Index References ----

Company: FBI SA; JACKSONVILLE STATE UNIVERSITY (INC); FRANCHISE BANCORP INC; PAC; JUSTICE DEPARTMENT

News Subject: (Social Issues (1SO05); Criminal Law (1CR79); Legal (1LE33); Financial Fraud (1FI18); Public Affairs (1PU31); Fraud (1FR30); Legislation (1LE97); Lobby & Pressure Groups (1LO18); Judicial (1JU36); Crime (1CR87); Corruption, Bribery & Embezzlement (1EM51); Government (1GO80); Local Government (1LO75); Regulatory Affairs (1RE51))

Region: (Alabama (1AL90); North America (1NO39); USA (1US73); Americas (1AM92); U.S. Southeast Region (1SO88))

Language: EN

Other Indexing: (AP; CODE; CUTLINES; FBI; JACKSONVILLE STATE UNIVERSITY; JUSTICE DEPARTMENT; LEGISLATIVE; LEGISLATURE; PAC; QUOTE; REPUBLICAN KAY IVEY; REPUBLICAN LUTHER STRANGE; REPUBLICAN ROBERT BENTLEY; STATE REP; US JUSTICE DEPARTMENT) (Alabamians; Barring; Bennett; Democrat; Democrat Ron; GLEN BROWDER; Ironically; James Anderson; Jeff McLaughlin; Jim Bennett; Jim Campbell; Jim Folsom; Milton McGregor; Rich)

Keywords: INSIGHT; GAMBLING

Edition: 01

Word Count: 1223

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

10/27/10 Press-Register (Mobile, AL) A8
2010 WLNR 21659461

Press-Register (Mobile, AL)
Copyright ©2010 Press-Register. All Rights Reserved. Used by NewsBank with Permission.

October 27, 2010

Section: A

PAC money makes it seem justice is for sale

PAC money makes it seem justice is for sale

Huey Long on the campaign trail and Solomon in the courtroom?

AS LONG as state Supreme Court justices have to raise money - sometimes lots of it - to win their seats, justice in Alabama is going to look like it' s for sale.

That perception may or may not be true. What' s clear, however, is that in order to become a justice, one must first become a candidate. And as a candidate, that person has to sell his or her political brand to the voters and to donors.

In Alabama, campaigning for the high court is an expensive and partisan proposition. Even though campaign spending is lower this year - perhaps because one party is seen as dominating - the state has had the nation' s costliest (and nastiest) supreme court races since the early 1990s. In fact, Alabama' s 2006 race was the most expensive high court election ever, according to the advocacy group Justice at Stake.

To raise the money necessary to win a hotly contested race, a candidate has to hit the road, shake a lot of hands and ask for a lot of money. Donors may not necessarily seek to sway the court' s opinion on a certain case, but they may very well want to back a certain political bent.

Bert Brandenburg, Justice at Stake' s executive director, had this to say on the subject: " As long as we' re asking more judges to dial for dollars from the people who appear before them, then the more we' re asking judges to act like Huey Long on the campaign trail and then turn around and act like Solomon in the courtroom," he told NPR' s " Morning Edition."

The perception problem in Alabama is magnified by the state' s love affair with political action committees and PAC-to-PAC transfers. If justice were for sale here, voters would be the last ones to know: Candidates and donors can legally steer contributions - and hide them at the same time - by transferring the money through a series of PACs.

Supreme Justice Tom Parker got into hot water recently when it was disclosed that a PAC linked to his re-election campaign got money from a PAC that takes contributions only from gambling interests.

To prove his independence from gambling, Justice Parker vowed to return the $8,000. But thanks to PAC-to-PAC transfers, there' s no way to tell whether he knew about the connection beforehand or not.

Meanwhile, Justice Mike Bolin raised $582,380 for his re-election campaign, with a whopping 86 percent coming from four pro-business PACs.

What kind of influence might such donations have on the high court? Maybe some. Maybe none. Who knows?

Ex. B, Selected News Articles, 1993-2011
318

As long as the litmus test for Alabama Supreme Court justices is how well they can fund a political campaign, then the state's going to be stuck with the reputation - or at least the perception - that it tolerates tainted justice.

---- **Index References** ----

Company: JUSTICE; NIPPON PETROLEUM REFINING COMPANY LIMTED; PAC

News Subject: (Legal (1LE33); Government (1GO80); Lobby & Pressure Groups (1LO18); Judicial (1JU36))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73); U.S. Southeast Region (1SO88))

Language: EN

Other Indexing: (ALABAMA SUPREME COURT; JUSTICE; JUSTICE PARKER; NPR; PAC; SUPREME COURT; SUPREME JUSTICE TOM) (Alabama; Bert Brandenburg; Huey Long)

Keywords: OPINION PAGE; EDITORIAL PAGE; EDITORIAL; MOBILE/BALDWIN EDITION

Edition: 02

Word Count: 486

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

10/31/10 Dothan Eagle (Ala.) (Pg. Unavail. Online)
2010 WLNR 21771563

Dothan Eagle (AL)
Copyright ©2010 Dothan Eagle, Ala.

October 31, 2010

Shell game: PAC-to-PAC transfers hide funding sources, destinations

Jim Cook

Dothan Eagle, Ala.

Oct. 31--If you want to see a good disguise this Halloween, try taking a look at the sources of your local legislator's campaign funding.

More than $100 million was funnelled to candidates for the Alabama House and Senate and other statewide offices over the past four years from political action committees, much of it in a process known as PAC-to-PAC transfers. These transfers make unmasking the true source of a candidate or political advertiser's funding nearly impossible.

PACS, or political action committees, are organizations that collect donations from individuals, companies or interest groups and then use the money to make donations to candidates or to pay for political advertising or activities. PAC-to-PAC transfers move money from one PAC to another, usually with the intent of obscuring the original source of the funding.

There are at least 1,100 PACS operating in Alabama, 300 of which were formed during the current election cycle.

How it works

If an individual or business wants to make a $500 donation to a particular candidate, but having a contribution on the books in their name would be embarrassing for some reason, they can donate that money to a PAC. Often that PAC will also collect donations from other individuals and businesses. The money collected might then be transferred to a second PAC, which would make the $500 donation to the candidate. In some cases, the original donation might be transferred to several PACs before it makes it to the candidate who the original donor had intended to be the recipient.

Because the money has changed hands and has been co-mingled with other money, it's hard for the public to discern who's really backing who. But there are at least two people who know.

"The giver and receiver both know it," said Jeff McLaughlin, a Democratic member of the Alabama House who has sought for years to ban PAC-to-PAC transfers.

McLaughlin has introduced legislation 10 times that would ban PAC-to-PAC transfers. McLaughlin has managed to get his bill passed by the House eight times, but it invariably dies in the Senate, where it is regularly bottled up in committees or *exiled to the nether regions of the Legislature's calendar where it becomes part of the Senate's unfinished business each year.*

McLaughlin said there's little desire by either party to see a PAC-to-PAC ban because senators don't want to bring down the system that has put them in office and kept them in office.

Following the records

Ex. B, Selected News Articles, 1993-2011
283

The Alabama Secretary of State' s website lists campaign records for candidates for state office, the donations they received, and their expenditures.

If you look at a candidate' s list of contributions, you' ll often see donations from PACs, but with more than 1,100 PACs in Alabama, a PAC s name or acronym tells you little about why it donates thousands of dollars to a candidate.

If you use the same website to look at a PAC that contributed to a candidate, you' ll often see that the PAC actually received its money from other PACs. To find out where those PACs received their money, you have to further research their sources of funding. By then, money has been transferred a few times and co-mingled with other donations, so it is hard to pinpoint exactly where a donation actually originated.

An example would be a $4,000 donation received by former House Dist. 87 candidate Vickie Moore, who announced on July 28 that she was withdrawing as the Democratic candidate, leaving only Republican Donnie Chesteen on the ballot.
The Secretary of State' s website shows Moore accepted two $4,000 donations on July 30, including one from ALABEZ PAC.

According to the same records, ALABEZ PAC received contributions from six different PACs on July 23. All of those PACs list the same address in Montgomery. Of those six PACs, one called Boat PAC made a $4,000 donation to ALABEZ. If you then look at Boat PAC s records, you find that on June 29, it received a $10,000 donation from the Poarch Band of Creek Indians.

So, did the $4,000 contribution Moore received from ALABEZ PAC originate from the Poarch Band of Creek Indians, which operate casinos in Alabama?

When called Friday morning by the Dothan Eagle and asked about the ALABEZ donation, Moore said she' d have to check her campaign finance records, but she didn' t return the phone call or answer her phone when called again Friday afternoon.

Why reform is needed

According to the Alabama Policy Institute, a conservative-leaning, non-profit, non-partisan research organization, a PAC-to-PAC ban is necessary to improve transparency and accountability in government.

Jeff Fink, Alabama Policy Institute chief operating officer, said PAC-to-PAC transfers allow legislators and candidates for office to play it fast and loose with the truth, taking up one position publicly, and then secretly taking money from an organization on the other side of the issue and voting for them.

The practice also leads to deceptive advertising campaigns that muddy the waters concerning candidates and issues.

Consider former Alabama gubernatorial candidate Bradley Byrne. During the Republican primary, the Alabama Education Association funded a PAC called The True Republicans, which ran ads against Byrne. The state' s Republican party leaders later forced the group to drop that name, according to The Birmingham News.

" Having PACS isn' t the problem," said Betty Peters, a state school board member and opponent of PAC-to-PAC transfers. " The problem is hiding the facts with PACs."

Fink said the recent indictments of Alabama legislators, businessmen and lobbyists may finally be the big push the Legislature needs to ban PAC-to-PAC transfers. Or not.

The Alabama Legislature may not move to ban PAC-to-PAC transfers, but the Alabama Policy Institute has taken steps to throw a little more light on the subject. The organization has recently created a database at www.alabamarighttoknow.org that can be used to track where PACs and legislators get their money from. Although it can' t unravel the spool of PAC-to-PAC transfers back to their source, it can help citizens learn a little bit about where legislators' funding is coming from.

Fink said the site is superior to campaign finance reports on the Alabama Secretary of State' s website because it is presented in a format that' s easier to understand and research.

Beyond banning PAC-to-PAC transfers, Fink said other reforms are needed, including the elimination of handwritten campaign finance reports. Fink said candidates should have to submit reports in an electronic format that would be easier for citizens to read and research.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

"It boils down to transparency," Fink said. " We need to have a greater level of transparency. Eliminating PAC-to-PAC is a step in the direction of raising the bar for elected officials."

---- Index References ----

Company: PAN ARAB CONTINENCE SOCIETY; ALABAMA EDUCATION ASSOCIATION; PAC

News Subject: (U.S. Congressional Campaigns (1US07); Government (1GO80); Public Affairs (1PU31); Legislation (1LE97); Lobby & Pressure Groups (1LO18); Local Government (1LO75); Regulatory Affairs (1RE51))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73); U.S. Southeast Region (1SO88))

Language: EN

Other Indexing: (ALABAMA; ALABAMA EDUCATION ASSOCIATION; ALABAMA HOUSE; ALABAMA LEGISLATURE; ALABAMA POLICY INSTITUTE; ALABEZ; ALABEZ PAC; BOAT PAC; DEMOCRATIC; DOTHAN EAGLE; HOUSE; LEGISLATURE; PAC; PACS; POARCH BAND OF CREEK; SENATE) (Betty Peters; Bradley Byrne; Byrne; Fink; Jeff Fink; Jeff McLaughlin; McLaughlin; Moore; Shell; Vickie Moore)

Ticker Symbol: NYSE:RDS.A

Word Count: 1125

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

11/27/10 Press-Register (Mobile, AL) A8
2010 WLNR 24020206

Press-Register (Mobile, AL)
Copyright ©2010 Press-Register. All Rights Reserved. Used by NewsBank with Permission.

November 27, 2010

Section: A

*Campaign Finance Reform The devil is in the loopholes EDITORIAL*

Campaign Finance Reform The devil is in the loopholes

EDITORIAL

By cmcphail

Funneling cash through a series of PACs makes it virtually untraceable, so the public remains in the dark about any influence *that the special interest has on the candidate.*

WATCH THE loopholes, legislators.

When Gov. Bob Riley calls a special session on ethics reform, you can bet that the special interests will try to come up with new, improved ways of hiding campaign contributions. Let s make sure that when one loophole is tamped down, another doesn t suddenly pop up somewhere else in the law.

The chief offender right now is the allowance of PAC-to-PAC transfers. Legislators can make eliminating this loophole their *top priority. They can keep the state s 859 political action committees, but they must eliminate the transfers - with no* exceptions for political parties or legislative caucuses.

PAC-to-PAC transfers are the closest thing yet to legalized money laundering. This is how the scheme works: Say a special interest in Alabama wants to give a candidate money but wants to keep it out of sight of the voters. The special interest gives the money to a PAC, which gives it to another PAC and another PAC and so on, until the donation arrives in the hands of the targeted candidate.

Funneling the cash through a series of PACs makes it virtually untraceable, so the public remains in the dark about any influence that the special interest has on the candidate. And therein lies the ethics problem.

Allowing PAC-to-PAC transfers was a loophole created by attorney general opinions in 1989 and 1991 after the passage of the Alabama Fair Campaign Practices Act. The sponsors of that act will tell you today that they didn t intend to allow such shenanigans to subvert the democratic process. But the special interests found a way nonetheless.

Consider the Alabama Education Association s wily use of a " 527 organization" it created and named the Conservative Coalition of Alabama. This is the organization the AEA employed earlier this year to mount an ad blitz against gubernatorial candidate Bradley Byrne.

As a 527 organization, the Conservative Coalition didn t have to register with the secretary of state and report its donors before the election, as PACs do. So the coalition was able to attack Mr. Byrne and keep voters in the dark until it was all over. That s yet another example of the loophole-style weaponry being added to the arsenals of the special interests.

Given such gun power, should Alabama s newly-elected, fresh-faced legislators surrender before the battle even begins? Of course not.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

Or should they require their colleagues to take the high road sought by former state Rep. Jeff McLaughlin of Guntersville, and refuse all campaign contributions? Though attractive on its face, it's not a realistic alternative, either.

This year, legislators can be fearless simply because they are backed up by an electorate that is sick of corruption and scandals.

They have been sent to Montgomery with a strong mandate. Voters want a change in the way government works, and they want it now

When lawmakers are called to a special session on ethics reform, they can answer with vigilance against special interests' dirty tricks and finally deliver the kind of positive change voters want.
CUTLINES:

NICK ANDERSON/The Houston Chronicle

---- **Index References** ----

Company: METALLBAU NICK GMBH; MONTGOMERY WINN DIXIE INC; ALABAMA EDUCATION ASSOCIATION; AEA INVESTORS LLC; HOKURIKU KENZAISYA INC; MONTGOMERY STREET INCOME SECURITIES INC; PAC

News Subject: (Government (1GO80); Public Affairs (1PU31); Political Parties (1PO73); Legislation (1LE97); Lobby & Pressure Groups (1LO18))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73); U.S. Southeast Region (1SO88))

Language: EN

Other Indexing: (AEA; ALABAMA; ALABAMA EDUCATION ASSOCIATION; ALABAMA FAIR CAMPAIGN PRACTICES; CAMPAIGN FINANCE REFORM; CONSERVATIVE COALITION; CONSERVATIVE COALITION OF ALABAMA; CUTLINES; EDITORIAL; MONTGOMERY; NICK; PAC; WATCH) (Bob Riley; Bradley Byrne; Byrne; Funneling; Jeff McLaughlin)

Edition: 02

Word Count: 549

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

12/2/10 N.Y. Times A20
2010 WLNR 23902765

New York Times (NY)
Copyright ©2010 The New York Times Company

December 2, 2010

Section: A

Ethics Plan Is Offered By Governor In Alabama

CAMPBELL ROBERTSON

Alabama Gov Bob Riley calls special session of Legislature to address several loopholes in state ethics laws, some of which are at root of corruption indictments of four State senators (M)

Less than two months after a federal corruption investigation led to the arrest of four state senators, Gov. Bob Riley of Alabama announced Wednesday that he was calling a special session of the Legislature this month and urged lawmakers to pass an aggressive ethics overhaul package.

The proposal that the governor unveiled would address several loopholes in state ethics laws, some of which are at the root of recent corruption indictments.

'' The opportunity to enact real reforms has never been better, and the need has never been greater,' ' the governor said in a statement.

Mr. Riley, a Republican who will leave office in January and is prevented by term limits from running again, called for the special session to begin next Wednesday.

Efforts at an ethics overhaul have for the most part faltered in Alabama since the nationwide wave of state ethics initiatives that followed the Watergate scandal in the 1970s. Some rules were strengthened in the mid-1990s, but large gaps have remained.

'' I think it s just been institutional resistance,' ' said James L. Sumner, the director of the Alabama Ethics Commission. ° You could never actually single out a person or a group that was opposed to ethics reform. It was essentially death by a thousand cuts.' '

Law enforcement has stepped in where ethics rules fell short. One governor, Guy Hunt, resigned after a felony conviction on charges that included theft. Another, Don Siegelman, is appealing a bribery conviction. Two wide-ranging federal corruption investigations in the last few years have led to the arrest, conviction or guilty pleas of numerous state officials.

As recently as October, 11 people were arrested, including four lawmakers and three lobbyists, on charges related to what the authorities called a scheme by casino operators to buy votes for legislation favorable to gambling.

This drumbeat of scandal has made the prospects for a substantial ethics overhaul as good as they have been in years. The state government is also firmly in the control of the Republicans for the first time in more than a century, giving the party s legislators an incentive to act on a broadly popular issue.

The most significant proposal in the ethics package, in Mr. Sumner s estimation, involves the state s campaign finance laws, which have gained a national reputation for looseness due largely to the presence of so-called P.A.C.-to-P.A.C. transfers.

Ex. B, Selected News Articles, 1993-2011

Currently, a donation to one political action committee can be bundled with other donations and given to another committee, and then to another, a process that essentially launders campaign donations and renders their origins untraceable. The ethics package would ban such transfers.

Other proposals are aimed at curtailing the influence of lobbyists, one of the core issues of the federal vote-buying inquiry. Currently, lobbyists, or anyone for that matter, can more or less spend as much as they want on hospitality, meals, travel, tickets and other gifts for public officials. Spending that adds up to less than $250 a day does not even have to be disclosed.

The proposed overhaul would, with some exceptions, put a $25 limit on gifts to a public official on any one occasion, and a $100 limit on gifts to an official from one source per year. All spending would have to be disclosed.

The package would also give the state ethics commission the power of subpoena for the first time, a shortcoming that has severely hampered state ethics inquiries, leaving investigators dependent on local district attorneys who were often themselves politically compromised.

---- Index References ----

News Subject: (Social Issues (1SO05); Fraud (1FR30); Legislation (1LE97); Lobby & Pressure Groups (1LO18); Crime (1CR87); Corruption, Bribery & Embezzlement (1EM51); Government (1GO80); Local Government (1LO75); Regulatory Affairs (1RE51))

Industry: (Casinos (1CA80); Entertainment (1EN08))

Region: (Alabama (1AL90); North America (1NO39); USA (1US73); Americas (1AM92); U.S. Southeast Region (1SO88))

Language: EN

Other Indexing: (ALABAMA ETHICS COMMISSION; ALABAMA GOV BOB RILEY; BOB RILEY OF ALABAMA; GOV; WATERGATE) (Guy Hunt; James L. Sumner; Riley; Sumner)

Edition: Late Edition - Final

Word Count: 588

**End of Document**

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

12/15/10 Montgomery Advert. (Ala.) (Pg. Unavail. Online)
2010 WLNR 24804083

Montgomery Advertiser (AL)
Copyright ©2010 Montgomery Advertiser, Ala.

December 15, 2010

BRIEF: Legislature votes to ban PAC to PAC transfers

Sebastian Kitchen

Montgomery Advertiser, Ala.

Dec. 15--The Legislature passed a bill on Wednesday that would stop the longtime practice of transferring campaign contributions between political action committees, which essentially hides the original source of the contribution.

Both chambers unanimously passed a version on Wednesday after members met to work out differences. The bill now goes to Gov. Bob Riley for his signature.

Political observers have argued for years that candidates have used PACs to hide who they were receiving campaign funding from.

"It s been a long time coming," said Sen. Arthur Orr, R-Decatur.

-- posted by Sebastian Kitchen

---- Index References ----

News Subject: (Government (1GO80); Lobby & Pressure Groups (1LO18); Local Government (1LO75))

Language: EN

Other Indexing: (BRIEF: LEGISLATURE; LEGISLATURE) (Arthur Orr; Bob Riley; Dec; Sebastian Kitchen)

Word Count: 95

End of Document                                    © 2011 Thomson Reuters. No claim to original U.S. Government Works.

2/7/11 Birmingham News (AL) 1
2011 WLNR 2496299

Birmingham News (AL)
Copyright ©2011 Birmingham News. All Rights Reserved.

February 7, 2011

Volume 123
Section: NEWS

Gambling money network dissolves 50 PACs have been closed

ERIC VELASCO News staff writer

A network of political action committees has been partially dismantled, months after helping to funnel nearly $6.3 million from gambling interests into 2010 political campaigns, financial disclosure forms show.

Since the Nov. 2 election, 50 PACs that handled money from state casino and racetrack owners have been shut down, state records show.

All were set up September 2009 through September 2010, funded mainly by the Poarch Band of Creek Indians and by Birmingham and Shorter track owner Milton McGregor, records show.

Those committees were among the 144 PACs that handled political contributions originating from the Poarch Band, McGregor, Eutaw s Greenetrack and the Country Crossing resort near Dothan that briefly included a casino, a Birmingham News analysis of disclosures shows.

Out-of-state gambling-industry companies also made political donations through a handful of PACs during the campaign cycle, which started in June 2009.

The campaign s final disclosures, filed last week, helped illuminate the efforts pro-electronic bingo forces made to elect like-minded state and local officials.

Disclosures through the election cycle also demonstrated the ebb and flow of pro-gambling contributions in a year when gambling dominated political debate.

'' It was a hot political topic,'' said William Stewart, political science professor emeritus at the University of Alabama and an expert on state politics.

'' I don t think it dominated the funding of candidates,'' he said. '' But there were other issues people were concerned about that did not get the attention that gambling did.' '

Tumultous year

At the beginning of the year it seemed like a good bet that the Legislature would pass a bill legalizing electronic bingo.

But pro-bingo bills died that spring amid a federal probe into an alleged bribes-for-votes scheme. Eleven people, including state senators, lobbyists and casino owners, were indicted in federal court in October.

In late December, Jarrod Massey, a then-lobbyist who prosecutors say was a central figure in the case, pleaded guilty to charges that he conspired to influence state senators for Country Crossing.

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

The other defendants, including McGregor and Country Crossing co-owner Ronnie Gilley, have pleaded not guilty in the case.

McGregor, Greenetrack and interests connected to Country Crossing donated most of their money to the PACs in 2009, disclosures show.

The Poarch Band also donated heavily in 2009. But it also kept donating money throughout the campaign season, sometimes using the 26 PACs set up in the summer of 2010 that exclusively handled Poarch money, disclosures show.

Some gambling money donated to PACs went directly to candidates, mostly Democrats, running for state executive, legislative and judicial offices, and even city and county posts, reports show.

Other gambling money ran through a maze of PACs, sometimes combined with money from non-gambling sources. Then it was donated to campaigns or spent on candidate support services such as consulting, advertising and polling.

Gambling money also helped fund get-out-the vote efforts in several counties, disclosures show.

In late October, PACs associated with Greenetrack donated $104,000 to the 2010 Campaign for Jobs and Justice. The protest group was formed after Greenetrack shut down its electronic bingo operation in June to avoid a raid by the anti-gambling task force run by then-Gov. Bob Riley.
Previous Birmingham News tallies of political contributions by gambling interests did not include money connected to Massey, whose lobbying clients included Country Crossing and Gilley.

Massey s lobbying firm at the time, Mantra Governmental, funded 10 PACs created in 2009, records show.

After the indictment but before he pleaded guilty, Massey terminated his PACs, state records show.

In the federal criminal case, Massey admitted charges he worked with Gilley and McGregor to promise campaign contributions and other benefits to legislators, including state Sen. Harri Anne Smith, if they would back pro-bingo bills in the 2010 session.

In December 2009, Gilley helped stage a benefit concert for Smith, disclosures show. At the time, Smith received contributions totaling $20,000 from 40 businesses connected to Gilley, state records show.

Contractors and others associated with Country Crossing also gave Smith a total of $160,000 the same day, records show.

Federal prosecutors cite the concert and donations among the overt acts in the bribery conspiracy indictment. Smith, who was elected as an independent candidate last year, has denied the federal charges.

Fallout from ban

With the recent ban on PAC-to-PAC transfers, the trend of starting temporary PACs to exclusively handle special-interest money is expected to expand.

'' If you can' t transfer among PACs, I would expect you would see more PACs to try to hide the source of contributions and keep the public confused about the source of the money,' ' Stewart said.

EMAIL: evelasco@bhamnews.com

---- Index References ----

Company: UNIVERSITY OF ALABAMA IN HUNTSVILLE; UNIVERSITY OF ALABAMA

News Subject: (Government (1GO80); Lobby & Pressure Groups (1LO18))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73); U.S. Southeast Region (1SO88))

Language: EN

2/15/11 Birmingham News (AL) 6
2011 WLNR 3071902

Birmingham News (AL)
Copyright ©2011 Birmingham News. All Rights Reserved.

February 15, 2011

Volume 123
Section: EDITORIAL

PAC men

THE ISSUE Part of the gambling PAC network may be gone, but that doesn't mean the money game in Montgomery is over.

Gambling interests poured almost $6.3 million into the 2010 election cycle, using more than 140 political action committees. But now, just like that, about a third of the PACs are gone.

Since the election last fall, operators have shut down 50 PACs that had helped funnel gambling money since the latter part of 2009 to candidates for state and local office.

The rise and partial fall of the gambling money machine could be a reflection of nothing more than the end of another political season. The PACs served their purpose, and then they were dismantled.

The folding of the network also could have something to do with the fact a promising push for electronic bingo legislation seems unlikely in the near future. The Poarch Band of Creek Indians, whose $2.8 million in donations for 2010 made it the largest of the gambling donors, has a big interest in what the Legislature does with regard to the industry. But leaders of the new Republican majority don't plan to revisit bingo.

Or it could have something to do with the fact some of the other big funding sources, including Birmingham Race Course owner Milton McGregor, were charged last fall with public corruption. With a trial scheduled to start in April, they have other priorities right now.

But, unfortunately, the demise of even a substantial number of PACs shouldn't be taken as a sign the money games are over in Montgomery. There'll still be money flowing into the political process, and there'll still be attempts to hide where it's coming from.

It's true the state Legislature closed off one huge thoroughfare for shielding candidates' donors from public disclosure in December when lawmakers outlawed transfers among PACs. By shuffling money from one PAC to another to yet another, it was hard for voters to keep up with who was giving what to whom. And that was the whole idea.

While that method has been shut down, the idea behind it is undoubtedly alive and well.

William Stewart, a retired University of Alabama professor and keen observer of state politics, told The News' Eric Velasco he doesn't expect to see fewer PACs in the future as a result of the new law. Indeed, he expects just the opposite.

'' If you can't transfer among PACs,'' he said, '' I would expect you would see more PACs to try to hide the source of the contributions and keep the public confused about the source of the money.''

That's a little dismaying even if it does have the ring of truth, assuming history is a guide. It's obvious that all it takes to give a donor and candidate plausible deniability about where a campaign contribution came from is for a PAC to take in money

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

from multiple sources before distributing it. As a result, the new ban on PAC-toPAC money transfers may have a limited effect if Stewart is right about PACs proliferating.

We don't know if the gambling money machine is being dismantled or just taking a break. But it's a pretty good bet the money games in Montgomery will go on.

---- Index References ----

Company: PRIME ACTIVE CAPITAL PLC; UNIVERSITY OF ALABAMA IN HUNTSVILLE; PAN ARAB CONTINENCE SOCIETY; UNIVERSITY OF ALABAMA; POARCH BAND OF CREEK INDIANS; PAC

News Subject: (Government (1GO80); Legislation (1LE97); Lobby & Pressure Groups (1LO18))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73); U.S. Southeast Region (1SO88))

Language: EN

Other Indexing: (LEGISLATURE; PAC; PACS; POARCH BAND OF CREEK INDIANS; STATE LEGISLATURE; UNIVERSITY OF ALABAMA) (Milton McGregor; Stewart; William Stewart)

Word Count: 536

End of Document

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# NewsRoom

7/13/11 Birmingham News (AL) 1
2011 WLNR 14038740

Birmingham News (AL)
Copyright © 2011 Birmingham News. All Rights Reserved.

July 13, 2011

Volume 124
Section: LOCAL NEWS

Lawyers tee off on Massey's reputation Phone call on $200K to Smith

BRENDAN KIRBY Press-Register and KIM CHANDLER News staff wri

BINGO TRIAL

MONTGOMERY - An attorney for VictoryLand owner Milton McGregor launched a steady stream of attacks Tuesday in an attempt to discredit key prosecution witness Jarrod Massey during a State House corruption trial.

Massey heard himself called a liar, criminal and reputation-ruiner.

And those were just the unflattering labels Massey agreed with.

"You have been a dishonest person for years and years and years," attorney Bobby Segall said during his cross-examination of Massey, a lobbyist who has admitted guilt in the case.

When Massey answered that he agreed with that statement, Segall asked, "Why should anyone believe a word you tell them?"

McGregor is on trial with eight other defendants, including four current or former legislators. Segall will resume his cross-examination this morning before attorneys for the other defendants take their turn.

For the most part, Massey admitted under questioning Tuesday that his behavior over the years has been poor.

"I agree with you; I'm a criminal," Massey said at one point.

In fact, Segall said, Massey has been violating the law for many years. "I agree with you 100 percent," Massey answered.

Although Massey, who was a lobbyist for Country Crossing developer Ronnie Gilley, readily conceded much of the negative assessment offered by Segall, that did not prevent sometimes testy exchanges between the two. At one point, Massey disagreed with Segall's assertion that Massey and McGregor had barely any kind of relationship with each other.

"When you offer bribes to people in the same room, I think you come to know each other pretty well," Massey testified.

Massey kept his composure during hostile attacks on his character. But he broke down crying when describing conversations with his wife about his decision to begin serving prison time in January even though he has yet to be sentenced.

Ex. B, Selected News Articles, 1993-2011

Massey testified that advisory sentencing guidelines call for a prison term of at least 14 years for the charges to which he has pleaded guilty. But Massey told jurors he hopes to be sentenced to the time he has spent behind bars after he has finished cooperating with prosecutors.

Massey said that cooperation consists of telling the truth. But Segall pointed out that it's prosecutors who will determine whether Massey has told the truth - which the attorney suggested creates a powerful incentive to help the government.

Earlier Tuesday, Massey testified about money he funneled from Gilley to Sen. Harri Anne Smith. Smith, an independent from Slocomb, also is a defendant in the trial.

Massey testified that he used political action committees and "conduit" individuals to disguise money Gilley gave to Smith to influence her vote on the gambling bill.

In a phone call recorded by the FBI and played for the jury, Massey asked Country Crossing spokesman Jay Walker to talk to Gilley about an additional $200,000 that Smith said he had pledged to her. Massey testified that, until Smith told him about the money, he did not know that Gilley had promised more campaign contributions.

The sums that Gilley gave Smith were unusually large, said Massey. "It's the largest amount I've ever been involved with," he testified.

But Smith was not the only legislator to whom Gilley gave money.
"I had bribed multiple legislators," he told jurors. That includes $3,000 monthly payments he said he made to then-state Rep. Terry Spicer from 2001 or 2002 until 2008.

The testimony conflicts somewhat with testimony he gave during a February hearing, in which he said he paid $1,000 to $2,000 a month to the Elba Democrat in exchange for help getting lobbying clients, including Gilley.

EMAIL: bkirby@press-register.com

---- Index References ----

Company: FBI; FUJAIRAH BUILDING INDUSTRIES P S C; FBI SA; MONTGOMERY AND CO LLC; FRIESLAND BANK INVESTMENTS BV

News Subject: (Social Issues (1SO05); Criminal Law (1CR79); Legal (1LE33); Crime (1CR87); Corruption, Bribery & Embezzlement (1EM51); Government (1GO80); Fraud (1FR30); Legislation (1LE97); Lobby & Pressure Groups (1LO18))

Language: EN

Other Indexing: (COUNTRY CROSSING; ELBA DEMOCRAT; FBI; MONTGOMERY; STATE HOUSE; VICTORYLAND) (Bobby Segall; Earlier Tuesday; Gilley; Harri Anne Smith; Jarrod Massey; Jay Walker; Massey; McGregor; Milton McGregor; Ronnie Gilley; Segall; Smith; Terry Spicer)

Word Count: 602

End of Document — © 2011 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room

# Black lawmakers voted for law challenged by ADC

*Posted: Jul 16, 2011 12:10 PM CDT*
*Updated: Jul 16, 2011 12:43 PM CDT*

By BOB JOHNSON
Associated Press

MONTGOMERY, Ala. (AP) - Alabama's black lawmakers supported and helped pass a new law that is now being challenged in court by a black political organization.

The lawsuit by the Alabama Democratic Conference, the black wing of the state Democratic Party, targets legislation that bans the transfer of campaign contributions between political action committees.

The lawsuit filed earlier this month in federal court in Birmingham says the ban on PAC-to-PAC transfers violates the ADC's free speech rights and hurts its efforts to get black voters to the polls.

ADC chairman Joe Reed says the ban restricts the Democratic Party's ability to transfer money to the ADC.

But black legislators have historically supported efforts to ban PAC-to-PAC transfers and without dissent backed the bill by Republican Rep. Mac McCutcheon of Capshaw.

*Copyright 2011 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.*





All content © Copyright 2000 - 2011 WorldNow and WBMA. All Rights Reserved.
For more information on this site, please read our Privacy Policy and Terms of Service.

7/18/11 Dothan Eagle (Ala.) (Pg. Unavail. Online)
2011 WLNR 14234052

Dothan Eagle (AL)
Copyright ©2011 Dothan Eagle, Ala.

July 18, 2011

BLOG: Around the Circle: Bingo corruption trial: Prosecutor, defense attorney spar over questions

Lance Griffin

Dothan Eagle, Ala.

July 18--5:20 P.M. -- Prosecutor Emily Woods and defense attorney Bobby Segall argued extensively during Segall's re-cross examination of lobbyist Jarrod Massey.

Woods objected to most of Segall's questions to Massey on the grounds that the questions did not fall in the scope of re-cross and that Segall often tried to question Massey using documents not in evidence. Rules preclude defense attorneys from asking questions they could have previously asked during their initial examination of Massey. Segall also tried to point to inconsistencies in statements Massey made to the FBI. However, Massey's FBI statements have not been admitted into evidence.

U.S. District Judge Myron Thompson sustained more than 10 of Woods' objections, and admonished Segall several times.

Segall was attempting to establish that Massey often misunderstood others, and that others often misunderstood him. Segall asserted that McGregor could have misunderstood Massey's intent to bribe Sen. Scott Beason during a Feb. 18, 2009 meeting at Massey's office in which McGregor was present.

3:01 p.m. -- Although lobbyist Jarrod Massey has pleaded guilty to bribing five different legislators, he said he only had concerns about Sen. Scott Beason recording his conversations. Beason was, in fact, wearing a wire when Massey offered money and other things of value for his vote on bingo legislation.

" I had the most direct involvement in respect to all my criminal activities with Sen. Beason and had the least trust with Sen. Beason compared to the other individuals," Massey said

Massey said he did not suspect that Sen. Jim Preuitt was recording conversations with him because Preuitt was an " old school" legislator.

" Preuitt is from the old school. Just kind of a faux pas, wearing a wire against your peers," Massey said.

During further redirect questioning from prosecutor Emily Woods, Massey said he did not suspect Milton McGregor was wearing a wire.

" We clearly were participating in something that was illegal," Massey said.

Woods:" What was McGregor's role in the senate passage of SB380 as you understand it?"

Massey: " He was working as hard if not harder than Gilley and I were. They were coordinating activities with respect to legislators."

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

Woods also asked Massey about a series of contributions he helped deliver to the Smith campaign or to political action committees for the purpose of sending money from Gilley to the Smith campaign.

Woods:" How did Smith know all this money was coming from Gilley?'

Massey:" I did tell her we would be contributing to her campaign."

How much time between you telling her and the money coming in?' (in reference to $40,000 in 2008.)

Massey:" A week and a half."

Woods:" In regards to the December, 2009 fundraiser, did Smith know Gilley was hosting the fundraiser?'

Massey:" Yes. It was abundantly clear. Everybody knew it."

Woods:" What about the PAC transfers that followed soon after?'

Massey: " I coordinated with Claire Austin. She had a close professional and personal relationship with Smith. I communicated this with Austin and let her know it was for the balance from the December 2009 fundraiser."

Woods: What about Smith' s request for you to relay to Gilley about $200,000 on the day of the senate vote?

Massey:" The vote was 7-8 p.m. that evening. She communicated this to me the afternoon of the final vote."
12:12 p.m. -- Lobbyist Jarrod Massey said he never felt that Sen. Quinton Ross would actually vote against pro-gambling legislation in 2010 although Ross had sought campaign donations from Massey in the days leading up to the Senate vote on SB380 March 30, 2010.

"Never felt like I had a gun to my head," Massey said.

Massey said he believed Ross would vote in favor of SB380 because VictoryLand owner Milton McGregor had been a long-time contributor to the Ross campaign.

"I did not feel at the end of the day Ross would go off the reservation because Mr. McGregor had been a long-time supporter of Ross," Massey said.

Massey said he had already previously contributed to the Ross campaign, and told Ross during a face-to-face conversation that he would not make any more contributions until after the Senate vote. Massey testified that his employee, Jennifer Pouncy, told him Ross was asking for an extra $20,000 or $25,000.

"So $20,000 or $25,000 was too much for Sen. Ross, but you were willing to pay another senator a million or two million?' asked Ross attorney Lewis Gillis.

"That' s correct," Massey said.

Gillis also asked Massey if he told the FBI that the democratic black caucus was notorious for coming up at the last hour asking for money, bringing up tentative obstacles to certain bills. Massey said he told the FBI" some members" of the black caucus were notorious for that.

Before lunch, Ron Wise, attorney for Jim Preuitt, asked Massey if there was ever an explicit agreement between Massey and Preuitt in regards to his vote on SB380.

"We did not specifically discuss a connection," Massey said.

Wise also asked Massey if Jennifer Pouncy told him that Preuitt was" not about the money" and if Pouncy cautioned Massey and Gilley against" coming on too strong" with Preuitt.

"She did," Massey said.

Wise:" Taken the fact Sen. Preuitt had traditionally voted pro-gambling, and was connected to Sen. Means and his interests, taken the fact the smaller simple bingo bill gave Etowah County a better opportunity to get a gaming facility and taken the

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

fact all three of you agreed that if you got to 20 votes, Sen. Preuitt wasn't going to stop you, then all this activity you testified about dealing with Sen. Preuitt, it was kind of silly, don't you think?'

Massey:" Not exactly."

10:48 a.m. -- Lobbyist Jarrod Massey said he was mistaken about the date he said he made campaign contributions to Sen. Quinton Ross.

Massey had previously testified he had lunch with Ross on Dec. 2, 2009, at a Montgomery restaurant to deliver a $5,000 check to Ross. Massey previously said the purpose of the contribution was tied to gambling legislation.

Lewis Gillis, attorney for Ross, introduced receipts that indicate Massey and Ross had lunch Oct. 7, 2009, during the time Ross was speaking at a symposium.

"I stand corrected," Massey said.

Massey also previously testified Ross sought campaign donations from Massey and employee Jennifer Pouncy as the vote on gambling legislation in 2010 was about to occur. Massey said Ross called him several times during March, but that he did not return his calls. Gillis asked Massey if Ross could have been trying to contact him to ask questions about contracts that Massey's lobbying firm had. Ross serves on committees that may have reviewed some of the contracts Massey's lobbying firm helped secure.

Massey said all of his contact with Ross concerned fundraising and gambling legislation.

Click here [http://bit.ly/poePkE] to read the list of 2009 contributors [http://bit.ly/poePkE] to the Ross campaign.
8:20 a.m. -- Attorneys for former Country Crossing spokesperson Jay Walker are seeking access to a diary lobbyist Jarrod Massey said he has kept since he began cooperating for the government a few days after his arrest last October.

Walker's attorneys filed the motion (which can be read here [http://bit.ly/pkvXBF]) Saturday. Massey's attorneys have objected and U.S. District Judge Myron Thompson is expected to hear arguments on the motion today before Massey's testimony concludes.

Massey will be on the stand for an eighth day today when testimony begins at 9 a.m. Three additional defense attorneys will question Massey, then government prosecutor Emily Woods will have a chance to question Massey additionally. It is likely Massey's testimony will extend to the lunch break. FBI Special Agent George Glaser will be the next witness, then the government will call former Massey employee Jennifer Pouncy.

Testimony ended Friday with Jim Parkman, attorney for Sen. Harri Anne Smith, ending his cross examination by asking Massey if he believed Ronnie Gilley to be truthful.

"I think that's in question," Massey testified.

Parkman also said Massey's statements to the FBI do not include a reference to Smith and a mention of $500,000 he said she made at a dinner meeting at Garrett's Restaurant March 4, 2009. Massey testified that Smith told Sen. Scott Beason and later Rep. Benjamin Lewis that Gilley and others at the dinner meeting could help make $500,000 available for their campaigns. However, Parkman said there is no mention of the $500,000 reference in any of the interviews Massey had with the FBI.

---- Index References ----

Company: PRIME ACTIVE CAPITAL PLC; FBI; FUJAIRAH BUILDING INDUSTRIES P S C; FBI SA; PAC SGPS SA; MONTGOMERY AND CO LLC; FRIESLAND BANK INVESTMENTS BV; PRODUCTION AIDS AND CONSULTANTS PVT LTD; PAC

News Subject: (Social Issues (1SO05); Criminal Law (1CR79); Legal (1LE33); Crime (1CR87); Corruption, Bribery & Embezzlement (1EM51); Government (1GO80); Fraud (1FR30); Legislation (1LE97); Lobby & Pressure Groups (1LO18))

Industry: (Security Agencies (1SE35); Security (1SE29))

© 2011 Thomson Reuters. No claim to original U.S. Government Works.

# **News**Room

7/29/11 Montgomery Advert. (Ala.) (Pg. Unavail. Online)
2011 WLNR 15026166

Montgomery Advertiser (AL)
Copyright © 2011 Montgomery Advertiser, Ala.

July 29, 2011

*Records show ADC hasn't filed finance reports since 2008*

Brian Lyman

Montgomery Advertiser, Ala.

July 29--The Alabama Democratic Conference accepted significant contributions from Democratic campaigns in 2010 and made its own contributions in 2009 and 2010, but has not filed a campaign finance report since 2008, according to state records.

The lack of reporting has prompted the Alabama Republican Party's senior vice chairman to file a complaint with Alabama Attorney General Luther Strange.

"I don't think it's politically motivated," said George Williams, who also has served as the GOP's minority chair. "I think if you're doing wrong, if it's determined you're doing wrong, politics is out."

The ADC, a 50-year-old black political organization, referred questions to chairman Joe Reed. Several attempts to reach Reed on Thursday were unsuccessful.

A spokeswoman for Strange's office said they had received the complaint but had no further comment on it.

Records with the Alabama secretary of state's office show the ADC filed a 10-day report with the secretary of state Oct. 27, 2008. No other reports have been filed with the office since.

Alabama's Fair Campaign Practices Act requires candidates and political committees to file annual reports with the secretary of state's office; to file reports 45 to 50 and five to 10 days before primary and general elections, and between five to 10 days before runoffs. Violations of the reporting section are a Class B misdemeanor, punishable by up to six months in jail and a $3,000 fine.

Campaign records from other candidates show the ADC making and receiving contributions to Democratic candidates last year. Charley Grimsley, the Democrats' candidate for state treasurer in 2010, gave $36,000 to the ADC, according to his campaign filings. Grimsley, who lost to Republican Young Boozer, said the money was used for get-out-the-vote efforts.

"In most of the major population centers, they have a door-to-door campaign," he said. "It's an army of volunteers, and there's a number of voters they touch."

Nearly all of the Democrats' candidates for constitutional offices in 2010 gave money to the ADC, according to campaign finance reports. Ron Sparks, the party's nominee for governor, gave the group $54,300 in 2009 and 2010; Lt. Gov. Jim Folsom Jr. gave $18,000; attorney general nominee James Anderson gave $13,270.

**Ex. B, Selected News Articles, 1993-2011**

Records compiled by Williams show the ADC gave $5,865 to Sen. Priscilla Dunn, D-Bessemer, in 2009 and $1,200 to the State Democratic Executive Committee in 2010.

The ADC has filed suit to overturn the state's ban on PAC-to-PAC transfers, saying it would undermine the ADC's ability to run its get-out-the-vote efforts. The ban passed the Legislature last December with the unanimous support from lawmakers of both parties and all races.

Williams said the suit was one of the reasons that led to his complaint, but said he also felt the ADC was trying to keep black Republicans in the state from assuming office, citing last year's race for House District 98, won by Napoleon Bracy, D-Prichard.

"Some of the information coming from those camps was if you vote for Republicans, you vote to go back to the Jim Crow days," he said. "(Or) if you vote for Republicans, you vote to go back to the cotton fields. If you vote for the Republicans, you vote for the devil."

The GOP took control of the Legislature last November.
Williams' letter asks Strange "to prosecute this illegal activity to the fullest extent of the law."

He said he has not heard yet from Strange.

—- Index References —-

Company: ADC GMBH; ADC AFRICAN DEVELOPMENT CORPORATION GMBH AND CO KGAA; ANDALUSIA DISTRIBUTING CO INC; ADC; ARABIAN DRILLING CO

News Subject: (U.S. Congressional Campaigns (1US07); Government (1GO80); Public Affairs (1PU31); Political Parties (1PO73))

Region: (Alabama (1AL90); North America (1NO39); Americas (1AM92); USA (1US73); U.S. Southeast Region (1SO88))

Language: EN

Other Indexing: (ADC; ALABAMA; ALABAMA ATTORNEY; ALABAMA DEMOCRATIC CONFERENCE; ALABAMA REPUBLICAN PARTY; DEMOCRATIC; DEMOCRATS; FAIR CAMPAIGN PRACTICES ACT; GOP; RECORDS; REPUBLICANS; STATE DEMOCRATIC EXECUTIVE COMMITTEE) (Charley Grimsley; George Williams; Grimsley; James Anderson; Jim Crow; Jim Folsom Jr.; Joe Reed; Luther Strange; Napoleon Bracy; Priscilla Dunn; Reed; Ron Sparks; Strange; Williams; Young Boozer)

Word Count: 560

End of Document      © 2011 Thomson Reuters. No claim to original U.S. Government Works.

**News**Room