IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ALABAMA,
NORTHEASTERN DIVISION

| | |
|---|---|
| THE ALABAMA DEMOCRATIC CONFERENCE, an Alabama political action committee, et al., | |
| Plaintiffs, | CIVIL ACTION NO. 5:11-cv-02449-JEO |
| v. | |
| LUTHER STRANGE in his official capacity as the Attorney General of Alabama; et al., | |
| Defendants. | |

## Plaintiffs' Brief in Support of
## Motion for Partial Summary Judgment
## and in Opposition to Defendants' Motion to Dismiss

### Introduction

Plaintiffs respectfully submit this brief as their response to Defendants' Motion to Dismiss (Doc. 7) and in support of Plaintiffs' Motion for Partial Summary Judgment on Count I of the Complaint, the violation of the First Amendment by the ban on transfers between political action committees (hereinafter "PAC-to-PAC transfer ban") as it affects voter education and advocacy as opposed to donations to candidates.[1]

---

[1] Plaintiffs have made no response to the Affirmative Defenses raised by the Defendants, since they did not provide any facts or arguments to

Parts II-VIII provide the procedural background and addresses the First Amendment claim. They demonstrate that the ban on all PAC-to-PAC transfers, as opposed to only transfers that go to candidates, intrudes on clearly established rights of political expression, including independent expenditures and expenditures for political communication. The ban thus affects the ability of citizens to associate in common cause and to conduct political education and advocacy protected by the First Amendment. These Parts thus also provide the basis for Plaintiffs' Motion for Summary Judgment on the First Amendment claim.

Part IX addresses Plaintiffs' claim under the Voting Rights Act. Recognizing that claims under the Voting Rights Act are complex and fact intensive, Plaintiffs do not at this early stage move for a summary judgment under the Voting Rights Act. Part IX simply responds to the Defendants' Motion to Dismiss the Voting Rights Act claim. It demonstrates that the ban discriminatorily interferes with the ability of citizens to participate in the political process.

## I.  Statement of undisputed facts.

1.  Alabama law does not limit the amount of money that a person can donate directly to a candidate or a PAC.

---

support them. We presume they are made at this time simply to comply with Rule 12's time requirement.

2.  Alabama law does not limit the amount of money that a non-business entity can donate directly to a candidate.

3.  Alabama has reporting requirements that apply to most political expenditures, including those made by PACs.

4.  Alabama's definition of a PAC is broad, and includes all groups raising or expending as little as $1,000.

5.  The Alabama Democratic Conference (ADC) is an association of citizens that was established during the 1960 Kennedy-Johnson campaign to encourage black political participation in the face of the many barriers the state placed in the way of black citizens, and to support for the Democratic ticket.

6.  The elector-candidates of the Alabama Democratic Party (still running under the slogan "White Supremacy – For the Right") were not pledged to the national party's candidates in 1960.

7.  The ADC has continued to exist as a grass roots voter-advocacy organization since 1960.

8.  The ADC is intertwined in a number of ways with the Alabama Democratic Party.

9.  Many members of the ADC serve as officers or members of the Alabama State Democratic Executive Committee.

10.  The ADC and Democratic Party make contributions to each other in order to support and advance their common political ideals.

11.  Because it has received and spent over $1,000 per year on election-related activities, the ADC has a political action committee as required by Alabama law.

12.  The Alabama Democratic Party is a political action committee.

13.  The ADC occasionally has made contributions to candidates or to non-affiliated PACs.

14.  The ADC's primary functions over the past decade haves been to educate and protect voters and to run get-out-the-vote (GOTV) drives.

15.  ADC's GOTV drives include a voter-educational component.

16.  During the past half century, the ADC has used its resources to communicate with black citizens, through its GOTV activities and otherwise, on a wide range of activities related to their access to the political process including, but not limited to, the following:

      a.  communications on their right to register to vote,

      b.  the varying standards and procedures for voter registration,

      c.  the varying methods of casting a ballot,

      d.  the implications of election practices and procedures in their communities and how to obtain more fair procedures,

      e.  the opportunity to serve as poll workers,

f.  the right of voters to be free from discriminatory treatment at the polls, and

g.  the right of voters who need help in voting to receive assistance and to choose for themselves the person whom they wish to provide that assistance.

17.  The ADC has sponsored candidate forums involving communication between its members and candidates for office on issues of the day.

18.  The ADC has communicated information concerning racially discriminatory practices to federal law enforcement officials.

19.  The ADC has brought or supported lawsuits against at-large voting and other racially discriminatory election practices.

20.  Under Act 2010-765, the ADC will still be able to collect contributions from individuals and businesses for use in making expenditures to candidates and for GOTV-related activities.

21.  Under Act 2010-765, the ADC will no longer be allowed to receive contributions from PACs, including the Democratic Party, from 527 organizations, from private foundations, or from principal campaign committees of candidates, even if the funds will be used solely for communication with voters and not for contributions to candidates.

22.  The median per capita income for blacks in Alabama was $13,851 according to the 2005-07 American Community Survey, table B19301B.

23.  The median per capita income for whites in Alabama was $25,327 according to the 2005-07 American Community Survey, table B19301A.

24.  Alabama has a long history of discrimination in voting.

25.  Alabama has a long history of discrimination in education.

26.  The effects of Alabama's past discrimination continue today in the continuing educational gaps among those who have attended (or are attending) public schools and those who bear the social and economic effects of past discrimination.

27.  The 2000 Census showed the following data for blacks and whites over the age of 25:

|  | Less than 9th grade education | Total lacking a high school diploma | Total number |
| --- | --- | --- | --- |
| Whites | 159,182 | 475,725 | 2,157,934 |
| % among whites | 7.4% | 22.0% |  |
| Blacks | 71,586 | 217,327 | 657,233 |
| % among blacks | 10.9% | 33.1% |  |

28.  The Justice Department has assigned federal observers to monitor elections in Conecuh County as a result of evidence of violations of the Fifteenth Amendment as recently as 2006.

29.  Since 1995, federal observers have been assigned to monitor elections in Autauga County on November 2, 2010, Barbour County on July 13, 2010; Chambers County on November 7, 2006; Dallas County on June 2, 1998, August 27, 1996 and November 5, 1996; Hale County for seven elections from 1997 to 2006; Lowndes County on October 7, 2000, August 27 1996 and September 17, 1996; Perry County

on June 23, 2008, August 26, 2008 and November 4, 2008; Russell County on July 13, 2010.

30. Election campaigns are highly complex, highly expensive, and constantly evolving processes.

31. Election campaigns involve much specialization by organizations that appeal to certain sectors of the electorate or that perform certain functions (door-to-door advocacy, voter turnout, voter protection, distributing handbills, and the like).

32. Attached to Dr. Joe L. Reed's Declaration are Attachments A and B which summarize the campaign finance forms filed with the Secretary of State by the ADC from 2005 to 2010.

33. Attachment A shows that the main contributors to the ADC have been the Alabama Education Association, A-VOTE (a PAC affiliated with AEA), the Alabama Trial Lawyers Association, TRIAL (a PAC affiliated with ATLA), and the Alabama State Democratic Executive Committee.

34. The organizations listed in the preceding paragraph have given funds to the ADC in the past to carry out GOTV work.

35. The organizations listed in the second preceding paragraph have given funds to the ADC in the past to carry out GOTV work because of ADC's expertise in the field and the efficiency of having one GOTV organization, rather than many, working among black voters.

36. PACs other than principal campaign committees of candidates have together contributed more than half of all ADC's funds during 2005-10.

37. Attachment B shows that the principal use of the ADC's funds during 2005-10 has been GOTV activities.

38. Attachment B shows that funds were given to candidates and campaigns for two reasons: as a contribution for the candidate, and for GOTV work.

39. Under Alabama law, one PAC is free to coordinate expenditures and activities with another PAC without limit—so long as money does not change hands between the two PACs.


## II.  Procedural Background

Plaintiffs brought this case under the First Amendment and the Voting Rights Act, alleging that the sweeping ban on all PAC-to-PAC transfers, to the limited extent that it limits voter education, voter protection, and get-out-the-vote ("GOTV") activities, violates the First Amendment rights of speech and association, Count 1, and that it results in a denial to black citizens of Alabama an equal opportunity to participate in the political process and elect representatives of their choice, Count 2.

As Defendants have noted, Alabama does not limit the amount of money that a person can donate directly to a candidate. The state does, however, have reporting requirements that apply to most political

expenditures, including those made by PACs. The definition of a PAC is broad, and includes all groups raising or expending as little as $1,000. Under the ban, groups that raise such amounts cannot transfer funds to or receive funds from each other, except under limited circumstances.[2]

Defendants filed a Motion to Dismiss both counts. In support of their argument, Defendants provided a series of editorials on the ability of donors to mask donations to political candidates by transferring the donations from one PAC to another before giving the money to the candidate.[3] The editorials and commentary, along with a handful of news articles, in some cases track contributions from donor to one or more PACs to candidate, and thus underline the fact that all donations to and expenditures by PACs are in fact disclosed. Aside from these news stories, which are themselves hearsay, the press accounts consist entirely of opinions rather than fact.

Of course, Plaintiffs do not challenge the statue insofar as it prohibits PAC-to-PAC transfers of funds to candidates. Plaintiffs only challenge the statue as it affects political education and advocacy.

---

[2] Ala. Code § 17-5-2(4) contains a definition of expenditures with seven exceptions which apply to candidates and PACs alike. Ala. Code § 17-5-7, as amended by Act 2010-765, sets out two circumstances under which a PAC-to-Party transfer may occur.

[3] Such editorials lack any evidentiary weight. Editorialits and others often inveigh against constitutionally protected activity, as witness the reaction to the Supreme Court decision in *Citizens United v. Federal Election Com'n,* 130 S.Ct. 876 (2010).

Defendants also offer a lengthy (295 counts charged against various individuals) federal indictment that included, among many other things, allegations that in some cases funds designed to go to candidates were distributed through PAC-to-PAC transfers. Doc. 7-2. As a matter of law, a criminal indictment is simply a series of allegations that must be presumed to be untrue unless and until a jury determines guilt. As it happens, the jury in that particular case now has acted, and no defendant was found guilty on any of the 295 counts. (The court declared a mistrial on many counts which continue to carry a presumption of innocence.)

The Alabama Democratic Conference (ADC) is an association of citizens that was established during the 1960 Kennedy-Johnson campaign to encourage black political participation in the face of the many barriers the state placed in the way of black citizens, and to support for the Democratic ticket, since the elector-candidates of the Alabama Democratic Party (still running under the slogan "White Supremacy – For the Right") were not pledged to the national party's candidates. The ADC is intertwined in a number of ways with another PAC, the Alabama Democratic Party. Many members of the ADC serve as officers or members of the Alabama State Democratic Executive Committee. The ADC and Democratic Party make contributions to each other in order to support and advance their common political ideals.

The ADC has continued to exist as a grass roots voter-advocacy organization. Because it has received and spent over $1,000 per year on

election-related activities, the ADC has been a political action committee (hereinafter, "PAC") as required by Alabama law.[4] The ADC occasionally has made contributions to candidates or to non-affiliated PACs, but that has not been its primary function and in this action the ADC does not challenge the state's regulation of PAC-to-PAC transfers as they involve contributions eventually going to candidates. The challenge is rather to the extraordinary limitations of the PAC-to-PAC ban on the First Amendment activities that form the core of the ADC work.

During the past half century, the ADC has used its resources to communicate with black citizens on a wide range of activities related to their access to the political process. These include but are not limited to

- communications on their right to register to vote,
- the varying standards and procedures for voter registration,
- the varying methods of casting a ballot,
- the implications of election practices and procedures in their communities and how to obtain more fair procedures,
- the opportunity to serve as poll workers,

---

[4] Ala. Code 17-5-2 defines a PAC as "Any political action committee, club, association, political party, or other group of one or more persons which receives or anticipates receiving contributions or makes or anticipates making expenditures to or on behalf of any elected official, proposition, candidate, principal campaign committee or other political action committee."

- the right of voters to be free from discriminatory treatment at the polls, and
- the right of voters who need help in voting to receive assistance and to choose for themselves the person whom they wish to provide that assistance.

Many of these activities have been undertaken in conjunction with get-out-the-vote (GOTV) drives, and those GOTV drives invariably include an educational dimension. The ADC also has sponsored candidate forums involving communication between its members and candidates for office on issues of the day. The ADC also has used its resources to communicate information concerning racially discriminatory practices to federal law enforcement officials, and also to support its own lawsuits against at-large voting and other racially discriminatory election practices.

In the past, the ADC has received contributions from individuals, businesses, and the Alabama Democratic Party, itself a PAC, and from other PACs. In turn, the ADC has made some expenditures to candidates, including primarily payment of filing fees or for GOTV drives, but the bulk of its money has gone to maintaining its communication infrastructure and to support the communication efforts of its county units, especially in conjunction with GOTV activities.[5]

---

[5] See Attachment B to the Declaration of Dr. Joe L. Reed.

Under Act 2010-765, the ADC will still be able to collect contributions from individuals and businesses for use in making expenditures to candidates and for GOTV-related activities. However, the ADC will no longer be allowed to receive contributions from PACs, including the Democratic Party, from 527 organizations,[6] from private foundations, or from principal campaign committees of candidates, even if the funds will be used solely for communication with voters.

This suit seeks only relief against the application of the Act to funds received by the ADC for communication, GOTV and independent expenditures[7] – whether those funds come from individuals, businesses, PACs, or 527s. As more fully explicated below, the First Amendment forbids the application of the Act to funds that do not eventually flow directly to candidates. That is, while the state interest in combating *quid pro quo* corruption allows it to regulate contributions to candidates, the state has no legitimate interest in regulating campaign speech such as undertaken by the ADC, and the state has no legitimate

---

[6] See paragraph 25 of the complaint for a definition of a 527 organization.

[7] Alabama law does not expressly define "independent expenditure." The term was used by the U.S. Supreme Court in *Buckley v. Valeo,* 424 U.S. 1 (1976), to describe a narrowing construction of the Federal Election Campaign Act. The Federal Election Commission regulations have codified the definition of an independent expenditure as one for a communication "expressly advocating the election or defeat of a clearly identified candidate that is not made in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate, a candidate's authorized committee, or their agents, or a political party or its agents." 11 CFR 100.16(a).

interest in regulating efforts to encourage black citizens to vote or to assist and protect them in voting.

To put the requested relief in tabular terms, the Plaintiffs seek a declaration and injunction as follows:

| Transfers | Effect of the Act |
|---|---|
| PAC transfers to the ADC which in turn transfers the funds to a candidate | Forbidden by the Act and remains unaffected by this suit |
| PAC transfers to the ADC which in turn uses the funds for independent expenditures, GOTV, and communications with black voters | Forbidden by the Act, but Plaintiffs seek an injunction against enforcement of the Act in this situation |

The Defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted.

This brief responds to the Defendants' motion and supports the motion of the Plaintiffs for partial summary judgment.

III.     **The ADC has made changes to its structure to operate within the restrictions of Act 2010-765 – to the extent the Act is constitutional.**

The ADC has established two funds on its books[8] so as to segregate funds that may constitutionally be restricted by the Act and

---

[8] In *Minnesota Citizens Concerned for Life, Inc. v. Swanson,* --- F.Supp.2d ----, 2010 WL 3768041 (D.Minn. 2010), the court described a PAC with two funds which used "an internal bookkeeping device, such as a spreadsheet, to facilitate the tracking of funds for disclosure purposes." On the other hand, the Federal Elections Commission (FEC)

those that may not. The two funds are called the Candidate Fund and the GOTV Fund.

The Candidate Fund will receive contributions from individuals and businesses and will disburse those funds to candidates' principal campaign committees as the Act permits. It may also transfer money to the GOTV Fund.

The ADC proposes that the GOTV Fund should be able to receive contributions from any entity – businesses, individuals, 527s, candidates, political parties, other PACs. The ADC will spend those funds for maintaining the ADC infrastructure and for GOTV-related communication efforts and other independent expenditures; none of the money in the GOTV Fund will be transferred to candidates or their committees.

## IV. The U.S. Supreme Court applies several levels of scrutiny to political speech and campaign finance.

### B. Strict scrutiny.

The Supreme Court has held, "Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly

---

requires that funds be kept in separate bank accounts. The District Court for the District of Columbia likewise required separate bank accounts for a federal PAC that the court allowed to collect "hard money" and "soft money." *Carey v. Federal Election Com'n,* --- F.Supp.2d ----, 2011 WL 2322964 (D.D.C. 2011).

tailed to achieve that interest." *Citizens United v. Federal Election Com'n,* 130 S.Ct. 876, 898 (2010) (citation and internal quotation marks omitted). In addition, the Eighth Circuit has held, "State-enforced limits on contributions to political action committees stifle not only free political speech, but also free political association, and are reviewed according to a strict scrutiny standard." *Russell v. Burris,* 146 F.3d 563, 571 (8th Cir. 1998) (citation and internal quotation marks omitted).

The Defendants' Motion to Dismiss (Doc. 7) discusses strict scrutiny at 9-11 (hereafter "Doc. 7").

C. Closely drawn scrutiny.

"Thus, a contribution limit involving even significant interference with associational rights is nevertheless valid if it satisfies the lesser demand of being closely drawn to match a sufficiently important interest." *McConnell v. Federal Election Com'n,* 540 U.S. 93, 136 (2003) (citation and internal quotation marks omitted). See also Doc. 7 at 10, 19.

D. Exacting scrutiny.

"Disclaimer and disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities, and do not prevent anyone from speaking. The Court has subjected these requirements to exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Citizens United v.*

*Federal Election Com'n,* 130 S.Ct. 876, 914 (2010) (citations and internal quotation marks omitted). See also Doc. 7 at 13.

## V. Whatever the proper level of scrutiny, the State of Alabama has no legitimate interest justifying the campaign-finance restrictions challenged in this case.

The Supreme Court has held, "[P]reventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." *Federal Election Com'n v. National Conservative Political Action Committee,* 470 U.S. 480, 496-97 (1985). The Court has defined the only type of "corruption" that may be used as a governmental interest in regulating campaign finance: "When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption." *Citizens United,* 130 S.Ct. at 909.

The *Citizens United* Court also held, "Limits on independent expenditures … have a chilling effect extending well beyond the Government's interest in preventing *quid pro quo* corruption. … [I]ndependent expenditures ... do not give rise to corruption or the appearance of corruption." *Citizens United,* 130 S.Ct. at 908, 909. Similarly, the D.C. Circuit has held that the anti-corruption principle does not apply to independent expenditures.

> As the [Supreme] Court has explained the anti-corruption principle, mere *donations* to non-profit groups cannot corrupt candidates and officeholders. In

the words of the Fourth Circuit, it is "implausible that contributions to independent expenditure political committees are corrupting." *N.C. Right to Life,* 525 F.3d at 293 (internal quotation marks omitted). And to the extent a non-profit then *spends* its donations on activities such as advertisements, get-out-the-vote efforts, and voter registration drives, those expenditures are not considered corrupting, even though they may generate gratitude from and influence with officeholders and candidates. Rather, under *Buckley,* those expenditures are constitutionally protected. Therefore, limiting donations to and spending by non-profits in order to prevent corruption of candidates and officeholders represents a kind of "prophylaxis-upon-prophylaxis" regulation to which the Supreme Court has emphatically stated, "Enough is enough." *FEC v. Wis. Right to Life, Inc. (WRTL),* 551 U.S. 449, 478-79, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (controlling opinion of Roberts, C.J.).

*Emily's List v. Federal Election Com'n,* 581 F.3d 1, 6-7 (DC Cir 2009).

To summarize, a contribution to a PAC that will use the money for communication, GOTV, or other independent expenditures does not involve the possibility of *quid pro quo* corruption because a candidate does not receive the money. Unless there is the possibility of *quid pro quo* corruption, the State has no justified interest in regulating the contribution.

## VI. The State's justification of the PAC-to-PAC transfer ban is unpersuasive.

A. *Quid pro quo* corruption involves contributions to candidates, not for GOTV activities.

Much of the Defendants' argument ignores the distinction between independent expenditures and contributions to candidates. The Defendants argue that the ban on PAC-to-PAC transfers used for GOTV are justified because of the possibility of *quid pro quo* corruption. See Doc. 7 at 18 ("Large, direct contributions **to candidates**, as are possible under Alabama's scheme of minimal regulation, pose a special possibility of quid-pro-quo corruption, … and thus would justify 'preventative' measures even if it was difficult to ascertain the true extent of any actual corruption." [Emphasis added.]) As noted above, funds that do not go to candidates "do not give rise to corruption or the appearance of corruption." *Citizens United,* 130 S.Ct. at 908, 909. So, the Defendants' argument is not directed to the relief the Plaintiffs seek.

> B.    The ban on PAC-to-PAC transfers for GOTV and independent expenditures is not comparable to a disclosure requirement.

The Defendants also argue that "the PAC transfer ban looks most like a disclosure requirement under which candidates or groups must identify their contributors." Doc. 7 at 12-13. A ban is not the same thing as mandated disclosure. "Don't take (or make) a contribution" and "list who gave the contributions" are not functional equivalents. Similarly, an edict that Mitt Romney may not advertise his candidacy does not "loo[k] most like" requiring "Paid for by Romney for President, Inc." on each advertisement.

Transparency can be achieved by making information more easily available to the public, not by restricting a type of contribution. The PAC-to-PAC ban might have made more sense when, as was formerly was the case, contribution disclosure forms could be viewed only by travelling to Montgomery to the Office of the Secretary of State and examining the reports during office hours – or paying $1.00 per page to copy them and analyze them at leisure. Sen. Cam Ward, "Time for More Transparency in Campaign Finance Laws." http://www.politicalparlor.net/wp/2011/02/25/time-for-more-transparency-in-campaign-finance-laws/. That time is gone. Disclosure forms now are available online in a searchable database on the Secretary of State's web site. Transparency has been revolutionized, and further enhancements are under way. Indeed, Act 2011-687 (attached as Appendix A) will make campaign contributions more transparent by requiring more frequent reports (and increasing in frequency close to an election). The Secretary of State's website will be fully transparent because "[t]he searchable database shall provide the ability to search by a recipient's name, a contributor's name, a contributor's or recipient's zip code, and dates of contributions." Act 2011-687, § 2(b). The gaps in transparency of donations thus are rapidly closing, and any delay in full transparency results from the state's own dilatoriness in accommodating new technology.

C.    The ban on PAC-to-PAC transfers for GOTV and independent expenditures does not prevent circumvention of disclosure.

Likewise, the Defendants argue that the PAC-to-PAC transfer ban is necessary to "preven[t] the circumvention of the State's disclosure requirements," Doc. 7 at 13. A review of the "disclosure requirements" will show this argument is simply wrong.

*First*, the fact that this disclosure requirement is not a compelling, or even very important to the State of Alabama is shown by its lawyers providing a roadmap for evading disclosure under the new law: according to the Defendants' brief, one "PAC [is] free to coordinate expenditures and activities with another PAC without limit—so long as money does not change hands between the two PACs." Doc. 7 at 12; see also Doc. 7 at 4 n.2 (earmarking of contributions is not prohibited). This casual attitude indicates that the disclosure interest is incidental to other purposes and effects of the statute.

*Second*, many of the cases cited by the Defendants justify disclosures as a way to prevent evasion of **contributions** limits. See Doc. 7 at 14-15 (citing *FEC v. Colorado Republican Fed. Campaign Comm.,* 533 U.S. 431, 456 (2001); *Buckley*, 424 U.S. at 67-68; *Minnesota Citizens Concerned for Life, Inc. v. Kelley,* 427 F.3d 1106, 1112-13 (8th Cir. 2005)). Alabama has no contribution limits for individuals or PACs and ineffectual limits on contributions by corporations. Doc. 7 at 4 and n.2. If there are no limits, how can the State argue that its PAC-to-PAC transfer ban furthers the non-existent contribution limit?

*Third*, all PAC contributions in fact already are disclosed under Alabama law, and Alabama's current disclosure system (the searchable database noted above) is working well enough that numerous articles collected by Defendants track and detail the source of a particular PAC's money. See Defendants' Exhibit B "Selected News Articles 1993-2011,"[9] Doc 7-4 at 6 ("Ultimate PAC Funnel Lobbyists, Candidates Have Found a Favorite Route for Channeling Money: PACs Managed by Fine Geddie"), 11 ("Spreading the Wealth Without Leaving a Trail, McGregor Gets Lesson on PACs"), 21 ("Passing Money to Other PACs a Legal Way to Hide Donations"), 63 ("McGregor, Creeks put money on candidates Gambling interests add almost $1.2 million to campaign chests"), 72 ("Shell game treats voters like suckers"), and Doc 7-5 at 8 ("EDITORIAL: PAC transfers need to be transparent"). These articles were based on campaign-finance disclosure reports the Alabama Secretary of State receives and makes available to the public.[10] That the donations are transparent to moderately energetic reporters, opposition researchers, and law enforcement indicates that the state interest in further disclosure is less than compelling.

The ban on PAC-to-PAC transfers does not, indeed, fundamentally alter the search for contributions. Under the PAC-to-PAC ban as interpreted by Defendants, individuals and businesses will be able to give unlimited sums to an unlimited number of PACs, 527

_____

[9] Defendants' Exhibit B is actually selected editorials, for the most part.
[10] Since 1999, the data has been available online.

organizations, and private foundations. A news reporter, individual, or opposition researcher will still have to wade through scores or hundreds of reports of individual PACs to total all of the contributions by a particular individual, business, or entity.

Newspaper editorialists liked to complain that the public could not follow the money exactly from source to recipient in 2010 and earlier. See, e.g., Doc 7-5 at 23 ("The PAC wash cycle rinses away the direct link from contributor to candidate, making it almost impossible for the public to know for sure who is funding whose campaign.") The same can be said of almost any PAC if it gives money to more than one candidate and has more than one contributor. For instance, assume a large Alabama law firm's PAC makes contributions to the Democratic and Republican candidates for the Alabama Supreme Court. A reporter (or interested citizen) could look at the reports of the PAC and not be able to figure out which lawyer or lawyers in the firm had given the money that went to a particular candidate without the same sort of digging that the *status quo ante* required.

On the other hand, some who are directly involved in politics as candidates find that the job of "following the money" is easy. Former Republican gubernatorial candidate Bradley Byrne challenged his fellow GOP candidates in October 2009 not to take AEA money directly or indirectly.

> Yeah, y'all know how to read the financial reports. You can follow a PAC contribution, even if they wash it through this PAC-to-PAC thing. If you see A-vote [sic]

money or one of the other PACs that (AEA) have given to this PAC, giving to that PAC and it ends up in my campaign or somebody else's campaign, it's going to tell you.

Later he decided that the state needed a ban on PAC-to-PAC transfers.[11]

Whatever the level of inconvenience in tracking campaign contributions directly to candidates that may exist, such inconvenience is a product of the state's own disclosure system. The state simply has lagged in utilizing technology to make disclosure of Alabama contributions fully transparent.

**VII.** *Citizens Against Rent Control* **provides the answer for this case.**

A rough parallel to this case is found in *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, Cal.,* 454 U.S. 290 (1981). In *Citizens Against Rent Control,* two sections of the city's Election Reform Act of 1974 were at issue: one (§ 112) required publication of names of all contributors to committees campaigning for or against a ballot measure; the other (§ 602) forbade contributions more than $250 to such committees. Under Alabama law, all contributions of more than one hundred dollars must be disclosed, and

---

[11] "Reports show why PAC-to-PAC transfer ban needed, Byrne says," *Montgomery Advertiser,* 16 March 2010, available at http://www.montgomeryadvertiser.com/article/20100316/NEWS/3140317/Reports-show-why-PAC-PAC-transfer-ban-needed-Byrne-says.

Alabama law forbids contributions of any size from one PAC to another PAC (with a few exceptions).

In considering whether Berkeley's restriction on contributions was constitutional, the Court held,

> The public interest allegedly advanced by § 602--identifying the sources of support for and opposition to ballot measures--is insubstantial because voters may identify those sources under the provisions of § 112. … It is clear, therefore, that § 602 does not advance a legitimate governmental interest significant enough to justify its infringement of First Amendment rights.

*Citizens Against Rent Control,* 454 U.S. at 298-99.

The Defendants in this case have argued that the PAC-to-PAC transfer ban should be considered "a disclosure requirement under which candidates or groups must identify their contributors." Doc. 7 at 12-13. This is the same argument the City of Berkeley made in support of § 602 ("identifying the sources of support for and opposition"). And like Berkeley's argument, the Defendants' argument must be rejected because the State already requires the disclosure of contributions.

## VIII.   The PAC-to-PAC ban adversely affects the associational rights of the ADC.

The State of Alabama has a history of unconstitutional interference with the right of its black citizens to associate in the advancement of their legitimate interests, *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449 (1958), *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288 (1964). Such interference has occurred under the guise of the

Alabama Corrupt Practices Act (the precedessor to the Fair Campaign Pratices Act), *Hadnott v. Amos*, 394 U.S. 358, 361-362 (1969), and has involved unconstitutional criminal prosecutions, *Wallace v. Brewer*, 315 F. Supp. 431 (1970). See also, section 5 objection of July, 19, 1982 at [http://www.lawyerscommittee.org/admin/section_5/objections/files/1982_07_19_AL_82-1365_.pdf](http://www.lawyerscommittee.org/admin/section_5/objections/files/1982_07_19_AL_82-1365_.pdf). The PAC-to-PAC ban continues that unconstitutional interference with the rights of association of the ADC in several ways.

As noted above, the ADC is intertwined in a number of ways with the Alabama Democratic Party, which also is a PAC: members of the ADC serve as officers or members of the Alabama State Democratic Executive Committee, and the ADC and Democratic Party make contributions to each other in order to support and advance their common political ideals. The associational rights of political parties are well-established, *Democratic Party v. Wisconsin ex rel. LaFollette*, 450 U.S. 107, 121 (1981) ("This First Amendment freedom to gather in association for the purpose of advancing shared beliefs is protected by the Fourteenth Amendment from infringement by any State.") The PAC-to-PAC ban criminalizes future financial exchanges between these two intertwined PACs in violation of their First Amendment rights.

The ADC also associates with various candidates and with other PACs with common political interests, and uses contributions from such PACs and from candidates' principal campaign committees to further their common political ends. The state has no valid interest in

regulating such inter-PAC contributions except where the funds go to candidates as opposed to voter education, advocacy, GOTV, and the like. The state has no legitimate interest in regulating contributions from candidates' political campaign committees for GOTV. It is money *to* candidates rather than *from* candidates that implicates potential anti-corruption interests.

Defendants suggest, Doc. 7 at 28-30, that the rights of minority voters still will be served by channels other than the ADC. It is not, however, the right or responsibility of the state to choose those channels, to impede certain channels of association or to impose associations on voters, *Williams v. Rhodes*, 393 U.S. 23 (1968), *Kusper v. Pontikes,* 414 U.S. 51 (1973), any more than it is the right or responsibility of the state to choose what voters may say. *FEC v. Wisconsin Right to Life*, 551 U.S. 449 (2007).

The sweeping ban also interferes with potential future alliances. Alabama, of course, has a rapidly growing Hispanic population that shares many interests with the ADC and which also is beset by the Alabama Legislature. See, e.g., http://www.justice.gov/opa/documents/complaint-us-v-alabama.pdf. The ADC supports the efforts of Hispanic citizens to participate in the political process, and the future prospect that the ADC will contribute to a PAC to support Hispanic participation is on the near horizon. The State of Alabama has no interest in preventing such a contribution. The PAC-to-PAC ban, however, would not only criminalize the contribution

but would criminalize any efforts by the ADC to associate with other PACS in support of the Hispanic group.

While the state has an interest in regulating associational rights in terms of contributions to candidates, it has no legitimate interest in regulation campaign speech or GOTV activities. Here, as in *Democratic Party v. Wisconsin ex re. LaFollette, supra* at 126, "these interests are not incompatible, and to the limited extent they clash in this case, both interests can be preserved." Alabama has a range of alternatives for disclosure of inter-PAC contributions; indeed the state has implemented major steps to enhance its disclosure, and belatedly is taking additional steps that will, by the state elections in 2014, provide full and complete disclosure. The ADC action in response to the PAC-to-PAC ban demonstrates one such option by separating accounts for candidate contributions from those for campaign speech, GOTV, and other activities the state has no legitimate interests in regulating. Clearly, the PAC-to-PAC ban is not tailored to address the state's legitimate interest, but spreads far and wide to interfere with First Amendment rights.

## IX.     Count 2 states a valid claim against the PAC-to-PAC transfer ban under the Voting Rights Act.

Section 2 of the Voting Rights Act prohibits all voting standards, practices, and procedures that give voters "less opportunity than other members of the electorate to participate in the political process and elect candidates of their choice." 42 U.S.C. 1973. The PAC-

to-PAC ban constitutes a voting standard, practice or procedure that discriminatorily affects the rights of black citizens to participate in the political process. Indeed, the notion that access to funds is unrelated to the ability to participate in the political process flies in the face of a host of laws and court decisions. *See. e.g., Buckley v. Valeo*, 424 U.S. 1 (1976), and its progeny.

The reach of the Voting Rights Act, moreover, is designed to be broad, "to reach any state enactment which altered the election law of a covered State in even a minor way." *Allen v. State Board of Elections*, 393 U.S. 544, 566 (1969). The Act is "aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race," *id.,* at 565, so that the phrase "standard, practice, or procedure" must be given the "broadest possible scope," *id.,* at 567. The *Allen* Court held that a law that made independent candidacies more burdensome was covered by the Act since it could "undermine the effectiveness" of voters who wish to elect such a candidate. 393 U.S., at 570. See also, *Hadnott v. Amos*, 394 U.S. 358 (1969).

The Defendants cite to the minor and sensible limitation on the scope of the Act to rule changes that occur after the election is over, the victors are in office, and the duties of office are divided, *Presley v. Etowah County Commission*, 502 U.S. 491 (1992). This limitation is a far cry, however, from the activities of the ADC that occur before the election, in conjunction with the election, on election day, and at the

polls themselves. The activities "bear a direct relation to voting itself." *Presley*, 502 U.S. at 510. To say that a law burdening voter protection activities or GOTV efforts does not affect voting is to speak nonsense.[12]

A change on voters' access to the polls, including their access to transportation to the polls affects voting. See e.g., section 5 objections in Pike County MS, June 28, 1999,

---

[12] Defendants also suggest that the failure of the Department of Justice to file suit somehow suggests that the Department support their position. Doc. 7 at 26-27. In fact, the Department's inaction says nothing. The failure of the Attorney General to act with respect to a particular voting change is hardly dispositive of the merits of the instant complaint or any complaint under the Voting Rights Act. Various Attorneys General have failed to pursue valid claims under the Voting Rights Act in *Blanding v. Dubose*, 454 U.S. 393 (1982) (minority citizens appealed successfully where Attorney General failed to appeal an adverse section 5 ruling); *Young v. Fordyce*, 520 U.S. 273, 281 (1997); *LULAC v. Perry*, 548 U.S. 399 (2006) (voting change precleared by the Attorney General found to be racially discriminatory); *Buskey v Oliver*, 565 F. Supp 1473 (M.D. Ala. 1983) (voting change precleared by the Attorney General found to be racially discriminatory); and *Major v Treen*, 574 F. Supp. 325 (E.D. La 1983) (three judge court) (voting change precleared by the Attorney General found to be racially discriminatory), to name a handful of cases. Indeed, it appears that in anticipation of a flood of redistricting activity, the Voting Section has substantially scaled back its litigation program under the Voting Rights Act from six cases, to one section 2 case, from 12 to four cases under section 203 (42 U.S.C. § 1973aa-1a), and from three cases to none under section 5 (42 U.S.C. § 1973c) from Jan, 1, 2009 as compared to the preceding 30 months (July 1, 2006-Dec. 31 2008). See http://www.justice.gov/crt/about/vot/litigation/caselist.php. (The Voting Section also filed on case in 2009 under section 11(b), 42 U. S.C. § 1973i(b), and a number of the section 203 cases in both periods also contained a count under section 208, 42 U.S.C. § 1973aa-6.)

http://www.lawyerscommittee.org/admin/section_5/objections/files/1999_06_28_MS_97-3795_.pdf ; Navapache Hospital District, AZ, August 16, 1985

http://www.lawyerscommittee.org/admin/section_5/objections/files/1985_08_16_AZ_85-1768_.pdf ; and Wilson County, TX, November 4, 1980, http://www.lawyerscommittee.org/admin/section_5/objections/files/1980_11_04_TX_80-1100_.pdf. In Wilson County, one of the factors on which the objection was based was the amplified effect on voting because many black voters lack automobiles, as is the case among many black voters in Alabama. A law that, like the ban on PAC-to-PAC transfers, limits the practical ability of voters to obtain rides to the polls is a practice that affects voting.

The financial aspects of election regulation, including the candidate filing fees that comprise many ADC donations to candidates, fall within the Voting Rights Act, *Bullock v. Carter* 405 U.S. 134, 143-144 (1972) ("The effect of this exclusionary mechanism on voters is neither incidental nor remote. Not only are voters substantially limited in their choice of candidates, but also there is the obvious likelihood that this limitation would fall more heavily on the less affluent segment of the community") , as do other more subtle and indirect costs, such as limits on candidates' public employment[13] and onerous candidate-petition requirements.[14]

---

[13] *Dougherty County v. White*, 439 U.S. 32 (1978).

[14] Section 5 objections to candidate-petition requirements by the State of Alabama and Mobile, Alabama,

The less affluent segment of the community in Alabama is, of course, the black community. Alabama has a long history of discrimination in voting. The effects of that past discrimination continue today not only in the continuing educational gaps among those who have attended (or are attending) separate and unequal schools and those who bear the social and economic effects of past discrimination. Defendants blandly wave aside the very real burdens on equal participation by black citizens of Alabama, but they are very real, and they are burdens that the state itself created.

The educational, social, and economic burdens are inter-related. Racial discrimination in education has left a disproportionate number of black citizens in need of assistance at the polls.[15] Black

http://www.lawyerscommittee.org/admin/section_5/objections/files/1972_08_14_AL_V4074.pdf and http://www.lawyerscommittee.org/admin/section_5/objections/files/1973_08_03_AL_V5607.pdf.

[15] *Harris v. Graddick*, 593 F. Supp. 128, 131 n. 2 (M.D. Ala. 1984). In addition to the historical qualitative differences between educational facilities in Alabama for black and white citizens, black adults are more likely than whites to lack a high school education or even a ninth-grade education. The 2000 Census showed the following data for blacks and whites over the age of 25:

|  | Less than 9th grade education | Total lacking a high school diploma | Total number |
|---|---|---|---|
| Whites | 159,182 | 475,725 | 2,157,934 |
| % among whites | 7.4% | 22.0% | |
| Blacks | 71,586 | 217,327 | 657,233 |
| % among blacks | 10.9% | 33.1% | |

voters in Alabama have been subject to intimidation at polling places by poll workers and others. *Harris v. Graddick*, 593 F. Supp. at 131. ("The evidence now before the court dramatically and persuasively reflects that many blacks, in particular the elderly and the uneducated, still labor under these past memories of personal humiliation, intimidation and violence. They understandably still harbor strong fears of entering all-white public places, even though they are now legally entitled to do so. They find the simple act of registering and voting, especially when the voting officials are all white, an extremely intimidating experience; and as a result, many of them do not register, and many of those who do register do not vote.")

The history of abuse of black voters at the polls has made many black voters unwilling to accept assistance from poll workers.[16] Education-related socio-economic disparities leave many black citizens divorced from official communication channels, and disproportionately in need of assistance to get to the polls. For each of these purposes the

Source: http://factfinder2.census.gov, tables P148A and P148B (accessed 13 August 2011).

[16] The conduct of poll officials that prompted *United States v. Conecuh County,* civil action no. 83-1201-H (S.D. Ala. June 12, 1984) included gross racial slurs spoken directly to black voters among other overtly discriminatory conduct, *Voting Rights Act: Sections 6, 7 and 8 – the Federal Examiner and Observer Program: Hearings before the Subcomm. on the Constitution of the H. Comm. On the Judiciary*, 109th Cong. 47 (2005) (statement of Barry H., Weinberg, former Deputy Chief and Acting Chief, Voting Section, Civil Rights Div., U.S. Dep't of Justice).

legacy of racial discrimination in voting has led to the establishment and maintenance of groups like the ADC that provide a dependable, non-discriminatory and essential part of the voting process. The state's interference with the right of the ADC to associate with other organizations to fund voter education, voter protection, and voter-facilitation activities undermines these essential parts of the voting process for many black citizens. The effects of this interference will ripple throughout the ability of black voters to participate equally in the political process and to have an equal opportunity to elect candidates of their choice in violation of section 2.

The discrimination against black voters, moreover, is hardly a thing of the past. The Justice Department has assigned federal observers to monitor elections in Conecuh County as a result of evidence of violations of the Fifteenth Amendment as recently as 2006. Since 1995 alone, federal observers also have been assigned to monitor elections in Autauga County on November 2, 2010, Barbour County on July 13, 2010; Chambers County on November 7, 2006; Dallas County on June 2, 1998, August 27, 1996 and November 5, 1996; Hale County for seven elections from 1997 to 2006; Lowndes County on October 7, 2000, August 27 1996 and September 17, 1996; Perry County on June 23, 2008, August 26, 2008 and November 4, 2008; Russell County on July 13, 2010. *See*, http://www.lawyerscommittee.org/projects/section_5/. With respect to each assignment of federal observers, federal law has required a

determination by the Department of Justice that there is credible evidence of violations of voters' Fourteenth or Fifteenth Amendment rights.[17]

The appointment of federal observers is far from the only evidence that legacy of discrimination continues to this very day in racist attitudes and a disposition to minimize black voter turnout in Alabama elections. See, e..g.,

http://blog.al.com/spotnews/2011/06/alabama_senator_scott_beason_w.html and the following exchange from the *U.S. v. McGregor* trial (the case based on the indictment that is Defendants' Ex. C), from a press account omitted by Defendants from their Ex. B:

> VictoryLand Milton McGregor defense lawyer Bobby Segall had Beason read the transcripts of those remarks to jurors, about half of whom are black. In one conversation, Beason and others discuss their fears that many black voters would turn up at the polls if a constitutional amendment on electronic bingo was placed on the ballot.
>
> "Every black in this state will be bused to the polls," said a person who was not identified on the transcript.

---

[17] Under the Voting Rights Act as originally crafted, such assignments were through section 6, 42 U.S.C. § 1973d (appointment of federal examiners), and section 8, 42 U.S.C. § 1973f (appointment of federal observers to counties where an examiner had been appointed). The 2006 amendments to the Act (section 3) eliminated the federal examiner provision and retained the observer provision. The predicate substantive requirement that the Attorney General determine that appointment be necessary to protect Fourteenth or Fifteenth Amendment rights remains.

Larry Dixon, who was a Republican state senator from Montgomery at the time, said the voters will be taken to the polls on "HUD-financed buses."

Beason responded, "That's right. That's right. This will be busing extra."

In another conversation, Beason and others are discussing the distressed economy of Greene County, home to Greenetrack.

"That's y'all's Indians," said former state Rep. Benjamin Lewis, R-Dothan.

"They're aborigines, but they're not Indians," Beason responded.

Beason testified that he did not remember the conversation.

"I'd want to forget it, too," Segall quipped.

"What must you say, Senator Beason, when you don't know you are on tape," Segall said.

The state's history of discrimination continues, despite the sedulous efforts of the Congress, the courts, organizations like the ADC, and many citizens of good will.[18] Some apparently have yet to accept that for

---

[18] The fact that there was unanimous support for a self-styled anti-corruption measure, Doc. 7 at 31-33, at a time when several current and former members had been indicted and word of future indictments filled the air, is hardly probative of anything other than a desire to live to fight another day and not to get caught up in an over-aggressive prosecution *a la* Sen. Ted Stevens. The fact that the proposal had languished for a decade is more suggestive of the substantive views of legislators.

"every black voter in the state" to go to the polls is a good thing, not a problem.

At the heart of the Defendants' Motion is a contention that the burdens of the PAC-to-PAC ban are trivial because new organizations will spring forth to take the place of the ADC, and new financial streams will flow to support them. Election campaigns, however, are highly complex, highly expensive, and constantly evolving processes. They involve much specialization by organizations that appeal to certain sectors of the electorate or that perform certain functions (door-to-door advocacy, voter turnout, voter protection, distributing handbills, and the like). Preventing such groups from affiliating (by transferring funds) not only interferes with their associational rights, but by drying up a source of funding it can have a very direct and very damaging effect on the voters. Expertise gained and systems established over the course of 51 years cannot be replaced overnight. This is especially true in an unsettled and constricted national economic situation.

Defendants blithely aver, for example, that the Alabama Education Association, having supported the ADC in the past, will continue to do so in the future. That support, however, has come primarily through the Association's PAC, A-VOTE, and such transfers will be prohibited in the future. The State of Alabama, moreover, has enacted legislation (Act 2010-761) to restrict the ability of the Association to have any involvement whatsoever in voting, least of all making contributions to the ADC. Far from being "implausible to

assume" that the AEA will not continue to be involved in get-out-the-vote programs" Doc. 7 at 29, the PAC-to-PAC ban is the second statute the Alabama Legislature passed to prevent such involvement. *Alabama Education Association v. Bentley,* --- F.Supp.2d ----, 2011 WL 1484077 (N.D. Ala. 2011) (preliminarily enjoining act under the First Amendment). Rather than show the absence of any burden, the state's rather disingenuous argument suggests the breadth and inter-related nature of the efforts to restrict political activity by the ADC and associated organizations.

Whatever may be the case in the long run, elections are not held in the long run. An election will be held in Montgomery next week. Special elections for House Districts 45 and 48 are set for October. Many more elections will follow in 2012 (including presidential primaries and general election) and every year after. By the major state elections in 2014, when the campaign disclosure forms are fully on line and fully cross-searchable and the entire rationale for the ban on PAC-to-PAC transfers, even to candidates, will have disappeared, it may be that some of the structures and systems may have been replaced. The rights denied and votes lost, however, will never be replaced.

CONCLUSION

Based on the foregoing, the Defendants' Motion to Dismiss should be denied, and the Plaintiffs' Motion for Partial Summary Judgment should be granted. The challenged portions of the PAC-to-

PAC ban clearly violate both the right of association and the freedom of speech in violation of the First Amendment, and should be enjoined. Far from being "implausible," the Voting Rights Act claim is a serious challenge to the PAC-to-PAC ban.

Submitted by,

/s/ Edward Still

Osaygefo Grubbs
Joe M. Reed & Associates, LLC
524 S. Union Street
Montgomery, AL 36104
Phone: 334-834-2000
Fax: 334-834-2088
email: ogrubbs@bellsouth.net

Edward Still
PMB 304
130 Wildwood Pkwy STE 108
Birmingham AL 35209
Phone & fax: 205-320-2882
email: still@votelaw.com

John K. Tanner
3743 Military Rd, NW
Washington DC 20015
Phone: 202-503-7696
Email:
john.k.tanner@gmail.com

CERTIFICATE OF SERVICE

I certify that on 16 August 2011 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys:

James W. Davis
Winfield J. Sinclair
William Parker Jr.
Attorney General's Office
PO Box 300152
Montgomery, AL 36130-0152
jimdavis@ago.state.al.us
wparker@ago.state.al.us
wsinclair@ago.state.al.us


                              /s/ Edward Still