IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| THE ALABAMA DEMOCRATIC CONFERENCE, an Alabama political action committee, *et al.*, </br></br>    *Plaintiffs,*</br></br>v.</br></br>LUTHER STRANGE, in his official capacity as Attorney General of Alabama, *et al.*,</br></br>    *Defendants.* | Civil Action No. </br>5:11-cv-02449-JEO |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS (DOC. 7) AND OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. 9)**

### INTRODUCTION

For years, Alabama political operatives would, consistent with state law, move campaign contributions among political action committees so as to skirt other state-law provisions requiring disclosure of the contributions' source. This practice elicited a sustained chorus of fears that such PAC-to-PAC transfers could be used to cover up corrupt deal-making, culminating in the October 2010 federal indictment of an Alabama state senator and several gambling proponents for just that sort of an arrangement. In response, the Alabama Legislature enacted Act No.

1

2010-765, which (with a few exceptions) outlaws the "transfer of funds" among PACs.

In just one of the nine sections in their opposition to the State's motion to dismiss do the plaintiffs argue that this measure might plausibly "den[y] or abridge[]" black citizens' right to vote "on account of race or color" in violation of Section 2 of the Voting Rights Act, 42 U.S.C. §1973(a). *See* doc. 10 at 28. And what relative little they say there reflects a fatal lack of substance. Their "on-account-of-race" argument, to give one example, amounts at most to a showing that effects of past discrimination "continue today," doc. 10 at 32, or that some Alabama elected officials might, "to this very day," harbor racist attitudes, doc. 10 at 35. But they do not even try to link these circumstances to the provision they challenge as racially discriminatory. *See* doc. 10 at 32-36.

It is thus apparent that the plaintiffs regard the First Amendment claim to be their most viable one. But on that claim, the plaintiffs face another big problem: They effectively concede that the PAC transfer ban need not withstand strict scrutiny. To be sure, they at times try to recast the measure as more burdensome than it really is. *See, e.g.*, doc. 10 at 19 (likening the provision to "an edict" that a particular candidate "may not advertise his candidacy"). But those attempts are divorced from any discussion of the appropriate scrutiny level, and, in any event, plainly wrong. Indeed, the plaintiffs take no position on the level-of-scrutiny

question, which is in many cases dispositive. Although the PAC transfer ban would survive even strict scrutiny, it easily bears the lower-level scrutiny the plaintiffs now appear to concede is applicable.[1]

ARGUMENT

I. **The PAC transfer ban does not violate the First Amendment.**

The plaintiffs have failed to establish that Alabama's ban on transferring money among political action committees could plausibly violate the First Amendment: They essentially have conceded that the provision need not withstand strict scrutiny. And, whatever the level of scrutiny, they have failed to show how the provision is not sufficiently tailored to achieve Alabama's interests in (1) ensuring the effectiveness of its campaign-finance disclosure rules and (2) preventing actual and apparent corruption.

A. **The plaintiffs concede that the PAC transfer ban need not withstand strict scrutiny, and their backdoor attempts to portray the provision as more burdensome are unpersuasive.**

---

[1] The plaintiffs' have set forth 39 assertedly undisputed facts, presumably in support of their motion for summary judgment on the First Amendment claim. *See* doc. 10 at 2-8. Some of these are in fact legal conclusions that do not precisely reflect the pertinent statutory language. *E.g., id.* at 2-3, ¶¶ 1-4. Others are comments like "Alabama has a long history of discrimination in voting," *id.* at 6, which may bear some truth but which have only a marginal connection to the issues in this case and are therefore overly inflammatory. Though it should go without saying, the State assumes these facts to be true only for purposes of the pending motions; as shown in this brief, the State should prevail on both motions as a matter of law. The State likewise does not agree to any of the plaintiffs' legal conclusions; the relevant statutes—and the State's briefing in this case—speak for themselves.

3

The PAC transfer ban does not share any traits with the campaign regulations the Supreme Court has subjected to strict scrutiny. It does not forbid particular messages or limit spending for political purposes. It does not limit the amount of contributions a group may receive, penalize the exercise of First Amendment rights, or discriminate based on viewpoint. And it does not prevent groups from coordinating their efforts to advance a common goal (so long as money doesn't change hands). Accordingly, it must be upheld if it bears a "substantial relation" to at least one of Alabama's important interests. *See* doc. 7 at 10-12.

As noted above, the plaintiffs essentially wave the white flag on this point. Significantly, they fail to take a position on the proper standard. *See id.* at 17 (arguing for the provision's invalidity "[w]hatever the proper level of scrutiny"). They instead set out a neutral list of various possible formulations, as if to invite the Court simply to pick one. *See id.* at 15 (the Supreme Court "applies several levels of scrutiny" in this context). With one exception, the quoted standards refer to *contribution limits,* which are far more burdensome than the PAC transfer ban in that they "impose direct quantity restrictions on political communication and association by persons, groups, candidates, and political parties." *Buckley v. Valeo*, 424 U.S. 1, 18 (1976) (per curiam).

The one exception in the plaintiffs' list of possible scrutiny levels is the standard for disclosure rules. *See* doc. 10 at 16. As the plaintiffs note, this standard has been described as "exacting." But by requiring merely a "substantial relation" between a challenged provision and a "sufficiently important governmental interest," this standard exemplifies the "lower level of scrutiny" the Supreme Court has used to uphold a variety of campaign restrictions the Court has found to be "less onerous." *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011). Indeed, this is precisely the standard that should be used to evaluate the PAC transfer ban.

Though failing to address the scrutiny-level issue head-on, the plaintiffs nevertheless resort to a number of backdoor tactics to portray the PAC transfer ban as more burdensome than it really is. As indicated, the most common of these is to equate the PAC transfer ban with contribution limits. *See* doc. 10 at 16 (citing *Russell v. Burris*, 146 F.3d 563, 571 (8th Cir. 1998) and *McConnell v. FEC*, 540 U.S. 93 (2003)); *id.* at 19 (summarizing the PAC transfer ban as saying "Don't take (or make) a contribution"); *id.* at 24-25 (citing *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981)). But for whatever force this attempt may have as a matter of state law (which defines "contributions" broadly), it gets them no traction under the First Amendment. That is because the contribution limits in the cases they cite all involve express limits on the amount of money a person or

group may make available for political expression. As described elsewhere, *e.g.* doc. 7 at 3-4, 11, that simply is not the case here.

The plaintiffs' attempts to exaggerate the PAC transfer measure's effect ultimately reach comic heights. They compare it to unconstitutional limits on "independent expenditures" (i.e., restrictions on how much a person or group may spend on political expression). *See* doc. 17 (citing *Citizens United v. FEC*, 130 S. Ct. 876, 908-09 (2010)). They even compare the PAC transfer ban to an to "an edict" that a particular candidate "may not advertise his candidacy." Doc. 17 at 19. These hysterics do not merit a response. In the end, the PAC transfer ban plainly qualifies for the lower-level scrutiny appropriate for a campaign-finance regulation imposing such a modest burden on protected activities.

**B. Nothing the plaintiffs have said undermines the PAC transfer ban's justification as an anti-corruption measure.**

Insofar as candidates were the intended recipients of the money involved in PAC-to-PAC transfers, the challenged provision shuts down one avenue for concealing the transactions necessary to effectuate a bribe. Or, in the very least, it will allay the justified concerns that PAC-to-PAC transfers were a means of covering up corrupt deals of this sort. *See id.* at 4-5, 16-18; *see also* docs. 7-4 & 7-5. Although the measure may also be upheld as a transparency measure, *see infra* Section I.C, it makes sense here first to assess the measure's value as an

6

anticorruption device because that is the subject of the plaintiffs' central objection to it.  *See* doc. 10 at 1, 2, 9, 11, 13, 14, 15, 17, 18, 19.

The plaintiffs do not question the compelling importance of Alabama's interest in fighting corruption (be it actual or perceived), and they do not seriously dispute that the PAC transfer ban serves that interest.  The one point they make on this front is to question the State's use of a federal indictment bringing corruption charges against state officials and various proponents of less stringent state gambling laws.  *See* doc. 10 at 10.  But the presumption of innocence in that criminal case in no way undermines the indictment's evidentiary value in this unrelated civil case.  And the indictment's purpose in any event is to confirm the strong *appearance* of corruption, regardless of whether the defendants in that case are found guilty.  When the United States government indicts a sitting state senator in part on the basis of her instructions to a lobbyist to conceal a bribe by "running it through various PACs," doc. 7-2, ¶147, the existence of that perception cannot "reasonably be questioned."  FED. R. EVID. 201(b).  (The States' proffered news articles similarly establish points that are beyond reasonable question.)

Instead, the plaintiffs' main argument is that the PAC transfer ban cannot constitutionally be applied to the Alabama Democratic Conference on an anticorruption rationale.  They note that the ADC exists primarily to run "political education and advocacy" programs. Doc. 10 at 9; *see also id.* at 10-12.  And they

argue that because the Supreme Court has limited governments' anticorruption interest to preventing actual or apparent *quid-pro-quo* arrangements with candidates for public office, Alabama may not constitutionally restrict PAC-to-PAC transfers whose purpose is to fund the ADC's core First-Amendment activities. *E.g.*, doc. 10 at 2, 9, 13-15. In other words, they argue that the PAC transfer ban is insufficiently tailored to achieve its stated purpose.

Given the lower-level scrutiny applicable here, *see supra* Section I.A, the first problem with the plaintiffs' argument is that the ADC is so rare in its alleged use of PAC-to-PAC transfers. As demonstrated by the news articles submitted in support of the State's motion to dismiss, *see* docs. 7-4 & 7-5, any casual observer of Alabama politics would know that PAC-to-PAC transfers are used almost exclusively to channel money to candidates. Indeed, the plaintiffs even admit that the PAC transfer ban would, as a general matter, affect core First Amendment activities to only a "limited extent." Doc. 10 at 8. What this means under the appropriate, lower-level scrutiny is that the measure easily bears a "substantial relation" to Alabama's compelling anticorruption interest.

As it turns out, though, the ADC is not so rare in its *actual* use of PAC-to-PAC transfers. As the plaintiffs repeatedly admit, the ADC has made candidate contributions in the past and has no plans to forsake the practice going forward. *See* doc. 10 at 11, 12, 13, 14-15. In other words, the one PAC claimed to be

unique is not in fact unique. In the absence of a PAC whose purpose does not include giving contributions to candidates, the PAC transfer ban will withstand even strict scrutiny. There is literally no alternative to the PAC transfer ban that would constitute a "less restrictive" means of preventing the corruption or appearance thereof made possible by PAC-to-PAC transfers.[2]

### C. Nothing the plaintiffs have said undermines the PAC transfer ban's justification as promoting transparency and preventing circumvention of disclosure rules.

By eliminating political operators' endless opportunities to launder contributions through multiple PACs, the PAC transfer ban's primary effect is to make it easier for citizens to trace contributions from a donor to his or her intended recipient. *See* doc. 7 at 4, 13-16.

Here, too, the plaintiffs do not validly question the importance of the State's interest in promoting transparency—i.e., "provid[ing] the electorate with information" about the sources of campaign funds, *Buckley*, 424 U.S. at 66, and helping citizens "'make informed choices in the political marketplace.'" *Citizens United*, 130 S. Ct. at 914 (citation omitted). Nor do they show that the PAC-to-

---

[2] ADC's proposed segregation of funds (*see* doc. 10 at 14-15) is beside the point. Such a proposal might be relevant if the issue was how to remedy a constitutional violation if one exists. But it sheds no light on the only question currently before the Court, which is whether the PAC transfer ban violates ADC's First Amendment rights at all.

9

PAC transfer ban will insufficiently further that interest. Each of their attempts to do so comes up woefully short.

For their lead-off argument, the plaintiffs posit our observation that PACs remain free to coordinate with one another as a "roadmap for evading disclosure under the new law." Doc. 10 at 21. They further say that this "roadmap" reflects a "casual attitude" by "its lawyers" showing that transparency is not a "compelling, or even very important" reason for the provision. *Id.* The plaintiffs do not explain how coordination between PACs (without money changing hands) evades disclosure rules, and we frankly do not understand their point here. But even if such coordination did work at cross-purposes to the State's transparency goals, "[t]he First Amendment does not require the government to curtail as much speech as may conceivably serve [those] goals." *Blount v. SEC*, 61 F.3d 938, 946 (D.C. Cir. 1995). (In any event, the issue is the importance, as a matter of law, of the *State*'s interest, not the State's lawyers' purported "attitude" about anything.)

The plaintiffs also suggest that "many" of the cases the State cited to justify the sufficiency of its interest are inapplicable because they involved circumvention of contribution limits, not disclosure rules. Doc. 10 at 21. "Many," of course, does not mean all, and *Mariani v. United States*, 212 F.2d 761, 775 (3rd Cir. 2000), which the plaintiffs never mention, upheld a federal ban on making contributions "in the name of another" precisely because it discouraged circumvention of

10

disclosure requirements. More critically, the plaintiffs simply mischaracterize the State's argument. The State cited the anti-circumvention cases only for the proposition that preventing circumvention of a valid requirement (whatever its substance) is itself a valid interest. *See* doc. 7 at 13-14. Here, the plaintiffs do not question the validity of Alabama's disclosure requirements, so it makes no difference that the PAC transfer ban cannot further a "non-existent contribution limit." Doc. 10 at 21.

Next, the plaintiffs cite *Citizens Against Rent Control* for its holding that a limit on contributions to a ballot-measure campaign did not serve a significant interest in transparency because a disclosure rule was effectively serving that interest. *See* doc. 10 at 24-25. This holding is inapplicable on its face. For reasons already discussed, *see supra* Section I.A, the PAC transfer ban cannot legitimately be compared to a true contribution limit as was at issue in *Citizens Against Rent Control*. Moreover, in *Citizens Against Rent Control*, the Court expressly based its decision on "the record in [that] case," which failed to support the conclusion that the contribution limit was "needed to preserve voters' confidence in the [campaign] process." 454 U.S. at 299. The record in *this* case, on the other hand, shows just the opposite.

Finally, as predicted, *see* doc. 7 at 20, the plaintiffs make a big to-do about the potential for disclosure rules to displace transparency as a justification for the

11

PAC transfer ban. *See* doc. 10 at 8-9, 20, 22-24. On one hand, they seem to argue that even the old disclosure rules were all that was necessary to achieve the State's interests in transparency. *See id.* at 8-9, 22, 23-24. On the other hand, they seem to say that even the new ban on PAC-to-PAC transfers will not result in perfect disclosure. *See id.* at 22-23. On still another hand, they argue that achieving "full transparency" is just a matter of more frequent campaign reports and the better use of technology. *Id.* at 20; *see also id.* at 24. Logical inconsistencies aside, not much more needs to be said here. *See* doc. 7 at 20-21. All that matters is that the provision bear a "substantial relation" to the goal of giving voters more information about the source of campaign contributions. Alabama's PAC transfer ban fits that description easily in light of the mountain of evidence documenting the system's deficiencies under the old law. *See* docs. 7-4 & 7-5. It therefore presents no First Amendment violation.

## II. The PAC transfer ban does not violate Section 2 of the Voting Rights Act.

To violate Section 2 of the Voting Rights Act, a state law must: (1) constitute a "voting . . . standard, practice, or procedure," (2) result "in a denial or abridgement of the right . . . to vote," and (3) bring about such a denial or abridgement "on account of race or color." 42 U.S.C. §1973(a). As stated at the outset, the plaintiffs' "on-account-of-race" argument consists only of a showing

12

that socioeconomic gaps persist along racial lines and that some Alabama elected officials may harbor racist attitudes. The plaintiffs have not alleged, or even argued, that the PAC transfer ban was motivated by racial animus or that it will interact with latent racial bias so as to dilute black citizens' voting rights. Accordingly, the State's motion to dismiss the Section 2 claim may be granted on this basis alone. *See Johnson v. Governor of Florida*, 405 F.3d 1214, 1235-39 (11th Cir. 2005) (en banc) (Tjoflat and Pryor, JJ., concurring); *Nipper v. Smith*, 39 F.3d 1494, 1509-10 (11th Cir. 1994) (en banc) (opinion of Tjoflat, C.J., joined by Anderson, J.).

A quick word on the other two elements of a Section 2 claim is also in order.

### A. The PAC transfer ban is not a voting "standard, practice, or procedure" within the meaning of Section 2.

The plaintiffs have not established the PAC transfer ban to be a voting "standard, practice, or procedure" under Section 2. The plaintiffs attempt to distinguish *Pressley v. Etowah County Commission*, 502 U.S. 491 (1992), which held that a provision diminishing an elected official's power is beyond Section 2's reach. But it was not merely the fact that such a change would occur "after the election is over," doc. 10 at 29, that drove the Court's decision there. It was rather that such a change hand no "*direct* relation to voting and the election process." 502 U.S. at 503 (emphasis added). Here, a central premise of the plaintiffs' First

Amendment argument is that the transfer ban applies to so many of the ADC's assorted activities, including, for example, sponsoring candidate forums. *See* doc. 10 at 5, ¶17. Under the plaintiffs' logic, the decision of a public university or city-run community center to restrict ADC-sponsored candidate forums to certain times or locations would be a decision the ADC could challenge in federal court under the Voting Rights Act. That surely is not the law.

The plaintiffs' citation to three, old DOJ objections to other States' election practices likewise does nothing to make the PAC transfer ban look more like a voting practice. Each of those objections involved a change in the location of polling places or the elimination of polling places. Thus, unlike the PAC transfer ban, these changes fit comfortably in the recognized category of "changes involv[ing] the manner of voting." *Id.* at 502. By arguing that the PAC transfer ban falls within Section 2, the plaintiffs are asking the Court to give the phrase "voting" "standard, practice or procedure" a meaning the statutory text simply cannot bear.

**B.    The plaintiffs have not established that the PAC transfer ban might plausibly abridge black citizens' right to vote.**

Finally, as to Section 2's second element, the plaintiffs assert that that the PAC transfer provision will prevent equal minority political participation by interfering "with the right of the ADC to associate with other organizations to fund

14

voter education, voter protection, and voter-facilitation activities." Doc. 10 at 34. This prediction is not plausible as a matter of law, but even if it was, it would not impinge on "the *right* of any citizen . . . to vote," 42 U.S.C. §1973(a), and it would result in no reduced "opportunity . . . to participate in the political process" as compared to "other members of the electorate," *id.* §1973(b).

First, the PAC transfer ban does not prevent ADC from associating with other organizations. It only prevents shifting money from one PAC to another so voters will know who is funding political speech. Even with the measure in place, any person who wants to donate money to ADC may do so in unlimited amounts. Moreover, if ADC desires, it may spend every dime of that money on get-out-the-vote programs.

Second, the provision does not prevent ADC's historic partners such as the AEA and the Alabama Democratic Party from continuing to support ADC's get-out-the-vote programs. Certainly, the text of the provision does not prevent them from doing so. On this point, the plaintiffs point only to another statute, a recently enacted ban on the use of state property to facilitate state employees' dues payments to such organizations. *See* doc. 10 at 38. As the State previously has argued, Section 2 is concerned with obstacles to electoral participation, not a group's affirmative encouragement of such participation. *See* doc. 7 at 31.

Refusing to subsidize one group that might assist another group's efforts to encourage political participation is therefore doubly irrelevant.

**CONCLUSION**

A State violates neither the First Amendment nor the Voting Rights Act when, after years of public confusion and justified concerns about corruption, it enacts a measure prohibiting the potentially endless transfer of political contributions among PAC bank accounts. Accordingly, the State's motion to dismiss (doc. 7) is due to be granted and the plaintiffs' motion for partial summary judgment (doc. 9) is due to be denied.

Respectfully submitted,

LUTHER STRANGE (ASB-0036-G42L)
*Attorney General*

s/William G. Parker, Jr.
Winfield J. Sinclair (ASB-1750-S81W)
James W. Davis (ASB-4063-I58J)
William G. Parker, Jr. (ASB-5142-I72P)
*Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
(334) 353-8440 (fax)
wsinclair@ago.state.al.us
jimdavis@ago.state.al.us
wparker@ago.state.al.us

**Attorneys for the State Defendants**

**CERTIFICATE OF SERVICE**

I certify that on August 23, 2011, I electronically filed the foregoing document using the Court's CM/ECF system which will send notification of such filing to the following persons:

Edward Still
130 Wildwood Parkway
Suite 108 - PMP 304
Birmingham, AL 35209
(205) 320-2882
still@votelaw.com

John K. Tanner
JOHN TANNER LAW OFFICE
3743 Military Road NW
Washington, DC 20015
(202) 503-7696
john.k.tanner@gmail.com

Norman O Grubbs
JOE M. REED & ASSOCIATES LLC
524 South Court Street
Montgomery, AL 36104
(334) 834-2000
ogrubbs@bellsouth.net

s/William G. Parker, Jr.
Winfield J. Sinclair (ASB-1750-S81W)
James W. Davis (ASB-4063-I58J)
William G. Parker, Jr. (ASB-5142-I72P)
*Assistant Attorneys General*
