FILED

2011 Dec-14  PM 04:18
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **THE ALABAMA DEMOCRATIC CONFERENCE, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No.:  5:11-cv-02449-JEO** |
| **v.** | ) ) | |
| **LUTHER STRANGE, in his official capacity as Attorney General of Alabama, et al.,** | ) ) ) ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on Defendants Luther Strange, in his official capacity as the Attorney General of Alabama, Robert L. Broussard, in his official capacity as District Attorney for the 23rd Judicial Circuit, and Bryce U. Graham's, in his official capacity as District Attorney for the 31st Judicial Circuit, Motion to Dismiss (doc. 7) and Plaintiffs the Alabama Democratic Conference ("ADC"), Eddie Greene, James Griffin, Bob Harrison, Emmitt E. Jimmar, and Jimmie Payne's Motion for Partial Summary Judgment (doc. 9).  Both motions have been fully briefed.  *See* Doc. 14 (Defendants' Reply in Support of Defendants' Motion to Dismiss (Doc. 7) and Opposition to Plaintiffs' Motion for Partial Summary Judgment); Doc. 16 (Plaintiffs' Reply Brief in Support of Motion for Partial Summary Judgment); Doc. 17 (Plaintiffs' Notice of Additional Authority and Motion for Expedited Relief); Doc. 19 (ADC's Memorandum on Its Proposed Remedy); Doc. 20 (Supplemental Brief in Support of Defendants' Motion to Dismiss); and Doc. 21 (Plaintiffs' Post-Argument Memorandum).

I.      **INTRODUCTION**

This case concerns the legality of an amendment to Alabama's Fair Campaign Practices Act ("Act") that was approved by the Alabama Legislature in December 2010.  Part of the amendment prohibits one political action committee ("PAC") from making a contribution, expenditure, or any other transfer of funds to any other PAC.[1]  Plaintiffs attack the legality of the PAC-to-PAC transfer ban on two grounds: (1) that it violates Plaintiffs' First Amendment Rights and (2) that it violates Section 2 of the Voting Rights Act. (Doc. 1).  Defendants moved to dismiss the Complaint while Plaintiffs moved for summary judgment on the First Amendment claim and contend that the Voting Rights Act claim is not due to be dismissed.

Before delving into the merits of the pending motions, it is important to note that Plaintiffs are only challenging the amendment as it applies to the ADC's proposed fund to be used for independent expenditures.  (Doc. 10 at 9) ("Of course, Plaintiffs do not challenge the statute insofar as it prohibits PAC-to-PAC transfers of funds to candidates."); (*Id*. at 11) ("[I]n this action the ADC does not challenge the state's regulation of PAC-to-PAC transfers as they involve contributions eventually going to candidates."); and (*Id*. at 13) ("This suit seeks only relief against the application of the Act to funds received by the ADC for communication, GOTV [get out the vote] and independent expenditures.").  Rather, Plaintiffs' action is premised on the belief that the government lacks an interest in regulating the transfer of money from one PAC to a different PAC when the PAC that receives the money does not then funnel the money to a

---

[1] As noted below, the amendment actually makes it unlawful for any PAC, 527 organization, or private foundation to make a contribution, expenditure, or any other transfer of funds to any other PAC, 527 organization, or private foundation.  ALA. CODE § 17-5-15.  However, for simplicity's sake, the court will refer to this prohibition as a ban on PAC-to-PAC transfers with the understanding that the prohibition applies more broadly.

candidate.

The undersigned will first address Plaintiffs' motion summary judgment on the First Amendment claims before discussing Defendants' motion to dismiss both the First Amendment and Voting Rights claims. For the reasons that follow, Plaintiffs' Motion for Partial Summary Judgment (doc. 9) is due to be granted and Defendants' Motion to Dismiss (doc. 7) is due to be granted in part and denied in part.

## II.   PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. 9)

### A.   INTRODUCTION AND STANDARD OF REVEIW

As noted above, Plaintiffs moved for partial summary judgment on their First Amendment Claim. In support, they offer the affidavit and supporting documentation of Dr. Joe L. Reed, Chairman of the ADC. (Doc. 9-1, 9-2, and 9-3). Defendants do not dispute the facts offered by Plaintiffs for purposes of summary judgment. (*See* Doc. 14 at 3 n.1). Accordingly, the court accepts those facts as true only for purposes of the instant motion.

There being no genuine dispute as to any material fact, the question thus becomes whether Plaintiffs are entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a).

### B.   FACTS

#### 1.   The Alabama Fair Campaign Practices Act

Alabama's political campaigns are governed by Alabama's Fair Campaign Practices Act. *See* ALA. CODE §§ 17-5-1, *et seq*. In December 2010, the Alabama Legislature amended the Act to prohibit PAC-to-PAC[2] transfers. *See* ALA. CODE § 17-5-15. The Act now provides:

---

[2]Under the Act, a PAC is defined broadly to include "[a]ny ... group of one or more persons which receives or anticipates receiving contributions or makes or anticipates making expenditures to or on behalf of any elected official, proposition, candidate, principal campaign committee or other political action committee." ALA. CODE §

(b) It shall be unlawful for any political action committee, 527 organization, or private foundation, including a principal campaign committee, to make a contribution, expenditure, or any other transfer of funds to any other political action committee, 527 organization, or private foundation.  It shall be unlawful for any principal campaign committee to make a contribution, expenditure, or any other transfer of funds to any other principal campaign committee, except where the contribution, expenditure, or any other transfer of funds is made from a principal campaign committee to another principal campaign committee on behalf of the same person.  Notwithstanding the foregoing, a political action committee that is not a principal campaign committee may make contributions, expenditures, or other transfers of funds to a principal campaign committee and a separate segregated fund established by a corporation under federal law if the fund does not receive any contributions from within this state other than contributions from its employees and directors is not restricted by this subsection in the amount it may transfer to a political action committee established under the provisions of Section 10A-21-1.01 by the same or an affiliated corporation.

*Id*.

In other words, the 2010 amendment, which became effective December 20, 2010, prohibits the transfer of money between two PACs, except in certain circumstances.  *Id*.  Those exceptions are as follows: First, a PAC that is not a candidate's principal campaign committee may give money to candidates' principal campaign committee.  *Id*.  Second, if a corporation maintains a "segregated fund established ... under federal law" (for participation in federal elections), that fund may freely transfer funds to the corporation's affiliated PAC established under ALA. CODE § 10A-21-1.01 (for participation in state elections).  *Id*.  Third, there is a limited exception (for one class of candidates' principal campaign committees) for party qualifying fees, party dues, and tickets to political party dinners or functions.  ALA. CODE § 17-5-7(a).

Defendants contend that the ban on PAC-to-PAC transfers was enacted because the

---

17-5-2(a)(11).

ability to transfer money freely between PACs led to the circumvention of Alabama's disclosure rules and provided effective anonymity for high-dollar political donors. (Doc. 7 at 4). Defendants argue that circumventing disclosure rules led to at least the appearance of corruption because donors were free to extract promises of official action as a condition for their contributions – and candidates were free to oblige them. (*Id*. at 5). Because of this, the legislature enacted the PAC transfer ban to prevent corruption and the appearance thereof and to further the State's interest in promoting transparency in campaigns. (*Id*. at 5-7).

### 2.  The Alabama Democratic Conference

The Alabama Democratic Conference ("ADC") is an association of citizens that was established during the 1960 Kennedy-Johnson campaign to encourage political participation among black citizens and to support the Democratic candidates. (Doc. 9-1 at 1-2). The ADC has continued to exist as a grass roots voter-advocacy group since that time and, in accordance with Alabama law, has a PAC. (Doc. 10 at 4). The ADC's primary functions over the past decade have been to educate and protect voters and to run get-out-the-vote ("GOTV") drives. (Doc. 9-1 at 2-3). In the past 50 years, the ADC has used its resources to communicate with black citizens, though its GOTV activities and otherwise, on a wide range of matters related to their access to the political process, including, but not limited to the following:

(1) communications on the right to register to vote;

(2) the varying standards and procedures for voter registration;

(3) the varying methods of casting a ballot;

(4) the implications of election practices and procedures in their communities and how to obtain more fair procedures;

(5) the opportunity to serve as poll workers;

(6) the right of voters to be free from discriminatory treatment at the polls; and

(7) the right of voters who need help in voting to receive assistance and to choose for themselves the person whom they wish to provide that assistance.

(*Id*.; Doc. 10 at 4-5).

In the past, the ADC received contributions from other PACs, including the Alabama Education Association ("AEA"), A-VOTE (a PAC associated with AEA), the Alabama Trial Lawyers Association ("ATLA"), TRIAL (a PAC associated with ATLA), and the Alabama State Democratic Executive Committee. (Doc. 9-1 at 3-4). PACs, other than the principal campaign committees of candidates, have together contributed more than half of all the ADC's funds during the period between 2005 and 2010. (Doc. 9-2 at 5). In the past, the ADC has spent the bulk of its resources maintaining its communication infrastructure and supporting the efforts of its county units, especially in conjunction with GOTV activities. (Doc. 9-3). It has also made some expenditures to candidates. (*Id*.)

However, since the passage of the amendment to the Act at issue here, the ADC is no longer allowed to accept contributions from other PACs. As noted multiple times in their briefing, Plaintiffs are only challenging the PAC transfer ban as it applies to the ADC's use of funds for operations excluding donations to candidates. To ensure that funds received from PACs do not eventually go to candidates, the ADC has established two funds – funds that may be constitutionally restricted by the Act and those that may not. (Doc. 9-1 at 4-6). The two funds are called the Candidate Fund and the GOTV Fund. (*Id*. at 5-6). Currently, the money for both funds is maintained in the same bank account, but separate books are kept on each fund. (*Id*. at 5

n.1).  The Candidate Fund will receive contributions from individuals and businesses, and the

ADC will disburse those funds to candidates' principal campaign committees.  (*Id*. at 5).  All

money going to candidates – regardless of whether it is as a campaign contribution or for the

candidate's GOTV efforts – will come from the Candidate Fund.  (*Id*.)  If the court grants the

injunction sought by the ADC, it will also establish a GOTV Fund.  (*Id*.)  The GOTV Fund will

seek and receive contributions from any entity – businesses, individuals, 527 organizations,

PACs, and political parties.  (*Id*.)  The ADC asserts that it will use the GOTV Fund for

maintaining the ADC infrastructure and for GOTV-related communication efforts and other

independent expenditures (including transfers to other PACs for use in their GOTV campaign or

for other independent expenditures).  (*Id*.)  Key to this GOTV Fund is that none of the money it

contains will be transferred to candidates or their committees.  (*Id*. at 6).

      With these facts in mind, the court turns to the merits of Plaintiffs' First Amendment

claim.

**C.     DISCUSSION**

      Plaintiffs argue that the absolute ban on PAC-to-PAC transfers violates the First

Amendment because it infringes upon the political speech and associational rights of the ADC.

First, it is clear that "contributing to political candidates [falls] within the First Amendment's

protection for speech and political association."  *FEC v. Colorado Republican Fed. Campaign*

*Comm.*, 533 U.S. 431, 440 (2001) (*Colorado II*).  The Supreme Court has stated that these rights

(the right of association and the right of expression) are not analyzed in a vacuum.  *Citizens*

*Against Rent Control/Coalition for Fair Housing v. City of Berkeley*, 454 U.S. 290, 300 (1981)

("A limit on contributions in this setting need not be analyzed exclusively in terms of the right of

association or the right of expression.  The two rights overlap and blend; to limit the right of association places an impermissible restraint on the right of expression.").  The Supreme Court has further found that "the right of association is a basic constitutional freedom ... that is closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society." *Buckley v. Valeo*, 424 U.S. 1, 25 (1976) (internal citations and quotation marks omitted).  With this in mind, this court will follow the lead of the Supreme Court and address these two rights together.

The first step in deciding whether a particular statute is constitutional is to determine the appropriate level of scrutiny to apply.  That decision is complicated by the fact that this court is unaware of any Supreme Court decision analyzing the constitutionality of a similar regulation.  Thus, the court must first analyze the levels of scrutiny applied in the campaign finance realm in the past and then determine the appropriate level of scrutiny to apply to the PAC transfer ban at issue in this case.  Once an appropriate level of scrutiny is determined, the court must apply that standard to the facts of this case to determine the constitutionality of the amendment.

### 1.     What is the appropriate level of scrutiny?

Determining the appropriate level of scrutiny is a two-step process.  First, this court will discuss the different levels of scrutiny that the Supreme Court has applied in challenges to campaign finance laws.  Second, it will discuss which level of scrutiny should apply when analyzing the PAC-to-PAC transfer ban in question.

### a.     Levels of Scrutiny

The Supreme Court has applied differing levels of scrutiny when analyzing whether regulations that affect political speech and freedom of association violate the First Amendment.

Recently, in *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, the Court

summarized the state of the law as follows:

> Discussion of public issues and debate on the qualifications of candidates are
> integral to the operation" of our system of government. *Buckley v. Valeo*, 424
> U.S. 1, 14 (1976) (*per curiam*). As a result, the First Amendment " 'has its fullest
> and most urgent application' to speech uttered during a campaign for political
> office." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214,
> 223 (1989) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971)).
> "Laws that burden political speech are" accordingly "subject to strict scrutiny,
> which requires the Government to prove that the restriction furthers a compelling
> interest and is narrowly tailored to achieve that interest." *Citizens United v.
> Federal Election Comm'n*, 558 U.S. ——, ——, 130 S. Ct. 876, 898 (2010)
> (internal quotation marks omitted); *see Federal Election Comm'n v.
> Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 256 (1986).
>
> Applying these principles, we have invalidated government-imposed restrictions
> on campaign expenditures, *Buckley*, *supra*, at 52–54, restraints on independent
> expenditures applied to express advocacy groups, *Massachusetts Citizens for Life*,
> supra, at 256–265, limits on uncoordinated political party expenditures, *Colorado
> Republican Federal Campaign Comm. v. Federal Election Comm'n*, 518 U.S.
> 604, 608 (1996) (opinion of BREYER, J.) (*Colorado I*), and regulations barring
> unions, nonprofit and other associations, and corporations from making
> independent expenditures for electioneering communication, *Citizens United*,
> *supra*, at ——, 130 S. Ct., at 917.
>
> At the same time, we have subjected strictures on campaign-related speech that
> we have found less onerous to a lower level of scrutiny and upheld those
> restrictions. For example, after finding that the restriction at issue was "closely
> drawn" to serve a "sufficiently important interest," *see, e.g.*, *McConnell v. Federal
> Election Comm'n*, 540 U.S. 93, 136 (2003) (internal quotation marks omitted);
> *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 387–388 (2000)
> (internal quotation marks omitted), we have upheld government-imposed limits
> on contributions to candidates, *Buckley*, *supra*, at 23–35, caps on coordinated
> party expenditures, *Federal Election Comm'n v. Colorado Republican Federal
> Campaign Comm.*, 533 U.S. 431, 437 (2001) (*Colorado II*), and requirements that
> political funding sources disclose their identities, *Citizens United*, *supra*, at ——
> – ——, 130 S. Ct., at 916–917.

___ U.S. ___, 131 S. Ct. 2806, 2816-17 (2011).

As noted above, the Supreme Court has applied strict scrutiny to those laws that "burden

speech."  Examples of laws that burden speech are those that limit the expenditures of candidates and political groups.  *Id*.  On the other hand, the Court has applied a lower level of scrutiny when the "strictures on campaign related speech" are less onerous – for example, regulations limiting contributions or requiring disclosure of the names of people who have contributed to a campaign.  *Id*.  While not discussed in *Arizona Free Enterprise Club's Freedom Club PAC*, the Supreme Court has applied this lower level scrutiny in two different ways depending on the type of regulation it is addressing.[3]  *See Buckley*, 424 U.S. at 20-30 and 64-68.

When determining the constitutionality of contribution limits, the Court has found that even a "significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms," hereinafter referred to as "closely drawn" scrutiny.  *Id*. at 25 (internal citations and quotation marks omitted).  Since this standard was announced in *Buckley*, the Court has consistently applied it when determining whether laws limiting contributions are valid.  *See Nixon v. Shrink Missouri Gov't*, 528 U.S. 377, 387-88 (2000); *McConnell v. FEC*, 540 U.S. 93, 231-32 (2003) (overruled on other grounds).

However, the Court has applied a slightly different lower level of scrutiny when addressing challenges to disclosures limits – exacting scrutiny, "which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest."  *Citizens United*, 130 S. Ct. at 914 (2010) (internal quotations omitted) (citing *Buckley*, 424 U.S. at 64; *McConnell*, 540 U.S. at 201).  Like with the standard the Court has applied to contribution

---

[3] Application of these lower levels of scrutiny did not come into play in *Arizona Free Enterprise Club's Freedom Club PAC*, 131 S. Ct. 2806.  In that case, the Court only discussed the application of strict scrutiny as it applied to the restriction in question. *Id.*

limits, the Court has consistently applied exacting scrutiny when analyzing disclosure requirements.  *See Buckley*, 424 U.S. 64-68; *Citizens United*, 130 S. Ct. at 914.

Thus, it is clear that the Supreme Court applies three levels of scrutiny in cases addressing political speech and associational rights – strict scrutiny and two lower level scrutinies, closely drawn scrutiny and exacting scrutiny.[4]

**b.     Which Level of Scrutiny Applies on the PAC-to-PAC Transfer Ban?**

Having identified the standards of review the Supreme Court has applied in the past, the court must next determine which level of scrutiny is applicable when analyzing the ban on PAC-to-PAC transfers.  Defendants argue that the ban on PAC transfers is constitutionally sound under any level of scrutiny, but state that because the ban on PAC transfers is most similar to a

---

[4] Defendants "reject[ ] the notion that there are distinct 'mid-level' standards of scrutiny for campaign finance regulations."  (Doc. 20 at 1).  In doing so they rely solely on the language from *Arizona Free Enterprise Club's Freedom Club PAC* cited above.  They argue that "although the Court has articulated the lower-level scrutiny in various ways, it should now be clear that the Court was in substance applying only one standard."  (*Id.* at 2).  While Defendants are right that the Court in *Arizona Free Enterprise Club's Freedom Club PAC* did only mention strict scrutiny and a lower level scrutiny, even a cursory review of the cases cited to support that proposition shows that there are in fact two lower levels of scrutiny used by the Court in those cases.  *Compare McConnell*, 540 U.S. at 137 ("[W]hen reviewing Congress' decision to enact contribution limits ... [t]he less rigorous standard of review we have applied to contribution limits (*Buckley's* 'closely drawn' scrutiny) shows proper deference to Congress' ability to weigh competing constitutional interests in an area in which it enjoys particular expertise."); *Nixon*, 528 U.S. 387 ("Thus, under *Buckley's* standard of scrutiny, a contribution limit involving 'significant interference' with associational rights ... could survive if the Government demonstrated that contribution regulation was 'closely drawn' to match a 'sufficiently important interest.'") (internal citations omitted); *Buckley*, 424 U.S. at 25 ("Even a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms.") (internal quotation marks and citations omitted); *Colorado II*, 533 U.S. at 456 ("We accordingly apply to a party's coordinated spending limitation the same scrutiny we have applied to the other political actors, that is, scrutiny appropriate for a contribution limit, enquiring whether the restriction is 'closely drawn' to match what we have recognized as the 'sufficiently important' government interest in combating political corruption."); *with Citizens United*, 130 S. Ct. at 914 ("The Court has subjected [disclaimer and disclosure] requirements to 'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest.") (internal citations omitted).  And, a reading of those cases shows that the standards employed by the Court differed both in substance and language.  Further, even if the Supreme Court were pronouncing a change in the law, which this court seriously doubts, such pronouncement would be dictum because a lower level of scrutiny was not at issue in *Arizona Free Enterprise Club's Freedom Club PAC*, 131 S. Ct. 2806 (unquestionably discussing and applying only strict scrutiny to the facts of the case).

disclosure requirement, the undersigned should apply a lower level scrutiny.  (Doc. 7 at 12-13).  Conversely, Plaintiffs argue that the ban is unconstitutional under all potentially applicable levels of scrutiny.  Nevertheless, they argue that the strict scrutiny, or alternatively, closely drawn scrutiny should apply.  (Doc. 16 at 6-9).

The first question the court must answer is whether the PAC-to-PAC transfer ban burdens speech, thus warranting application of strict scrutiny.  If the answer is no, the court must decide which of the lower standards apply to the restriction in question.  In order to answer the first question, the court must determine the extent to which the PAC-to-PAC transfer ban interferes with Plaintiffs' First Amendment rights.

The Supreme Court's analysis in *Buckley* is particularly illuminating here.  In *Buckley*, the Court compared the impact of contribution limits and expenditure limits on political speech and the right of association. 424 U.S. at 19-23.  The Court found that expenditure limitations "represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech." *Id*. at 19.  On the other hand, the Court found that "a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication." *Id*. at 20.  In reaching that conclusion, the Court reasoned that the contribution itself serves as the general expression of support and that the size of that contribution does not increase the quantity of communication by the contributor.  *Id*. at 21.  The Court further held:

> A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.  While contributions may result in political expression if

> spent by a candidate or an association to present views to the voters, the
> transformation of contributions into political debate involves speech by someone
> other than the contributor.

*Id*.

In this case, the law in question, like the contribution limit discussed in *Buckley*, only marginally affects political expression because it does not limit the amount or way in which the ADC can spend its money during a campaign. The ADC is only marginally affected because, while it cannot receive contributions from other PACs, it is still able to receive money from individuals and corporations.[5] Because the PAC transfer ban does not limit the amount or way in which the ADC can spend its money during a campaign, the ban cannot "burden speech" as is required for application of strict scrutiny.

The analysis of a regulation's impact on speech is not mutually exclusive from the analysis of a regulation's impact on association. Thus, the court must also look at the PAC transfer ban's effect on the ADC's associational rights before excluding strict scrutiny as the appropriate standard. "[M]aking a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals." *Buckley*, 424 U.S. at 22. However, when addressing the effect of a contribution limit, the court found that while the limitation in question limited "one

---

[5] When addressing the impact of a contribution limit, the Supreme Court has also stated that "contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy." *Buckley*, 424 U.S. at 21. In other words, the Supreme Court asked "whether the contribution limitation was so radical in effect as to render political association ineffective, drive the sound of the candidate's voice below the level of notice, and render contributions pointless." *Nixon*, 528 U.S. at 397. To the extent Plaintiffs argue that not being able to receive contributions from PACs and other political organizations would prevent them from amassing the resources necessary for effective advocacy, that argument is unpersuasive. Plaintiffs do not offer any evidence in support of the assertion that they would be unable to amass sufficient funds from individual and corporate donations. While, Plaintiffs have submitted evidence showing that in the past a great deal of their contributions had come from other PACs, this is insufficient to show that they will not be able to get sufficient funding from individuals and corporations in the future.

important means of associating with a candidate or committee, [it left] the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates." *Id*.  Because of this, the Court found that, like with political speech, limitations on expenditures affected a person's associational rights more significantly than a limitation on contributions.  *Id*.

However, in this case, unlike *Buckley*, PACs are not able to contribute to another PAC at all, thus limiting their associational rights.  Nonetheless, this limitation is not as severe as the limitation on independent expenditures discussed in *Buckley*.  Under the amendment, PACs are still able to contribute to a political candidate without limitation and are able to receive contributions from individuals and corporations.  The limitation on the ADC's associational rights is more akin to the limitation created by the contribution limit in *Buckley*.  Thus, the impact on ADC's associational rights is not severe enough to warrant application of strict scrutiny.  Because strict scrutiny is not the appropriate standard to apply to determine whether the PAC-to-PAC transfer ban survives the ADC's constitutional challenge, the court must now determine which lower level of scrutiny to apply.

In *Buckley*, the Supreme Court's seminal case on the First Amendment and campaign finance law, the Court addressed the constitutionality of both contribution limits and disclosure laws.  In doing so, the Court announced different standards for each.  *Compare Buckley*, 424 U.S. at 20-30 *with Buckley*, 424 U.S. at 64-68.  In determining that closely drawn scrutiny was the most appropriate standard to apply to contribution limits, the Court drew from several cases that addressed the right of association.  *Id*. at 25 (citing *Cousins v. Wigoda*, 419 U.S. 477, 488 (1975); *NAACP v. Button*, 371 U.S. 415, 438 (1963); *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).  On

14

the other hand, when determining that exacting scrutiny was the appropriate level of scrutiny to apply in cases concerning disclosure requirements, the *Buckley* Court looked to cases challenging the disclosure of membership lists from various organizations. *Id*. at 64-65 (citing *NAACP v. Alabama*, 357 U.S. 449, 461 (1958)).  A comparison between the analysis of the Court with respect to contribution limits and disclosure requirements, illustrates the distinction between the effects a contribution limit has on the rights of speech and association and the effects a disclosure requirement has on those same rights.  In discussing contribution limits, the Court recognized that contribution limits have a direct, albeit marginal, impact on a person's rights of speech and association.  *Id*. at 20-22 ("By contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute ... entails only a marginal restriction upon the contributor's ability to engage in free communication.").  However, when discussing disclosure requirements, the Court acknowledged that "[t]his type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure."  *Id*. at 65.  Thus, contribution limits directly, but insignificantly, impact a person's First Amendment rights, while disclosure requirements do not directly infringe upon a person's rights, but might have indirect effects on those same rights. *See NAACP v. Alabama*, 357, U.S. at 462-63.

In urging the court to apply a lower level scrutiny, Defendants analogize the ban on PAC-to-PAC transfers to disclosure requirements.  They argue:

> [G]iven its purpose and operation, the PAC transfer ban looks most like a disclosure requirement under which candidates or groups must identify their contributors.  Because disclosure requirements do not prevent anyone from

> speaking, and impose no ceiling on campaign-related activities, they have long been upheld under a less demanding standard of review....  The Supreme Court's descriptions of disclosure rules apply with equal force to the PAC transfer ban and thus require application of the corresponding, lower-level scrutiny.

(Doc. 7 at 12-13) (citations and internal quotations omitted).  On the other hand, Plaintiffs argue that exacting scrutiny should not apply because the Supreme Court has only applied this lowest level of scrutiny to disclosure/disclaimer requirements and the amendment to the Act being challenged here involves neither disclosure nor disclaimer limits.  (Doc. 16 at 6-7).

First, it is clear that the ban in question here is not a disclosure requirement.  Nothing in the language of ALA. CODE § 17-5-15 requires a PAC to disclose the identity of those people or groups making contributions nor does the amendment in question require the PAC to disclose what groups or candidates to which it contributes.  In fact, other provisions of the Act govern those very disclosure requirements.  *See* ALA. CODE § 17-5-8.  Further, the PAC-to-PAC transfer ban is not analogous to a disclosure requirement.  Prohibiting an organization from doing something is unlike requiring an organization to report that they did that very thing.

The direct effect the PAC transfer ban has on the ADC's rights further shows that it should not be classified as a disclosure requirement.  As addressed above, prohibiting the ADC from making or receiving contributions from other PACs directly limits, albeit marginally, the ADC's ability to engage in its rights of political speech and association.  This is distinct from disclosure requirements, where the possible effect on First Amendment rights is indirect.  *See Buckley*, 424 U.S. at 65.

This court's conclusion that the PAC transfer ban is unlike a disclose/disclaimer requirement is further supported by the similarity between the PAC transfer ban and a law setting

a limit on the amount of money a person can contribute to a candidate or PAC.  *See Minnesota Citizens Concerned for Life, Inc. v. Kelley*, 427 F.3d 1106, 1113 (8th Cir. 2005) (applying closely drawn scrutiny in a challenge to a provision prohibiting the transfer of funds between candidates' political committees).  Without question, if the amendment stated that "it shall be unlawful for any political action committee ... to make a contribution, expenditure, or any other transfer of funds in an amount greater than $500 to any other political action committee," there would be no discussion about whether to apply the standard of review applicable to contribution limits.  However, the hypothetical provision limiting contributions, expenditures, and transfers to $500, is not at all different from the actual ban – except rather than having a limit of $500, the limit is zero.  In other words, by banning PAC-to-PAC transfers, the Alabama legislature has essentially limited the amount one PAC can contribute to another PAC to zero.

In addition to the logical similarities between the PAC transfer ban and a contribution limit, there are also similarities in the way both restrictions affect the ADC's speech and associational rights.  As previously noted, in both cases the regulation has a direct, but marginal, effect on those rights.  Because Alabama's ban on PAC-to-PAC transfers is essentially imposing a contribution limit, the court must apply closely drawn scrutiny to determine whether the ban is closely drawn to match a sufficiently important interest.  *Buckley*, 424 U.S. at 25.

### 2.    Alabama's Interest in Banning PAC-to-PAC Transfers, Where, as is the Case Here, the Money does not Ultimately go to a Candidate

Having determined that the PAC transfer ban is a contribution limit at its core, the next step is to analyze the State's interests and determine whether they are closely drawn to match a sufficient government interest.  The first step in this analysis is whether the State has a sufficient

17

interest in regulating the speech in question.  Defendants argue that the ban furthers its interests in promoting transparency, preventing circumvention of disclosure rules, and eliminating actual and perceived corruption. (Doc. 7 at 10).

The court will first address whether the State's interest in transparency is sufficient under closely drawn scrutiny.  While it is clear transparency is a valid state interest to support a disclosure requirement, *Buckley*, 424 U.S. at 66-67, this court is not aware of any cases where the Supreme Court found that transparency, on its own, was a sufficient enough interest to justify a contribution limit analyzed under closely drawn scrutiny.[6]  In fact, a recent D.C. Circuit Court of Appeals opinion stated that "[t]he Supreme Court has recognized only one interest sufficiently important to outweigh the First Amendment interests implicated by contributions for political speech:  preventing corruption or the appearance of corruption."  *Speechnow.org v. FEC*, 599 F.3d 686, 692 (D.C. Cir. 2010) (citing *Davis v. FEC*, 554 U.S. 724, 740-41 (2008)); *See also, Colorado II*, 533 U.S. at 456 ("We accordingly apply to a party's coordinated spending limitation the same scrutiny we have applied to the other political actors, that is, scrutiny appropriate for a contribution limit, enquiring whether the restriction is 'closely drawn' to match what we have recognized as *the 'sufficiently important' government interest* in combating political corruption.") (emphasis added); *Nixon*, 528 U.S. at 428 (Thomas, J., dissenting) ("[P]reventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances.") (internal quotation marks omitted); *Wisconsin Right to Life State Political Action Comm. v. Barland*, No. 11-2623 Slip Op. at 25 (7th Cir. December 12, 2011) ("It's worth pausing here to reiterate that preventing actual or

---

[6] Further, neither party has brought such a case to the court's attention.

apparent quid pro quo corruption is the *only* interest the Supreme Court has recognized as sufficient to justify campaign-finance restrictions.  Over time, various other justifications restricting political speech have been offered – equalization of viewpoints, combating distortion, leveling electoral opportunity, encouraging the use of public financing, and reducing the appearance of favoritism and undue political access or influence – but the Court has repudiated them all.") (emphasis in original) (internal citations omitted).  Accordingly, it is clear that the State's interest in transparency, while perhaps sufficient to justify a disclosure requirement, is insufficient to justify the PAC-to-PAC transfer ban.[7]

The State additionally argues that it has a valid interest in preventing the circumvention of disclosure requirements. (Doc. 7 at 13).  Unquestionably, on its face, this is a valid state interest.  However, the question is whether it is a sufficient interest to justify the ban under closely drawn scrutiny.  As discussed above, the only valid interest justifying limits on contributions is preventing corruption or the appearance thereof.  Like with the State's transparency interest, it is likely that the State's interest in preventing the circumvention of disclosure requirements would survive a challenge under exacting scrutiny.  However, it is simply not a sufficient interest under closely drawn scrutiny.

Thus, the question becomes whether the State's interest in preventing corruption or the appearance of corruption is sufficient under the closely drawn level of scrutiny.  There is no question that the State has a legitimate interest in preventing corruption or the appearance of corruption in the political process.  *See Buckley*, 424 U.S. at 26-27.  It is this interest in

---

[7] Defendants argue that "there is no reason the State's transparency interest cannot justify the PAC transfer ban under either standard."  (Doc. 20 at 2).  However, the only support offered for that contention is cites to sections of opinions addressing the constitutionality of disclosure requirements, not contribution limits. (*Id.*)

preventing corruption or the appearance of corruption that the State cites as one of the evils the

PAC-to-PAC transfer prohibition seeks to remedy.  Recently, the Supreme Court addressed the

contours of a government's interests in preventing corruption or the appearance of corruption in

*Citizens United*.  There, the Supreme Court held that "[w]hen *Buckley* identified a sufficiently

important governmental interest in preventing corruption or the appearance of corruption, that

interest was limited to *quid pro quo* corruption.  *Citizens United*, 130 S.Ct. at 909-10.  Further,

the Court found that "independent expenditures ... do not give rise to corruption or the

appearance of corruption."[8]  *Id*.  The D.C. Circuit summarized this nicely as follows:

> In light of the Court's holding as a matter of law that independent expenditures do
> not corrupt or create the appearance of *quid pro quo* corruption, contributions to
> groups that make only independent expenditures also cannot corrupt or create the
> appearance of corruption.  The Court has effectively held that there is no
> corrupting "quid" for which a candidate might in exchange offer a corrupt "quo."

*Speechnow.org*, 599 F.3d at 432-33.

In the situation before the court, Plaintiffs challenge the ban on PAC-to-PAC transfers as

it applies to their proposed segregated fund scheme.  To review, the ADC has established two

funds on its books – the Candidate Fund and the GOTV Fund.  The Candidate Fund will receive

contributions from individuals and businesses and the ADC will disburse those funds to

candidates' principal campaign committees.  All money going to candidates – regardless of

whether it is as a campaign contribution or for the candidate's GOTV efforts will come from the

Candidate Fund.  The GOTV Fund will seek and receive contributions from any entity –

businesses, individuals, 527 organizations, PACs, and political parties.  The ADC will use the

---

[8] "By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate." *Citizens United*, 130 S. Ct. at 910.

GOTV Fund for maintaining the ADC infrastructure and for GOTV-related communication efforts and other independent expenditures (including transfers to other PACs for use in their GOTV campaign or for other independent expenditures).  Key to this GOTV Fund is that none of the money it contains will be transferred to candidates or their committees.

Plaintiffs argue that because contributions they receive from any PAC-to-PAC transfers will be used for independent expenditures only, there can be no corruption.  It follows then, if there can be no possibility for corruption, then preventing corruption or the appearance thereof cannot be a valid state interest.  *Citizens United*, 130 S. Ct. at 909.  The court agrees.  *See Wisconsin Right for Life State Political Action Comm.*, No. 11-2623 Slip Op. at 26 ("It follows, then, as a matter of law and logic, that Wisconsin's $10,000 aggregate annual contribution limit is unconstitutional as applied to organizations, like the Right to Life PAC, that engage in independent expenditures for political speech.  This is true even though the statute limits *contributions*, not *expenditures*.  Whether strict scrutiny or the intermediate 'closely drawn' standard applies, the anticorruption rationale cannot serve as a justification for limiting fundraising by groups that engage in independent spending on political speech.  No other justification for limits on political speech has been recognized, and none is offered here.") (emphasis in original); *Speechnow.org*, 599 F.3d at 432-33.

Given that preventing corruption or the appearance of corruption cannot be a valid interest if contributions are being made for purposes of independent expenditures,[9] it is clear that

---

[9] It is also worth pointing out that the Supreme Court has noted a distinction between independent expenditures and coordinated expenditures.  *See Colorado II*, 533 U.S. 431.  While it is clear under current Supreme Court precedent that an independent expenditure cannot lead to corruption or the appearance thereof, it is equally clear that coordinated expenditures between a PAC and a candidate can lead to corruption.  *Id.* at 442-43.  However, it is not the role of this court to divine whether Plaintiffs will limit the funds from the GOTV account to only independent expenditures.  At this juncture, it is simply the job of the court to address whether the PAC transfer ban

the State's interest in stopping corruption, or the appearance thereof, cannot support a ban on PAC-to-PAC transfers if the money does not ultimately get funneled to a candidate. Because the State cannot establish that it has a sufficient interest in infringing upon the ADC's First Amendment rights, this court must find that, as a matter of law, the PAC-to-PAC transfer ban is unconstitutional as applied to Plaintiffs. Accordingly, Plaintiffs' Motion for Partial Summary Judgment is due to be granted.

## III.   DEFENDANTS' MOTION TO DISMISS

### A.   INTRODUCTION AND STANDARD OF REVIEW

In addition to Plaintiffs' Motion for Partial Summary Judgment, the court also has before it Defendants' Motion to Dismiss. (Doc. 7). In their motion, Defendants seek dismissal of both the First Amendment and Voting Rights Act claims as a matter of law. Under Rule 12(b)(6), a count must be dismissed if Plaintiffs fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). However, unlike with a motion for summary judgment, whether a complaint properly states a claim upon which relief can be granted is determined based on the language contained within the four corners of the complaint.[10] *See* FED. R. CIV. P. 12(d). Thus, the question before the court is whether, based on the allegations in the complaint, Plaintiffs have stated a claim upon which relief can be granted. The court finds that they have with respect to the First Amendment Claim, but that they did not with respect to the Voting Rights Act Claim.

### B.   FIRST AMENDMENT CLAIMS

is constitutional as applied to a PAC that with a segregated account to be used only for independent expenditures. (*See* doc. 9-1 at 5-6)).

[10] In addition to the briefing submitted in support of the motion to dismiss, Defendants also submitted materials to "establish facts of which the Court may take judicial notice." (Doc. 7at 1 n.1). However, this additional evidence was not needed by the undersigned when making its determination.

For the same reasons, discussed in detail in Section II.C, that Plaintiffs are entitled to summary judgment as to their First Amendment claims, Defendants' motion to dismiss the First Amendment claims is due to be denied.

### C.      VOTING RIGHTS ACT CLAIMS[11]

In addition to the First Amendment claim, Defendants have also moved to dismiss Plaintiffs' claim that the PAC-to-PAC transfer ban violates Section 2 of the Voting Rights Act. (Doc. 7).

Section 2 of the Voting Rights Act provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
>
> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

Defendants' Motion to Dismiss challenges whether the ban is covered by Section 2 of the Voting Rights Act and, if so, whether Plaintiffs' Complaint contains allegations sufficient to

---

[11] Please see section II.B for an overview of the facts related to the PAC transfer ban.

show that it caused minority voters to be denied meaningful access to the political process.

The pertinent question here is whether the PAC-to-PAC transfer ban qualifies as a "voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen ... to vote on account of race or color." *Id*. To answer this question, the court must first consider whether the PAC-to-PAC transfer ban is a "standard, practice, or procedure" that is covered within the scope of the Voting Rights Act.[12]

Plaintiffs argue that the scope of the Voting Rights Act is designed to be broad, reaching "any state enactment which alter[s] the election law of a covered State in even a minor way." *Allen v. State Bd. Of Elections*, 393 U.S. 544, 566 (1969).  Because of the breadth of the scope of the Voting Rights Act, Plaintiffs' contend that the "PAC-to-PAC ban constitutes a voting standard, practice or procedure that discriminatorily affects the rights of black citizens to participate in the political process."  (Doc. 10 at 29).[13]  On the other hand, Defendants argue that the State's prohibition on one PAC transferring money to another PAC is not a voting standard, practice, or procedure.

This court was unable to find, nor did either of the parties produce, a case specifically defining the contours of what a "standard, practice or procedure" is under Section 2 of the Voting Rights Act.[14]  Thus, it is appropriate for the court to look to how that same language has been

---

[12] Neither party argues that the PAC-to-PAC transfer ban is a voting qualification or prerequisite to voting.

[13] Plaintiffs provide little more than conclusory statements to support this assertion.  In their response to Defendants' Motion to Dismiss, Plaintiffs argue that access to funds is directly related to the ability to participate in the political process and that the PAC-to-PAC transfer ban, which Plaintiffs claim burdens voter protection and GOTV efforts is directly related to voting.  (Doc. 10 at 28-31).  However, Plaintiffs provide little support for these statements and fail to show how the PAC transfer ban *directly* effects voting.

[14] In *Chisom v. Roemer*, the United States Supreme Court addressed whether, as amended, Section 2 applied to judicial elections, but it did not specifically address what a "standard, practice or procedure" was.  In it's discussion, the Court provided "a limit on the times that polls are open" as an example of a standard, practice, or

defined under Section 5 of the Voting Rights Act.[15]  *See FCC v. AT&T*, ___ U.S.___, 131 S. Ct.

1177, 1185 (2011) ("[I]dentical words and phrases within the same statute should normally be

given the same meaning."); *Nijhawan v. Holder*, 557 U.S. 29, 129 S. Ct. 2294, 2301 (2009)

("Where ... Congress uses similar statutory language and similar statutory structure in two

adjoining provisions, it normally intends similar interpretations.").

In *Presley v. Etowah Country Commission*, 502 U.S. 491 (1992)*,* the Supreme Court

addressed whether a particular law was a "standard, practice or procedure with respect to voting"

such that preclearance was required under Section 5 of the Voting Rights Act.  *Id.*  In its

discussion, the Court noted that the scope of Section 5 "is expansive within its sphere of

operation ... [and] comprehends all changes to rules governing voting." *Id.* at 501-02.  The Court

went on to say that "our cases ... reveal a consistent requirement that changes subject to § 5

pertain only to voting" and then listed the four categories of changes that the Court found were

covered by Section 5's preclearance requirements: (1) changes in the manner of voting;

(2) changes in candidacy requirements and qualifications; (3) changes in the composition of the

electorate that may vote for candidates for a given office; and (4) changes affecting the creation

of abolition of an elective office. *Id.* at 502-03.  The Court summarized the categories as follows:

The first three categories involve changes in election procedures, while all the

---

procedure. 501 U.S. 380, 396 (1991).

[15] Section 5 of the Voting Rights Act provides in relevant part:

Whenever a State . . . shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice or procedure with respect to voting . . . such State . . . may institute an action . . . for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.  42 U.S.C. § 1973c(a).

examples within the fourth category might be termed substantive changes as to which offices are elective.  But whether the changes are of procedure or substance, each has a direct relation to voting and the election process.

*Id*. at 503.

"The Voting Rights Act is not an all-purpose antidiscrimination statute." *Id.* at 509.  In fact, it only covers those laws that bear a "direct relation to voting itself." *Id.* at 510.  While Plaintiffs correctly assert that, as applied to the ADC, the PAC transfer ban might have an indirect affect on voting, that does not mean that the challenged provision comes within the scope of the Voting Rights Act.  It is clear that the PAC-to-PAC ban here does not fit into any of the categories described by the Court in *Presley*.  Further, the challenged law does not have any arguable *direct* relation to voting.[16]  For this court to find otherwise would greatly expand the scope of the Voting Rights Act to include almost any regulation passed by the state.  Such expansion, as the Supreme Court found with respect to Section 5 in *Presley*, was not Congress's intent. *Id.* at 505.  Accordingly, the court finds that as a matter of law, Plaintiffs cannot state a claim upon which relief may be granted under Section 2 of the Voting Rights Act.  Thus, Defendants' motion to dismiss is due to be granted as to this claim.

## IV.   CONCLUSION

With respect to Plaintiffs' Motion for Partial Summary Judgment, this ruling seeks only to answer the question posed by Plaintiffs – whether the PAC-to-PAC transfer ban is unconstitutional *as applied* to Plaintiff.  As explained above, the court finds that it is.  Thus,

---

[16] As noted in Footnote 13, Plaintiffs provide little support for the bold assertion that the PAC-to-PAC ban directly affects voting.  It is clear to the court, that any effect the ban may have on voting is indirect.  To get from a law banning the transfer of funds between PACs to the abridgment of the right to vote on account of color requires so many steps that the court cannot fathom how the regulation could be seen to have a direct effect on voting.

Plaintiffs' Motion for Partial Summary Judgment (doc. 9) is due to be granted. Additionally, the court finds that Defendants' Motion to Dismiss (doc. 7) is due to be denied with respect to the First Amendment claim and granted with respect to the Voting Rights Act claim.  An order consistent with this opinion will be entered.

**DONE**, this 14th day of December, 2011.

**JOHN E. OTT**
United States Magistrate Judge