IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF ALABAMA,
NORTHEASTERN DIVISION

| | |
|---|---|
| THE ALABAMA DEMOCRATIC CONFERENCE, an Alabama political action committee, et al., | |
| Plaintiffs, | CIVIL ACTION NO. 5:11-cv-02449-JEO |
| v. | |
| LUTHER STRANGE in his official capacity as the Attorney General of Alabama; et al., | |
| Defendants. | |

## Plaintiffs' Motion for Preliminary Injunction

Plaintiffs move for a preliminary injunction in the same terms as the Final Order (Doc. 25). Plaintiffs rely on the facts presented to the Court in support of their summary judgment motion (Doc. 9 and its attachments). The legal arguments in support of the motion are set out below.

## A. Standard or Scope of Review

The standard for "considering the propriety of preliminary relief" was summarized in *Scott v. Roberts,* 612 F.3d 1279, 1290 (11th Cir. 2010):

> (1) whether there is a substantial likelihood that the party applying for preliminary relief will succeed later

on the merits; (2) whether the applicant will suffer an irreparable injury absent preliminary relief; (3) whether the harm that the applicant will likely suffer outweighs any harm that its opponent will suffer as a result of an injunction; and (4) whether preliminary relief would disserve the public interest. *E.g., Burk v. Augusta-Richmond Cnty.,* 365 F.3d 1247, 1262-63 (11th Cir.2004). When the state is a party, the third and fourth considerations are largely the same. *Garcia-Mir v. Meese,* 781 F.2d 1450, 1455 (11th Cir.1986).

## B. Summary of the Facts

### 1. Legal background

#### a. The Fair Campaign Practices Act

When Alabama first enacted the Fair Campaign Practices Act (FCPA) in 1988, it sought to regulate the role of money in politics—not by limiting speech or the ability to finance speech—but by fostering disclosure and transparency. The FCPA placed no monetary limits on the amount individuals could give to candidates or PACs. Ala. Act No. 88-873. Nor did it limit the amount PACs could give to candidates or other PACs. The only hard money limits are for corporations, which are limited to contributing up to $500 to each candidate or PAC. Ala. Code §§ 17-5-14 and -14.1 (2013 Supp.)

To achieve its goal of transparency, the FCPA required candidates and groups to disclose certain information about their attempts to

influence political campaigns. Under the FCPA, any "group of one or more persons" that plans to receive or spend money to influence a state election is deemed a PAC and must report as such. Ala. Code § 17-5-2(a)(11). PACs must disclose the identities of their significant contributors, and their own expenditures. *Id.* § 17-5-8(c). The Secretary of State is required to make these reports publicly available. *Id.* § 17-5-10 and § 17-5-8.1 (2013 Supp.). PACs responsible for broadcasting or distributing paid political advertisements must disclose their identities in the advertisement itself. *Id.* §§ 17-5-12 & -13.

The FCPA also contains a provision making it "unlawful for any person to make a contribution in the name of another person." Ala. Code § 17-5-15(a). Laws of this nature—which either ban contributions through conduits or require disclosure of the contribution's true source—are practically universal.[1] Such laws provide a direct method

---

[1] *See* 2 U.S.C. § 441f (prohibition); Alaska Stat. § 15.13.074 (prohibition); Cal. Gov't Code § 84302 (disclosure); Conn. Gen. Stat. § 9-622(7) (prohibition); Del. Code tit. 15, § 8006(b) (prohibition); D.C. Code § 1-1131.01(e) (prohibition); Fla. Stat. § 106.08(5)(a) (prohibition); Ga. Code § 21-5-30(a) (prohibition); Haw. Rev. Stat. § 11-352 (prohibition); Idaho Code § 67-6614 (prohibition); 10 Ill. Comp. Stat. 5/9-25 (prohibition); Ind. Code § 3-9-4-16 (a) (prohibition); Iowa Code § 68A.502 (prohibition); Kan. Stat. § 25-4154(a) (prohibition); Ky. Rev. Stat. § 121.150(12) (prohibition); La. Rev. Stat. § 18:1505.2(A) (prohibition); 21-

for prohibiting efforts to subvert, through contributions made by straw entities or conduits, "the goal of complete and accurate disclosure of the contributors who finance elections." *United States v. Boender*, 649 F.3d 650, 661 (7th Cir. 2011).[2] The State interprets § 17-5-15(a) to only prevent "*individuals* from 'mak[ing] a contribution in the name of another person,'"[3] which likely explains why there are no reported decisions involving its application.

---

A Me. Rev. Stat. § 1004(3) (prohibition); Md. Code, Elec. Law § 13-602(a)(5)-(6) (prohibition); Mass. Gen. Laws ch. 55 § 10A (disclosure); Mich. Comp. Laws § 169.242(1) (disclosure); Minn. Stat. § 10A.29 (prohibition); Mo. Rev. Stat. § 130.031(3) (disclosure); Mont. Code § 13-37-217 (prohibition); Neb. Rev. Stat. § 49-1475 (disclosure); Nev. Rev. Stat. § 294A.112(1) (prohibition); N.J. Stat. § 19:44A-20 (prohibition); N.M. Stat. § 1-19-34.3 (prohibition); N.Y. Elec. Law § 14-120(1) (prohibition); N.C. Gen. Stat. § 163-278.14(a) (prohibition); N.D. Cent. Code § 16.1-08.1-03.3(5) (prohibition); Ohio Rev. Code § 3517.13(G) (prohibition); Okla. Admin. Code § 257:10-1-2 (disclosure); Or. Rev. Stat. § 260.402 (prohibition); 25 Pa. Stat. § 3254 (prohibition); R.I. Gen. Laws § 17-25-12 (prohibition); S.D. Codified Law § 12-27-12 (prohibition); Tenn. Code § 2-10-303(3) (disclosure); Tex. Elec. Code § 253.001 (disclosure); Utah Code § 20A-11-904 (prohibition); Vt. Stat. tit. 17, § 2805(e) (prohibition); Wash. Rev. Code § 42.17.730 (prohibition); W. Va. Code § 3-8-5a(h) (prohibition); Wis. Stat. § 11.30(1) (prohibition).

[2] *Accord United States v. O'Donnell*, 608 F.3d 546, 554 (9th Cir. 2010); *Mariani v. United States*, 212 F.3d 761, 775 (3d Cir. 2000).

[3] *See* State App. Brief 15-16 (emphasis added); *id.* at 52. *But cf.* Ala. Code § 17-5-2(9) (defining "person" for purposes of the FCPA to include an "individual, partnership, *committee*, association, corporation, labor

### b. The enactment of a categorical ban on transfers between PACs

In 2010, the Legislature enacted Ala. Act No. 2010-765, § 2 ("the Act"), which provides it is "unlawful for any political action committee, 527 organization, or private foundation, including a principal campaign committee, to make a contribution, expenditure, or any other transfer of funds to any other political action committee, 527 organization, or private foundation." (In 2013, this sentence was amended to read, "It shall be unlawful for any political action committee or tax exempt political organization under 26 U.S.C. § 527, including a principal campaign committee, or any person authorized to make an expenditure on behalf of such political action committee or 527 organization, to make a contribution, expenditure, or any other transfer of funds to any other political action committee or 527 organization." Ala. Code § 17-5-15(b).)

The Act creates a *complete* ban on transfers between PACs (except for transfers to a candidate's principal campaign committee). It makes

---

organization, or *any other organization or group of persons*") (emphasis added). Plaintiffs will deliver a copy of the State's appellate brief to the Court's Chambers.

no allowance for transfers that are fully and timely disclosed to the Secretary of State. Nor does its application admit of an exception for transfers that will be used exclusively to fund independent expenditures.

The portion of the Act at issue in this action is codified as § 17-5-15(b).

### c. Subsequent strengthening of the FCPA's disclosure requirements

In 2011 and 2013, the Legislature enacted three laws amending the FCPA's disclosure requirements for elections. The principal changes were:

First, the time for filing pre-election campaign finance reports was changed from 45 days and 5 days before a primary or general election to:

- The last day of every month beginning 12 months before the primary or general election;

- Every Friday in the month before the election;

- Daily during the eight days before the election if the PAC has received $5,000 or more since its last report;[4] and

- Within two days of receiving a single contribution of twenty thousand dollars or more.[5]

Second, the law required the Secretary of State to establish a system of electronic filing of reports and making the reports available on a searchable database on the Secretary's website.[6] PACs receiving less than ten thousand dollars per election cycle do not have to use the electronic filing system.[7] The electronic system is now in operation.

Third, any person or entity making an "electioneering communication" must file the same type of reports as PACs file. An electioneering communication is an expenditure over one thousand dollars for a communication made within 120 days of an election that contains the name or image of a candidate, and for which "the only reasonable conclusion to be drawn from the presentation and content ...

---

[4] Ala. Code § 17-5-8(a)(1), (2), and (3). All citations from the Code are to the current Code, unless otherwise noted.

[5] Ala. Code § 17-5-8.1(c).

[6] Ala. Code § 17-5-8(a)(3)b and § 17-5-8.1.

[7] Ala. Code § 17-5-8(g).

is that it is intended to influence the outcome of an election."[8] Communications by a trade or membership organization to its members, members' families, or members' employees are not electioneering communications. Ala. Code § 17-5-8(j) (2013 Supp.). There is also an exemption for churches unless the church makes an expenditure "used to influence the outcome of an election." Ala. Code § 17-5-8(i) (2013 Supp).

Fourth, the FCPA regulates legislative caucuses and treats them as PACs. Ala. Code § 17-5-5.1 (2013 Supp.).

Fifth, the Legislature amended the PAC-to-PAC transfer ban by removing references to private foundations. Ala. Code § 17-5-15(b) (2013 Supp.).

Sixth, the FCPA now contains a section on civil fines and criminal penalties. Ala. Code § 17-5-19 (2013 Supp.).

### 2. The ADC seeks to engage in transfers between PACs to fund independent expenditures, and it has established a separate bank account exclusively for this purpose.

The Alabama Democratic Conference (ADC) was originally founded in 1960 by a small group of black citizens who banded together

---

[8] Ala. Code § 17-5-2(a)(4).

that year to influence black voters to support the Democratic

presidential ticket of John F. Kennedy and Lyndon B. Johnson. Reed

decl. ¶ 4 (Doc. 9-1).[9]

Despite the similarity of names, the ADC is independent of the

Alabama Democratic Party. For instance, the ADC has sued the

Democratic Party and Democratic officials[10] and only supports those

Democratic candidates who meet its independent standards and has

withheld endorsement from Democratic candidates in the general

election many times. Unlike the Democratic Party, it actively endorses

candidates in primary elections, Reed decl. ¶ 4 (Doc. 9-1)

ADC seeks to join and associate with other PACs to pool their

resources to make independent expenditures. To facilitate these

---

[9] At that time, a significant portion of the black leadership – including the Rev. Martin L. King, Sr. (the father of Dr. Martin Luther King, Jr.) – backed the Republican Party generally and the Nixon-Lodge ticket specifically. Taylor Branch, *Parting the Waters: America in the King Years 1954-63* 349-50 (Simon and Schuster 1988).

[10] E.g., *Hawthorne v. Baker,* 750 F.Supp. 1090 (M.D.Ala. 1990), 756 F.Supp. 527 (M.D.Ala. 1990), 762 F.Supp. 1475 (M.D.Ala. 1991) (challenge to method of selection of members of governing bodies of state and county Democratic committees under Sections 2 and 5 of Voting Rights Act); *Harris v. Graddick,* 593 F.Supp. 128, 601 F.Supp. 70 (M.D. Ala. 1984) (suit attacking racially discriminatory method of appointing polling officials).

activities, ADC has, since the District Court's Order (Doc. 24), created a separate bank account used exclusively for independent-expenditure spending. By doing so, ADC has created a dual-account PAC structure similar to the one held to be constitutionally permissible in *Carey v. FEC*, 791 F.Supp.2d 121 (D.D.C. 2011), and which the Federal Election Commission (FEC) has subsequently authorized for use by all federally registered PACs in light of its acquiescence to the *Carey* decision.[11]

## C. Plaintiffs have a substantial chance of success on the merits.

1. The Act's Complete Ban on Transfers Between PACs to Finance Independent Expenditures Is Subject to "Closely Drawn" Scrutiny

The First Amendment mandates that "Congress shall make no law ... abridging the freedom of speech." In matters of "speech uttered during a campaign for public office," that constitutional admonition has "its fullest and most urgent application." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (citations and quotation marks omitted). This holds especially true when the speech involves making independent expenditures, which "[b]y definition, ... is political speech presented to

---

[11] *See* http://www.fec.gov/press/Press2011/20111006postcarey.shtml.

the electorate that is not coordinated with a candidate." *Id.* at 360. The fact that a speaker "is willing to spend money to try to persuade voters presupposes that the people have the ultimate influence over elected officials." *Id.*

A "contribution limit involving significant interference with associational rights must be closely drawn to serve a sufficiently important interest." *Davis v. FEC*, 554 U.S. 724, 740 n.7 (2008) (citation and quotation marks omitted); *accord Buckley v. Valeo*, 424 U.S. 1, 25 (1976). When "the government attempts to regulate the financing of political campaigns and express advocacy through contribution limits, ... it must have a countervailing interest that outweighs the limit's burden on the exercise of First Amendment rights." *SpeechNow.org v. FEC,* 599 F.3d 686, 692 (D.C. Cir.), *cert. denied*, 131 S.Ct. 553 (2010).

There can be no question that such "closely drawn" scrutiny applies to the Act's complete ban on transfers between PACs for purposes for financing independent expenditures.[12] *See id.* The State

---

[12] The State makes a half-hearted effort to contend that the Act's complete ban on transfers between PACs should be reviewed according to the lesser standard of "exacting scrutiny" reserved for campaign disclosures laws. (State App. Brief 30, 47.) This standard is plainly inapplicable because the Act does not require disclosure, nor can

has the burden to establish both the importance of its interest in enacting the ban and the requisite "fit" between the Act and the advancement of that interest. See *Bellotti*, 435 U.S. at 786. Significantly, a restriction cannot satisfy the requirement of being "closely drawn" if there are "many alternatives" to advancing the government's interest "that are not constitutionally suspect." *Homans v. City of Albuquerque*, 366 F.3d 900, 919 (10th Cir. 2004) (majority opinion of Tymkovich and O'Brien, JJ.) (concluding that a statute is not closely drawn in light of available alternatives); *cf. Supreme Ct. of Va. v. Friedman*, 487 U.S. 59, 67 (1988) (analyzing, in the context of heightened constitutional scrutiny, whether, "within the full panoply of legislative choices otherwise available to the State, there exist alternative means of furthering the State's purpose without implicating constitutional concerns").

---

transfers between PACs occur even if they are accompanied by the highest level of disclosure imaginable. *Cf. Citizens United*, 558 U.S. at 366 (observing that a true disclosure provision "impose[s] no ceiling on campaign-related activities, and do[es] not prevent anyone from speaking.") (citations and internal quotation marks omitted). The Act is therefore a contribution limit, plain and simple, and must be analyzed as such.

As we shall show, the State has failed to meet its burden of showing the Act is constitutional as applied to transfers between PACs to finance independent expenditures. First, the State's attempt to demonstrate the Act is justified by its interest in preventing corruption is bootless, for *Citizens United* holds *as a matter of law* that independent expenditures do not implicate a government anti-corruption interest and that such this interest therefore cannot justify restrictions on fundraising solely for independent expenditures. Second, the State cannot justify the Act as a transparency measure, as its complete ban is not closely drawn to promote that interest, particularly when there are many alternatives to the ban that are not constitutionally suspect. With all of these justifications swept away, the only remaining conclusion is that the Act cannot be constitutionally applied to transfers between PACs for financing independent expenditures.

2.    As a Matter of Law, the State Has No Anti-Corruption Interest in Enforcing the Act as to Transfers Between PACs for Financing Independent Expenditures.

The State spills much ink arguing the Act is needed to prevent corruption or the appearance of corruption. (*See* State App. Brief at 31-37.) But no detailed factual refutation of the State's claims is needed because *Citizens United* holds *as a matter of law* that independent expenditures do not implicate a governmental anti-corruption interest. That interest cannot be invoked as a justification for the Act where it bans transfers between PACs for financing independent expenditures.

*Citizens United* involved a nonprofit corporation that produced a film that was "in essence, ... a feature-length negative advertisement that urges viewers to vote against Senator [Hillary] Clinton for President." 558 U.S. at 325. The film was subject to the restriction under federal law, 2 U.S.C. § 441b, that made it unlawful for any corporation or union to use general treasury funds to make independent expenditures. The Court declared this expenditure ban unconstitutional, holding corporations may not be prohibited from spending money for express political advocacy when those expenditures are independent from candidates and uncoordinated with their campaigns. 558 U.S. at 365-66.

The independent nature of the expenditures at issue in *Citizens United* was key to the Court's decision. As the Court explained, "[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent ... alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Id.* at 908 (quoting *Buckley*, 424 U.S. at 47). The Court observed, saying that "[t]he fact that speakers may have influence over or access to elected officials does not mean that these officials are corrupt." 558 U.S. at 359. The Court therefore "conclude[d] that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." *Id.* at 357.

In the wake of *Citizens United*, every federal court to face the issue has recognized that the government cannot invoke its interest in preventing corruption to limit fundraising for independent expenditures. *See Wisconsin Right to Life State PAC v. Barland*, 664 F.3d 139, 154 (7th Cir. 2011) ("[A]fter *Citizens United* there is no valid governmental interest sufficient to justify imposing limits on fundraising by independent-expenditure organizations."); *Long Beach Area Chamber of Commerce v. City of Long Beach,* 603 F.3d 684, 695

(9th Cir.) ("Supreme Court precedent forecloses the City's argument that independent expenditures by independent expenditure committees raise the specter of corruption or the appearance thereof."), *cert. denied*, 131 S.Ct. 392 (2010); *SpeechNow.org*, 599 F.3d at 694-95 (concluding *Citizens United* held "as a matter of law that independent expenditures do not corrupt or create the appearance of quid pro quo corruption," and thus "contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption"); *Carey*, 791 F.Supp.2d at 126 (noting that where a PAC is "making independent expenditures, wholly separate from federal candidates or parties, the analysis is different because there is not that same governmental interest in protecting *quid pro quo* corruption") (footnote omitted); *Republican Party of N.M. v. King*, --- F.3d ----, 2013 WL 6645428, \*5 (10th Cir. 2013) ("It is worth repeating: the Court firmly rejected the contention that independent expenditures give rise to corruption or the appearance of corruption."); *Texans for Free Enterprise v. Texas Ethics Comm'n,* 2013 WL 5639542 at \*2 (5th Cir. 2013) ("There is no difference in principle—at least where the only asserted state interest is in preventing apparent or actual corruption—between banning an

organization . . . from engaging in advocacy and banning it from seeking funds to engage in that advocacy (or in giving funds to other organizations to allow them to engage in advocacy on its behalf).”); *New York Progress & Protection PAC v. Walsh,* 2013 WL 5746142 (2d Cir. 2013) (“Few contested legal questions are answered so consistently by so many courts and judges.”); *Personal PAC v. McGuffage*, 858 F.Supp.2d 963, 968 (N.D. Ill. 2012) (observing the “categorical rule that independent expenditures do not lead to *quid pro quo* corruption” and therefore “declin[ing] the invitation to study Illinois' political history” because “resolving [the issue] does not require an evidentiary record”) (citation and quotation marks omitted); *Yamada v. Weaver*, 872 F.Supp.2d 1023, 1041 (D. Haw. 2012) “[P]revention of corruption or its appearance cannot justify limiting campaign contributions if those contributions can lead only to independent campaign expenditures.”).[13]

---

[13] Even before the Supreme Court settled the issue conclusively in *Citizens United*, several courts had held that the government's anti-corruption interest could not be invoked to limit fundraising for independent expenditures. *See Emily's List v. FEC,* 581 F.3d 1, 6-7 (D.C. Cir. 2009); *N.C. Right to Life v. Leake,* 525 F.3d 274, 293 (4th Cir. 2008).

The State attempts to wish away this entire body of cases by asserting, "When courts have invalidated limits on PACs' ability to receive funds for independent expenditures in the past, they generally have done so only as to PACs that do not simultaneously make direct contributions to candidates." (State App. Brief at 36.) But these cases do not even remotely suggest the limitation the State asserts. And, what the State omits from its argument is *Carey*, *supra*, a case that (i) is directly on point in holding the FEC was constitutionally required to allow the PAC to use separate accounts for contributions and independent expenditures and (ii) rests its holding entirely on the same cases the State says are inapplicable here.

What ADC seeks to do here does not differ from what the plaintiff proposed to do in *Carey*. That is, ADC maintains a new bank account— separate from the one it uses for candidate contributions—to be used to make and receive unlimited contributions for financing independent expenditures. *Carey* squarely holds that the First Amendment affords ADC the right to have such a structure, and that holding follows ineluctably from *Citizens United* teaching that, as a matter of law,

independent expenditures do not implicate the government's interest in preventing corruption.

The State contends this two-account structure will lead to corruption because a donor could pass money through the independent-expenditure accounts of several PACs and, when those funds ultimately arrive at a particular PAC, the original donor could demand a direct contribution to a candidate from the final recipient PAC's contribution account. (State App. Brief 33-34.)

Even on the generous assumption that the State's imagined scenario implicates corruption,[14] the Act is not a "closely drawn" means of addressing it.[15] The first aspect of the scenario—transferring contributions through multiple conduit PACs—could be easily prevented by "alternatives that are not constitutionally suspect."

[14] Nothing in the State's scenario hints at actual *quid pro quo* corruption. Furthermore, because individuals and PACs may make unlimited contributions to candidates under current law, Alabama has made the policy decision that such contributions do not create the appearance of corruption.

[15] The State makes virtually no effort to argue why the Act's complete ban is "closely drawn," devoting to the issue only a single non-substantive paragraph of its brief that merely asserts that the Act satisfies this constitutional requirement. (State App. Brief at 43-44.) The State cannot satisfy its constitutional burden of justifying the Act by *ipse dixit*.

*Homans*, 366 F.3d at 919. Laws that restrict contributions through conduits are nearly universal and provide a time-tested means of preventing the kind of "money laundering" the State says is its main concern. *See Boender*, 649 F.3d at 661; *O'Donnell*, 608 F.3d at 554. Although the State has interpreted Alabama's existing ban on "contributions in the name of another," Ala. Code § 17-5-15(a), to apply only to contributions by *individuals*, there is nothing to prevent the State from interpreting it differently. Nor is there anything to prevent the Legislature from amending the law to apply to conduit contributions by PACs. Because there exist alternatives that address the State's concern more directly—and do so without the blatant overbreadth of a complete ban—the Act cannot pass muster as "closely drawn."

The Act does nothing to address the second part of the State's scenario—the transparency problem of contributions made at the *direction* of another. And, yet again, there are tried-and-true alternatives the State could use to deal with this issue that do not involve using the blunt instrument of a complete ban on transfers between PACs. Some states require contributions made at the direction of another to be reported as attributable to both persons. *See, e.g.*, Mich.

Comp. Laws § 169.270; Neb. Rev. Stat. § 49-1468(2). Other states

prohibit the practice altogether, treating it as tantamount to a

contribution in the name of another. *See, e.g.,* 2 Alaska Admin. Code §

50.25(c). However, the State has represented to the Court that two or

more PACs can coordinate their expenditures without making any

disclosure of the coordination. (State App. Brief 16.)

Ultimately, the State has failed to show that the First

Amendment permits the Act's enforcement as applied to transfers

between PACs for financing independent expenditures. The Supreme

Court has held as a matter of law that the State's anti-corruption

interest does not provide a constitutionally legitimate justification for

imposing limits on fundraising for independent expenditure. To the

extent the State can imagine a scenario of corruption that might arise

from a two-account structure, the Act is far too blunt an instrument to

be a "closely drawn" means of addressing the State's concern.

3.    The Ban Does Not Implicate Any Transparency
      Interest and, in Any Event, the Ban Is Not Closely
      Drawn To Advance that Interest.

The State also argues that the Act can be justified by its

separate interest in transparency and ensuring the adequate disclosure

of the sources of campaign spending. Although there is no reason to

dispute transparency is a legitimate and important governmental concern, the Act has only a tangential connection to that concern. The Act cannot satisfy the constitutional requirement of being a "closely drawn" means of advancing the State's interest.

To begin with the obvious, the Act is massively overbroad, reaching an entire universe of transfers that pose no transparency problem at all. Tellingly, no matter to what lengths a PAC went in disclosing its contribution to another PAC to finance independent expenditures, the Act would still treat that transfer as unlawful.

In contrast to a complete ban, there are "many alternatives" to advancing the government's interest that are both more effective and "are not constitutionally suspect." *Homans*, 366 F.3d at 919 (majority opinion of Tymkovich and O'Brien, JJ.). The solution that the federal government and most states employ to prevent the evasion of disclosure requirements is a straightforward ban on, or requiring disclosure of, contributions made through straw entities or conduits. *See* note 1, *supra*. As the State must acknowledge, this is the approach Alabama has taken, *see* Ala. Code § 17-5-15(a), at least as to contributions by individuals, *see* State App. Brief 15-16.

Likewise, there is no reason to believe the Act's complete ban is "closely drawn" when there are legal requirements already in place that provide for timely and full disclosure of campaign-related spending. As detailed above, the 2011 amendments to the FCPA strengthened existing disclosure provisions by requiring PACS make more frequent

reports, including a report within two days of receiving a contribution of $20,000 or more. For the 2014 election cycle, these reports are now even more accessible to public through a searchable database on the Secretary's website.

Even assuming these more muscular disclosure requirements do not generate the level of transparency the State seeks, there is no impediment to the Legislature imposing even more extensive or timely disclosures. And, to the extent the State is concerned about the public's ability to discern the source of funds used to finance particular advertisements, several states address this issue with disclaimer requirements that inform the public of a PAC's major contributors as part of the advertisement. *See*, *e.g.*, Alaska Stat. § 15.13.090(a) (requiring independent expenditures contain a disclaimer that identifies the committee's three largest contributors); Ariz. Rev. Stat. § 16-912(B) (same); Cal. Gov't Code § 84506(a) (same identifying two largest contributors); Rev. Code Wash. § 42.17.510(2) same regard to identification of five largest contributors). Such a law could be bolstered further by an enactment that makes it unlawful to "creat[e] or us[e] a ... committee to avoid ... the disclosure of any ... major funding source." Cal. Gov't Code § 84505. Again, these measures would fully vindicate the State's asserted interests without imposing the significant burdens of the complete ban.

The State's interest in transparency should be addressed by actual disclosure laws, which "impose no ceiling on campaign-related

activities and do not prevent anyone from speaking" or associating. *Citizens United*, 558 U.S. at 366. The complete ban is not a "closely drawn" means promoting transparency that can survive First Amendment scrutiny.

## D. Plaintiffs will suffer irreparable injury absent preliminary relief.

This action was brought to vindicate First Amendment rights. Complaint (Doc. 1), ¶¶ 29-43. As discussed above, the ADC's free-speech and association rights will be impaired by the enforcement of the Act.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). "The timeliness of political speech is particularly important." *Elrod,* at 374 n.29. "The rationale behind these decisions [is] that chilled free speech ..., because of [its] intangible nature, could not be compensated for by monetary damages; in other words, plaintiffs could not be made whole." *Northeast Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 896 F.2d 1283, 1285 (11th Cir.1990). And, "if [the injury] cannot be undone through monetary remedies," it is irreparable. *Cunningham v. Adams,* 808 F.2d 815, 821 (11th Cir.1987).

## E. The harm to plaintiffs (if there is no injunction) outweighs any harm to the State (as a result of an injunction).

The State will suffer no tangible harm by a preliminary injunction. It will not be required to spend money or forego income. "This ... is not a case in which preliminary relief would require the state to cancel or reschedule an election, discard ballots already cast, or prepare new ballots or other election materials." *Scott v. Roberts,* 612 F.3d 1279, 1296 (11th Cir. 2010).

As the court held in *KH Outdoor, LLC v. City of Trussville,* 458 F.3d 1261, 1272-73 (11th Cir. 2006), "[T]he threatened injury to the plaintiff clearly outweighs whatever damage the injunction may cause the [State] ... the [State] has no legitimate interest in enforcing an unconstitutional ordinance. For similar reasons, the injunction plainly is not adverse to the public interest. The public has no interest in enforcing an unconstitutional ordinance."

## F. The Rule 65(c) bond requirement should be waived because this is a public-interest lawsuit with no risk of financial loss for the state.

Having established that plaintiffs are entitled to a preliminary injunction, the only remaining question is the amount, if any, of the security plaintiffs must provide under Federal Rule of Civil Procedure 65(c). That Rule provides that federal courts may issue preliminary injunctions only if the applicant provides a bond in an amount

determined by the court. It is "well-established," however, that "the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC,* 425 F.3d 964, 971 (11th Cir. 2005) (internal quotation marks omitted). In this case, waiver of the bond requirement is appropriate.

District courts within the Eleventh Circuit frequently waive the Rule 65(c) bond requirement in public-interest lawsuits against the government. *See, e.g., Complete Angler, LLC v. City of Clearwater,* 607 F.Supp.2d 1326, 1335-36 (M.D. Fla. 2009); *Gay-Straight Alliance of Yulee High Sch. v. Sch. Bd.,* 602 F.Supp.2d 1233, 1238 (M.D. Fla. 2009); *Broward Coalition of Condominiums, Homeowners Associations and Community Organizations Inc. v. Browning,* 2008 WL 4791004 at *15 (N.D.Fla. 2008); *Gay-Straight Alliance of Okeechobee High School v. School Bd. of Okeechobee County,* 483 F.Supp.2d 1224 (S.D.Fla. 2007). *See also Ogden v. Marendt,* 264 F.Supp.2d 785, 795 (S.D.Ind. 2003) (no bond required for injunction against election regulation); *Smith v. Board of Election Com'rs for City of Chicago,* 591 F.Supp. 70 (N.D.Ill. 1984) (no bond required for preliminary injunction against statute requiring candidates to submit signatures representing ten percent of primary electors of their party).

Waiver of the bond requirement is also appropriate where, as here, there is no risk of financial loss to the enjoined party. *See, e.g.,*

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills,* 321 F.3d 878, 882 (9th Cir. 2003); *Gorbach v. Reno,* 219 F.3d 1087, 1092 (9th Cir. 2000); *Doctor's Assocs. v. Stuart,* 85 F.3d 975, 985 (2d Cir. 1996); and the cases in the previous paragraph. Accordingly, plaintiffs respectfully request that the Court waive the bond requirement in the event that it grants plaintiffs' motion for preliminary injunction.

## G. Conclusion

Plaintiffs pray the Court grant relief as follows:

1. Pending final resolution of this case or other order of the Court, defendants, their agents, servants, successors, and those acting in concert with them shall not enforce Ala. Code § 17-5-15(b) against Plaintiffs with regard to contributions the Alabama Democratic Conference receives to make independent expenditures as long as the Alabama Democratic Conference maintains a separate bank account so that funds received from any PAC or 527 organization shall only be used for independent expenditures.[16]

2. The requirement that the plaintiffs post security under Rule 65(c), Fed.R.Civ.P., be and hereby is waived. If it is later determined that this preliminary injunction was improvidently entered, the Court can make appropriate orders.

---

[16] This is the same as the injunction the Court entered in December 2011 except for the omission of any mention of "private foundations." The Act has been amended to remove that phrase.

Submitted by,

/s/ Edward Still

John K. Tanner
3743 Military Rd, NW
Washington DC 20015
Phone: 202-503-7696
Email:
john.k.tanner@gmail.com

Edward Still
PMB 304
130 Wildwood Pkwy STE 108
Birmingham AL 35209
Phone & fax: 205-320-2882
email: still@votelaw.com

Joe M. Reed
Joe M. Reed & Associates, LLC
524 S. Union Street
Montgomery, AL 36104
Phone: 334-834-2000
Fax: 334-834-2088
email: joe@joereedlaw.com

Norman Osaygefo Grubbs
The Grubbs Firm
1904 Berryhill Rd Ste 100
Montgomery, AL 36117-7789
E-mail:
ogrubbs@mylawyerlobby.com
Phone & fax: 334-523-9200

## CERTIFICATE OF SERVICE

I certify that on 16 January 2014 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys:

Andrew L. Brasher
James W. Davis
Winfield J. Sinclair
William Parker Jr.
Attorney General's Office
PO Box 300152
Montgomery, AL 36130-0152
abrasher@ago.state.al.us
jimdavis@ago.state.al.us
wparker@ago.state.al.us
wsinclair@ago.state.al.us

/s/ Edward Still