## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE NORTHERN DISTRICT OF ALABAMA,
## NORTHEASTERN DIVISION

| | |
|---|---|
| THE ALABAMA DEMOCRATIC CONFERENCE, an Alabama political action committee, et al., | |
| Plaintiffs, | CIVIL ACTION NO. 5:11-cv-02449-JEO |
| v. | |
| LUTHER STRANGE in his official capacity as the Attorney General of Alabama; et al., | |
| Defendants. | |

## Plaintiffs' Second Motion for Preliminary Injunction

i

**Table of Contents**

Plaintiffs' Second Motion for Preliminary Injunction ..............................i

Plaintiffs' Second Motion for Preliminary Injunction ............................1

A. Standard or Scope of Review ........................................1

B. Summary of the Facts....................................................1

C. Plaintiffs have a substantial chance of success on the merits. ....11

1. The Act's Complete Ban on Transfers Between PACs to Finance Independent Expenditures Is Subject to "Closely Drawn" Scrutiny ..........................................................11

2. As a Matter of Law, the State Has No Anti-Corruption Interest in Enforcing the Act as to Transfers Between PACs for Financing Independent Expenditures..............................................15

3. The Ban Does Not Implicate Any Transparency Interest and, in Any Event, the Ban Is Not Closely Drawn To Advance that Interest. ..........................................................25

D. Plaintiffs will suffer irreparable injury absent preliminary relief. 30

E. The harm to plaintiffs (if there is no injunction) outweighs any harm to the State (because of an injunction). .....................................30

F. The Rule 65(c) bond requirement should be waived because this is a public-interest lawsuit with no risk of financial loss for the state. 31

G. Conclusion ...................................................................33

**Cases**

*BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC,* 425 F.3d 964 (11th Cir. 2005).....................................................32

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers,* --- F.R.D. ----, 2014 WL 638014 (N.D. Ala. 2014).....................................32

*Broward Coalition of Condominiums, Homeowners Associations and Community Organizations Inc. v. Browning,* 2008 WL 4791004 (N.D.Fla. 2008)..................................................................................32

*Burk v. Augusta-Richmond Cnty.,* 365 F.3d 1247, 1262-63 (11th Cir.2004).............................................................................................1

*Carey v. FEC,* 791 F. Supp. 2d 121 (D.D.C. 2011).....................11, 18, 20

*Citizens United v. FEC,* 130 S.Ct. 876 (2010) ...............................passim

*Complete Angler, LLC v. City of Clearwater,* 607 F.Supp.2d 1326 (M.D. Fla. 2009) ...............................................................................32

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills,* 321 F.3d 878 (9th Cir. 2003).........................................................................33

*Cunningham v. Adams,* 808 F.2d 815 (11th Cir.1987)...........................30

*Davis v. FEC,* 554 U.S. 724 (2008)...............................................12, 22

*Doctor's Assocs. v. Stuart,* 85 F.3d 975 (2d Cir. 1996) ...........................33

*Elrod v. Burns,* 427 U.S. 347 (1976)...................................................30

*Emily's List v. FEC,* 581 F.3d 1 (D.C. Cir. 2009)....................................20

*Garcia-Mir v. Meese,* 781 F.2d 1450, 1455 (11th Cir.1986) .....................1

*Gay-Straight Alliance of Okeechobee High School v. School Bd. of Okeechobee County,* 483 F.Supp.2d 1224 (S.D.Fla. 2007) ................32

*Gay-Straight Alliance of Yulee High Sch. v. School Bd. of Nassau County,* 602 F.Supp.2d 1233 (M.D. Fla. 2009)....................................32

*Gilio ex rel. J.G. v. School Bd. of Hillsborough County, Fla.,* 905 F.Supp.2d 1262 (2012) ........................................................................32

*Gorbach v. Reno,* 219 F.3d 1087 (9th Cir. 2000)....................................33

*Harris v. Graddick,* 593 F.Supp. 128, 601 F.Supp. 70 (M.D. Ala. 1984) 10

*Hawthorne v. Baker,* 750 F.Supp. 1090 (M.D.Ala. 1990), 756 F.Supp. 527 (M.D.Ala. 1990), 762 F.Supp. 1475 (M.D.Ala. 1991)...................10

*Homans v. City of Albuquerque,* 366 F.3d 900 (10th Cir. 2004) 13, 23, 26

*Johnston v. Tampa Sports Authority,* 2006 WL 2970431 (M.D. Fla. 2006)..................................................................................32

*KH Outdoor, LLC v. City of Trussville,* 458 F.3d 1261 (11th Cir. 2006) ................................................................................31

*Long Beach Area Chamber of Commerce v. City of Long Beach,* 603 F.3d 684 (9th Cir.), *cert. denied,* 131 S.Ct. 392 (2010) ....................... 17

*Mariani v. United States,* 212 F.3d 761 (3d Cir. 2000) ........................... 4

*McCutcheon v. FEC,* __ S.Ct. __, 2014 WL 1301866 (April 2, 2014) ............................................................................................... passim

*N.C. Right to Life v. Leake,* 525 F.3d 274 (4th Cir. 2008)..................... 20

*New York Progress & Protection PAC v. Walsh,* 733 F.3d 483 (2d Cir. 2013) .................................................................................................. 19

*Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377 (2000) ........ 21

*Northeast Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 896 F.2d 1283 (11th Cir.1990) ........................ 30

*Ogden v. Marendt,* 264 F.Supp.2d 785 (S.D.Ind. 2003) ........................ 32

*Personal PAC v. McGuffage,* 858 F.Supp.2d 963 (N.D. Ill. 2012) .......... 19

*Republican Party of N.M. v. King,* 741 F.3d 1089 (10th Cir. 2013) ....... 18

*Scott v. Roberts,* 612 F.3d 1279 (11th Cir. 2010) ................................. 1, 31

*Smith v. Board of Election Com'rs for City of Chicago,* 591 F.Supp. 70 (N.D.Ill. 1984) ................................................................................. 33

*SpeechNow.org v. FEC,* 599 F.3d 686 (D.C. Cir.), *cert. denied,* 131 S.Ct. 553 (2010) ...................................................................................... 12, 18

*Supreme Ct. of Va. v. Friedman,* 487 U.S. 59 (1988) ............................ 14

*Texans for Free Enterprise v. Texas Ethics Comm'n,* 732 F.3d 535 (5th Cir. 2013) ......................................................................................... 18

*United States v. Boender,* 649 F.3d 650 (7th Cir. 2011) ................... 4, 23

*United States v. O'Donnell,* 608 F.3d 546 (9th Cir. 2010) ................. 4, 23

*United States v. Playboy Entertainment Group, Inc.,* 529 U. S. 803 (2000) ............................................................................................... 12

*Wisconsin Right to Life State PAC v. Barland,* 664 F.3d 139 (7th Cir. 2011) ................................................................................................ 17

*Yamada v. Weaver,* 872 F.Supp.2d 1023, 1041 (D. Haw. 2012) ............ 19

**Statutes**

Ala. Act No. 2010-765 .............................................................................. 5

Ala. Act No. 88-873 .................................................................................. 2

Ala. Code § 17-5-14 (2013 Supp.) ........................................................... 2

Ala. Code § 17-5-15 (2013 Supp.) ............................................. 4, 5, 8, 33

Ala. Code § 17-5-19 (2013 Supp.) ........................................................... 9

Ala. Code § 17-5-2 ........................................................................... 2, 4, 8

Ala. Code § 17-5-8 ........................................................................... 3, 7, 8

Ala. Code § 17-5-8.1 ................................................................................. 7

Ala. Code §§ 10A-21-1.03 and -1.04 (repealed by Act 2013-311)..............2
Alaska Stat. § 15.13.074.................................................................3
Alaska Stat. § 15.13.090.................................................................29
Alaska: 2 Alaska Admin. Code § 50.25 ...............................................24
Ariz. Rev. Stat. § 16-912................................................................29
Cal. Gov't Code § 84302.................................................................3
Cal. Gov't Code § 84505.................................................................29
Cal. Gov't Code § 84506.................................................................29
Conn. Gen. Stat. § 9-622...............................................................3
D.C. Code § 1-1131.01 ..................................................................3
Del. Code tit. 15, § 8006 ...............................................................3
Fla. Stat. § 106.08 ........................................................................3
Ga. Code § 21-5-30........................................................................3
Haw. Rev. Stat. § 11-352................................................................3
Idaho Code § 67-6614 ...................................................................3
Illinois: 10 Ill. Comp. Stat. 5/9-25 ..................................................3
Ind. Code § 3-9-4-16......................................................................3
Iowa Code § 68A.502 ....................................................................3
Kan. Stat. § 25-4154......................................................................3
Ky. Rev. Stat. § 121.150.................................................................3
La. Rev. Stat. § 18:1505.2(A).........................................................3
Maine: 21-A Me. Rev. Stat. § 1004..................................................3
Mass. Gen. Laws ch. 55 § 10A.......................................................3
Md. Code, Elec. Law § 13-602 .......................................................3
Mich. Comp. Laws § 169.242.........................................................3
Mich. Comp. Laws § 169.270.........................................................24
Minn. Stat. § 10A.29......................................................................3
Mo. Rev. Stat. § 130.031................................................................3
Mont. Code § 13-37-217.................................................................3
N.C. Gen. Stat. § 163-278.14..........................................................3
N.D. Cent. Code § 16.1-08.1-03.3 ...................................................4
N.J. Stat. § 19:44A-20 ...................................................................3
N.M. Stat. § 1-19-34.3 ...................................................................3
N.Y. Elec. Law § 14-120 ................................................................3
Neb. Rev. Stat. § 49-1468 ...........................................................24
Neb. Rev. Stat. § 49-1475..............................................................3
Nev. Rev. Stat. § 294A.112............................................................3
Ohio Rev. Code § 3517.13..............................................................4

Okla. Admin. Code § 257:10-1-2.................................................4

Or. Rev. Stat. § 260.402 ..........................................................4

Pennsylvania: 25 Pa. Stat. § 3254 ............................................4

R.I. Gen. Laws § 17-25-12 ........................................................4

Rev. Code Wash. § 42.17.510 ..................................................29

S.D. Codified Law § 12-27-12 ...................................................4

Tenn. Code § 2-10-303 .............................................................4

Tex. Elec. Code § 253.001 ........................................................4

United States: 2 U.S.C. § 441f .................................................3

Utah Code § 20A-11-904 ...........................................................4

Vt. Stat. tit. 17, § 2805 .............................................................4

W. Va. Code § 3-8-5a ................................................................4

Wash. Rev. Code § 42.17.730 ...................................................4

Wis. Stat. § 11.30.......................................................................4

# Plaintiffs' Second Motion for Preliminary Injunction

Plaintiffs move for a preliminary injunction on essentially the same terms as the Final Order (Doc. 25). Plaintiffs rely on the facts presented to the Court to support their summary judgment motion (Doc. 9 and its attachments). The legal arguments to support the motion are set out below, and reflect the Supreme Court's iteration and clarification of the limits governments can place on political speech.

## A. Standard or Scope of Review

The standard for "considering the propriety of preliminary relief" was summarized in *Scott v. Roberts,* 612 F.3d 1279, 1290 (11th Cir. 2010):

> (1) whether there is a substantial likelihood that the party applying for preliminary relief will succeed later on the merits; (2) whether the applicant will suffer an irreparable injury absent preliminary relief; (3) whether the harm that the applicant will likely suffer outweighs any harm that its opponent will suffer as a result of an injunction; and (4) whether preliminary relief would disserve the public interest. *E.g., Burk v. Augusta-Richmond Cnty.,* 365 F.3d 1247, 1262-63 (11th Cir.2004). When the state is a party, the third and fourth considerations are largely the same. *Garcia-Mir v. Meese,* 781 F.2d 1450, 1455 (11th Cir.1986).

## B. Summary of the Facts

### 1. Legal background

#### a. The Fair Campaign Practices Act

When Alabama first enacted the Fair Campaign Practices Act (FCPA) in 1988, it sought to regulate the role of money in politics—not by limiting speech or the ability to finance speech—but by fostering disclosure and transparency. The FCPA placed no monetary limits on the amount individuals could give to candidates or PACs. Ala. Act No. 88-873. Nor did it limit the amount PACs could give to candidates or other PACs. The only hard money limits were for corporations, which were limited to contributing up to $500 to each candidate or PAC. Ala. Code §§ 10A-21-1.03 and -1.04 (repealed by Act 2013-311). Only corporations regulated by the Public Service Commission are forbidden to contribute to candidates for the PSC. Ala. Code § 17-5-14 (2013 Supp.).

To achieve its goal of transparency, the FCPA comprehensively required candidates and groups to disclose certain information about their attempts to influence political campaigns. Under the FCPA, any "group of one or more persons" that plans to receive or spend money to influence a state election is deemed a PAC and must report contributions and expenditures as such. Ala. Code § 17-5-2(a)(11). PACs must disclose the identities of their significant contributors, and their

own expenditures. *Id.* § 17-5-8(c). The Secretary of State must make these reports publicly available. *Id.* § 17-5-10 and § 17-5-8.1 (2013 Supp.). PACs responsible for broadcasting or distributing paid political advertisements must disclose their identities in the advertisement itself. *Id.* §§ 17-5-12 & -13.

The FCPA also contains a provision making it "unlawful for any person to make a contribution in the name of another person." Ala. Code § 17-5-15(a). Laws of this nature—which either ban contributions through conduits or require disclosure of the contribution's true source—are practically universal.[1] Such laws provide a direct method

---

[1] *See* 2 U.S.C. § 441f (prohibition); Alaska Stat. § 15.13.074 (prohibition); Cal. Gov't Code § 84302 (disclosure); Conn. Gen. Stat. § 9-622(7) (prohibition); Del. Code tit. 15, § 8006(b) (prohibition); D.C. Code § 1-1131.01(e) (prohibition); Fla. Stat. § 106.08(5)(a) (prohibition); Ga. Code § 21-5-30(a) (prohibition); Haw. Rev. Stat. § 11-352 (prohibition); Idaho Code § 67-6614 (prohibition); 10 Ill. Comp. Stat. 5/9-25 (prohibition); Ind. Code § 3-9-4-16 (a) (prohibition); Iowa Code § 68A.502 (prohibition); Kan. Stat. § 25-4154(a) (prohibition); Ky. Rev. Stat. § 121.150(12) (prohibition); La. Rev. Stat. § 18:1505.2(A) (prohibition); 21-A Me. Rev. Stat. § 1004(3) (prohibition); Md. Code, Elec. Law § 13-602(a)(5)-(6) (prohibition); Mass. Gen. Laws ch. 55 § 10A (disclosure); Mich. Comp. Laws § 169.242(1) (disclosure); Minn. Stat. § 10A.29 (prohibition); Mo. Rev. Stat. § 130.031(3) (disclosure); Mont. Code § 13-37-217 (prohibition); Neb. Rev. Stat. § 49-1475 (disclosure); Nev. Rev. Stat. § 294A.112(1) (prohibition); N.J. Stat. § 19:44A-20 (prohibition); N.M. Stat. § 1-19-34.3 (prohibition); N.Y. Elec. Law § 14-120(1) (prohibition); N.C. Gen. Stat. § 163-278.14(a) (prohibition); N.D. Cent.

for prohibiting efforts to subvert, through contributions made by straw entities or conduits, "the goal of complete and accurate disclosure of the contributors who finance elections." *United States v. Boender*, 649 F.3d 650, 661 (7th Cir. 2011).[2] For reasons which are not clear, the Alabama Attorney General interprets § 17-5-15(a) to only prevent "*individuals* from 'mak[ing] a contribution in the name of another person,'"[3] rather than using the FCPA's definition of "person" including an "individual, partnership, *committee*, association, corporation, labor organization, or *any other organization or group of persons*") (emphasis added).[4]

### b. The enactment of a categorical ban on transfers between PACs

---

Code § 16.1-08.1-03.3(5) (prohibition); Ohio Rev. Code § 3517.13(G) (prohibition); Okla. Admin. Code § 257:10-1-2 (disclosure); Or. Rev. Stat. § 260.402 (prohibition); 25 Pa. Stat. § 3254 (prohibition); R.I. Gen. Laws § 17-25-12 (prohibition); S.D. Codified Law § 12-27-12 (prohibition); Tenn. Code § 2-10-303(3) (disclosure); Tex. Elec. Code § 253.001 (disclosure); Utah Code § 20A-11-904 (prohibition); Vt. Stat. tit. 17, § 2805(e) (prohibition); Wash. Rev. Code § 42.17.730 (prohibition); W. Va. Code § 3-8-5a(h) (prohibition); Wis. Stat. § 11.30(1) (prohibition).

[2] *Accord United States v. O'Donnell*, 608 F.3d 546, 554 (9th Cir. 2010); *Mariani v. United States*, 212 F.3d 761, 775 (3d Cir. 2000).

[3] *See* Doc. 39-3, State App. Brief, at 15-16 (emphasis added); *id.* at 52.

[4] Ala. Code § 17-5-2(9).

In 2010, the Legislature enacted Ala. Act No. 2010-765, § 2 ("the Act"), which provides it is "unlawful for any political action committee, 527 organization, or private foundation, including a principal campaign committee, to make a contribution, expenditure, or any other transfer of funds to any other political action committee, 527 organization, or private foundation." (In 2013, this sentence was amended to read, "It shall be unlawful for any political action committee or tax exempt political organization under 26 U.S.C. § 527, including a principal campaign committee, or any person authorized to make an expenditure on behalf of such political action committee or 527 organization, to make a contribution, expenditure, or any other transfer of funds to any other political action committee or 527 organization." Ala. Code § 17-5-15(b) (2013 Supp.).)

The Act creates a *complete* ban on transfers between PACs (except for transfers to a candidate's principal campaign committee). It makes no allowance for transfers that are fully and timely disclosed to the Secretary of State. Nor does its application admit of an exception for transfers that will be used exclusively to fund independent

expenditures. The statute places no restrictions on contributions to non-profit organizations, which are not required to disclose their members.

Within Alabama and, to the knowledge of the parties, within the entire United States, no expenditures between PACs has been used to facilitate *quid pro quo* corruption. Exhibit BB (Lisenby Depo) at 30:11 – 31:2, 33:7-18.[5] Nor does the Attorney General know of any cases in where bribery was facilitated by a transfer of money through a PAC. Exhibit BB (Lisenby Depo) at 18:9 – 19:8, 26:6-19.

### c. Subsequent strengthening of the FCPA's disclosure requirements

In 2011 and 2013, the Legislature addressed the actual impediments to public access to campaign contribution information by enacting three laws amending the FCPA's disclosure requirements for elections. The principal changes were:

First, the time for filing pre-election campaign finance reports was changed from 45 days and 5 days before a primary or general election to:

---

[5] Mr. William Lisenby was the designated representative of the Attorney General's Office.

- The second business day of every month beginning 12 months before the primary or general election;

- Every Monday for the four weeks before the election;

- Daily during the eight days before the election if the PAC has received $5,000 or more since its last report;[6] and

- Within two days of receiving a single contribution of twenty thousand dollars or more.[7]

Second, the law required the Secretary of State to establish a system of electronic filing of reports and making the reports available on a searchable database on the Secretary's website.[8] PACs receiving less than ten thousand dollars per election cycle do not have to use the electronic filing system.[9] The electronic system is now in operation and now "massive quantities of information can be accessed with the click of a mouse." *McCutcheon v. FEC,* __ S.Ct. __, 2014 WL 1301866, *15 (April 2, 2014).

_____

[6] Ala. Code § 17-5-8(a)(1), (2), and (3). All citations from the Code are to the current Code, unless otherwise noted.

[7] Ala. Code § 17-5-8.1(c).

[8] Ala. Code § 17-5-8(a)(3)b and § 17-5-8.1.

[9] Ala. Code § 17-5-8(g).

Third, any person or entity making an "electioneering communication" must file the same type of reports as PACs file. An electioneering communication is an expenditure over one thousand dollars for a communication made within 120 days of an election that contains the name or image of a candidate, and for which "the only reasonable conclusion to be drawn from the presentation and content ... is that it is intended to influence the outcome of an election."[10] Communications by a trade or membership organization to its members, members' families, or members' employees are not electioneering communications. Ala. Code § 17-5-8(j) (2013 Supp.). There is also an exemption for churches unless the church makes an expenditure "to influence the outcome of an election." Ala. Code § 17-5-8(i) (2013 Supp).

Fourth, the FCPA regulates legislative caucuses and treats them as PACs. Ala. Code § 17-5-5.1 (2013 Supp.).

Fifth, the Legislature amended the PAC-to-PAC transfer ban by removing references to private foundations. Ala. Code § 17-5-15(b) (2013 Supp.).

---

[10] Ala. Code § 17-5-2(a)(4).

Sixth, the FCPA now contains a section on civil fines and criminal penalties. Ala. Code § 17-5-19 (2013 Supp.).

**2. The ADC seeks to engage in transfers between PACs to fund independent expenditures, and it has established a separate bank account exclusively for this purpose.**

The Alabama Democratic Conference (ADC) was originally founded in 1960 by a small group of black citizens who banded together that year to influence black voters to support the Democratic presidential ticket of John F. Kennedy and Lyndon B. Johnson. Reed decl. ¶ 4 (Doc. 9-1).[11] The ADC is engaged primarily in voter education and get-out-the-vote, or GOTV activities. The ADC is a statewide organization with chapters in nearly every county, and it distributes available GOTV and voter education with (1) a set amount of funds to each of its counties in varying measure and (2) additional allocations, when available, to other counties where, in its independent determination, those funds will be best used. The GOTV and voter education funds are spread widely to support the multiplicity of state,

---

[11] At that time, a significant portion of the black leadership – including the Rev. Martin L. King, Sr. (the father of Dr. Martin Luther King, Jr.) – backed the Republican Party generally and the Nixon-Lodge ticket specifically. Taylor Branch, *Parting the Waters: America in the King Years 1954-63* 349-50 (Simon and Schuster 1988).

federal and local candidates it endorses across the state. Exhibit DD (Reed Depo) at 65-74.

Despite the similarity of names, the ADC is independent of the Alabama Democratic Party. For instance, the ADC has sued the Democratic Party and Democratic officials[12] and only supports those Democratic candidates who meet its independent standards and has withheld endorsement from Democratic candidates in the general election many times. Unlike the Democratic Party, it actively endorses candidates in primary elections, Reed decl. ¶ 4 (Doc. 9-1)

ADC seeks to join and associate with other PACs to pool their resources to make independent expenditures. To facilitate these activities, ADC has, since this Court's Order (Doc. 24), created a separate bank account used exclusively for independent-expenditure spending. By doing so, ADC has created a dual-account PAC structure similar to the one held to be constitutionally permissible in *Carey v.*

---

[12] E.g., *Hawthorne v. Baker,* 750 F.Supp. 1090 (M.D.Ala. 1990), 756 F.Supp. 527 (M.D.Ala. 1990), 762 F.Supp. 1475 (M.D.Ala. 1991) (challenge to method of selection of members of governing bodies of state and county Democratic committees under Sections 2 and 5 of Voting Rights Act); *Harris v. Graddick,* 593 F.Supp. 128, 601 F.Supp. 70 (M.D. Ala. 1984) (suit attacking racially discriminatory method of appointing polling officials).

*FEC*, 791 F.Supp.2d 121 (D.D.C. 2011), and which the Federal Election

Commission (FEC) has subsequently authorized for use by all federally

registered PACs in light of its acquiescence to the *Carey* decision.[13]

## C. Plaintiffs have a substantial chance of success on the merits.

> 1.     The Act's Complete Ban on Transfers Between PACs
>        to Finance Independent Expenditures Is Subject to
>        "Closely Drawn" Scrutiny

The First Amendment mandates that "Congress shall make no

law ... abridging the freedom of speech." In matters of "speech uttered

during a campaign for public office," that constitutional admonition has

"its fullest and most urgent application." *Citizens United v. FEC*, 558

U.S. 310, 339 (2010) (citations and quotation marks omitted). This holds

especially true when the speech involves making an independent

expenditure, which "[b]y definition, ... is political speech presented to

the electorate that is not coordinated with a candidate." *Id.* at 360. The

fact that a speaker "is willing to spend money to try to persuade voters

presupposes that the people have the ultimate influence over elected

officials." *Id.*

---

[13] *See* http://www.fec.gov/press/Press2011/20111006postcarey.shtml.

A "contribution limit involving significant interference with associational rights must be closely drawn to serve a sufficiently important interest." *Davis v. FEC*, 554 U.S. 724, 740 n.7 (2008) (citation and quotation marks omitted); *accord Buckley v. Valeo*, 424 U.S. 1, 25 (1976). When "the government attempts to regulate the financing of political campaigns and express advocacy through contribution limits, ... it must have a countervailing interest that outweighs the limit's burden on the exercise of First Amendment rights." *SpeechNow.org v. FEC,* 599 F.3d 686, 692 (D.C. Cir.), *cert. denied*, 131 S.Ct. 553 (2010). The Supreme Court has stressed close scrutiny is "a rigorous standard of review." *McCutcheon,* 2014 WL 1301866, *8, *10.

The State has the burden to establish both the importance of its interest in enacting the ban and the requisite "fit" between the Act and the advancement of that interest. See *Bellotti*, 435 U.S. at 786. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *McCutcheon,* 2014 WL 1301866, *17, *quoting United States v. Playboy Entertainment Group, Inc.,* 529 U. S. 803, 816 (2000).

There can be no question that such "closely drawn" scrutiny applies to the Act's complete ban on transfers between PACs for purposes for financing independent expenditures. *See id.* The State tries to contend that the Act's complete ban on transfers between PACs should be reviewed according to the lesser standard of "exacting scrutiny" reserved for campaign disclosures laws. (Doc. 39-3 [State App. Brief] at 30, 47.) This standard is plainly inapplicable because the Act does not require disclosure, nor can transfers between PACs occur even if they are accompanied by the highest level of disclosure imaginable. *Cf. Citizens United*, 558 U.S. at 366 (observing a true disclosure provision "impose[s] no ceiling on campaign-related activities, and do[es] not prevent anyone from speaking.") (citations and internal quotation marks omitted). The Act is therefore a contribution limit, plain and simple, and must be analyzed as such.

Significantly, a restriction cannot satisfy the requirement of being "closely drawn" if there are "many alternatives" to advancing the government's interest "that are not constitutionally suspect." *Homans v. City of Albuquerque*, 366 F.3d 900, 919 (10th Cir. 2004) (majority opinion of Tymkovich and O'Brien, JJ.) (concluding that a statute is not

closely drawn in light of available alternatives); *McCutcheon,* 2014 WL 1301866, *22 ("disclosure often represents a less restrictive alternative to flat bans on certain types or quantities of speech"); *cf. Supreme Ct. of Va. v. Friedman*, 487 U.S. 59, 67 (1988) (analyzing, in the context of heightened constitutional scrutiny, whether, "within the full panoply of legislative choices otherwise available to the State, there exist alternative means of furthering the State's purpose without implicating constitutional concerns").

 As we shall show, the State has failed to meet its burden of showing the Act is constitutional as applied to transfers between PACs to finance independent expenditures. First, the State's attempt to demonstrate the Act is justified by its interest in preventing corruption is unsuccessful, for *Citizens United* holds *as a matter of law* that independent expenditures do not implicate a government anti-corruption interest and that such this interest therefore cannot justify restrictions on fundraising solely for independent expenditures. Second, the State cannot justify the Act as a transparency measure, as its complete ban is not closely drawn to promote that interest, particularly when there are many alternatives to the ban that are not

constitutionally suspect. With all of these justifications swept away, the only remaining conclusion is that the Act cannot be constitutionally applied to transfers between PACs for financing independent expenditures.

> 2. As a Matter of Law, the State Has No Anti-Corruption Interest in Enforcing the Act as to Transfers Between PACs for Financing Independent Expenditures.

"Th[e Supreme] Court has identified only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption . . . . Moreover, while preventing corruption or its appearance is a legitimate objective, Congress may target only a specific type of corruption—"*quid pro quo*" corruption." *McCutcheon*, 2014 WL 1301866, *15.

The State argues the Act is needed to prevent corruption or the appearance of corruption. (*See* Doc. 39-3 [State App. Brief] at 31-37.) But no detailed factual refutation of the State's claims is needed because *Citizens United* holds *as a matter of law* that independent expenditures do not implicate a governmental anti-corruption interest.

That interest cannot be invoked as a justification for the Act where it bans transfers between PACs for financing independent expenditures.

*Citizens United* involved a nonprofit corporation that produced a film that was "in essence, ... a feature-length negative advertisement that urges viewers to vote against Senator [Hillary] Clinton for President." 558 U.S. at 325. The film was subject to the restriction under federal law, 2 U.S.C. § 441b, that made it unlawful for any corporation or union to use general treasury funds to make independent expenditures. The Court declared this expenditure ban unconstitutional, holding corporations may not be prohibited from spending money for express political advocacy when those expenditures are independent from candidates and uncoordinated with their campaigns. 558 U.S. at 365-66.

The independent nature of the expenditures at issue in *Citizens United* was key to the Court's decision. As the Court explained, "[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent ... alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Id.* at 908 (quoting *Buckley*, 424 U.S. at 47). The Court observed, saying

that "[t]he fact that speakers may have influence over or access to elected officials does not mean that these officials are corrupt." 558 U.S. at 359. The Court therefore "conclude[d] that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." *Id.* at 357.

In the wake of *Citizens United*, every federal court (except for the Eleventh Circuit in this case) to face the issue has recognized that the government cannot invoke its interest in preventing corruption to limit fundraising for independent expenditures.

- *Wisconsin Right to Life State PAC v. Barland*, 664 F.3d 139, 154 (7th Cir. 2011) ("[A]fter *Citizens United* there is no valid governmental interest sufficient to justify imposing limits on fundraising by independent-expenditure organizations.");

- *Long Beach Area Chamber of Commerce v. City of Long Beach,* 603 F.3d 684, 695 (9th Cir.) ("Supreme Court precedent forecloses the City's argument that independent expenditures by independent expenditure committees raise the specter of corruption or the appearance thereof."), *cert. denied*, 131 S.Ct. 392 (2010);

- *SpeechNow.org*, 599 F.3d at 694-95 (concluding *Citizens United* held "as a matter of law that independent expenditures do not corrupt or create the appearance of quid pro quo corruption," and thus "contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption");

- *Carey*, 791 F.Supp.2d at 126 (noting that where a PAC is "making independent expenditures, wholly separate from federal candidates or parties, the analysis is different because there is not that same governmental interest in protecting *quid pro quo* corruption") (footnote omitted);

- *Republican Party of N.M. v. King*, 741 F.3d 1089, 1095 (10th Cir. 2013) ("It is worth repeating: the Court firmly rejected the contention that independent expenditures give rise to corruption or the appearance of corruption.");

- *Texans for Free Enterprise v. Texas Ethics Comm'n,* 732 F.3d 535, 538 (5th Cir. 2013) ("There is no difference in principle—at least where the only asserted state interest is in preventing apparent or actual corruption—between

banning an organization . . . from engaging in advocacy and banning it from seeking funds to engage in that advocacy (or in giving funds to other organizations to allow them to engage in advocacy on its behalf).");

- *New York Progress & Protection PAC v. Walsh,* 733 F.3d 483, 488 (2d Cir. 2013) ("Few contested legal questions are answered so consistently by so many courts and judges.");

- *Personal PAC v. McGuffage*, 858 F.Supp.2d 963, 968 (N.D. Ill. 2012) (observing the "categorical rule that independent expenditures do not lead to *quid pro quo* corruption" and therefore "declin[ing] the invitation to study Illinois' political history" because "resolving [the issue] does not require an evidentiary record") (citation and quotation marks omitted);

- *Yamada v. Weaver*, 872 F.Supp.2d 1023, 1041 (D. Haw. 2012) "[P]revention of corruption or its appearance cannot justify limiting campaign contributions if those contributions can lead only to independent campaign expenditures.").[14]

_____

[14] Even before the Supreme Court settled the issue conclusively in *Citizens United*, several courts had held that the government's anti-corruption interest could not be invoked to limit fundraising for

The State attempts to wish away this entire body of cases by asserting, "When courts have invalidated limits on PACs' ability to receive funds for independent expenditures in the past, they generally have done so only as to PACs that do not simultaneously make direct contributions to candidates." (Doc. 39-3 [State App. Brief] at 36.) But these cases do not even remotely suggest the limitation the State asserts. And, what the State omits from its argument is *Carey, supra*, a case that (i) is directly on point in holding the FEC was constitutionally required to allow the PAC to use separate accounts for contributions and independent expenditures and (ii) rests its holding entirely on the same cases the State says are inapplicable here.

The ADC seeks to do here what the *Carey* plaintiff proposed to do. That is, ADC maintains a new bank account—separate from the one it uses for candidate contributions—to be used to make and receive unlimited contributions for financing independent expenditures. *Carey* squarely holds that the First Amendment affords ADC the right to have such a structure, and that holding follows ineluctably from *Citizens*

---

independent expenditures. *See Emily's List v. FEC,* 581 F.3d 1, 6-7 (D.C. Cir. 2009); *N.C. Right to Life v. Leake,* 525 F.3d 274, 293 (4th Cir. 2008).

*United* teaching that, as a matter of law, independent expenditures do not implicate the government's interest in preventing corruption.

The State contends this two-account structure will lead to corruption because a donor could pass money through the independent-expenditure accounts of several PACs and, when those funds ultimately arrive at a particular PAC, the original donor could demand a direct contribution to a candidate from the final recipient PAC's contribution account. (Doc. 39-3 [State App. Brief] at 33-34.) The Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden." *McCutcheon*, 2014 WL 1301866, *17, quoting *Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377, 392 (2000). When the State's own witness, Ashley Newman, treasurer of several PACs, was asked if she could do this, she responded, "Oh, that's illegal." Exhibit CC (Newman Depo) at 30:11 31:20, 36:6-17.[15]

---

[15] If the State considers the ADC to be suspect because it controls two PACs, then Ms. Newman must be even more suspect, since she is treasurer of three PACs, the designated filing agent of 18 PACs or candidate committees (Exhibit 2 to Exhibit CC (Newman Depo)), and the treasurer of several other political organizations (Exhibit CC (Newman Depo) at 17:8 – 19:13). (We are not suggesting the State investigate her, but offer this fact to show that those with campaign expertise often work for multiple groups.)

Nothing in the State's scenario hints at actual *quid pro quo* corruption. The Supreme Court has clarified that only *quid pro quo* transfers of money to candidates in return for promised state favors constitute the sort of corruption that can be regulated consistent with the First Amendment. The Alabama law is overbroad because it bans contribution from candidate PACs to the ADC. This turns corruption in its head: the candidate, who may be in a position to give state favors, is giving money to an organization which has no state favors to give. The State has yet to offer a credible explain how money given by a candidate to the ADC can corrupt that follows the definition of *quid pro* quo found in *McCutcheon*, *Citizens United*, and *Davis*.

Even on the generous assumption that the State's imagined scenario implicates corruption,[16] the Act is not a "closely drawn" means of addressing it.[17] The first aspect of the scenario—transferring

---

[16] Nothing in the State's scenario hints at actual *quid pro quo* corruption. Furthermore, because individuals, businesses, and PACs may make unlimited expenditures to candidates and as independent expenditures under current law, Alabama has made the policy decision that such expenditures do not create the appearance of corruption.

[17] The State makes virtually no effort to argue why the Act's complete ban is "closely drawn," devoting to the issue only a single non-substantive paragraph of its appellate brief that merely asserts that the

contributions through multiple conduit PACs—could be easily
prevented by "alternatives that are not constitutionally suspect."
*Homans*, 366 F.3d at 919. Laws that restrict contributions through
conduits are nearly universal and provide a time-tested means of
preventing the kind of "money laundering" the State says is its main
concern. *See Boender*, 649 F.3d at 661; *O'Donnell*, 608 F.3d at 554.
Although the Attorney General has interpreted Alabama's existing ban
on "contributions in the name of another," Ala. Code § 17-5-15(a), to
apply only to contributions by *individuals*, there is nothing to prevent
the State from interpreting it differently. Nor is there anything to
prevent the Legislature from amending the law to apply even more
clearly, if that is necessary, to conduit contributions by PACs. Because
there exist alternatives that address the State's concern more directly—
and do so without the blatant overbreadth of a complete ban—the Act
cannot pass muster as "closely drawn."

---

Act satisfies this constitutional requirement. (Doc. 39-3 [State App.
Brief] at 43-44.) The State cannot satisfy its constitutional burden of
justifying the Act by *ipse dixit*. In *McCutcheon* the Supreme Court
emphasized the government's burden of establishing a close "fit."

The Act does nothing to address the second part of the State's scenario—the transparency problem of contributions made at the *direction* of another. And, yet again, there are tried-and-true alternatives the State could use to deal with this issue that do not involve using the blunt instrument of a complete ban on transfers between PACs. Some states require contributions made at the direction of another to be reported as attributable to both persons. *See*, *e.g.*, Mich. Comp. Laws § 169.270; Neb. Rev. Stat. § 49-1468(2) . Other states prohibit the practice altogether, treating it as tantamount to a contribution in the name of another. *See*, *e.g.,* 2 Alaska Admin. Code § 50.25(c). However, the State has represented to the Appeals Court that two or more PACs can coordinate their expenditures without making any disclosure of the coordination. (Doc. 39-3 [State App. Brief] at 16.)

Ultimately, the State has failed to show that the First Amendment permits the Act's enforcement as applied to transfers between PACs for financing independent expenditures. The Supreme Court has held as a matter of law that the State's anti-corruption interest does not provide a constitutionally legitimate justification for imposing limits on fundraising for independent expenditure. Absent any

record of actual corruption through PAC to PAC transfers, to the extent the State can conjure a scenario of corruption that might arise from a two-account structure, the Act is far too blunt an instrument to be a "closely drawn" means of addressing the State's concern. "This sort of speculation, however, cannot justify the substantial intrusion on the First Amendment rights at issue in this case." *McCutcheon,* 2014 WL 1301866, *21.

      3.    The Ban Does Not Implicate Any Transparency Interest and, in Any Event, the Ban Is Not Closely Drawn To Advance that Interest.

The State also argues that the Act can be justified by its separate interest in transparency and ensuring the adequate disclosure of the sources of campaign spending. Although there is no reason to dispute transparency is a legitimate and important governmental concern, the Act has only a tangential connection to that concern. The Act cannot satisfy the constitutional requirement of being a "closely drawn" means of advancing the State's interest.

To begin with the obvious, the Act is massively overbroad, reaching an entire universe of transfers that pose no transparency problem at all. For instance, no matter to what lengths a PAC went in disclosing its contribution to another PAC to finance independent expenditures, the Act would still treat that transfer as unlawful.

In contrast to a complete ban, there are "many alternatives" to advancing the government's interest that are both more effective and "are not constitutionally suspect." *Homans*, 366 F.3d at 919 (majority opinion of Tymkovich and O'Brien, JJ.). The solution that the federal government and most states employ to prevent the evasion of disclosure requirements is a straightforward ban on, or requiring disclosure of, contributions made through straw entities or conduits. *See* note 1, *supra*. As the State must acknowledge, this is the approach Alabama has taken, *see* Ala. Code § 17-5-15(a), at least as to contributions by individuals, *see* Doc. 39-3 [State App. Brief] at 15-16. Likewise, there is no reason to believe the Act's complete ban is "closely drawn" when there are legal requirements already in place that provide for timely and full disclosure of campaign-related spending. . All of the State's evidentiary submissions have related to the period when information on campaign contributions was "virtually inaccessible" and even in that period reflect considerable ability of the press to track campaign contributions. And the evidence conflates illegal *quid pro quo* corruption with the sort of influence and access that the Supreme Court has emphasized do not constitute corruption or the appearance of corruption. *McCutcheon,* 2014 WL 1301866, *15.

As detailed above, the 2011 amendments to the FCPA strengthened existing disclosure provisions by requiring PACs make more frequent reports, including a report within two days of receiving a contribution of $20,000 or more. For the 2014 election cycle, these

reports are now thoroughly accessible to public through a searchable database on the Secretary's website. For instance, campaign reports are searchable by (full or partial) name of the committee, candidate, committee members, contributors, and major contributions ($20,000 or more).[18] A user may download a complete file of data for a full year (or the year to date) for cash contributions, in-kind contributions, and expenditures.[19] The downloaded data may be opened in an Excel spreadsheet for easy analysis. For instance, the spreadsheet could be sorted by the contributor column to allow a quick access to the names of contributors.

The State is arguing that the public must be able to trace campaign funds from the first donor through the PAC to the ultimate recipient, and that adding another PAC between the first donor and the ultimate recipient violates the "transparency" of the process. On one level, the newspaper reports submitted by the state show that even under the pre-Internet filing and reporting system in place before the 2011 and 2013 enactments discussed above, there was sufficient transparency for the press to track funds from and to newsworthy sources. If the ADC or another group received money from a PAC, interested persons would be able to track the sources of funds for the donating PAC and draw such inferences and offer their fellow citizens

---

[18] Exhibit AA (Packard Depo) at 16-23. Packard was the designated representative of the Secretary of State's Office.

[19] Exhibit AA (Packard Depo) at 26-28 and its Exhibit 3.

such conclusions as they pleased. With the reports now searchable on line, today that citizen can access "massive quantities of information …with a click of a mouse," *McCutcheon,* 2014 WL 1301866, 15, from the comfort of her home or office. By harnessing technology, the State has achieved real transparency with no restriction of First Amendment rights.

At another level, it is not possible under any existing system to track money with absolute transparency. The State ignores the fungible nature of money. Once a PAC receives contributions from multiple donors and makes expenditures to multiple recipients, the "transparency" of the process – meaning the ability to track one donor's dollar to one recipient – has turned translucent. The identity of the donor of the one dollar is no longer sharp and clear, but is "seen through a glass, darkly." 1 Corinthians 13:12 (KJV). An interested citizen can track campaign funds one step at a time, that is, from one donor to the immediate recipient. The translucence of contributions will continue unless and until someone invents a way to assign a serial number to a contribution and require the recipient committee or candidate to report how that particular amount of cash was transferred to the next vendor or recipient. Until that day, however, anyone who is interested has at his fingertips information on the source of reported campaign funds.[20]

---

[20] Ms. Newman described the translucence, although not using that word, in trying to determine if gambling money (from Milton McGregor) could have been the source of contributions to a PAC opposing her client Bradley Byrne in the pre-Internet filing/searchable database era. Exhibit CC (Newman Depo) 40:4 – 41:11.

Even assuming these more muscular disclosure requirements do not generate the level of transparency the State seeks, additional tools are available. There is no impediment to the Legislature imposing even more extensive or timely disclosures. And, to the extent the State is concerned about the public's ability to discern the source of funds used to finance particular advertisements, several states address this issue with disclaimer requirements that inform the public of a PAC's major contributors as part of the independent expenditure. *See*, *e.g.*, Alaska Stat. § 15.13.090(a) (requiring independent expenditures contain a disclaimer that identifies the committee's three largest contributors); Ariz. Rev. Stat. § 16-912(B) (same); Cal. Gov't Code § 84506(a) (same identifying two largest contributors); Rev. Code Wash. § 42.17.510(2) same regard to identification of five largest contributors). Such a law could be bolstered further by an enactment that makes it unlawful to "creat[e] or us[e] a ... committee to avoid ... the disclosure of any ... major funding source." Cal. Gov't Code § 84505. Again, these measures would fully vindicate the State's asserted interests without imposing the significant burdens of the complete ban.

The State's interest in transparency can and should be addressed by actual disclosure laws, which "impose no ceiling on campaign-related activities and do not prevent anyone from speaking" or associating. *Citizens United*, 558 U.S. at 366. The complete ban is

not a "closely drawn" means promoting transparency that can survive First Amendment scrutiny.

## D. Plaintiffs will suffer irreparable injury absent preliminary relief.

This action was brought to vindicate First Amendment rights. Complaint (Doc. 1), ¶¶ 29-43. As discussed above, the ADC's free-speech and association rights will be impaired by the enforcement of the Act.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). "The timeliness of political speech is particularly important." *Elrod,* at 374 n.29. "The rationale behind these decisions [is] that chilled free speech ..., because of [its] intangible nature, could not be compensated for by monetary damages; in other words, plaintiffs could not be made whole." *Northeast Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 896 F.2d 1283, 1285 (11th Cir.1990). And, "if [the injury] cannot be undone through monetary remedies," it is irreparable. *Cunningham v. Adams,* 808 F.2d 815, 821 (11th Cir.1987).

## E. The harm to plaintiffs (if there is no injunction) outweighs any harm to the State (because of an injunction).

The State will suffer no tangible harm by a preliminary injunction. It will not be required to spend money or forego income.

"This ... is not a case in which preliminary relief would require the state to cancel or reschedule an election, discard ballots already cast, or prepare new ballots or other election materials." *Scott v. Roberts,* 612 F.3d 1279, 1296 (11th Cir. 2010).

As the court held in *KH Outdoor, LLC v. City of Trussville,* 458 F.3d 1261, 1272-73 (11th Cir. 2006), "[T]he threatened injury to the plaintiff clearly outweighs whatever damage the injunction may cause the [State because] ... the [State] has no legitimate interest in enforcing an unconstitutional ordinance. For similar reasons, the injunction plainly is not adverse to the public interest. The public has no interest in enforcing an unconstitutional ordinance."

## F. The Rule 65(c) bond requirement should be waived because this is a public-interest lawsuit with no risk of financial loss for the state.

Having established plaintiffs are entitled to a preliminary injunction, the only remaining question is the amount, if any, of the security plaintiffs must provide under Federal Rule of Civil Procedure 65(c). That Rule provides that federal courts may issue preliminary injunctions only if the applicant provides a bond in an amount determined by the court. It is "well-established," however, that "the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all." *BellSouth Telecomms., Inc. v. MCImetro Access Transmission*

*Servs., LLC,* 425 F.3d 964, 971 (11th Cir. 2005) (internal quotation marks omitted). In this case, waiver of the bond requirement is appropriate.

District courts within the Eleventh Circuit frequently waive the Rule 65(c) bond requirement in public-interest lawsuits against the government. *See, e.g., Gilio ex rel. J.G. v. School Bd. of Hillsborough County, Fla.,* 905 F.Supp.2d 1262, 1265 (2012) (First Amendment speech and establishment clause); *Complete Angler, LLC v. City of Clearwater,* 607 F.Supp.2d 1326, 1335-36 (M.D. Fla. 2009); *Gay-Straight Alliance of Yulee High Sch. v. School Bd. of Nassau County,* 602 F.Supp.2d 1233, 1238 (M.D. Fla. 2009); *Broward Coalition of Condominiums, Homeowners Associations and Community Organizations Inc. v. Browning,* 2008 WL 4791004 at *15 (N.D.Fla. 2008); *Gay-Straight Alliance of Okeechobee High School v. School Bd. of Okeechobee County,* 483 F.Supp.2d 1224 (S.D.Fla. 2007); *Johnston v. Tampa Sports Authority,* 2006 WL 2970431 (M.D. Fla. 2006) ("in a case where, as here, Plaintiff's fundamental constitutional rights are at issue, imposing a financial burden on a plaintiff as a condition to protecting fundamental constitutional rights would create an unfair hardship on that plaintiff"); *but see Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers,* --- F.R.D. ----, 2014 WL 638014 (N.D. Ala. 2014) (denying waiver of bond "[b]ecause an injunction would cause great economic harm to some of the parties sought to be enjoined"). *See also Ogden v. Marendt,* 264 F.Supp.2d 785, 795 (S.D.Ind. 2003) (no

bond required for injunction against election regulation); *Smith v. Board of Election Com'rs for City of Chicago,* 591 F.Supp. 70 (N.D.Ill. 1984) (no bond required for preliminary injunction against statute requiring candidates to submit signatures representing ten percent of primary electors of their party).

Waiver of the bond requirement is also appropriate where, as here, there is no risk of financial loss to the enjoined party. *See, e.g., Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills,* 321 F.3d 878, 882 (9th Cir. 2003); *Gorbach v. Reno,* 219 F.3d 1087, 1092 (9th Cir. 2000); *Doctor's Assocs. v. Stuart,* 85 F.3d 975, 985 (2d Cir. 1996); and the cases in the previous paragraph. Plaintiffs respectfully request that the Court waive the bond requirement if it grants plaintiffs' motion for preliminary injunction.

## G. Conclusion

Plaintiffs pray the Court grant relief :

1. Pending final resolution of this case or other order of the Court, defendants, their agents, servants, successors, and those acting in concert with them shall not enforce Ala. Code § 17-5-15(b) against Plaintiffs regarding contributions the Alabama Democratic Conference receives to make independent expenditures if the Alabama Democratic Conference maintains a separate bank account so funds received from

any PAC or 527 organization shall only be used for independent expenditures.[21]

      2. The requirement that the plaintiffs post security under Rule 65(c), Fed.R.Civ.P., be waived. If it is later determined this preliminary injunction was improvidently entered, the Court can make appropriate orders.

Submitted by,

/s/ Edward Still

| | |
|---|---|
| John K. Tanner | Edward Still |
| 3743 Military Rd, NW | PMB 304 |
| Washington DC 20015 | 130 Wildwood Pkwy STE 108 |
| Phone: 202-503-7696 | Birmingham AL 35209 |
| Email: | Phone & fax: 205-320-2882 |
| john.k.tanner@gmail.com | email: still@votelaw.com |
| | |
| Joe M. Reed | Norman Osaygefo Grubbs |
| Joe M. Reed & Associates, LLC | The Grubbs Firm |
| 524 S. Union Street | 1904 Berryhill Rd Ste 100 |
| Montgomery, AL 36104 | Montgomery, AL 36117-7789 |
| Phone: 334-834-2000 | E-mail: |
| Fax: 334-834-2088 | ogrubbs@mylawyerlobby.com |
| email: joe@joereedlaw.com | Phone & fax: 334-523-9200 |

---

[21] This is the same as the injunction the Court entered in December 2011 except for the omission of any mention of "private foundations." The Act has been amended to remove that phrase.

CERTIFICATE OF SERVICE

I certify that on 4 April 2014 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys:

Andrew L. Brasher
James W. Davis
Winfield J. Sinclair
William Parker Jr.
Attorney General's Office
PO Box 300152
Montgomery, AL 36130-0152
abrasher@ago.state.al.us
jimdavis@ago.state.al.us
wparker@ago.state.al.us
wsinclair@ago.state.al.us

/s/ Edward Still