# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

THE ALABAMA DEMOCRATIC  )
CONFERENCE, an Alabama political  )
action committee, *et al.*,  )
    *Plaintiffs,*  )
           )      Civil Action No.
    v.  )    5:11-cv-02449-JEO
LUTHER STRANGE, in his official  )
capacity as Attorney General of Ala-  )
bama, *et al.*,  )
    *Defendants*.  )
           )

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

LUTHER STRANGE (ASB-0036-G42L)
    *Attorney General*

Andrew L. Brasher (ASB-4325-W73B)
    *Solicitor General*

Winfield J. Sinclair (ASB-1750-S81W)
James W. Davis (ASB-4063-I58J)
William G. Parker, Jr. (ASB-5142-I72P)
    *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
(334) 353-8440 (fax)
wsinclair@ago.state.al.us
jimdavis@ago.state.al.us
wparker@ago.state.al.us

TABLE OF CONTENTS

Introduction ........................................................................................ 4

Background & Undisputed Facts .......................................................... 6

    A.    "PAC-to-PAC transfers" fostered public corruption and
         deception of the electorate ................................................. 7

         1.    Alabama traditionally has regulated political
              activity only through public-disclosure rules ........................... 7

         2.    PAC-to-PAC transfers provided a means of
              evading Alabama's public-disclosure rules ............................. 9

         3.    Events in 2010 highlighted the corrosive effects of
              unfettered PAC-to-PAC transfers ........................................ 12

    B.    The Alabama Legislature unanimously voted to end
         PAC-to-PAC transfers ...................................................... 16

    C.    The Alabama Democratic Conference is closely aligned
         with the Alabama Democratic Party and coordinates it
         activities with Democratic candidates for office ...................... 18

         1.    The ADC is "intertwined" with, and bears a
              resemblance to, the Alabama Democratic Party ...................... 18

         2.    The ADC coordinates its activities with candidates
              and officeholders ........................................................... 21

Procedural History ........................................................................... 23

Standards for Relief ......................................................................... 27

Argument ........................................................................................ 27

I.    The PAC transfer law, as applied to ADC, is valid under the First Amendment. ......................................................................... 28

    A.    The PAC transfer law need not satisfy strict scrutiny........................ 29

    B.    Alabama's interests in preventing actual or apparent corruption, and in promoting campaign-finance transparency, are sufficiently "important" interests........................... 32

    C.    The PAC transfer law serves Alabama's anti-corruption and transparency interests .................................................. 34

        1.    The PAC transfer law prevents actual or apparent corruption in all of its applications ........................................... 34

        2.    The PAC transfer law prevents actual or apparent corruption as applied to groups, like the ADC, which make contributions to candidates.................................. 41

        3.    The PAC transfer law prevents actual or apparent corruption as applied to groups, like the ADC, which are political parties or affiliates of a political party........................................................................................ 44

        4.    The PAC transfer law prevents actual or apparent corruption as applied to groups, like the ADC, which coordinate their expenditures with candidates.............................................................................. 48

        5.    The PAC transfer law serves Alabama's interest in providing transparency for campaign finances....................... 49

    D.    The PAC transfer law is appropriately tailored to advance the State's anticorruption and transparency interests........................ 50

II.    The ADC is not entitled to preliminary injunctive relief ............................. 57

Conclusion ....................................................................................................... 58

Certificate of Service .......................................................................................... 60

Appendix: Numbered Statement of Undisputed Facts ........................................... 62

# INTRODUCTION

This case involves an Alabama campaign finance law unanimously enacted to secure the First Amendment ideal of "'uninhibited, robust, and wide-open'" political debate. *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2829 (2011) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). For two decades prior to the law's passage, political operatives made a mockery of the State's campaign disclosure laws by transferring money indiscriminately among political action committees—*i.e.*, groups registered for the purpose of influencing elections. The purpose of these so-called "PAC-to-PAC transfers," as documented in the pages that follow, was bribery of public officials and deceit of the voting public.

By 2010, a broad consensus had emerged—among conservatives and liberals, Republicans and Democrats, and editorial boards throughout the State—that PAC-to-PAC transfers had undermined the system's legitimacy. Thus, the Legislature voted unanimously to end them. The resulting act does not require a reduction in the total amount of speech or money in elections—which Alabama does not meaningfully restrict in the first place. Nor does it attempt to "'level the playing field' . . . or to 'equaliz[e] the financial resources of candidates [or groups].'" *McCutcheon v. FEC*, 134 S. Ct. 1434, 1450 (2014) (quoting *Bennett*, 131 S. Ct. at

2825-26; *Buckley v. Valeo*, 424 U.S. 1, 56 (1976)). It simply eliminates the ability to disguise the true source and recipient of a campaign contribution.

Seizing on the Supreme Court's decision in *Citizens United v. FEC*, 558 U.S. 310 (2010), to invalidate the ban on "independent" corporate campaign expenditures, the Alabama Democratic Conference challenges the PAC-transfer law's application to funds it claims it wants to devote to such outlays. *Citizens United* was undeniably a game changer in the world of First Amendment campaign-finance law. But even that decision cannot bear the weight ADC seeks to place on it. The *Citizens United* Court specifically noted that it was not "reconsider[ing] whether contribution limits should be subject to rigorous First Amendment scrutiny." 558 U.S. at 359. And *Citizens United* left undisturbed the line of decisions upholding contribution limits that are more restrictive than the provision at issue here. Of course, by its very nature, *Citizens United* addressed claims by an organization that looks nothing like the ADC—a party- and candidate-centric group uniquely unlikely ever to make independent expenditures.

For these reasons, and as further explained below, the ADC cannot succeed on its First Amendment claim. The Court, accordingly, should deny the ADC's request for a preliminary injunction, grant the defendants summary judgment, and uphold the PAC transfer law—either in general or as applied to the ADC.

Because the central facts in this case are those that motivated the Legislature to enact the PAC transfer statute, it may be helpful to begin by defining a few terms frequently used in campaign-finance law. First, courts distinguish "contributions" from "expenditures." Contributions are "payments made to a candidate, party, political committee or other campaign actor that are then used to fund communications to the voters (or to make a contribution to another campaign actor)." Richard Briffault, *On Dejudicializing American Campaign Finance Law*, 27 GA. ST. U. L. REV. 887, 896 (2011). Expenditures, on the other hand, are "spending by candidates, parties, political committees and other organizations, groups or individuals on communications to the voters (including expenses preparing for such communications)." *Id.*

Second, when it comes to "expenditures," courts have further distinguished between independent expenditures and coordinated expenditures. The former are expenditures made in "[t]he absence of prearrangement and coordination . . . with the candidate or his agent." *Citizens United v. FEC*, 558 U.S. 310, 357 (2010) (quoting *Buckley v. Valeo*, 424 U.S. 1, 47 (1976) (per curiam)). The latter *are* "prearrange[d]" with candidates or their agents . They, accordingly, count as direct contributions for constitutional purposes. *See FEC v. Colorado Republican Federal Campaign Comm.*, 533 U.S. 431, 464 (2001) (*Colorado II*) ("There is no signif-

icant functional difference between a party's coordinated expenditure [with a candidate] and a direct party contribution to the candidate.").

This case concerns the State's authority to regulate a narrowly confined subset of "contributions" between PACs that the PACs say they intend to use to make "independent expenditures." In recounting the relevant facts, this brief cites numbered facts from the "Statement of Undisputed Facts" located in the appendix. Direct record references for each numbered fact appear in that portion of this document.

**A.**    **"PAC-to-PAC transfers" fostered public corruption and deception of the electorate.**

     **1.**    **Alabama traditionally has regulated political activity only through public-disclosure rules.**

Alabama's principal law regulating campaign finance is the Fair Campaign Practices Act. The main unit of regulation is a PAC, which is defined as "[a]ny . . . group of one or more persons" that plans to receive or spend money for the purpose of influencing a state election. ALA. CODE § 17-5-2(a)(11); *see also id.* § 17-5-2(a)(2)-(5). A candidate's principal campaign committee is a type of PAC. *Id.* § 17-5-2(a)(12). But the definition excludes "individual[s] who make[] a personal political contribution." *Id.* § 17-5-2(11).

The Act strives to ensure that candidates and groups act consistently with the public interest through disclosure rules, not spending or contribution caps. To that

end, PACs must register, appoint certain officers, maintain a separate bank account, and keep certain records. *See id*. §§ 17-5-3, -5, & -8. They also must report, to the Secretary of State, the identities of their significant contributors, their significant contributions to candidates and groups, and any expenditures they make. *Id*. § 17-5-8(c)(2) & (7). The Secretary of State then posts those reports for public review on his website. *See* http://sos.state.al.us/vb/inquiry/inquiry.aspx?area= Campaign%20Finance. In addition to the required disclosure reports, if a PAC is responsible for broadcasting or distributing certain ads and literature, the PAC must disclose this fact on the ad or literature itself. *See* ALA. CODE §§ 17-5-12 & -13. Finally, to make the disclosure rules effective, a person cannot "make a contribution" to a PAC "in the name of another person," and a PAC cannot knowingly accept such a contribution. *See id*. § 17-5-15(a).

At least until December 2010, when the Legislature enacted the PAC transfer law, Alabama had no other major limits or controls on PACs. They could raise, spend, and contribute as much as they wanted. And individuals and groups (other than corporations[1]) could contribute as much as they wanted to PACs, just as they

---

[1] Prior to 2013, the Alabama Code purported to limit corporations' political contributions to $500 "per election." *See* doc. 7 at 4 n.2. In part due to PAC proliferation, that limit was almost entirely meaningless. *See* Hosp, *supra*, at 381-82. In any event, the 2013 Alabama Legislature repealed the pre-existing corporate contribution limits such that corporations may now generally "make a contribution or expenditure to or on behalf of any candidate or political action committee in the same manner [as] an individual." Ala. Act No. 2013-311, *codified at* ALA. CODE § 17-5-14.

can today. The regulatory focus thus was on requiring PACs to make critical disclosures to the public, which then could make its own decisions about how to vote with the help of the disclosed information.

### 2. PAC-to-PAC transfers provided a means of evading Alabama's public-disclosure rules.

The problem before December 2010 was that political operatives had developed a pervasive means of circumventing these PAC disclosure rules. By the mid-1990s, political operatives had learned how to use PAC-to-PAC transfers to "render contributions virtually anonymous" and to make it nearly impossible to determine the persons responsible for actions taken by a PAC. Edward A. Hosp, *Alabama Campaign Finance Law*, 68 ALA. LAW. 379, 382 (2007); *see also* UF 1. As longtime Alabama campaign finance consultant Ashley Newman has testified, the loophole worked like this: An individual or interest group could conceal a contribution by "mak[ing] a contribution to one PAC, which could then make a contribution to another PAC, which could then make a contribution to another PAC, and on and on until some PAC eventually delivered the money to the candidate." UF 2, 7; *see also* doc. 7-4 at 50 (news account of the same phenomenon). At that point, there would be "no way to effectively trace the contribution from the original contributor to the ultimate recipient." UF 2; *see also* doc. 7-4 at 50. Because Alabama has never imposed limits on the number of PACs any one person may create, "a single campaign operative could control all of the PACs in [a] contribution chain"

and carry out the scheme to conceal the source of a campaign contribution "simply by moving credits from one ledge to another." UF 3, 4.

From this basic model, more sophisticated schemes were possible. For example, when PAC-to-PAC transfers were lawful, "some donors would break up large contributions into smaller, discrete 'chunks' of funds and then run [those] smaller amounts through their own series of PAC-to-PAC transfers." UF 5; *see also* Hosp, *supra*, at 386. What is more, donors would "stagger the timing of their [contributions]" to further conceal or obscure the source of the funds. UF 6; *see also* Hosp, *supra*, at 386. Taken together, these tactics made PAC-to-PAC transfers, in the words of one newspaper editorial, "the closest thing yet to legalized money laundering." Doc. 7-5 at 50.

Indeed, beginning in the early 1990s, newspapers began to sound the alarm about the evils of PAC-to-PAC transfers. *See* docs. 7-4 & 7-5. Over the course of almost twenty years, the coverage (and editorial opinions) focused on two main problems. First was the opportunities PAC-to-PAC transfers created for corrupt deal-making between influence-seekers and public officials. Because PAC-to-PAC transfers concealed the true source of a campaign contribution, unscrupulous donors had a covert way to extract promises of official action and unscrupulous candidates had a covert way to oblige them. One elected official reportedly likened the practice to "slipping hundred dollar bills under the table." Doc. 7-5 at 19. And as

one editorial board put it, whether or not Alabamians understood "the ins and outs of PAC-to-PAC transfers," they knew "corruption when they smell[ed] it." Doc. 7-5 at 7; *see also* doc. 7-4 at 13, 51-52, 62-63; doc. 7-5 at 18-21, 29-30.

The other main problem state newspapers identified was the lack of transparency itself. One article reported a former Alabama Secretary of State's estimate that "a third of the PACs" in Alabama "are pass-through PACs" that "exist solely for the purpose of misleading the voter." Doc. 7-4 at 47. The name of these PACs would often be "filled with initials that mean nothing to most voters," or even a deceitful name that made voters believe that the speaker was of the precise opposite political persuasion as the actual speaker. Doc. 7-5 at 2; *see also id.* at 20, 27. For example, in 2006, the "Children's PAC" listed "children's issues" as its primary concern on its disclosure forms. Doc. 7-4 at 56. But the "Children's PAC" was funded by gambling and business interests, and the PAC itself simply forwarded its funding to other similarly misnamed PACs. *See* doc. 7-4 at 56. PAC-to-PAC transfers thus allowed groups to run "deceptive advertising campaigns that muddy the waters concerning candidates and issues." Doc. 7-5 at 48.

Anecdotal evidence from the Alabama Secretary of State's Office confirms at least these latter points. Before passage of the PAC transfer law, that office observed particular individuals or entities creating "noticeable numbers of PACs." UF 31. On one occasion, a person who previously had created "a number of PACs"

registered four more PACs under the names "Please PAC," "Watch PAC," "Your PAC," and "Step PAC." UF 32. The inspiration for the names, according to the individual, was a sign he had just seen in the stairwell. UF 32.

### 3. Events in 2010 highlighted the corrosive effects of unfettered PAC-to-PAC transfers.

Two examples from 2010 illustrate the problematic nature of PAC-to-PAC transfers. Both examples show not only the capacity of PAC-to-PAC transfers to confuse voters, but also their capacity to conceal corrupt relationships between donors and candidates or officeholders.

***The True Republican PAC.*** In 2010, Ashley Newman was working for Bradley Byrne's campaign for the Republican gubernatorial nomination when a PAC named the "True Republican PAC" began running attack ads in opposition to Byrne's candidacy. UF 8, 9. Newman began investigating, but could not determine the source of True Republican PAC's funds because "virtually all of [its] funds had been transferred through multiple PACs in a confusing manner on different dates." UF 11; *see also* UF 10. On its final report before the primary, for example, True Republican PAC said it had received 37 contributions totaling over $850,000 from 21 PACs—over half of whom appeared to be controlled by one of three operatives. UF 14-18. Ultimately, after spending over two days working on the problem, Newman and her team of two other Byrne campaign staffers "gave up" after tracing the funds "through ten 'generations' of transfers without a definitive answer."

12

UF 27; *see also* UF 12. A reporter for a state newspaper even contacted Newman looking for help identifying True Republican's funders. UF 29. The reporter wanted to write an article about the blitz of attack ads True Republican PAC was airing across the State. UF 30. But like Newman, the reporter could not crack the mystery. UF 30.

Trying to trace just one of True Republican PAC's contributions proves the impossibility of Newman's and the reporter's task. True Republican received three contributions totaling $19,000 from "Deserve Victory PAC" before the 2010 Alabama primary election. UF 19. But that money could have come (at a minimum) from either "TOC PAC" or "Merit PAC"—both of which gave $20,000 or more to Deserve Victory PAC earlier that year. UF 21. Much of Merit PAC's funds, in turn, came from TOC PAC itself, but some also could have come from "TAG PAC." UF 23. TOC PAC, in turn, received funds almost exclusively from four other PACs. UF 24, 25. And so the chain presumably continues. As Newman later testified, this one PAC-transfer chain "merely scratches the surface of the problem and vastly understates the difficulty in identifying the true source of a contribution." UF 26.

Ashley Newman's frustration in 2010 did not end with her inability to pinpoint who was attacking the Byrne campaign. Instead, something she noticed when scouring campaign reports convinced her that one of Bradley Byrne's primary op-

ponents may also have been connected to the scheme. *See* UF 34-36. That something was the involvement of Claire H. Austin. Austin was an officer of Deserve Victory PAC as well as TAG PAC in 2010, so she conceivably played a role in delivering contributions to the True Republican PAC through PAC-to-PAC transfers before that year's primary. UF 37, 38. At the same time, however, Austin's company, Alabama Strategy Group LLC, was employed as a fundraiser for gubernatorial candidate Tim James—one of Byrne's opponents in the primary. UF 39-41. To Newman, these facts made it "highly likely" that True Republican PAC was coordinating its attack ads against Byrne with the Tim James campaign. UF 42, 44. Assuming so, Newman testified, "donors to the True Republican PAC—whomever they were—were able to effectively deliver campaign contributions to Tim James without anyone knowing about it." UF 43, 45.

In Ashley Newman's words, the True Republican PAC phenomenon reveals the "ease with which PAC-to-PAC transfers can be used as a tool to conceal efforts between a PAC and a candidate to work together"—"even if a PAC represents that it will not coordinate with candidates its expenditures of the PAC-transferred funds." UF 36, 35. The True Republican PAC filed only five disclosure reports over the course of its existence in 2010. UF 46. But in none of those reports did it report making an expenditure to a candidate or candidate-related entity. UF 47. Indeed, True Republican made payments to only two entities—Denver-based Media

Strategies and Research and radio station WIN 98.5 FM in Demopolis, Alabama—all for purposes of advertising. UF 48. It is unknown whether True Republican PAC claimed to be an "independent-expenditure-only" PAC in 2010, but there are no rules or other reasons that would prevent it from doing so. UF 49.

*Federal Corruption Trial.* In the spring of 2010, the Justice Department announced an investigation into a bribery conspiracy surrounding gambling legislation. UF 50. By October, a grand jury had indicted 11 people, including a bipartisan group of four state senators. *See id.*; doc. 7-5 at 5. According to the indictment, these individuals had conspired to provide campaign contributions to incumbent legislators and candidates in exchange for their support of pro-gambling legislation. UF 50; *see also* doc. 7-2 at 8. The indictment alleged that the conspirators accomplished this bribery in part by "disguis[ing] payments made to legislators from whom they sought support by concealing illicit payments through political action committees ('PACs') and using conduit contributors." Doc. 7-2 at 9; UF 51.

The indictment explained in detail how the conspirators routed campaign contributions through PACs to cover up their alleged bribes. For example, the indictment contained the following account of a wiretapped conversation between Senator Harri Anne Smith and Ronald Gilley, a gambling promoter:

> On or about March 24, 2010, SMITH asked GILLEY about his promised campaign contributions, and GILLEY assured her that he would "get those checks busted up, the way they need to be." . . .

> Later that same day, on or about March 24, 2010, SMITH and GILLEY continued their discussion of how GILLEY'S contribution to SMITH would be concealed by running it through various PACs. When GILLEY asked SMITH if she was comfortable using a PAC with a name associated with a different political party than SMITH's, SMITH consented, explaining, "'Cause what we're gonna do is put it through another. . . . Like, what we'll do, it will go to that one, and then we're gonna move it to a different one."

Doc. 7-2 at 32-33; UF 52. Although a jury later found Senator Smith (and other defendants) not guilty, gambling promoter Ronald Gilley pleaded guilty, admitting that he "attempted to conceal the true nature, source, and control of the payments made to members of the Alabama Legislature" by "disguising illicit payments through political action committees." UF 53; *see also United States v. Gilley*, No. 2:10-cr-00186-MHT, (M.D. Ala.) (Doc. 986 at 4, Apr. 22, 2011); *United States v. McGregor, et al.*, No. 2:10-cr-00186-MHT (M.D. Ala.) (Doc. 2433, Mar. 16, 2012). As with the True Republican PAC, it is unknown whether any of the PACs Gilley and Smith allegedly used were "independent-expenditure-only" PACs. But as the True Republican example teaches, there would have been a clear path for doing so if, from the conspirators' perspective, circumstances called for it.

## B. The Alabama Legislature unanimously voted to end PAC-to-PAC transfers.

Against this backdrop, Alabama's Governor called a special legislative session in December 2010 for the purpose of, among other things, closing the PAC-to-PAC loophole. *See* doc. 7-5 at 52-53. The Legislature responded by unanimously

enacting the "Congressman Mike Rogers/Jeff McLaughlin Campaign Finance Transparency Act."

This new Transparency Act supplemented the section of the Fair Campaign Practices Act that already forbade individuals from "mak[ing] a contribution in the name of another person." Doc. 7-1 at 6 (Ala. Act No. 2010-765, amending Ala. Code § 17-5-15). The Legislature amended this section in 2013 (during the pendency of this litigation), and the statutory language now in effect reads as follows:

> It shall be unlawful for any political action committee or tax exempt political organization under 26 U.S.C. § 527, including a principal campaign committee, or any person authorized to make an expenditure on behalf of such political action committee or 527 organization, to make a contribution, expenditure, or any other transfer of funds to any other political action committee or 527 organization.

Ala. Code § 17-5-15(b). In other words, with certain exceptions not relevant for present purposes, PACs can no longer exchange money between themselves. But otherwise they are able to speak and raise as much as they see fit. They are free to contribute unlimited amounts of money to candidates and to work with other PACs in ways that do not involve transfers between them.

Later, in 2011, the Legislature passed other measures designed to improve voters' access to information about the source of campaign funding. It increased the frequency of PACs' required financial disclosure reports, *see* Ala. Act No. 2011-687 (amending Ala. Code § 17-5-8), and required greater disclosure about funding for "electioneering communications," *see* Ala. Act No. 2011-697 (amend-

ing Ala. Code §§ 17-5-2, -8, & -12). In 2013, the Legislature also clarified the Fair Campaign Practices Act's criminal enforcement provisions and repealed all prior restrictions on corporate contributions. *See supra* note 1.

**C. The Alabama Democratic Conference is closely aligned with the Alabama Democratic Party and coordinates it activities with Democratic candidates for office.**

**1. The ADC is "intertwined" with, and bears a resemblance to, the Alabama Democratic Party.**

The ADC considers itself to be "intertwined in a number of ways with the Alabama Democratic Party." Doc. 10 (ADC's initial summary-judgment brief) at 3; *see also* UF 72. To this point, at deposition, ADC Chair Joe Reed understood himself to be present in two capacities: "[a]s a representative of the Alabama Democratic Conference and as a representative of the [D]emocrats." UF 73. Indeed, when asked why the ADC brought this lawsuit, ADC Chair Joe Reed's first reaction was to lament that "the [D]emocratic [P]arty, for example, could not contribute to [the ADC's] get out to vote effort if [the ADC] wanted to . . . help some candidates." UF 74.

To be sure, the ADC does not walk in lockstep with the ADP on every political issue or race. But at the same time, there are ample reasons to take the ADC's admission of "intertwinement" with the Party at face value. According to the ADC's constitution, its purpose is in part to "advocate and advance the cause of the Democratic Party." UF 75. And to be a member of the ADC, or to receive a candi-

date endorsement from the ADC, "you've got to be a [D]emocrat." UF 82; *see also* UF 87-89 (ADC candidate endorsement policy).

The ADC's funding and membership patterns confirm the tenor of its official policies. From 2005-2010, the organization received over half its funding from the Alabama Democratic Party and Democratic candidates for office. *See generally* doc. 9-2 (Ex. A to Reed Decl.); *see also* UF 96. (Since 2010, the ADC has not received money from the Party primarily because "[t]he party's been so broke." UF 97.)[2] And currently, all five of the non-vacant ADC executive officer positions are held by members of the State Democratic Executive Committee, while over a third of that Committee's members are ADC members. UF 91, 92. A case in point for this overlap is ADC Chair Reed, who over the years has amassed considerable personal influence over the ADC. *See* UF 67, 68, 69, 70, 71. For the past twenty-four years, Reed has served not only as ADC Chair, but also as Vice Chairman for Minority Affairs of the Party's State Executive Committee. UF 93. Reed agrees that his duties in these two capacities "sound very similar" to one another. UF 95. In particular, he travels the State encouraging party members "to be good democrats,"

---

[2] What funding the ADC does not receive from the Democratic Party or Democratic candidates, it receives mostly from other PACs. Some of those are established PACs like A-VOTE, which is affiliated with the teachers' lobby, and TRIAL, which is affiliated with the State's trial-lawyer association. *See* doc. 9-1 (Reed Decl. ¶6). Others PACs funding the ADC have more cryptic names like "BizPac," "BOND PA[C]," and "BOX PAC." Doc. 9-2 at 2; *see also* UF 127.

and works with the party chair "in promoting the party, in defending the party, [and] in advancing the party." UF 94; *see also* UF 100.

As one might expect based on the ADC's litigation statements, official policies, and funding and membership patterns, the ADC's day-to-day operations are party-like indeed. Although the ADC occasionally runs ads in support of particular candidates, the two crown jewels of its state and local political efforts are its "yellow sample ballot"—a publication identifying the ADC's slate of endorsed candidates—and its get-out-the-vote (or "GOTV") efforts.  UF 103, 62, 64. Its GOTV efforts include distributing the yellow sample ballots at churches, polling places, and door-to-door, as well as visiting church or community meetings, conducting pone-bank and robocall campaigns, and paying for rides to the polls—again, all activities that support the ADC's slate of preferred candidates as a whole. UF 63, 65.

When the ADC is not pushing its candidate slate in the throes of a campaign, the ADC is still focused on party-building activities. At ADC Executive Committee meetings, ADC Chair Joe Reed regularly encourages members to get involved in state and local party affairs and to run for state and local party offices. UF 78, 80-81, 83-86. For example, Reed announced at an ADC Executive Committee meeting held in late 2006 that the group's "theme" for 2007 would be "'Building the Democratic Party at the Local and State Level.'" UF 76.

### 2. The ADC coordinates its activities with candidates and officeholders.

To whatever extent the ADC is not an extension of the Alabama Democratic Party, or a party-like entity itself, it is certainly connected to candidates and officeholders. Such persons (past or present) fill at least twelve spots on the ADC's Executive Committee, including all three of the five non-vacant officer positions. UF 98, 99, 101, 102. And Reed has noted on at least one occasion that "[s]ome local [ADC] organizations are leaving it up to local elected officials to determine the [ADC] agenda." UF 107. As mentioned above, moreover, from 2005 to 2010, the ADC received substantial sums (roughly 44% of its revenue) from Democratic candidates for public office. UF 123. Indeed, in 2010, three of the four ADC-endorsed candidates for Alabama state office contributed a total of $122,000 to the ADC. UF 125. The ADC, in turn, also regularly *contributes* to candidates—often in exchange for help conducting its GOTV activities in particular locales. UF 100, 112, 124.

The pattern of candidates funding the ADC is not a coincidence. ADC Chair Reed considers a candidate's contribution to ADC's GOTV efforts to be an "invest[ment]" in that candidate's own campaign, and he tells them so when he solicits contributions from them. UF 108-111. "[Y]ou need to put some money in your campaign," Reed says when soliciting candidates; "[t]his is your campaign. Not mine." UF 111. There is some evidence Reed in fact *expects* candidates to contrib-

ute to the ADC to support the GOTV effort. At a 2006 meeting of the ADC Executive Committee, he referred to candidate contributions as "Fair Share 'GOTV' contributions." UF 105. And at a similar meeting held after the 2010 elections, Reed announced that "[c]andidates who do not help pay for the GOTV effort will be left off the [yellow sample] ballot." UF 106.

The upshot of these intertwined relationships is that the ADC routinely consults with the candidates it endorses about campaign strategy. UF 113, 114, 116, 118, 122. Specifically, according to Reed, the ADC tells candidates "what our [GOTV] plans are. And if they have something that they want to suggest to us, we listen to it. And if we like it, we'll do it." UF 117.

\* \* \*

In response to the PAC transfer law at issue in this litigation, the ADC has established two bank accounts. The purpose of one—the "candidate" account—is to receive contributions from individuals and business only for the purposes of making direct contributions to candidates. The ADC claims that, notwithstanding the PAC transfer law, it should be allowed to use the other account to receive contributions from any source, including other PACs, to fund purportedly "independent" expenditures. UF 132. Significantly, the ADC admits that these two accounts are controlled by the same entity or people. UF 133.

Meanwhile, the ADC's views on PAC-to-PAC transfers and the PAC-transfer law are something of a mixed bag. On one hand, ADC Chair Joe Reed could not say at deposition who was behind certain PACs that have funded the ADC in the recent past—*e.g.*, "Box PAC," "Cedar PAC," "Green PAC," and "Please PAC." UF 129. And he admitted that there are certain groups—*e.g.*, pay-day lenders, "anti-religion" groups, etc.—that the ADC "wouldn't want to be associated with." UF 130. At the same, though, the ADC supports the use of PAC transfers to conceal the true source of a political contribution. UF 128. According to Reed, "[i]t's a First Amendment right to give." *Id.*

## PROCEDURAL HISTORY

Shortly after the Governor signed the PAC-to-PAC law, the ADC and five of its members (collectively "the ADC") sued the Alabama Attorney General and two District Attorneys to enjoin the law in part on First Amendment grounds.[3] Two of the plaintiffs are longtime county commissioners who have benefited over the years from the ADC's endorsements and "Get Out The Vote" activities. *See* doc. 1 ¶¶4-5. Of those, one has held office both in the ADC and in one of the ADC's county affiliates. *See id.* ¶5.

---

[3] The ADC also brought a claim under the Voting Rights Act, but this Court properly dismissed that claim earlier in this litigation. *See* doc. 24 at 23-26.

In its complaint, the ADC does not dispute that Alabama may forbid the ADC from using funds transferred to it from other PACs for making direct candidate contributions. *See id.* at 14-15. But the ADC argues that the law is unconstitutional insofar as it "prohibits transfers of funds" by other PACs to the ADC "that will be used for independent expenditures, for ['Get Out The Vote'] activities, for voter protection activities, and for other communication expenditures." *Id.* ¶41.a.

To that end, the ADC alleges that it has "established procedures to isolate donations from individuals and businesses and to ensure that no funds from other PACs, 527 organizations, or private foundations will be contributed to candidates." *Id.* ¶41.c. The ADC later specified that it has created two bank accounts, including a "Candidate Fund" and an account "used exclusively for independent expenditures." Doc. 43 at 16; *see also* doc. 9-1 ¶12; UF 132. According to the chairman, the Candidate Fund will be used to receive contributions from individuals and businesses for the purpose of making direct candidate contributions. *See* doc. 9-1 ¶12. The separate account, on the other hand, will be used to receive funds "from any entity"—including PACs—to finance the ADC's other attempts to influence state elections through its so-called "independent" expenditures. *Id.* ¶12.

Denying the State's motion to dismiss, this Court granted the ADC's summary-judgment motion and permanently enjoined the PAC-to-PAC transfer ban as applied to "contributions the [ADC] receives to make independent expenditures."

Doc. 25 at 1. The injunction was to apply "as long as the [ADC] maintains a separate bank account so that funds received from any PAC, 527 organization, or private foundation shall only be used for independent expenditures." Doc. 25 at 1-2.

In its supporting opinion, the Court rejected the ADC's argument that the PAC-to-PAC law is subject to strict scrutiny. Doc. 24 at 14. The Court instead subjected the law to "closely drawn scrutiny to determine whether the ban is closely drawn to match a sufficiently important interest." Doc. 24 at 17 (citing *Buckley*, 424 U.S. at 25). The Court concluded that "the State's interest in transparency, while perhaps sufficient to justify a disclosure requirement, is insufficient" to sustain the PAC transfer law. Doc. 24 at 19. The Court also held that the law did not serve the State's anticorruption interest, as a matter of law, because when the ADC makes allegedly "independent" expenditures, "money does not ultimately get funneled to a candidate." Doc. 24 at 22. The Court acknowledged that so-called "independent" expenditures that were nonetheless "coordinated" between "a PAC and a candidate can lead to corruption." Doc. 24 at 21 n.9. But the Court believed that summary judgment was proper because it was not its "role" to "divine whether Plaintiffs will limit the funds from the GOTV account to only independent expenditures." *Id.*

The Eleventh Circuit reversed. *See Ala. Democratic Conference v. Broussard*, 541 F. App'x 931 (11th Cir. 2013). It agreed with this Court that the PAC

transfer law is subject to *Buckley*'s "closely drawn" scrutiny, and that the State's transparency interest was not "sufficiently important." *See id.* at 932-33. But the Court of Appeals nevertheless took issue with this Court's view that the PAC transfer law could not serve the State's important interest in preventing actual or apparent corruption. "[W]e cannot hold as a matter of law that the State's interest in preventing corruption or the appearance of corruption is insufficient to justify contribution limits on funds used for independent expenditures when the receiving organization also makes campaign contributions." *Id.* at 935. To the contrary, the State had presented "ample evidence of possible corruption through PAC-to-PAC transfers to withstand summary judgment." *Id.* at 936. Ultimately, the Court concluded, "[w]hether the anti-corruption interest is sufficient in light of the evidence in the record in this case, and whether the transfer ban is a closely drawn means of furthering that interest, given ADC's dual account proposal, are mixed questions of law and fact that should be explored in the first instance by the district court." *Id.* As a result of this disposition, the Court saw no reason to resolve other arguments the State had advanced. *See id.* at 935 n.4.

On remand to this Court, the plaintiffs promptly moved for a preliminary injunction. *See* doc. 37. In an effort to "expeditious[ly]" resolve this case, the Court and parties agreed to proceed on an "accelerated discovery [discovery] schedule" and then combine the plaintiffs' preliminary-injunction motion with a final adjudi-

cation on the merits. Doc. 38. Notwithstanding that agreement, the plaintiffs have styled their most recent filing as a "Second Motion for Preliminary Injunction." Doc. 43 at 1. As noted at the outset, the State not only opposes the issuance of any injunction; it contends that it is entitled to summary judgment.

## STANDARDS FOR RELIEF

To the extent a motion for preliminary injunction is properly before the Court, the ADC appears to have correctly stated the standard for that relief. *See* doc. 43 at 7. But the ADC's preliminary-injunction motions are not properly before the Court given the agreement to proceed to final adjudication. *See* doc. 38. As to the State's motion for summary judgment, the Court should grant it if "there is no genuine dispute as to any material fact and the [State] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

## ARGUMENT

In framing its challenge, the ADC has effectively acknowledged that the Legislature was on solid First Amendment ground when it stopped candidates from directly receiving PAC-transferred funds. But because that is right, the ADC cannot successfully challenge the law's application to funds that will supposedly be used for "independent" expenditures. The same two justifications that support barring transfers in the first circumstance equally support the law's application in the

latter one. If ADC's challenge prevails, political operatives will replace the "PAC-to-PAC loophole" described above with a new "independent-expenditure loophole" as a method of undermining the integrity of Alabama's elections. Whether it rules on the plaintiffs' preliminary-injunction motions or as a final matter, this Court should not allow that to happen.

## I. The PAC transfer law, as applied to ADC, is valid under the First Amendment.

Even after *Citizens United* and the Supreme Court's just-released decision in *McCutcheon v. FEC*, governments seeking to protect the integrity of their elections can do all of the following:

- They can prohibit nonprofit advocacy corporations from soliciting funds from members of the general public. *FEC v. National Right to Work Committee*, 459 U.S. 197 (1982)*; Citizens United*, 558 U.S. at 358-59 (distinguishing *National Right to Work*).

- They can altogether *ban* corporations from contributing to candidates. *FEC v. Beaumont*, 539 U.S. 146 (2003); *United States v. Danielczyk*, 683 F.3d 611, 617 (4th Cir. 2012) (*Citizens United* "did not discuss *Beaumont* and explicitly declined to address the constitutionality of the ban on direct [corporate] contributions").

- They can maintain a comprehensive scheme of candidate-contribution limits—and a complex system of safeguards to prevent circumvention of those limits. *E.g.*, *Cal. Med. Ass'n v. FEC*, 453 U.S. 182 (1981) (plurality); *see also id.* at 201 (Blackmun, J., concurring); *McCutcheon,* 134 S. Ct. at 1453-56; *id.* at 1458-59.

If government can validly enact these measures, then surely Alabama has the authority to enact a modest prohibition on fund-transfers among PACs in the context

of a regulatory regime that imposes no other impediments to campaign activity. As explained below, that is true as a general matter. But for a variety of reasons, it is especially true in the case of a group like ADC.

**A. The PAC transfer law need not satisfy strict scrutiny.**

The Eleventh Circuit's opinion in this case establishes *Buckley v. Valeo*'s "closely drawn" scrutiny as the proper analytical framework here. That is, this Court must uphold the PAC transfer law if it is "'closely drawn' to serve a 'sufficiently important interest.'" *Ala. Democratic Conference*, 541 F. App'x at 933 (quoting *Buckley*, 424 U.S. at 23-25). Before engaging in this inquiry, however, it is important to put this level of scrutiny in proper context. The ADC's brief glosses over at least two important aspects of this framework that make its selection weigh heavily in favor of the PAC transfer law's validity.

First, to state the obvious, "closely drawn" scrutiny is not strict scrutiny. Far from it, this standard is a "relatively complaisant" form of First Amendment review. *Beaumont*, 539 U.S. at 161. On that point, the Supreme Court has observed that this "less rigorous standard of review" shows "proper deference to [legislatures'] ability to weigh competing constitutional interests in an area in which [they] enjoy[] particular expertise." *McConnell v. FEC*, 540 U.S. 93, 137 (2003), *overruled on other grounds by Citizens United*, 558 U.S. at 336-66. It likewise "provides [legislatures] with sufficient room to anticipate and respond to concerns

about circumvention of regulations designed to protect the integrity of the political process." *Id.* Indeed, the distinction between strict scrutiny and closely drawn scrutiny is the "only practical way to square two leading cases," *Beaumont*, 539 U.S. at 162:

> *National Right to Work* approved strict solicitation limits on a PAC organized to make contributions, . . . whereas [*FEC v.*]*Massachusetts Citizens for Life*[*, Inc.*, 479 U.S. 238 (1986),] applied a compelling interest test to invalidate the ban on an advocacy corporation's expenditures in light of PAC regulatory burdens . . . . Each case involved [the same statute], after all, and the same "ban" on the same corporate "sources" of political activity applied in both cases.

*Id.* (citations omitted). Under this level of review, therefore, unlike under strict scrutiny, the courts will not "second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *National Right to Work Comm.*, 459 U.S. at 210.

The second important thing to note about closely drawn scrutiny is its origin in the Supreme Court's longstanding recognition that "contributions lie closer to the edges than to the core of political expression." *Beaumont*, 539 U.S. at 161; *see also McCutcheon*, 134 S. Ct. at 1444. As far back as *Buckley*, the Court acknowledged that, "[b]y contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication." 424 U.S. at 20-21. That is be-

cause "the transformation of contributions into political debate involves speech by someone other than the contributor." *Id.* at 21. Furthermore, although contribution limits "impinge on protected associational freedoms" by "limit[ing] one important means of associating with a candidate or committee," they do not preclude other means of association, and still "permit associations and candidates to aggregate large sums of money to promote effective advocacy." *Id.* at 22. Although contribution limits may "require candidates and political committees to raise funds from a greater number of persons" (or "expend [their] funds on direct political expression"), "[t]here is no indication . . . that [they] would have any dramatic adverse effect on the funding of campaigns and political associations." *Id.* at 21-22.

In this case, the PAC transfer law is even less onerous than an ordinary contribution limit because it imposes *no* quantity restrictions and directly affects *no* individuals. Thus, because the "degree of scrutiny turns on the nature of the activity regulated," the Court should if anything err on the side of less rigor within the closely drawn framework. *Beaumont*, 539 U.S. at 162. In any event, this standard's built-in deference requires sustaining the PAC transfer law if it is supported by a reasonably valid need and if it operates within a reasonably valid scope. For the reasons that follow, it does.

**B. Alabama's interests in preventing actual or apparent corruption, and in promoting campaign-finance transparency, are sufficiently "important" interests.**

Turning to the application of the closely drawn framework, it is clear that Alabama's proffered interests in enforcing the PAC transfer law are "sufficiently important."

First are the State's corruption-related interests. "As *Buckley* explained, [Government] may permissibly seek to rein in 'large contributions [that] are given to secure a political *quid pro quo* from current and potential office holders.'" *McCutcheon*, 134 S. Ct. at 1450 (quoting *Buckley*, 424 U.S. at 26). "In addition to 'actual *quid pro quo* arrangements,' [legislatures] may permissibly limit 'the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions' to particular candidates." *Id.* (quoting *Buckley*, 424 U.S. at 27). Both of these concerns are inherently broad enough to also justify measures that prevent the circumvention of valid anti-corruption laws. *See Colorado II*, 533 U.S. at 456 ("[A]ll Members of the Court agree that circumvention is a valid theory of corruption."). Because the Supreme Court has held that these anti-corruption interests are not only "'sufficiently important'" but also "'compelling'" (so as to satisfy strict scrutiny), the validity of them here is beyond dispute. *McCutcheon*, 134 S. Ct. at 1445 (quoting

*Buckley*, 424 U.S. at 26-27; *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985)).

The State also seeks to justify its law by invoking its interest in ensuring transparency in the political process. This is so even recognizing that the Eleventh Circuit refused to recognize this interest as a general matter. *See Ala. Democratic Conference*, 541 F. App'x at 933. For preservation purposes, the State re-asserts by reference each of the arguments it made before the Eleventh Circuit on this point. *See* doc. 39-3 (State's Eleventh Circuit brief) at 59-65. But those arguments aside, this Court should accept the transparency interest for a reason the Eleventh Circuit did not address: Both before the Eleventh Circuit, and now in this Court, the ADC has *affirmatively conceded* that "there is no reason to dispute transparency [as] a legitimate and important governmental concern." Doc. 43 at 31.

In the ordinary case, such a concession may be insufficient to trump a court's duty to enforce its independent understanding of the Constitution. But this is no ordinary case. This is the ADC's as-applied challenge, and the outcome of this litigation need not affect any other party besides the ADC. Accordingly, this Court should allow the ADC to prosecute its First Amendment claim on its own terms. If the ADC says "transparency" is valid to justify the law as applied to the ADC, then that position should rule the day.

### C. The PAC transfer law serves Alabama's anti-corruption and transparency interests.

Having established the sufficiency of the State's proffered interests, the question becomes whether the PAC transfer law serves those interests. For a variety of reasons, it does. As an aside, it was this step of the analysis where a "ban on corporate-funded independent expenditures" met its demise in *Citizens United*. 558 U.S. at 321. This case is different. Here, the PAC transfer law does in fact prevent corruption and promote transparency—both in general and especially as applied to the ADC.

### 1. The PAC transfer law prevents actual or apparent corruption in all of its applications.

As an initial matter, the PAC transfer law prevents *quid pro quo* corruption—whether real or apparent—in all of its applications. The factual case for this proposition is straightforward and compelling:

(1) *First*, PAC-to-PAC transfers provided donors and candidates a means of concealing the true source and recipient of campaign contributions.

(2) *Second*, because PAC-to-PAC transfers operated in this way, they also provided candidates and donors a means of concealing coordination with one another, even where the PACs involved were not ostensibly connected to a candidate.

(3) *Finally*, because PAC-to-PAC transfers operated in *that* way, they provided donors a covert way of effectively delivering campaign contributions to candidates. *Cf. Colorado II*, 533 U.S. at 464 ("There is no significant functional difference between a party's coordinated expenditure [with a candidate] and a direct party contribution to the candidate.").

Because the prospect that donors and candidates would take advantage of these opportunities is not remotely "novel[]" or "[im]plausible," the "quantum of empirical evidence needed" to carry the State's burden is minimal in this case. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000). It is therefore clear that the State has more than adequately carried its evidentiary burden: The True Republican PAC's likely possible connection to the 2010 Tim James campaign proves it (*see* UF 1-49); the 2010 federal corruption trial proves it (*see* UF 50-54); and so do the voluminous "newspaper accounts . . . supporting inferences of impropriety" (*see* docs. 7-4 & 7-5). *Id.* at 393. Quite simply, these bases for concluding that PAC-to-PAC transfers could facilitate *quid pro quo* corruption are not "mere conjecture." *Nixon,* 528 U.S. at 392. "Although the scope of such pernicious practices can never be reliably ascertained, the deeply disturbing examples surfacing [before the 2010 Alabama primary] election demonstrate that the problem is not an illusory one" and that the PAC transfer law therefore validly serves its compelling purpose. *Buckley*, 424 U.S. at 27.

Importantly, nothing in *Citizens United* undermines this point. The ADC's brief twice states that *Citizens United* "holds *as a matter of law*" that the anticorruption interest "cannot justify restrictions on fundraising solely for independent expenditures." Doc. 43 at 20; *see also id.* at 24. But the Court simply did not say that, and the PAC transfer law at issue here looks nothing like the "outright ban on

corporate political speech" at issue there. *Citizens United,* 558 U.S. at 361; *see also United States v. Danielczyk*, 683 F.3d 611, 614 (4th Cir. 2012), *cert. denied*, 133 S. Ct. 1459 (2013) ("*Citizens United* left untouched § 441b(a)'s ban on direct corporate contributions."); *id.* at 617 ("the 'corporations-are-equal-to-people logic' of *Citizens United* is not applicable to contribution restrictions"); *In re Cao*, 619 F.3d 410, 422 (5th Cir. 2010) (en banc) ("[W]e do not read *Citizens United* as changing how this court should evaluate contribution limits on political parties and PACs."). Indeed, the ADC's argument runs counter to the main holding of the Eleventh Circuit's decision in this case: It was error, the Eleventh Circuit concluded, to "hold[] that the State's interest in preventing corruption or the appearance of corruption was insufficient as a matter of law to justify the ban on PAC-to-PAC transfers." 541 F. App'x at 936.

If anything, *Citizens United* and the more recently decided *McCutcheon* case affirmatively support the PAC transfer law as a general matter. *Citizens United*, for example, left room for legislation like the PAC transfer law, which assists in the detection of "sham" independent expenditures:

> The [*McConnell*] record establishes that certain donations to political parties, called "soft money," [i.e., money not designated for expenditure in federal elections[4]] were made to gain access to elected offi-

---

[4] Before passage of the legislation at issue in *McConnell*, "soft money" was not subject to federal regulation because it was not given to influence an election for federal office. *See* 540 U.S. at 122-23. *McConnell* upheld a ban on federal political parties "soliciting, receiving, directing, or spending any soft money." *Id.* at 133 (quoting 2 U.S.C. § 441i(a)).

cials. This case, however, is about independent expenditures, not soft money. When Congress finds that a problem exists, we must give that finding due deference; but Congress may not choose an unconstitutional remedy. If elected officials succumb to improper influences from independent expenditures; if they surrender their best judgment; and if they put expediency before principle, then surely there is cause for concern. We must give weight to attempts by Congress to seek to dispel either the appearance or the reality of these influences.

558 U.S. at 360-61 (citations omitted). Likewise, *McCutcheon* cited existing PAC

antiproliferation rules in concluding that an individual aggregate contribution limit

did not serve the government's interest in stamping out corruption:

[I]f 100 PACs were to contribute to Smith and few other candidates, and if specific individuals like our ardent Smith supporter were to contribute to each, the FEC could weigh those "circumstantial factors" to determine whether to deem the PACs affiliated. 11 CFR § 100.5(g)(4)(ii). The FEC's analysis could take account of a "common or overlapping membership" and "similar patterns of contributions or contributors," among other considerations. §§ 100.5(g)(4)(ii)(D), (J).

134 S. Ct. at 1454. Just imagine what the State could have concluded if such a reg-

ulation were in place in Alabama prior to the PAC transfer law: What percentage

of the PACs then in existence would have been deemed "affiliated"? In any event,

the presumed validity of *some* regulations like the one cited in *McCutcheon* only

supports the law at issue here. These rules do not operate to hinder independent

expenditures. They instead work to ensure that such expenditures truly are inde-

pendent. *See Republican Party of N.M. v. King*, 741 F.3d 1089, 1096 n.4 (10th Cir.

2013) (noting that *Citizens United* "did not question the government's authority to

enforce restrictions against coordination between candidates and independent ex-

penditure PACs" because "coordination breaks the essential independence of the expenditure and has always been deemed the functional equivalent of a candidate contribution.").

Before leaving *Citizens United*, it is important to note that that decision did not overrule the Supreme Court's numerous other precedents expressly allowing legislatures to restrict contributions to and from organizations. For example, the Court in *National Right to Work* recognized that the "'differing structures and purposes' of different entities 'may require different forms of regulation in order to protect the integrity of the electoral process.'" 459 U.S. at 210 (quoting *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 201 (1982) (plurality opinion)). And it found no "no reason" in the context of campaign contributions that "why [the government's anti-corruption interest] may not . . . be accomplished by treating unions, corporations, and similar organizations differently from individuals." *Id.* at 210-11 (citing *Cal-Med*, 453 U.S. at 201). The Court likewise has upheld bans and restrictions on organizational contributions at least in part because doing so "hedges against their use as conduits for 'circumvention of [valid] contribution limits." *Beaumont*, 539 U.S. at 155 (quoting *Colorado II*, 533 U.S. at 456 & n.18); *see also Cal-Med*, 453 at 197-98 & n.18. All of these cases are good law and remain binding on this Court. *See, e.g.*, *Citizens United*, 558 U.S. at 358-59 (distinguishing *National Right to Work* because it upheld "contribution limits . . . , which, unlike limits on inde-

pendent expenditures, have been an accepted means to prevent *quid pro quo* corruption"); *Danielczyk*, 683 F.3d at 617 (noting that *Citizens United*, "did not discuss *Beaumont* and explicitly declined to address the constitutionality of the ban on direct [corporate] contributions"). *Citizens United* certainly did not disturb the reasoning of those decisions highlighted here.

The significance of Alabama's decision not to impose contribution limits cannot be overstated. If groups can be banned from receiving or giving contributions to avoid circumvention of contribution limits, they can be banned from making cash transfers to avoid circumvention of disclosure laws. To this point, Alabama's campaign-finance regime is actually a *less restrictive means* of preventing corruption than the scheme the federal government and other States impose. *McCutcheon* makes clear that the background legal context matters in determining whether any particular provision serves the corruption interest. The aggregate contribution limits at issue in that case failed to serve the government's anticorruption interests precisely because so many other rules and regulations would have prevented money given in excess of the aggregate limits from getting to candidates or office holders. *See, e.g.*, 134 S. Ct. at 1453-56. Accordingly, *McCutcheon* makes it easy to see why, in the *absence* of such a labyrinthine maze of regulations, Alabama's PAC transfer law is in fact directed at "'the narrow category of money gifts

that are directed, in some manner, to a candidate or officeholder.'" *Id.* at 1452 (quoting *McConnell*, 540 U.S. at 310 (opinion of Kennedy, J.)).

Finally, Alabama's minimalist approach to campaign-finance regulation points to a critical distinction between the PAC transfer law and the contribution limits invalidated in the cases ADC cites for the proposition that government cannot restrict finances for independent expenditures. *See* doc. 43 at 23-25. As a rule, those cases involved limits on the *quantity* of money *individual contributors* could provide to a particular independent-expenditure group—not a prohibition of cash transfers between the groups once they receive that money. *See, e.g.*, *SpeechNow.org v. FEC*, 599 F.3d 686, 691 (D.C. Cir. 2010) (addressing an as-applied challenge to the federal, individual-level quantity limits on contributions to political committees); *Wisconsin Right to Life State PAC v. Barland*, 664 F.3d 139, 154 (7th Cir. 2011) ("At issue here is a statute that limits the amount individuals may contribute to . . . political committees to a total of $10,000 in any calendar year." (citation and internal quotation marks omitted)). In other words, just because the PAC transfer law is a "contribution limit" for purposes of selecting the proper scrutiny level does not mean that it is comparable to a traditional contribution limit in its capacity to prevent *quid pro quo* corruption or the appearance thereof. As the undisputed facts in this case show, Alabama's PAC transfer law does exactly that.

## 2. The PAC transfer law prevents actual or apparent corruption as applied to groups, like the ADC, which make contributions to candidates.

As just demonstrated, the PAC transfer law would serve the State's anticorruption interests even as applied to a group claiming to make only independent expenditures. For that reason, it even more clearly would serve these interests as applied to a group like ADC, who intends to make contributions to candidates as well as purportedly independent expenditures. *See* UF 133 (ADC's admission that the same "entity or people" will control both its candidate-contribution and independent-expenditure bank accounts).

Consider what will happen if ADC prevails. So-called "hybrid" groups will set up multiple PACs with two bank accounts. One they will label an "independent expenditure" account. The other they will designate for "direct contributions." To launder money for *quid pro quo* payments, these PACs then will make the same dizzying array of transfers they made previously, but will do so only through their putative "independent expenditure" accounts. Once the "independent expenditure" money arrives at the final-destination PAC, that PAC will formally put the transferred money in its "independent expenditure account." But at the original transferor's request, that PAC can simultaneously make a contribution of a similar dollar amount from its "direct contributions" account to a candidate. The final-destination PAC then can either use the "independent expenditure" funds for its

own purposes, or can transfer those funds to another PAC that wishes to make independent expenditures. By using putative "independent expenditure" transfers to effectively fund candidate contributions in this way, PACs can put Alabama, and the perception of *quid pro quo* that has marked its political processes, back at square one.

The First Amendment does not require the States to ignore the fact that "candidates, donors, and parties test the limits of the current law." *Colorado II*, 533 U.S. at 457. And against the preceding paragraph's disturbing scenario, it is (again) no answer to cite the post-*Citizen United* court decisions invalidating individual-level quantity limits to independent-expenditure groups. *Cf.* doc. 43 at 23-25. In addition to involving different kinds of *regulations* (as discussed in the preceding section), those cases also involved different kinds of *groups*: Specifically, they generally involved independent-expenditure-*only* groups—not groups, like the ADC, that want to also contribute to candidates. *See, e.g.*, *Barland*, 664 F.3d at 143-44 ; *Speechnow.org*, 599 F.3d at 689. Although the ADC did cite *Carey v. FEC*, 791 F. Supp. 2d 121 (D.D.C. 2011), as a case authorizing a "dual-account structure" like the one the ADC wants to maintain, that decision is both wrong—because it ignored the Supreme Court's decision in *Cal-Med*, and rested on an erroneous interpretation of *Citizens United*—and distinguishable—because it fea-

tured a different record, a different procedural posture, and a different background regulatory scheme. *See* doc. 39-4 (State's Eleventh Circuit reply brief) at 10-14.

The Supreme Court's decision in *Cal-Med* ultimately dispels any notion that a contribution limit cannot serve the government's anticorruption interests. In that case, a corporation challenged the federal law "limiting the amount an unincorporated association may contribute to a multicandidate political committee." 453 U.S. at 184. Justice Blackmun's controlling concurring opinion provided the fifth vote to uphold the limit, and he did so expressly because the PAC at issue there "ma[d]e contributions to five or more candidates for federal office." *Id.* at 203 (Blackmun, J., concurring). "Multicandidate political committees," Justice Blackmun concluded, are "essentially conduits for contributions to candidates, and as such they pose a perceived threat of actual or potential corruption." *Id.* Especially in light of Alabama's historical experience with PAC-to-PAC transfers and the ADC's insistence on contributing to candidates, the same thing can be said here. Alabama's PAC transfer law thus serves to prevent corruption as applied to groups like the ADC.

### 3. The PAC transfer law prevents actual or apparent corruption as applied to groups, like the ADC, which are political parties or affiliates of a political party.

Beyond the appearance of corruption inherent in a PAC's ability to obfuscate the source of "independent expenditure" transfers, the ADC's intertwined relationship with the Democratic Party and Democratic candidates creates a further, independent, corruption-based justification for applying the law to all of the ADC's PAC-to-PAC receipts. The Supreme Court has held that corruption concerns can justify governmentally imposed restrictions on a political party's ability to raise money for so-called "independent" expenditures. *See McConnell*, 540 U.S. at 144-46, . Because the ADC is effectively a wing of the state Democratic Party and is closely related to Democratic candidates, applying the Act to all its PAC-to-PAC receipts serves this anticorruption goal.

In upholding limits on so-called "soft-money" donations to parties for purposes that would include putatively "independent" expenditures, the Court in *McConnell* explained that "large contributions to a national party can corrupt or, at the very least, create the appearance of corruption of federal candidates and office-holders." 540 U.S. at 144. That is so because "contributions to a federal candidate's party in aid of that candidate's campaign threaten to create—no less than would a direct contribution to the candidate—a sense of obligation." *Id.* Political parties serve as "'agents for spending on behalf of those who seek to produce obli-

gated officeholders.'" *Id.* at 145 (quoting *Colorado II* , 533 U.S. at 452). "[I]t is not only plausible, but likely, that candidates would feel grateful for such donations and that donors would seek to exploit that gratitude." *Id.* at 351, 124 S. Ct. at 778.

*McConnell* reached a similar conclusion as to certain affiliates of the national parties—there, state and local parties—because their voter-registration, voter-identification, and get-out-the-vote activities "confer substantial benefits on federal candidates" and thus "create[] a significant risk of actual and apparent corruption." *Id.* at 168. Thus, *McConnell* held that the government has a corruption-based justification for limiting transfers to political parties for any purpose. So-called "independent" expenditures by political parties and their affiliates are inherently not "independent" at all.

These considerations make the anticorruption rationale apply to the ADC's receipt of PAC-to-PAC transfers, for whatever purpose, because the ADC is analogous to a political party or at least to an affiliate of a political party. Either way, the ADC is closely related to a political party and the candidates the party supports. *Cf. Farris v. Seabrook*, 667 F.3d 1051, 1058 (9th Cir. 2012) (noting that the anticorruption interest can justify "limits on contributions to committees that, although formally separate from the candidate, are sufficiently close to the candidate to present a risk of actual or apparent corruption."). When the ADC previously moved for summary judgment, it admitted the following:

- it is "intertwined in a number of ways with the Alabama Democratic Party;"

- "[m]any members of the ADC serve as officers or members of the Alabama State Democratic Executive Committee";

- "[t]he ADC and Democratic Party make contributions to each other in order to support and advance their common political ideals"; and

- the ADC engages in "get out the vote" drives that benefit Democratic candidates.

Doc. 10, ¶¶ 8-10, 14. Likewise, the ADC's complaint discloses that the ADC endorses "Democratic candidates," and two of the ADC members serving as individual plaintiffs are longtime county officeholders and beneficiaries of the ADC's get-out-the-vote efforts. Doc. 1, ¶ 13. According to the ADC, the State Democratic Party has outsourced its "get-out-the-vote" efforts in the African-American community to the ADC. Doc 9-1 – Pg 4. The undisputed facts uncovered in discovery only confirm the closeness of the ADC's relationship with, and similarity to, the Alabama Democratic Party—based on its policies, funding and membership patterns, and operational activities. *See* UF 72-125.

The ADC thus stands on the same ground as the political parties or other coordinating groups for which *McConnell* held that the government has a strong anti-corruption justification for donation limits. Given the "close connection and alignment of interests" between the ADC and so many officeholders, large donations to the PAC "are likely to create actual or apparent indebtedness on the part of" state

officeholders. *McConnell*, 540 U.S. at 155, 124 S. Ct. at 667. The "close affilia-tion" between the ADC and both officeholders and the state party "has also placed" the ADC "in a position to sell access to" officeholders and the party "in exchange for [unregulated] contributions that" the ADC "can then use for its own purposes." *Id.* And ADC's get-out-the-vote efforts on behalf of particular candidates are just as "capable" as the state party's "of putting [state] candidate[s] in the debt of the contributor." *Id.* at 167, 124 S. Ct. at 674. They thus pose just as much "a threat of corruption or the appearance of corruption." *Id.*

Although *Citizens United* overruled a different aspect of *McConnell*, *see Citizens United*, 130 S. Ct. at 913, it did not overrule or undermine *McConnell*'s justi-fication for regulating political parties and their affiliates. As a three-judge panel recently concluded, this holding of *McConnell* remains good law after *Citizens United* and justifies restrictions on contributions to political parties "regardless of how those contributions ultimately may be used." *Republican Nat'l Comm. v. FEC*, 698 F. Supp. 2d 150, 159 (D.D.C. 2010), *aff'd*, 130 S. Ct. 3544 (2010). This ra-tionale, then, suffices by itself to justify the Act's restriction on PAC-to-PAC transfers to the ADC.

### 4. The PAC transfer law prevents actual or apparent corruption as applied to groups, like the ADC, which coordinate their expenditures with candidates.

The ADC's close ties with the party and its candidates highlights a final, independent corruption-based concern that justifies applying the law to the ADC's PAC-to-PAC receipts. This Court previously recognized that "coordinated expenditures between a PAC and a candidate can lead to corruption" (doc. 24 at 21 n.9), and that much of what the ADC intends to do with its "get-out-the-vote" fund "falls more into" the realm of "a coordinated-type expenditure" than a truly "independent" expenditure. Doc. 32 (transcript hearing) at 36. Today, after the accelerated discovery period in this case, there is now substantial evidence that ADC routinely coordinates its get-out-the-vote activities with particular candidates, such that the ADC's purportedly "independent" get-out-the-vote expenditures are the functional equivalent of direct candidate contributions for First Amendment purposes. *See* UF 108-118; *see also Colorado II*, 533 U.S. at 446 (because "coordinated expenditures are as useful to the candidate as cash, . . . such 'disguised contributions' might be given 'as a *quid pro quo* for improper commitments from the candidate'"). Thus, to the extent the Court previously was concerned about its "role" in divining whether the ADC coordinates its expenditures with candidates, that concern is no longer warranted.

Indeed, in light of the undisputed facts, the ADC's activities are "coordinated" with the candidates they support as a matter of law. The Democratic candidates that the ADC supports are the ones footing more than half the bill for the ADC's activities, either directly through their own campaign funds or indirectly through the Democratic Party. *See* doc. 9-2. Given that fact, none of the ADC's expenditures on behalf of a candidate can be considered to be without "prearrangement and coordination . . . with the candidate or his agent." *Citizens United*, 130 S. Ct. at 908 (quoting *Buckley*, 424 U.S. at 47, 96 S. Ct. at 648). A candidate providing money so that a PAC will turn out voters to benefit the candidate is coordination, plain and simple. For these reasons, the PAC transfer law serves its anticorruption purpose even apart from the ADC status as a party, party affiliate, or relevant analogue.

> **5.    The PAC transfer law serves Alabama's interest in providing transparency for campaign finances.**

Just as the PAC transfer law furthers the State's anticorruption interests, the measure also furthers the State's interest in providing voters with information about the source of political speech. Ashley Newman's testimony, not to mention the drumbeat of coverage in the state news media, makes clear that PAC-to-PAC transfer obscured the true source of political contributions by putting additional layers—and usually many layers upon layers—of intermediaries between the publicly identified donor and the true donor. *See* UF 1-33. It makes common sense,

then, that simply eliminating PAC transfers would bring added transparency to the process. Indeed, just as the ADC admits the sufficiency of the State's transparency interest, it also admits that the law serves this interest. *See* doc. 43 at 31 (agreeing that the law has a "connection," albeit a "tangential connection," to this "concern"). The question thus becomes whether the law is appropriately tailored in advancing this interest. As explained in the next section, the answer to that question is "yes."

### D. The PAC transfer law is appropriately tailored to advance the State's anticorruption and transparency interests.

To reiterate an earlier point, the selection of *Buckley*'s "closely drawn" scrutiny level weighs heavily in favor of the PAC transfer law's validity. And nowhere is that more evident than in the tailoring analysis. As compared to strict scrutiny, this "less rigorous standard" "shows proper deference to [legislatures'] ability to weigh competing constitutional interests in an area in which [they] enjoy particular expertise." *McConnell*, 540 U.S. at 137. "It also provides [them] with sufficient room to anticipate and respond to concerns about circumvention of regulations designed to protect the integrity of the political process." *McConnell*, 540 U.S. at 137. Accordingly, the basic requirement is "'a fit that is not necessarily perfect, but reasonable'"—i.e., a fit "'that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.'" *McCutcheon*, 134 S.

Ct. at 1456-57 (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480 (1989)). For the PAC transfer law, meeting that requirement is not a problem.

1.     As an initial matter, ADC's complaints about tailoring do not square with *Buckley*'s rejection of an overbreadth challenge to the basic federal campaign contribution limit (at the time, of $1,000 per candidate). In bringing that particular attack, "[t]he challengers argued that the base limit was fatally overbroad because most large donors do not seek improper influence over legislators' actions." *McCutcheon*, 134 S. Ct. at 1445. "Although the Court accepted that premise, it nevertheless rejected the overbreadth challenge for two reasons." *Id.* "First, it was too 'difficult to isolate suspect contributions' based on a contributor's subjective intent." *Id.* (quoting *Buckley*, 424 U.S. at 30). "Second, 'Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the *opportunity* for abuse inherent in the process of raising large monetary contributions be eliminated.'" *Id.* (quoting *Buckley*, 424 U.S. at 30 (emphasis added)).

The ADC's tailoring arguments cannot prevail for these very reasons, but that is not the end of the matter. Instead, it is worth noting that the PAC transfer law operates much more narrowly than Buckley's contribution limit. The law does not limit the amount of independent expenditures PACs can make. It does not limit the amount of contributions PACs can make to candidates. Nor does it disturb

PACs' ability to receive monetary contributions from individuals and corporations. Indeed, the law still allows unbridled coordination between PACs to influence elections through independent expenditures—so long as those PACs do not engage in the transactions that previously derailed the system.[5] What is more, the PAC transfer law is Alabama's only substantive limit on campaign activity; so no one can accuse the State of taking the "'prophylaxis-upon-prophylaxis approach'" the Court has condemned in other contexts. *Id.* at 1458 (quoting *FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 479 (2007)); *cf. Cal-Med*, 453 U.S. at 199 n.20 (rejecting an improper-tailoring argument, notwithstanding the presence of "other antifraud provisions" because the contribution limit "does not restrict the ability of individuals to engage in protected political advocacy"). Finally, there is also evidence that the law is working—*i.e.*, that the law's scope is indeed "in proportion to the interest served"—and that political operatives are actually "shift[ing] their priorities" in response to the law. *Id.* at 1456, 1458. Since passage of the law, the Alabama Sec-

---

[5] If the PAC transfer law is comparable to a contribution limit at all, it is comparable to bans on specific *types* of contributions such as cash or "straw-man" contributions. Like the PAC transfer law, those kinds of limits restrict only one avenue of funding, and thus leave many other avenues of association unimpeded. "A law that forbids making a contribution using another person's name is not . . . more burdensome than a law . . . requiring disclosure of the identity of the contributor in the first instance." *State v. Moyer*, 230 P.3d 7, 17 (Or. 2010) (en banc), *cert. denied*, 131 S. Ct. 326 (2010). As the Sixth Circuit explained, such laws "do[] not limit the overall amount which a person can contribute," but only "the amount which one can give without some record of a gift." *Frank v. City of Akron*, 290 F.3d 813, 818-19 (6th Cir. 2002). Like these limits, the PAC transfer law is at most a regulation on "the *manner* in which one may contribute" to a political cause. *Id. Accord Anderson v. Spear*, 356 F.3d 651 (6th Cir. 2004). It is not a law that prevents citizens from working together.

retary of State's Office has noticed that some of the "PAC proliferators" under the old system have been dissolving PACs and thereby "reducing their number of PACs." UF 33. Taking all these points together, it is clear the PAC transfer law targets the same problem of corruption as was at issue in Buckley, but in a much less restrictive manner. Under closely drawn scrutiny, that is the essence of a well-tailored law.

And these are just the general points in favor of a conclusion that the law is properly tailored. As described above, *see supra* at Sections I.C.2 to I.C.4, there are several ways in which the law uniquely serves an important state interest as applied to the ADC. To the extent the Court relies on those "as-applied" justifications of the law, the Court would have no occasion to engage a general tailoring analysis. Because the law serves an important interest *as to* the ADC, the law is properly tailored *as to* the ADC.

2.      Failing to consider these general points, the ADC instead argues that this unanimously enacted law fails because the Legislature could have adopted supposedly "tried-and-true alternatives." Doc. 43 at 30. These supposed "alternatives" include some undefined combination of laws that require PACs to report contributions made at the direction of another (*see id.* at 30), laws that make it illegal for a person to "earmark" or "pass through" a contribution (*see id.* at 9), and laws that require advertisements to disclaim the identity of a PAC's major contrib-

utors (*see id.* at 35). The State strongly suspects that, were the Legislature to adopt this package of reforms, the ADC would be challenging them as unconstitutional as well. But the larger point is that closely-related scrutiny does not require the Legislature to adopt the least restrictive means to serve its interests. Instead, by making these arguments about a package of alterative laws, the ADC is improperly urging this Court to review the PAC transfer law under *de facto* strict scrutiny.

For proof that the ADC is asking this Court to impose strict scrutiny, the Court need look no further than the ADC's principal case on this point—*a case applying strict scrutiny*. The ADC repeatedly quotes the two-judge concurrence in *Homans v. City of Albuquerque*, 366 F.3d 900, 915, 919 (10th Cir. 2004), for the proposition that closely drawn scrutiny cannot be satisfied "if there are 'many alternatives' to advancing the government's interest 'that are not constitutionally suspect.'" *See, e.g.*, doc. 43 at 19, 29, 32. But *Homans* was a case about a direct limitation on the amount of money that a candidate could spend in a municipal election. *Homans*, 366 F.3d at 902-03. And, as the court correctly held in that case, "the standard for expenditure limits operates identically to strict scrutiny review." *Id.* at 906. The two-judge concurrence similarly applied strict scrutiny, holding that "whatever the merits of spending limits, they must be narrowly tailored to further the constitutional justification." *Id.* at 919; *see also Colo. Right To Life Comm., Inc. v. Coffman*, 498 F.3d 1137, 1146 (10th Cir. 2007) (citing *Homans* as a case

applying strict scrutiny). The ADC has not argued that the PAC transfer law is subject to a *de jure* strict scrutiny standard, and it would be error for this Court to apply the *de facto* strict scrutiny standard urged by the ADC's brief.

In any event, there is no reason to believe that the ADC's proposed alternatives would work to accomplish the same results as the law that the Legislature unanimously chose. The ADC's main argument on this front is that Alabama should, like some other States, forbid a PAC's contributors from earmarking their contributions for specific purposes such that they are "passed through" a "conduit" PAC. *See* doc. 43 at 9-10, 30. As an initial matter, the ADC appears genuinely confused about the meaning of Alabama's pre-existing law against making contributions "in the name of another," Ala. Code § 17-5-15(a). *See, e.g.*, doc.43 at 9-10. That law prevents persons and groups from giving a contribution under a false name. It has not been interpreted to prevent a donor from earmarking contributions to a PAC such that they are "passed through." *See* Ala. Attorney Gen. Op. No. 91-135 (Jan. 10, 1991) (statute does not prevent earmarking). Similarly, it appears that many of the out-of-state statutes cited by the ADC as anti-earmarking or "passthrough" statutes are actually false-name statutes.[6] *See* doc. 43 at 9 n.1.

---

[6] *Compare, e.g.*, DEL. CODE ANN. TIT. 15, § 8006 & HAW. REV. STAT. § 11-352 (false name statutes), *with* MASS. GEN. LAWS ANN. ch. 55, § 10A & NEV. REV. STAT. ANN. § 294A.112 (no earmarking or pass-through contributions).

Regardless, an anti-earmarking or "pass-through" law is no panacea. First, as the Supreme Court explained in *Colorado II* when discussing political parties, an "earmarking provision . . . would reach only the most clumsy attempts to pass contributions through" a PAC. *Colorado II*, 533 U.S. at 462. "To treat the earmarking provision as the outer limit of acceptable tailoring would disarm any serious effort to limit the corrosive effects of ... 'understandings' regarding what donors give what amounts to the [PAC], which candidates are to receive what funds from the [PAC], and what interests particular donors are seeking to promote." *Id.* Second, several of the States that have adopted strong anti-earmarking and "pass-through" provisions also have laws that prevent certain PAC-to-PAC transfers.[7] The fact that other States have a PAC transfer law *in addition* to an anti-earmarking law strongly suggests that an anti-earmarking law is not by itself sufficient to serve the government's interests in anticorruption and transparency. Finally, there is no way to police compliance with an anti-earmarking or "pass-through" law without delving into each donor's intention at the time he or she contributes to a PAC. There is a fuzzy line between "earmarking" and supporting a PAC with the knowledge or understanding that the PAC will transfer one's money to another group. The PAC

---

[7] States that prohibit pass-through contributions and also limit PAC-to-PAC transfers include **Connecticut**, CONN. GEN. STAT. § 9-622(7) (earmarking); CONN. GEN. STAT. § 9-619 ($2,000 limit on PAC transfers), **Missouri**, MO. REV. STAT. §130.031(3) (earmarking); MO. REV. STAT. § 130.031(13) (no PAC transfers),**Vermont**, VT. STAT., tit. 17, § 2805(e) (earmarking); VT. STAT. tit. 17, § 2805(e)(no PAC transfers), and **Oklahoma**, OKLA ST. ETHICS COMM. 257:10-1-2(i) (earmarking); OKLA ST. ETHICS COMM. 257:10-1-2(e) (limited PAC transfers).

transfer law is a clear, bright-line rule, and the Legislature reasonably determined that this rule was the preferable course.

Finally, strengthened disclaimer and disclosure requirements also are not the answer. *See* doc. 43 at 35. As the State has explained, unbridled PAC-to- PAC transfers undermine disclosure and disclaimer laws because, as long as fly-by-night shell PACs can launder money amongst themselves, there is no way for an observer to trace the money with any certainty even if each step in the chain is exposed. In other words, PAC-to-PAC transfers *inherently* undermine disclosure rules, regardless of how "muscular" those rules may be. Doc. 43 at 35.

## II.     The ADC is not entitled to preliminary injunctive relief.

As explained before, the ADC's motions for preliminary injunction are not properly before the Court in light of the agreement by the Court and the parties to proceed to a final adjudication on the merits. *See* doc. 38 at 1. Having said that, the ADC is not entitled to preliminary injunctive relief in any event. The foregoing analysis demonstrates why the ADC possesses no chance of succeeding on the merits of its claim—let alone a "substantial likelihood" of success. And given the weakness of the ADC's claim, it has also failed to identify both an imminent, irreparable injury and any reason that its interest in obtaining an injunction outweighs the public's interest in honest and transparent elections.

**CONCLUSION**

For the foregoing reasons, the Court should deny the ADC's requests for a preliminary injunction and grant summary judgment in favor of the State on the ADC's sole remaining First Amendment claim.

Respectfully submitted,

LUTHER STRANGE (ASB-0036-G42L)
   *Attorney General*

Andrew L. Brasher (ASB-4325-W73B)
   *Solicitor General*

s/William G. Parker, Jr.
Winfield J. Sinclair (ASB-1750-S81W)
James W. Davis (ASB-4063-I58J)
William G. Parker, Jr. (ASB-5142-I72P)
   *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
(334) 353-8440 (fax)
wsinclair@ago.state.al.us
jimdavis@ago.state.al.us
wparker@ago.state.al.us

**Attorneys for Attorney General Strange, District Attorney Broussard, and District Attorney Graham**

CERTIFICATE OF SERVICE

I certify that on April 25, 2014, I electronically filed the foregoing document using the Court's CM/ECF system which will send notification of such filing to the following persons:

Edward Still
130 Wildwood Parkway
Suite 108 - PMP 304
Birmingham, AL 35209
(205) 320-2882
still@votelaw.com

John K. Tanner
JOHN TANNER LAW OFFICE
3743 Military Road NW
Washington, DC 20015
(202) 503-7696
john.k.tanner@gmail.com

Norman O Grubbs
JOE M. REED & ASSOCIATES LLC
524 South Court Street
Montgomery, AL 36104
(334) 834-2000
ogrubbs@bellsouth.net

                                        s/William G. Parker, Jr.
                                        Winfield J. Sinclair (ASB-1750-S81W)
                                        James W. Davis (ASB-4063-I58J)
                                        William G. Parker, Jr. (ASB-5142-I72P)
                                        *Assistant Attorneys General*

## *Appendix*

# NUMBERED STATEMENT OF UNDISPUTED FACTS

**APPENDIX: NUMBERED STATEMENT OF UNDISPUTED FACTS**

The State requests summary judgment be entered in its favor. Accordingly, it identifies the following list of undisputed facts as revealed by the accelerated discovery process in this case. The facts fall into two broad categories: (I) facts about PAC-to-PAC transfers and (II) facts about the Alabama Democratic Conference. Each numbered fact cites exhibits attached to the State's contemporaneously filed motion for summary judgment (doc. 44), the State's previously filed motion to dismiss (doc. 7), the Plaintiffs' previous motion for summary judgment (doc. 9), or the Plaintiffs' Second Motion for Preliminary Injunction (doc. 43).

## I. Facts about PAC-to-PAC transfers

### A. PAC-to-PAC transfers' capacity to conceal the true source of a campaign contribution

1. PAC-to-PAC transfers can be used to obfuscate the true source of a campaign contribution. Doc. 44-1 (Newman Decl.) ¶ 4.

2. Before Act No. 2010-765 became law, an individual or interest group could conceal a contribution by "mak[ing] a contribution to one PAC, which could then make a contribution to another PAC, which could then make a contribution to another PAC, and on and on until some PAC eventually delivered the money to the candidate"—at which point there would be "no way to effectively trace the contribution from the original contributor to the ultimate recipient." Doc. 44-1 (Newman Decl.) ¶ 5.

3. Alabama has never imposed limits on the number of PACs any one person can create. Doc. 44-1 (Newman Decl.) ¶ 5.

4. When PAC-to-PAC transfers were lawful, "a single campaign operative could control all of the PACs in [a] contribution chain" and carry out a

scheme to conceal the source of a campaign contribution "simply by moving credits from one ledger to another." Doc. 44-1 (Newman Decl.) ¶ 5.

5.  When PAC-to-PAC transfers were lawful, "some donors would break up large contributions into smaller, discrete 'chunks' of funds and then run [those] smaller amounts through their own series of PAC-to-PAC transfers." Doc. 44-1 (Newman Decl.) ¶ 6.

6.  When PAC-to-PAC transfers were lawful, donors would "stagger the timing of their [contributions]" to further conceal or obscure the source of the funds. Doc. 44-1 (Newman Decl.) ¶ 6.

7.  For the past seventeen years, Ashley Newman has been a campaign-finance compliance consultant in Alabama. Doc. 44-1 (Newman Decl.) ¶ 1.

8.  In the 2010 Alabama primary election, one of Ashley Newman's clients was Bradley Byrne's campaign for the Republican gubernatorial nomination. Doc. 44-1 (Newman Decl.) ¶ 7.

9.  During the 2010 Alabama elections, a PAC named the "True Republican PAC" began running attack ads in opposition to Bradley Byrne's candidacy. Doc. 44-1 (Newman Decl.) ¶ 7.

10. Using campaign disclosure reports on file in the Alabama Secretary of State's office, Ashley Newman could not determine "with absolute certainty" the source of True Republican PAC's funds. Doc. 44-1 (Newman Decl.) ¶ 7.

11. Ashley Newman's inability to determine the source of True Republican PAC's funds was because "virtually all of True Republican PAC's funds had been transferred through multiple PACs in a confusing manner on different dates." Doc. 44-1 (Newman Decl.) ¶ 7.

12. Two Byrne campaign employees and Ashley Newman spent "over two work days" trying to ascertain the original source of True Republican PAC's contributions, but they could not definitively do so. Doc. 44-1 (Newman Decl.) ¶ 7.

13. Prior to 2011, Alabama PACs had to file disclosure reports annually, 45 days before an election, and within 10-5 days before an election. Doc. 44-1 (Newman Decl.) ¶ 8 n.1.

14. According to True Republican PAC's 10-day disclosure report before the 2010 primary election, 21 PACs (and no individuals) contributed $877,441.00 to it during the reporting period through 37 separate contributions. Doc. 44-1 (Newman Decl.) ¶ 8.

15. According to True Republican PAC's 2010 primary 10-day report, it received contributions from the following PACs: Mainstream PAC, First Decade PAC, BIZ PAC, Fund for Alabama's Children and Education, Environmental Campaign Fund, Penny PAC, Arbor Committee PAC, STA PAC, TEC PAC, JEFFCO PAC, and TOC PAC. Doc. 44-1 (Newman Decl.) ¶ 8.

16. Mainstream PAC, First Decade PAC, and BIZ PAC are all controlled by the same person. Doc. 44-1 (Newman Decl.) ¶ 8.

17. Fund for Alabama's Children and Education, Environmental Campaign Fund, Penny PAC, and Arbor Committee PAC are all controlled by the same person. Doc. 44-1 (Newman Decl.) ¶ 8.

18. STA PAC, TEC PAC, JEFFCO PAC, and TOC PAC are all controlled by the same person. Doc. 44-1 (Newman Decl.) ¶ 8.

19. According to True Republican PAC's May 26, 2010 contribution report, it received separate contributions from Deserve Victory PAC of $10,000 and $5,000 on April 19, 2010, and $4,000 on May 11, 2010, for a total of $19,000. Doc. 44-1 (Newman Decl.) ¶ 9.

20. Deserve Victory PAC did not report receiving any contributions within 45 days of the 2010 primary. Doc. 44-1 (Newman Decl.) ¶ 9.

21. According to Deserve Victory PAC's report filed 45 days before the 2010 primary, it received $5,000 from TAG PAC on February 10, 2010; $5,000 from MWL Architects on February 22, 2010; $50,000 from TOC PAC on March 3, 2010; and $20,000 from Merit PAC on April 2, 2010. Doc. 44-1 (Newman Decl.) ¶ 9.

22. According to the Alabama Secretary of State's online filing system, Merit PAC—the source of Deserve Victory's $20,000 contribution on April 2, 2010—has filed only one report in the course of its existence, a 45-day report in advance of the 2010 primary election. Doc. 44-1 (Newman Decl.) ¶ 9.

23. According to Merit PAC's 2010 primary 45-day report, it received just two contributions: (1) $50,000 from TOC PAC on March 15, 2010 and (2) $15,000 from TAG PAC on April 9, 2010. Doc. 44-1 (Newman Decl.) ¶ 9.

24. TOC PAC—the source of Merit PAC's $50,000 contribution on March 15, 2010, and Deserve Victory PAC's $50,000 contribution on March 3, 2010—received contributions almost exclusively from PACs prior to the 2010 primary election. Doc. 44-1 (Newman Decl.) ¶ 9.

25. According to TOC PAC's 2010 primary 45-day report, it received over $137,000 in contributions from the following PACs: Secure PAC, Alabama Voice of Teachers, Green PAC, and Jefferson PAC. Doc. 44-1 (Newman Decl.) ¶ 9.

26. The difficulties encountered in trying to identify the source of True Republican PAC's contributions from Deserve Victory PAC "merely scratch[] the surface of the problem and vastly understate[] the difficulty in identifying the true source of a contribution." Doc. 44-1 (Newman Decl.) ¶ 9.

27. When Ashley Newman tried to identify the source of True Republican PAC's funds during the 2010 Alabama primary campaign, she "gave up" after tracing the funds "through ten 'generations' of transfers without a definitive answer." Doc. 44-1 (Newman Decl.) ¶ 9.

28. Numerous people have contacted Ashley Newman and asked her to help identify the source of various candidates' funding. Doc. 44-1 (Newman Decl.) ¶ 10.

29. During the 2010 Alabama primary election, a reporter for a state newspaper contacted Ashley Newman in his attempt to identify the source of True Republican PAC's finances. Doc. 44-1 (Newman Decl.) ¶ 10.

30. The reporter who contacted Ashley Newman during the 2010 Alabama primary election wanted to write an article about the attack ads True Republican PAC was running against Bradley Byrne, but he could not determine the source of the funds being used to finance the advertisements. Doc. 44-1 (Newman Decl.) ¶ 10.

31. Prior to passage of Act 2010-765, the Alabama Secretary of State's office observed that some individuals or entities created "noticeable numbers of PACs." Doc. 43-1 (Packard Depo.) at 46:15-47:2.

32. Prior to passage of Act 2010-765, one gentleman who had already registered "a number of PACs" registered four more PACs under the names "Please PAC," "Watch PAC," "Your PAC," and "Step PAC"; the names were inspired by a sign the man had just seen in the stairwell. Doc. 43-1 (Packard Depo.) at 47:13-48:4.

33. After Act 2010-765 went into effect, the Alabama Secretary of State's office noted that some of the individuals who had created multiple PACs were dissolving PACs and thereby "reducing their number of PACs." Doc. 43-1 (Packard Depo.) at 47:3-7.

### B. PAC-to-PAC transfers' capacity to facilitate quid pro quo corruption

34. Ashley Newman has observed that "PAC-to-PAC transfers can provide ill-intentioned donors and candidates an opportunity to covertly exchange campaign contributions for political favors." Doc. 44-1 (Newman Decl.) ¶ 4.

35. Ashley Newman has observed that PAC-to-PAC transfers provide an "opportunity for covert deal-making between donors and candidates even if a PAC represents that it will not coordinate with candidates its expenditures of the PAC-transferred funds." Doc. 44-1 (Newman Decl.) ¶ 4.

36. "The True Republican PAC example from the 2010 Alabama gubernatorial primary highlights the ease with which PAC-to-PAC transfers can be used as a tool to conceal efforts between a PAC and a candidate to work together." Doc. 44-1 (Newman Decl.) ¶ 11.

37. Claire H. Austin was an officer of the Deserve Victory PAC as well as TAG PAC in 2010. Doc. 44-1 (Newman Decl.) ¶ 11.

38. Claire Austin conceivably played some role in delivering contributions to the True Republican PAC through PAC-to-PAC transfers before the 2010 Alabama primary election. Doc. 44-1 (Newman Decl.) ¶ 11.

39.    Claire Austin was the organizer and an initial member of Alabama Strategy Group LLC. Doc. 44-1 (Newman Decl.) ¶ 11.

40.    Tim James was a candidate for the Republican gubernatorial nomination in 2010. Doc. 44-1 (Newman Decl.) ¶ 11.

41.    According to Tim James's 2010 primary 45-day report, his campaign paid Alabama Strategy Group LLC $4,986.34 for fundraising services during the Alabama 2010 primary campaign. Doc. 44-1 (Newman Decl.) ¶ 11.

42.    Based on Claire Austin's connection to Deserve Victory PAC (a contributor to True Republican PAC), and her connection to Tim James' gubernatorial campaign, it is "highly likely" that True Republican PAC coordinated with Tim James its attack ads against Bradley Byrne. Doc. 44-1 (Newman Decl.) ¶ 11.

43.    If True Republican PAC coordinated with candidate Tim James its attack ads against candidate Bradley Byrne, "donors to the True Republican PAC—whomever they were—were able to effectively deliver campaign contributions to Tim James without anyone knowing about it." Doc. 44-1 (Newman Decl.) ¶ 11.

44.    Based on Claire Austin's connection to Deserve Victory PAC (a contributor to True Republican PAC), and her connection to Tim James' gubernatorial campaign, Ashley Newman perceived True Republican PAC to coordinate with Tim James its attack ads against Bradley Byrne. Doc. 44-1 (Newman Decl.) ¶ 11.

45.    Based on her perception that True Republican PAC coordinated with candidate Tim James its attack ads against candidate Bradley Byrne, Ashley Newman perceived that donors to the True Republican PAC were able to use PAC-to-PAC transfers to conceal campaign contributions to Tim James. Doc. 44-1 (Newman Decl.) ¶ 11.

46.    True Republican PAC filed five disclosure reports over the course of its existence in 2010. Doc. 44-1 (Newman Decl.) ¶ 12.

47.    In none of the five reports it filed in 2010, did True Republican PAC report making an expenditure to a candidate or any other entity that is obviously related to a candidate. Doc. 44-1 (Newman Decl.) ¶ 12.

48. Over the course of its existence in 2010, True Republican PAC reported making contributions to only two entities—Denver-based Media Strategies and Research and WIN 98.5—both for purposes of advertising. Doc. 44-1 (Newman Decl.) ¶ 12.

49. Ashley Newman does not know whether True Republican PAC claimed to be an "independent-expenditure-only" PAC, but there are no rules or other reasons that would prevent it from doing so. Doc. 44-1 (Newman Decl.) ¶ 12.

50. In 2010, the federal government indicted 11 people, including a bipartisan group of Alabama state senators, based on allegations that the defendants conspired to provide campaign contributions to incumbent legislators and candidates in exchange for their support of pro-gambling legislation pending in the Alabama Legislature. *See generally* Doc. 7-2.

51. The 2010 federal bribery indictment alleged that the conspirators "disguised payments made to legislators from whom they sought support by concealing illicit payments through political action committees ('PACs') and using conduit contributors." Doc. 7-2 at 9.

52. The 2010 federal bribery indictment contained the following account of a wiretapped conversation between Alabama Senator Harri Anne Smith and Ronald Gilley, a gambling promoter:

> On or about March 24, 2010, SMITH asked GILLEY about his promised campaign contributions, and GILLEY assured her that he would "get those checks busted up, the way they need to be." . . .

> Later that same day, on or about March 24, 2010, SMITH and GILLEY continued their discussion of how GILLEY'S contribution to SMITH would be concealed by running it through various PACs. When GILLEY asked SMITH if she was comfortable using a PAC with a name associated with a different political party than SMITH's, SMITH consented, explaining, "'Cause what we're gonna do is put it through another. . . . Like, what we'll do, it will go to that one, and then we're gonna move it to a different one."

Doc. 7-2 at 32-33.

53. Although a jury later found Senator Smith (and other defendants) not guilty in the 2010 federal bribery case, gambling promoter Ronald Gilley pleaded guilty, admitting that he "attempted to conceal the true nature, source, and control of the payments made to members of the Alabama Legislature" by "disguising illicit payments through political action committees." *See United States v. Gilley*, No. 2:10-cr-00186-MHT (M.D. Ala.) (Doc. 986 at 4, Apr. 22, 2011).

## II. Facts about the Alabama Democratic Conference

### A. *Background/organization*

54. ADC is a corporation. Doc. 43-4 (Reed Depo.) at 47:14-20.

55. The ADC has around 3,000 members across the State. Doc. 43-4 (Reed Depo.) at 42:8-15.

56. ADC members must pay dues on an annual basis of $15. Doc. 43-4 (Reed Depo.) at 43:15-44:2.

57. ADC's basic mission is to "organize and unify the black vote." Doc. 43-4 (Reed Depo.) at 39:7-13.

58. ADC is organized by "county units" or local chapters. Doc. 43-4 (Reed Depo.) at 46:11-22.

59. ADC's local chapters are not separately incorporated from the ADC; they are internal divisions within the ADC, created for administrative purposes. Doc. 43-4 (Reed Depo.) at 48:5-16.

60. An ADC member "cannot join the county [chapter of ADC] without joining the state [organization]" and "cannot join the state [organization] without joining the county [chapter]." Doc. 43-4 (Reed Depo.) at 47:2-4.

61. Depending on available funds, ADC distributes money to the county chapters based on the following factors: (1) a set base amount per chapter (typically $500); (2) an amount prorated based on the size of the county's black voting population; and (3) the county unit's effectiveness at promoting the ADC's goals. Doc. 43-4 (Reed Depo.) at 65:11-67:7, 68:4-70:1, 73:10-

74:19. *See also, e.g.*, doc. 44-6 (ADC 2010 Annual Disclosure Report) at 9-30

62. Besides distributing funds to ADC county chapters, ADC's primary political expenses relate to printing yellow sample ballots which indicate the candidates the ADC endorses. Doc. 43-4 (Reed Depo.) at 75:1-76:2.

63. ADC's get-out-the-vote activities include distributing yellow sample ballots (at churches or door-to-door or at polling places), calling people to encourage them to vote, attending churches or ministers' meetings to promote ADC's message, promoting the use of absentee ballots, running radio spots to encourage people to vote, conducting phone-bank and robocall campaigns, paying for rides to the polls. Doc. 43-4 (Reed Depo.) at 121:14-122:5, 124:3-126:4, 134:1-135:17, 135:22-136:9, 136:10-137:13, 137:14-139:3, 185:3-21

64. ADC publishes and distributes a "yellow sample ballot" in every county that identifies the local candidates endorsed by the relevant ADC county unit and the state candidates (including state legislators and candidates for statewide office) endorsed by the ADC as a whole. Doc. 43-4 (Reed Depo.) at 154:12-156:11. *See also* doc. 44-5 at 3-85 (2010 Primary ADC Yellow Ballots).

65. ADC's promotion of candidates, including state-level candidates, is primarily accomplished through county chapters. Doc. 43-4 (Reed Depo.) at 50:16-23.

66. ADC endorses state candidates at the state level, and its local chapters endorse local candidates at the county level. Doc. 43-4 (Reed Depo.) at 50:10-15.

67. ADC Chair Joe Reed has chaired the ADC continuously since 1970. Doc. 43-4 (Reed Depo.) at 22:13-14, 23:8-15.

68. ADC Chair Joe Reed distributes funds to the ADC county chapters pursuant to the factors identified in Undisputed Fact #61 without consulting the ADC Executive Committee. Doc. 43-4 (Reed Depo.) at 65:17-66:2, 67:8-17, 70:2-17, 71:21-23.

69. ADC Chair Joe Reed admits that the third factor in the ADC's county funding formula is "a little bit arbitrary." Doc. 43-4 (Reed Depo.) at 68:9.

70.     ADC Chair Joe Reed appoints the members of the candidate screening committees who make recommendations about which candidates the ADC will endorse. Doc. 43-4 (Reed Depo.) at 158:4-13, 163:19-164:10.

71.     ADC Chair Joe Reed is an ex officio member of all ADC candidate screening committees. Doc. 43-4 (Reed Depo.) at 171:20-172:7.

### B. ADC's relationship to the Alabama Democratic Party

72.     "The ADC has a close working relationship with the Alabama Democratic Party." Doc. 9-1 (Reed Decl.) ¶ 6.

73.     At deposition, ADC Chair Joe Reed understood himself to be present in two capacities: "[a]s a representative of the Alabama Democratic Conference and as a representative of the [D]emocrats." Doc. 43-4 (Reed Depo.) at 11:22-12:6.

74.     When asked why the ADC brought this lawsuit, ADC Chair Joe Reed's first reaction was to lament that "the [D]emocratic [P]arty, for example, could not contribute to [the ADC's] get out to vote effort if [the ADC] wanted to . . . help some candidates." Doc. 43-4 (Reed Depo.) at 20:6-12.

75.     According to the ADC's constitution, its purpose is in part to "advocate and advance the cause of the Democratic Party." Doc. 43-4 (Reed Depo.) at 34:17-35:22. *See also* doc. 44-2 (ADC Constitution) at 2.

76.     At the ADC Executive Committee meeting held December 16, 2006, ADC Chair Joe Reed announced that ADC's "theme" for 2007 would be "'Building the Democratic Party at the Local and State Level.'" Doc. 44-7 (ADC Exec. Comm. Minutes) at 2.

77.     At the ADC Executive Committee meeting held December 16, 2006, ADC Chair Joe Reed announced that "DNC staffers would be available to assist" local ADC county chapters in organizing community meetings. Doc. 44-7 (ADC Exec. Comm. Minutes) at 2.

78.     At the ADC Executive Committee meeting held December 16, 2006, ADC Chair Joe Reed "talked about the relationship between Democratic Party Executive Committees and Alabama Democratic Conference Chapters. He stated if a local Democratic Party Executive Committee is not going in the right direction then we (the local ADC chapters) are going to get involved in mak-

ing them go in the right direction." Doc. 44-7 (ADC Exec. Comm. Minutes) at 3.

79. "State [Democratic] Party Chair Joe Turnham gave brief remarks" at the ADC Executive Committee meeting held December 16, 2006. Doc. 44-7 (ADC Exec. Comm. Minutes) at 4.

80. At the ADC Executive Committee meeting held December 15, 2007, ADC Chair Joe Reed noted that "[i]t is important for ADC members to be involved in the local Democratic Executive Committee meetings since this group will play a very important role in the upcoming elections." Doc. 44-7 (ADC Exec. Comm. Minutes) at 8.

81. At the ADC Executive Committee meeting held December 11, 2010, ADC Chair Joe Reed advised members to "[b]ecome active in your county Democratic Party to be a part of the reorganization." Doc. 44-7 (ADC Exec. Comm. Minutes) at 15.

82. "To be a member of ADC, you've got to be a [D]emocrat." Doc. 43-4 (Reed Depo.) at 55:16-23.

83. At a January 2014 meeting of ADC's executive committee, the members "talked about getting folks qualified for – to run for the state [democratic executive] committee." Doc. 43-4 (Reed Depo.) at 85:3-86:2.

84. At the March 25, 2006, meeting of ADC's executive committee, ADC Chair Joe Reed's report included discussion of "[q]ualifying folk for the SDEC from the various House Districts." Doc. 44-7 (ADC Exec. Comm. Minutes) at 1.

85. At the ADC Executive Committee Meeting held December 14, 2013, ADC Chair Joe Reed advised that "ADC affiliates need to start now, running folk for [State Democratic Executive Committee] positions and/or encouraging those persons who have served well from your counties to run again within the appropriate district." Doc. 44-7 (ADC Exec. Comm. Minutes) at 16.

86. In addition to candidates for public office, the ADC endorses candidates running to be a delegate to the Democratic National Convention and candidates for the Alabama Democratic Executive Committee. Doc. 43-4 (Reed Depo.) at 186:13-187:23, 188:1-22.

87. Unless ADC "purposely and willfully" opposes a particular Democratic candidate, it endorses and supports "everybody on the democratic ticket." Doc. 43-4 (Reed Depo.) at 149:22-150:8.

88. For the general election, ADC's yellow sample ballot usually recommends a "straight [Democratic] ticket vote." Doc. 43-4 (Reed Depo.) at 179:12-20.

89. All candidates for Alabama state office that the ADC supports are nominees or aspiring nominees of the Alabama Democratic Party. Doc. 44-2 (State's discovery requests & ADC's responses) at 6, (request for admission #22); *see also* doc. 43-4 (Reed Depo.) at 40:3-10, 184:9-12.

90. Aside from candidates, ADC's main contributors are the Alabama Education Association, A-VOTE (AEA's PAC), Association for Justice, TRIAL (AAJ's PAC), and the Alabama Democratic Party. Doc. 43-4 (Reed Depo.) at 108:18-109:13, 112:10-14; *see also* doc. 9-1 (Reed Decl.) ¶ 9.

91. As of February 27, 2014, all five of the non-vacant ADC executive officer positions were held by members of the Alabama State Democratic Executive Committee. Doc. 43-4 (Reed Depo.) at 54:10-64:14.

92. Approximately 107 out of the 292 total members of the Alabama Democratic Executive Committee are members of the ADC. Doc. 43-4 (Reed Depo.) at 90:15-91:20. *See also* doc. 44-3 (annotated ADEC membership list).

93. From 1990 to present, ADC Chair Joe Reed has served as Vice Chairman for Minority Affairs of the Alabama Democratic Executive Committee. Doc. 43-4 (Reed Depo.) at 94:1-10; *cf.* doc. 44-4 (SDEC Bylaws) at 9.

94. As Vice Chairman for Minority Affairs for the Alabama Democratic Executive Committee, ADC Chair Joe Reed encourages black and white party members "to be good democrats," and works with the party chair "in promoting the party, in defending the party, [and] in advancing the party." Doc. 43-4 (Reed Depo.) at 96:18-97:7.

95. ADC Chair Joe Reed agrees that his duties as Vice Chair for Minority Affairs of the Alabama Democratic Executive Committee "sound very similar" to his duties as ADC Chair. Doc. 43-4 (Reed Depo.) at 97:10-12.

96. From 2005-2010, the ADC received 4 contributions from the Alabama Democratic Party, totaling $87,648. Doc. 9-2 (Exhibit A to Reed Decl.) at 4 (lines 100 & 110-12).

97. Since 2010, the ADC has not received money from the Alabama Democratic Party primarily because "[t]he party's been so broke." Doc. 43-4 (Reed Depo.) at 115:7-116:18.

### C. ADC's relationship to candidates and officeholders

98. As of February 27, 2014, three of the five non-vacant ADC executive officer positions were held by individuals who are current or previous public office-holders. Doc. 43-4 (Reed Depo.) at 54:10-64:14.

99. The ADC's Executive Committee includes "nine elected ex-officio members who shall be allocated as follows: three members of the Alabama Legislature, three elected municipal officials, [and] three elected county officials." Doc. 44-2 (ADC Constitution) at 6; *see also* Doc. 43-4 (Reed Depo.) at 206:7-13.

100. ADC Chair Joe Reed believes his "primary function" as chair includes "be[ing] sure" that the county chapters "work with candidates" and "help candidates." Doc. 43-4 (Reed Depo.) at 49:17-22.

101. ADC Chair Joe Reed served on the Montgomery City Council for 24 years and served as ADC Chair for that entire time. Doc. 43-4 (Reed Depo.) at 22:15-15, 25:6-15.

102. ADC Chair Joe Reed ran unsuccessfully for the Alabama legislature in 1970 and 1999, and served as ADC Chair at the same time he ran for those offices. Doc. 43-4 (Reed Depo.) at 31:7-21.

103. Occasionally, the ADC runs radio ads in support of candidates. Doc. 43-4 (Reed Depo.) at 76:1-15.

104. ADC performed get-out-the-vote activities in support of each of the candidates that contributed to the ADC in 2010. Doc. 43-4 (Reed Depo.) at 149:14-150:8.

105. At the ADC Executive Committee meeting held March 25, 2006, ADC Chair Joe Reed's report included discussion of "Fair Share 'GOTV' contri-

butions from local candidates." Doc. 44-7 (ADC Exec. Comm. Minutes) at 1.

106. At the ADC Executive Committee meeting held December 11, 2010, ADC Chair Joe Reed announced that "[c]andidates who do not help pay for the GOTV effort will be left off the [yellow sample] ballot." Doc. 44-7 (ADC Exec. Comm. Minutes) at 15.

107. At the ADC Executive Committee meeting held August 4, 2007, ADC Chair Joe Reed noted that "[s]ome local organizations are leaving it up to local elected officials to determine the agenda of the [local ADC chapters]." Doc. 44-7 (ADC Exec. Comm. Minutes) at 5.

108. Candidates give money to the ADC "[t]o turn the vote out to help them get elected." Doc. 43-4 (Reed Depo.) at 117:15-22. *See also, e.g.*, doc. 44-6 (ADC 2010 Annual Disclosure Report) at 2-8.

109. ADC Chair Joe Reed considers a candidate's contribution to ADC's get-out-the-vote efforts to be an "invest[ment]" in that candidate's own campaign. Doc. 43-4 (Reed Depo.) at 117:8-118:15.

110. ADC Chair personally solicits contributions to the ADC from candidates. Doc. 43-4 (Reed Depo.) at 140:3-141:14.

111. ADC Chair Joe Reed requests candidates to contribute to the ADC by telling them "you need to put some money in your campaign. This is your campaign. Not mine." Doc. 43-4 (Reed Depo.) at 117:23-118:10, 142:21-143:4.

112. On occasion, ADC works with or contributes to candidates to bolster its get-out-the-vote efforts. Doc. 43-4 (Reed Depo.) at 148:3-149:9, 150:21-151:13, 152:5-10. *See also, e.g.*, doc. 44-6 (ADC 2010 Annual Disclosure Report).

113. From time to time, the ADC consults with the candidates it endorses about campaign strategy. Doc. 43-4 (Reed Depo.) at 215:15-218:20.

114. ADC shares its voter mobilization procedures with candidates. Doc. 43-4 (Reed Depo.) at 216:8-14.

115. The ADC "can't be everybody's campaign manager. And oftentimes [the candidates] want that." Doc. 43-4 (Reed Depo.) at 218:9-11.

116. ADC works with candidates regarding how ADC will conduct its get-out-the-vote efforts. Doc. 43-4 (Reed Depo.) at 223:22-224:7. *See also, e.g.*, doc. 44-6 (ADC 2010 Annual Disclosure Report) at 9.

117. ADC tells candidates "what our [GOTV] plans are. And if they have something that they want to suggest to us, we listen to it. And if we like it, we'll do it." Doc. 43-4 (Reed Depo.) at 224:8-14.

118. When ADC consults with candidates, sometimes the consultation involves the candidate himself; "if he can't [talk], then you've got somebody there, the campaign chairman I may talk to." Doc. 43-4 (Reed Depo.) at 217:17-23.

119. In the second weekend of May 2010, ADC endorsed Ron Sparks for the Democratic nomination for Governor. Doc. 43-4 (Reed Depo.) at 141:15-18, 142:12-20.

120. On May 20, 2010, Democratic gubernatorial candidate Ron Sparks contributed $45,000 to the ADC. Doc. 43-4 (Reed Depo.) at 140:22-141:6

121. At deposition, ADC Chair Joe Reed did not deny talking to the Sparks campaign about contributing to the ADC prior to the ADC's endorsement of him. Doc. 43-4 (Reed Depo.) at 142:21-143:4.

122. ADC "did talk some" with 2010 Democratic Attorney General candidate James Anderson.

123. From 2005 to 2010, the ADC received approximately $502,350.95, or approximately 44.38% of its revenue, in contributions from candidates for public office. Doc. 9-2 (Exhibit A to Reed Decl.) at 5 (lines 141-143).

124. From 2005 to 2010, the ADC made approximately $41,340.00 in expenditures to candidates for purposes of assisting with its get-out-the-vote efforts. Doc. 9-3 (Exhibit B to Reed Decl.) at 19 (line 513).

125. In 2010, three of the four ADC-endorsed candidates for Alabama state office contributed a total of $122,000 to the ADC. Doc. 44-5 (Killough Decl.) ¶ 4.

### D. ADC and PAC-to-PAC transfers

126. ADC Chair Joe Reed claims never to heard of the concern that PAC-to-PAC transfers can be used to conceal the true source of a political contribution. Doc. 43-4 (Reed Depo.) at 9:22-10:3.

127. ADC Chair Joe Reed claims never to have heard of people concealing the source of a political contribution through any method. Doc. 43-4 (Reed Depo.) at 19:13-18.

128. ADC approves of the use of PAC-to-PAC transfers to conceal the true source of a political contribution. "It's a First Amendment right to give." Doc. 43-4 (Reed Depo.) at 9:3-14, 202:18-204:22.

129. At deposition, ADC Chair Joe Reed could not say who was connected to the following PACs who contributed to the ADC in 2010: Box PAC, Cedar PAC, Green PAC, or Please PAC. Doc. 43-4 (Reed Depo.) at 143:5-148:2, 201:11-22.

130. There are certain groups—e.g., payday lenders, "anti-religion" groups, etc.—that ADC "wouldn't want to be associated with." Doc. 43-4 (Reed Depo.) at 201:11-202:17.

131. ADC Chair Joe Reed has never proposed any alternatives to the PAC transfer law. Doc. 43-4 (Reed Depo.) at 18:10-16.

132. Since the adoption of Act 2011-765, the ADC has established two bank accounts, one to receive contributions from individuals and businesses for the purpose of making contributions to candidates (the Candidate Account) and the other to receive contributions from any entity, including other PACs, for any purpose, including transfers to other PACs. Doc. 9-1 (Reed Decl.) ¶ 12; doc. 43 at CM/ECF page 16-17.

133. ADC's independent-expenditure-only bank account is controlled by the same entity or people that control the ADC's candidate-contribution bank account. Doc. 44-8 (State's discovery requests & ADC's responses) at 5 (request for admission #8), __ (#8 "admitted").