# IN THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ALABAMA, NORTHEASTERN DIVISION

| | |
|---|---|
| THE ALABAMA DEMOCRATIC CONFERENCE, an Alabama political action committee, et al., | |
| Plaintiffs, | CIVIL ACTION NO. 5:11-cv-02449-JEO |
| v. | |
| LUTHER STRANGE in his official capacity as the Attorney General of Alabama; et al., | |
| Defendants. | |

## Plaintiffs' Reply Brief
## on Second Motion for Injunction
## and Response to Defendants' Motion for Summary Judgment

# Table of Contents

Plaintiffs' Reply Brief on Second Motion for Injunction and Response to Defendants' Motion for Summary Judgment ........................................... 1

    1.   The Act's Complete Ban on Transfers Between PACs to Finance Independent Expenditures Is Subject to "Closely Drawn" Scrutiny. ............................................................................... 2

    2.   As a Matter of Law, the State Has No Anti-Corruption Interest in Enforcing the Act as to Transfers Between PACs for Financing Independent Expenditures ............................................................. 4

    3.   The Ban Does Not Implicate Any Transparency Interest and, in Any Event, the Ban Is Not Closely Drawn To Advance that Interest. ........................................................................... 18

# Table of Authorities

**Cases**

*Alabama Democratic Conference v. Broussard*, 541 Fed.Appx. 931 (11th Cir. 2013)..................................................................................18

*Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, —— U.S. ——, 131 S.Ct. 2806 (2011) ..........................................................2, 5

*Buckley v. Valeo*, 424 U.S. 1 (1976) ............................................ passim

*California Med. Ass'n v. FEC, 453 U.S. 182 (1981)*................................13

*Citizens United v. FEC*, 558 U.S. 310 (2010) ................................ passim

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002)..........21

*Davis v. FEC*, 554 U.S. 724 (2008)......................................................21

*Farris v. Seabrook*, 677 F.3d 858 (9th Cir. 2012) .................................16

*FEC v. Beaumont*, 539 U.S. 146 (2003) ..........................................2, 3, 4

*FEC v. National Conservative Political Action Comm.*, 470 U.S. 480 (1985)...................................................................................4, 5

*Green Party of Connecticut v. Garfield*, 616 F.3d 189 (2d Cir.2010).......3

*Harris v. Graddick*, 593 F.Supp. 128, 601 F.Supp. 70 (M.D. Ala. 1984) 15

*Hawthorne v. Baker*, 750 F.Supp. 1090 (M.D.Ala. 1990), 756 F.Supp. 527 (M.D.Ala. 1990); 762 F.Supp. 1475 (M.D.Ala. 1991)....................15

*McConnell v. FEC, 540 U.S. 93 (2003)* ......................................5, 7, 8, 18

*McCormick v. United States,* 500 U.S. 257 (1991) ..................................4

*McCutcheon v. FEC*, 134 S.Ct. 1434 (2014)................................... passim

*Preston v. Leake*, 660 F.3d 726 (4th Cir.2011)........................................3

*Republican Nat. Committee v. FEC,* 698 F.Supp.2d 150 (D.D.C. 2010) (3-judge court).....................................................................15

*Texans for Free Enterprise v. Texas Ethics Comm'n*, 732 F.3d 535 (5th Cir. 2013)...................................................................................1

*Wagner v. FEC*, 854 F.Supp.2d 83 (D.D.C. 2012) ................................3, 4

**Other Authorities**

"Leadership PACs," Center for Responsive Politics, http://www.opensecrets.org/industries/indus.php?ind=Q03...............17

"Political Committees with Non-Contribution Accounts," Federal Election Commission, http://goo.gl/0mprBY. .......................................9

Briffault, "Nonprofits and Disclosure in the Wake of *Citizens United*," 10 *Election Law Journal* 337 (2011)...................................................20

Frederick, *Stand Up For Alabama: Governor George C. Wallace* (2007) ................................................................................................14

Plutarch, *The Parallel Lives*, http://penelope.uchicago.edu/Thayer/E/Roman/Texts/Plutarch/Lives/Pyrrhus*.html#21 ..................................................................10

*Yellowhammer*, http://yellowhammernews.com/ ....................................11

For the assistance of the Court and parties in following Plaintiffs' arguments, this brief has been arranged using the same headings as in the Second Motion for Preliminary Injunction (Doc. 43). Plaintiffs have endeavored not to repeat arguments made before.

Let us begin with first principles. In *Buckley v. Valeo,* the Court held,

> A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.[FN18] This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs. Speeches and rallies generally necessitate hiring a hall and publicizing the event.
>
> > [FN18] Being free to engage in unlimited political expression subject to a ceiling on expenditures is like being free to drive an automobile as far and as often as one desires on a single tank of gasoline.

*Buckley v. Valeo*, 424 U.S. 1, 19 (1976). The Fifth Circuit expounded on that principle in *Texans for Free Enterprise v. Texas Ethics Comm'n*, 732 F.3d 535, 538 (5th Cir. 2013):

> There is no difference in principle—at least where the only asserted state interest is in preventing apparent or actual corruption—between banning an organization . . . from engaging in advocacy and banning it from seeking funds to engage in that advocacy (or in giving

funds to other organizations to allow them to engage in advocacy on its behalf).

Although the State is not banning the ADC from speaking, it is limiting it "a single tank of gasoline" by banning other PACs from "giving funds to [ADC] to allow [it] to engage in advocacy."

1. The Act's Complete Ban on Transfers between PACs to Finance Independent Expenditures Is Subject to "Closely Drawn" Scrutiny.

Under the heading, "The PAC transfer law need not satisfy strict scrutiny," Doc. 45 at 29, Defendants are really arguing for an extremely deferential level of review. But the burden of authority is against them.

> Under that form of heightened scrutiny, a restriction on First Amendment freedoms passes constitutional muster only if it is "'closely drawn to match a sufficiently important interest.' " [*FEC v.*] *Beaumont*, 539 U.S. [146,] 161, 123 S.Ct. 2200 [(2003)] (quoting *Nixon [Nixon v. Shrink Missouri Government PAC]*, 528 U.S. [377,] 387–88, 120 S.Ct. 897 [(2000)] (quoting *Buckley*, 424 U.S. at 25, 96 S.Ct. 612) (internal quotation marks omitted)); see also *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, —— U.S. ——, 131 S.Ct. 2806, 2817, 180 L.Ed.2d 664 (2011) (reaffirming that closely drawn standard for campaign contributions remains valid after *Citizens United* [*v. FEC*, 558 U.S. 310,] 369 (2010)]). Even though *Beaumont* concerned a contribution *limit*, whereas this case involves a *ban*, the standard of review is the same. The level of scrutiny depends on "the importance of the 'political activity at issue' to effective speech or political association," not the degree

to which the freedom to engage in that activity is curtailed. *Beaumont*, 539 U.S. at 161, 123 S.Ct. 2200 (citation omitted). Because the difference between a contribution limit and a ban is a difference in scope, not kind, closely drawn scrutiny applies to both. See *Preston v. Leake*, 660 F.3d 726, 734 (4th Cir.2011) ("Although a ban ends association rights to a greater degree than does a limit by foreclosing the ability to make even a small donation, this amounts to a difference in the scope of the particular law, not a difference in the type of activity regulated by the law."); see also *Green Party of Connecticut v. Garfield*, 616 F.3d 189, 199 (2d Cir.2010) (applying closely drawn scrutiny to ban on campaign contributions by state contractors and lobbyists). As the Court in *Beaumont* pointed out, "[T]he time to consider [the difference between a ban and a limit] is when applying scrutiny at the level selected, not in selecting the standard of review itself." 539 U.S. at 162, 123 S.Ct. 2200.

*Wagner v. FEC*, 854 F.Supp.2d 83, 88 (D.D.C. 2012) (emphasis in original).

A restriction that is closely drawn must nevertheless "avoid unnecessary abridgement of associational freedoms," as "the right of association is a 'basic constitutional freedom' ... that is 'closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.' " *Buckley*, 424 U.S. at 25, 96 S.Ct. 612. Because an outright ban on contributions "precludes 'the symbolic expression' that comes with a small contribution," it "causes considerably more constitutional damage" than a limit. *Green Party*, 616 F.3d at 204. Whether the provision at issue involves a ban or a limit is thus an important factor in the First Amendment analysis. *See id*. at 204 (where a contribution limit, as opposed to a total ban,

will adequately achieve the government's objectives, "it will be difficult for the government to establish that a contribution ban is 'closely drawn' to its asserted interests"); see also *Beaumont*, 539 U.S. at 162, 123 S.Ct. 2200 (the time to consider the difference between a ban and a limit is when applying the appropriate level of scrutiny, not when choosing it).

*Wagner v. Federal Election Com'n*, 854 F.Supp.2d 83, 90 (D.D.C. 2012).

2.  As a Matter of Law, the State Has No Anti-Corruption Interest in Enforcing the Act as to Transfers Between PACs for Financing Independent Expenditures.

Defendants continue to argue that the Act is based on the State's anti-corruption interests, Doc. 45 at 32 ff.

Corruption means *quid pro quo* corruption (and the appearance of corruption is limited to *quid pro quo* corruption, as well), as the Supreme Court recently reiterated in *McCutcheon v. FEC*, 134 S.Ct. 1434 (2014):

Any regulation must instead target what we have called "*quid pro quo*" corruption or its appearance. See id., at 359, 130 S.Ct. 876. That Latin phrase captures the notion of a direct exchange of an official act for money. See *McCormick v. United States,* 500 U.S. 257, 266, 111 S.Ct. 1807, 114 L.Ed.2d 307 (1991). "The hallmark of corruption is the financial quid pro quo: dollars for political favors." *Federal Election Comm'n v. National Conservative Political Action Comm.,* 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). Campaign finance restrictions that pursue other objectives, we have explained, impermissibly inject the Government "into the debate over who should govern."

[*Arizona Free Enterprise Club's Freedom Club PAC v.*] *Bennett*, supra, at ——, 131 S.Ct. [2806,] 2826. And those who govern should be the last people to help decide who *should* govern.

*McCutcheon*, 134 S.Ct. at 1441-42.


**_Citizens United_ held that independent expenditures[1] do not create _quid pro quo_ corruption.**

When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption. See *McConnell* [*v. FEC,* 540 U.S. 93] 296–298, 124 S.Ct. 619 [(2003)] (opinion of KENNEDY, J.) (citing *Buckley, supra*, at 26–28, 30, 46–48, 96 S.Ct. 612); *NCPAC*, 470 U.S., at 497, 105 S.Ct. 1459 ("The hallmark of corruption is the financial *quid pro quo*: dollars for political favors"); *id.*, at 498, 105 S.Ct. 1459. The fact that speakers may have influence over or access to elected officials does not mean that these officials are corrupt . . . .

*Citizens United,* at 360.

The *McConnell* record was "over 100,000 pages" long, *McConnell I*, 251 F.Supp.2d, at 209, yet it "does not have any direct examples of votes being exchanged for ... expenditures," id., at 560 (opinion of Kollar–Kotelly, J.). This confirms *Buckley's* reasoning that independent expenditures do not lead to, or create the appearance of, quid pro quo corruption.

*Citizens United,* at 360.

---

[1] Independent expenditures are sometimes referred to as "IE."

> We must give weight to attempts by Congress to seek
> to dispel either the appearance or the reality of these
> influences. The remedies enacted by law, however,
> must comply with the First Amendment; and, it is our
> law and our tradition that more speech, not less, is the
> governing rule. An outright ban on corporate political
> speech during the critical preelection period is not a
> permissible remedy. Here Congress has created
> categorical bans on speech that are asymmetrical to
> preventing *quid pro quo* corruption.

*Citizens United,* at 361.


### Coordination

In arguing that candidates receive a *quid pro quo* via PAC-to-PAC transfers for independent expenditures, the Defendants have a list piling speculation atop speculation (Doc. 45 at 34). First, they assert PAC-to-PAC transfers aided donors **and candidates** in obscuring the source of funds. That might have been true for contributions to candidates, although the changes to the State's reporting technology now shed light on all such contributions, but the ADC's Independent Expenditure Account is not contributing to candidates.

In their second point they assert PAC-to-PAC transfers provide "a means of concealing coordination" between donors **and candidates**. Again, there are no candidates receiving funds from the ADC's IE Account. In addition, the Fair Campaign Practices Act does not prohibit or regulate coordination except in one circumstance. The definition of "contribution" contains lists of things that are and are not contributions. In the list of items that are **not** contributions, the last is,

"The value or cost of polling data and voter preference data and information if provided to a candidate or political committee, unless the information was compiled with the advance knowledge of and approval of the candidate or the political committee." Ala. Code § 17-5-2(a)(2)b6. Using the canon of construction *expressio unius est exclusio alterius* ("the express mention of one thing excludes all others"), we can see that the main definition of "contribution" does not include advance knowledge and approval – which only appears in an exception to an exception. Indeed, the State has advised the Court that under the ban on PAC-to-PAC transfers, PACs will still be able to coordinate contributions to candidates, as where two or more PACs share the cost of office space or divide expenses, one PAC renting the cars, another paying for gasoline. 11-21-11 Transcript at 26-27, 30-31. The State states plainly, "Within the context of coordination, the sky is the limit." *Id.* at 31.

These limitations on coordination in the transfer and expenditure of funds as enacted by the State have been upheld only in the context of dollar limits on campaign contributions. See, e.g., *McConnell v. FEC,* 540 U.S. 93, 137 (2003), and other dated cases cited by Defendants. In that context, coordination is a means of evading those limits. In Alabama, however, there are no dollar limits on campaign contributions, so there is nothing to evade. In the Alabama context, therefore, coordination among individual and groups is nothing more than exercise of the right of association guaranteed by the First

Amendment. As the Court noted in *McCutcheon*, "Contributing money to a candidate is an exercise of an individual's right to participate in the electoral process through both political expression and political association." 134 S. Ct. at 1438. Absent an interest in limiting contributions through coordination, there is no governmental interest in limiting association.

In the third step, the Defendants assert "PAC-to-PAC transfers . . . provided donors a covert way of effectively delivering campaign contributions to candidates." Since the first two steps in the argument are not true, neither is the third.

### The Lack of Proof of Corruption via PAC-to-PAC Transfers

Throughout their brief, the Defendants assert that independent expenditures go to candidates or "are directed, in some manner, to a candidate." Doc. 45 at 40 (quoting Justice Kennedy's opinion in *McConnell* "concurring in the judgment in part and dissenting in part with respect to BCRA Titles I and II").[2] They assert, but never offer proof of the redirection of independent expenditures into the bank account of candidates. They have no such proof. Assistant Attorney

_____

[2] Justice Kennedy was dissenting in the quoted portion, but it does not signify, because the Defendants have plucked those words out of their surrounding context. Justice Kennedy made plain his view that contributions to candidates only can be limited to prevent actual or apparent *quid pro quo* corruption, *McConnell*, 540 U.S. at 291-294, and that view is now settled law. *Citizens United, supra; McCutcheon, supra.*

General Bill Lisenby, the designated representative of the Attorney General's Office, testified there have been no prosecutions in Alabama for a PAC-to-PAC transfer leading to a corrupt *quid pro quo*. Lisenby Depo. at 30:11-31:2, 33:7-18. Nor does the Alabama Attorney General know of any cases where bribery was facilitated by transferring money through a PAC. Lisenby Depo. at 18:9-19:8, 26:6-19.

### The Implausible Hypothetical

Instead of actual evidence, the Defendants have again put forth their scenario in which an originating PAC (let's call it Alpha PAC) transfers independent-expenditure funds through several intermediaries (Beta PAC, Gamma PAC, and so on) until the funds arrive at the "final-destination PAC" (we call it Omega PAC). Omega then makes a contribution (in the same amount as the IE funds it has just received) to a candidate chosen by Alpha. "[Omega] PAC then can either use the 'independent expenditure' funds for its own purposes, or can transfer those funds to another PAC that wishes to make independent expenditures." Defendants' Appellate Brief, Doc. 39-3 at 49.[3]

---

[3] The FEC has registered 81 committees with dual accounts. "Political Committees with Non-Contribution Accounts," Federal Election Commission, http://goo.gl/0mprBY. The Defendants have presented no evidence that any of these federal committees have engaged in the hidden contributions Defendants allege are possible.

To understand this scenario, get out a stack of Monopoly® money. Give $5000 each to three players: Alpha, Omega, and Pluto (the other PAC that wishes to make independent expenditures). Omega puts half the money in its IE account and half in its candidate-contribution account. Another player, candidate Bill McKay,[4] starts out with no money. To simplify things, we will leave out all the intermediate PACs between Alpha and Omega.

Pass $1000 from Alpha to Omega. Now, per the State's scenario, Omega pays $1000 to McKay, and passes another $1000 to Pluto PAC. If you count the money at this point, Alpha has $4000; Pluto has $6000; McKay has $1000; and Omega has $2500 in its IE account and $1500 in its candidate-contribution account. Where is the benefit to Omega PAC? It has contributed $1000 to McKay, but has no more money in its IE account as "payment." (Or, as King Pyrrhus said after a battle in which he lost a large percentage of his army, "If we are victorious in one more battle with the Romans, we shall be utterly ruined."[5])

For the State's scenario to make sense, Alpha would have to give Omega $2,000 or more (and expend the time and effort to set up multiple PACs, cut multiple checks, etc.) in order to transfer $1,000 to

---

[4] Played by Robert Redford in *The Candidate* (1972).

[5] "The Life of Pyrrhus," 21:8-9 in Plutarch, *The Parallel Lives*, http://penelope.uchicago.edu/Thayer/E/Roman/Texts/Plutarch/Lives/Pyrrhus*.html#21.

McKay. And all of this activity now would be completely transparent on the Secretary of State's web site.[6]

The State's hypothetical is as "implausible" as that advanced by the FEC in *McCutcheon,* 134 S. Ct. at 1453-54 ("the 100-PAC scenario"), if not more so. There the Court noted that transfers vitiate the potential for corruption in any contribution. *Id.* Except when an individual controls multiple PACs which only support a single candidate, a circumstance now fully transparent in Alabama, a donor loses control of her funds when she donates to a PAC. *See McCutcheon* 134 S. Ct. at 1452.[7] Small wonder there had been no successful prosecutions based

---

[6] Funneling money through non-profits is apparently the new rage among wanna-be anonymous donors; PAC-to-PAC transfers are now passé. For example, the Republican leadership has set up the Foundation for Accountability in Education, Reform Alabama, Alabamians for a Brighter Future, House Republican Caucus Foundation, and Alabama House Republican Conference, Inc.—all as 501(c)(4) organizations. The Foundation for Accountability in Education has been running TV ads attacking the Alabama Education Association. "Dissecting the crushing anti-AEA ad currently running on statewide TV," *Yellowhammer*, http://yellowhammernews.com/tag/foundation-for-accountability-in-education/ (21 March 2014). In turn, Republicans have been complaining about ads run by the Alabama Foundation for Limited Government. See four stories at "Tagged: Alabama foundation for limited government," *Yellowhammer*, http://yellowhammernews.com/tag/alabama-foundation-for-limited-government/. The *Yellowhammer* articles are offered only to show the current complaints about other groups, not for the truth of the assertions in the articles.

[7] If this were not barrier enough, the State could instead have adopted limits on the proliferation of PACs similar to those in 2 U.S.C. §

on PAC-to-PAC transfers even before the searchable State system lifted the barriers to transparency.

The force of campaign contributions to the ADC are inherently diluted, as the organization pools contributions and gives a base amount to each of 63 or more county branches (more to larger counties), each of which enjoys discretion in how those funds are spent, and where those expenditures support multiple candidates at the state level and additional multiples in each county. Reed Decl. ¶¶ 16-18. The ADC's selection of which candidates to support is determined by separate committees working independently of each other. *Id.* at ¶¶ 14-15.

While the State makes much of candidates' contributions to the ADC, such contributions add nothing to justify the PAC-to-PAC ban's restriction on First Amendment rights. The ADC is not in a position to give governmental benefits to the candidate: it cannot give "a direct exchange of an official act for money." *McCutcheon*, 134 S.Ct at 1441. As the ADC cannot direct government benefits if the candidate is elected, there is no *quid* the ADC can offer for a candidate's *quo*: the potential for corruption inherently runs in the opposite direction. The State simply has no anti-corruption interest in the transfer of money from a candidate to a non-governmental organization such as the ADC.

---

441a(a)(5); 11 CFR § 100.5(g)(4). *See, McCutcheon*, 134 S.Ct. at 1446-47.

### *Cal-Med* and the ADC's Dual-PAC Structure

In another of the Defendants' examples, they assert, "The Supreme Court's 1981 decision in *Cal-Med* ultimately dispels any notion that a contribution limit cannot serve the government's anticorruption interests." Doc. 45 at 43.[8] Defendants rely on Justice Blackmun's concurring opinion, but truncate his reasoning by omitting the immediately following sentence, which we have italicized: "Multicandidate political committees are therefore essentially conduits for contributions to candidates, and as such they pose a perceived threat of actual or potential corruption. *In contrast, contributions to a committee that makes only independent expenditures pose no such threat.*" *Cal-Med,* 453 U.S. at 203 (Blackmun, J., concurring in part and concurring in the judgment).

The ADC's IE account is "a committee that makes only independent expenditures." Under Alabama law, a PAC must "maintain a checking account and shall deposit any contributions received by such committee into such account. No expenditure of funds may be made by any such committee except by check drawn on such account, or out of a petty cash fund . . . ." Ala. Code § 17-5-6. Under this Court's preliminary injunction, the ADC was supposed to (and did) set up two bank accounts – one for IEs and another for funds destined for candidate contributions. Each bank account fits the requirements of § 17-5-6. They should be treated the same as the multiple accounts over which

---

[8] Citing *California Med. Ass'n v. FEC,* 453 U.S. 182 (1981).

Ashley Newman has authority as treasurer. Newman depo at 13:22 – 18:10 and Exhibit 1 to the deposition.

### Intertwinement

The Defendants argue the State may regulate PAC-to-PAC transfers involving the ADC because it "is effectively a wing of the state Democratic Party and is closely related to Democratic candidates." Doc. 45 at 44.

The ADC is not a wing of the Alabama Democratic Party. It was created separately from the Party when the Party was under the control of white supremacists and still used "White Supremacy for the Right" as the Party slogan on its ballot symbol. Exhibit HH, Jeff Frederick, *Stand Up For Alabama: Governor George C. Wallace*, 140-42 (2007).[9]

The ADC endorses and actively supports certain candidates and actively opposes others in Democratic primary elections. And the ADC actively seeks to influence the Democratic Party. Reed Decl. ¶ 11. The ADC activities thus are intertwined with the Democratic Party, but it is independent of the Democratic Party. Friction between the two groups is not uncommon. See, e.g., Reed Depo. 118:16 - 119:11(disputes over reserved positions on SDEC for ADC and other matters). 22. The ADC refuses to endorse certain Democratic candidates in general elections, and opposes actions and policies of Democratic Party leaders

---

[9] All exhibits are text-searchable.

and Democratic elected officials. Reed Depo. 181:19 - 183:5; 183:21 - 184:8.

From time to time the ADC has sued the Democratic Party under the Voting Rights Act, 42 U.S.C. §1973, et seq. For example, under Alabama law, county party executive committees play a role in selecting poll officials. The ADC has sued to bar racial discrimination in the selection and behavior of poll officials, *Harris v. Graddick*, 593 F.Supp. 128, 601 F.Supp. 70 (M.D. Ala. 1984), and to obtain racially fair selection of members of the state and county Democratic committees, *Hawthorne v. Baker*, 750 F.Supp. 1090 (M.D.Ala. 1990), 756 F.Supp. 527 (M.D.Ala. 1990); 762 F.Supp. 1475 (M.D.Ala. 1991); and the ADC understandably continues to promote vigilance as to the activities of the state and county party committees.

The ADC should not lose its right to gather the resources so it can endorse candidates and get out the vote for them. In *Republican Nat. Committee v. FEC,* 698 F.Supp.2d 150, 162 (D.D.C. 2010) (3-judge court), the court held, "[T]he Chairman [of the Republican National Committee] may solicit soft-money donations on behalf of state and local parties and candidates, so long as he does so in his individual capacity and does not use RNC resources or his title as Chairman of the RNC to further his fundraising efforts." The Defendants cited the *RNC* case to support their position, but neglected to mention this important caveat. Likewise, they have presented no evidence that any official of the ADC uses his or her Democratic Party title (if any) to solicit

contributions to the ADC. Nor did they note that *RNC* involved campaign contributions limits that do not exist in Alabama, much less the undermining of the restriction by the rationale of *McCutcheon*.

The Defendants also argue "the ADC is closely related to a political party and the candidates the party supports" (Doc. 45 at 45) and cites *Farris v. Seabrook,* 677 F.3d 858, 866 (9th Cir. 2012),[10] for the proposition an anticorruption interest can justify "limits on contributions to committees that, although formally separate from the candidate, are sufficiently close to the candidate to present a risk of actual or apparent corruption." The quoted statement from the *Farris* case is *dicta* and, even if it were not, *Farris* involved campaign contributions limits that do not exist in Alabama. The statement was based on a hypothetical issue concerning Washington State's recall procedures, state campaign finance rules on coordination between a candidate for the possibly-soon-to-be-vacant position and the recall committee, and the court's conjecture regarding its ruling "if there were evidence that contributions were being made with a 'wink and a nod' from Council members indicating that a particular candidate would be appointed." *Farris,* 677 F.3d at 867 n.8.

The State's "closely related to a political party and the candidates the party supports" argument is inconsistent with the lack of

_____

[10] The Defendants cited an earlier version of the Ninth Circuit opinion, but both the version cited by Defendants and the amended one cited in the text have the same language quoted by Defendants.

any effort to prohibit legislators – especially legislative leaders – from running separate PACs designed to be the central place to encourage businesses to give contributions which the leader can then dole out to candidates to build or reward loyalty to him. A prime example of such a "leadership PAC"[11] is Speaker Mike Hubbard's Storming the State House PAC. Exhibit GG shows the organization's registration and its reports over the past 10 months.

Defendants assert that more than half the ADC's funds come from candidates, but they base that on pre-Act data. Data for the 2012 election – while this Court's injunction was in effect – shows that ADC received no funds from candidates (The ADC's campaign finance reports for 2012 are attached as Exhibit EE and a summary of income and expenditures is in Exhibit FF) and, as noted above, the ADC has no government benefits within its gift, so any contributions to the ADC cannot be corrupting.

---

[11] "A leadership PAC is a political action committee that can be established by current and former members of Congress as well as other prominent political figures. Leadership PACs are designed for two things: to make money and to make friends. In the rough and tumble political game, elected officials know that money and friends in high places are very important to winning elections and leadership positions." "Leadership PACs," Center for Responsive Politics, http://www.opensecrets.org/industries/indus.php?ind=Q03.

3. The Ban Does Not Implicate Any Transparency Interest and, in Any Event, the Ban Is Not Closely Drawn To Advance that Interest.

**The State's interest in disclosure of campaign contributions is not met by restricting contributions.**

This is a contribution-regulation case. To begin with, transparency is not a basis for contribution regulation. The Eleventh Circuit said in its appellate decision in this case,

> But the Supreme Court has relied on the transparency interest only to uphold disclosure requirements, which are "a less restrictive alternative to more comprehensive regulations of speech." *Citizens United v. FEC*, 558 U.S. 310,] 369 (2010). It has never held that a government interest in transparency is sufficient to justify limits on contributions or expenditures. See *id.* (upholding disclosure requirement, but invalidating restrictions on independent expenditures); *McConnell* [*v. FEC*], 540 U.S. [93,] 196, 124 S.Ct. 619 (upholding disclosure requirements based on government's interest in "providing the electorate with information"); *Buckley* [*v. Valeo*], 424 U.S. [1,] 76, 96 S.Ct. 612 (upholding disclosure requirements for independent expenditures while invalidating limits on expenditures).

*Alabama Democratic Conference v. Broussard*, 541 Fed.Appx. 931, 933 (11th Cir. 2013) (bold emphasis added).

The Defendants continue to argue that PAC-to-PAC transfers obscure the ultimate source of funds. Doc. 45 at 49-50. It is clear, though, that if transparency is an interest of the State, the interest has already been met by the State's adoption of a searchable online database of campaign contributions and expenditures, and of the

18

individuals who manage and control those PACs. The State's evidence of a putative need for a ban on PAC-to-PAC transfers to further transparency is entirely drawn from the State's old reporting system in which paper forms were submitted to the Secretary of State, scanned, and placed on the Secretary's website.[12] That system had limited search capabilities. Ashley Newton complained she was unable to track contributions even after two full days of effort in 2010. Doc. 45 at 12. But the situation changed in 2013 when the State implemented a searchable database so that now, as at the federal level, "massive quantities of information can be accessed at the click of a mouse, [and] disclosure is effective to a degree not possible at the time" the Act was adopted. *McCutcheon* 134 S.Ct. at 1460. The system removes the tedium from the search process: the search that overwhelmed Ms. Newton now can be completed in minutes.

### Tracking Contributions from Source to Final Use

The campaign finance reporting system is now as transparent as it can be. As the Office of the Secretary of State pointed out (and as Plaintiffs have noted), one cannot determine which individual's contribution to a multi-contributor PAC[13] provided the funds the PAC

---

[12] The Defendants' newspaper evidence is also inadmissible hearsay.

[13] Of course, as noted above, a contribution from a single-contributor PAC can now be tracked with ease, as can contributions through multiple PACs controlled by a single individual or team of individuals.

gave to a particular candidate. Both Bill Lisenby and Ed Packard could not trace the exact contributor of funds paid to a particular candidate. Packard Depo. 28:11 - 31:17; Lisenby Depo. 14:19 – 17:5. A PAC is a mixing bowl. The money flows into a pool and a particular contribution is indistinguishable from the others. Trying to figure out the source of a contribution from a PAC or any other group of donors is like taking a bucket of water from the Mississippi at New Orleans and trying to figure out if the **whole bucket** of water came from the Upper Mississippi, the Missouri, the Ohio, or the Tennessee River. See *McCutcheon*, 134 S.Ct. at 1452-54. The State quite simply has failed to show any gap in disclosure that can be met short of a clearly unconstitutional complete ban on associated political activity.

As Prof. Briffault recently said, "[D]isclosure provides voters with information relevant to their voting decisions, and so is entirely consistent with, indeed, supportive of, the First Amendment . . . ." Richard Briffault, "Nonprofits and Disclosure in the Wake of *Citizens United*," 10 *Election Law Journal* 337, 345 (2011). Shutting down certain types of speech cannot be described as "provid[ing] . . . information."

### The Burden of Proof in Disclosure Cases

In *Davis v. FEC*, the Supreme Court held the burden is on the State to justify an encroachment on freedom of speech by disclosure requirements:

> [W]e have closely scrutinized disclosure requirements, including requirements governing independent expenditures made to further individuals' political speech. To survive this scrutiny, significant encroachments "cannot be justified by a mere showing of some legitimate governmental interest." Instead, there must be "a 'relevant correlation' or 'substantial relation' between the governmental interest and the information required to be disclosed," and **the governmental interest "must survive exacting scrutiny."** That is, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.

*Davis*, 554 U.S. 724, 744 (2008) (citations omitted; bold emphasis added).

When the government restricts First Amendment freedoms, its "burden is not satisfied by mere speculation or conjecture, but only by demonstrating that the harms the government recites are real and that its restriction will in fact alleviate them to a material degree." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 458 n.3 (2002) (quotation and citation omitted).

### CONCLUSION

The state never has experienced a prosecution for corruption based on a PAC-to-PAC transfer, and knows of none anywhere in the

United States; the statute was aimed not at corruption but against influence and access, which the Court has made clear are not legitimate targets for First Amendment restrictions. Any need for the statute for those lesser goals has been erased by the modernization of campaign reporting by the State: those reforms hit the target at which the PAC-to-PAC ban so awkwardly aimed. The Supreme Court has allowed States to restrict the amount of money one can give to a single candidate, and it has allowed states to limit coordination between donors when it has been aimed at evading such individual contribution limits. In Alabama, however, there are no limits on individual contributions to campaigns and no potential justification for limiting coordination. Under the State statute coordination is permissible if what is pooled is not money: the State would restrict how citizens can exercise their First Amendment rights to awkward and inefficient procedures. The State even would restrict candidates from making donations to PACs, even though such donations cannot possibly be corrupting. Put simply, the State's rationale for its restrictions on First Amendment rights is incoherent.

Submitted by,

/s/ Edward Still

John K. Tanner
3743 Military Rd, NW
Washington DC 20015
Phone: 202-503-7696
Email:
john.k.tanner@gmail.com

Edward Still
PMB 304
130 Wildwood Pkwy STE 108
Birmingham AL 35209
Phone & fax: 205-320-2882
email: still@votelaw.com

Joe M. Reed
Joe M. Reed & Associates, LLC
524 S. Union Street
Montgomery, AL 36104
Phone: 334-834-2000
Fax: 334-834-2088
email: joe@joereedlaw.com

Norman Osaygefo Grubbs
The Grubbs Firm
1904 Berryhill Rd Ste 100
Montgomery, AL 36117-7789
E-mail:
ogrubbs@mylawyerlobby.com
Phone & fax: 334-523-9200

## CERTIFICATE OF SERVICE

I certify that on 5 May 2014 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following attorneys:

Andrew L. Brasher
James W. Davis
Winfield J. Sinclair
William Parker Jr.
Attorney General's Office
PO Box 300152
Montgomery, AL 36130-0152
abrasher@ago.state.al.us
jimdavis@ago.state.al.us
wparker@ago.state.al.us
wsinclair@ago.state.al.us

/s/ Edward Still