FILED
2014 May-19 PM 11:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| THE ALABAMA DEMOCRATIC CONFERENCE, an Alabama political action committee, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> LUTHER STRANGE, in his official capacity as Attorney General of Alabama, *et al.*, <br><br> *Defendants*. | Civil Action No. <br> 5:11-cv-02449-JEO |

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

LUTHER STRANGE (ASB-0036-G42L)
  *Attorney General*

Andrew L. Brasher (ASB-4325-W73B)
  *Solicitor General*

Winfield J. Sinclair (ASB-1750-S81W)
James W. Davis (ASB-4063-I58J)
William G. Parker, Jr. (ASB-5142-I72P)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
(334) 353-8440 (fax)
wsinclair@ago.state.al.us
jimdavis@ago.state.al.us
wparker@ago.state.al.us

## TABLE OF CONTENTS

A. Closely drawn scrutiny is in fact a deferential form of First Amendment review. ................................................................. 4

B. Fighting corruption and promoting transparency are sufficiently "important" state goals. ............................................. 5

C. The PAC transfer law prevents corruption and promotes transparency in Alabama. ................................................................. 6

    1. The PAC transfer law serves Alabama's anticorruption interests in all of its applications. ................................. 7

    2. The PAC transfer law serves Alabama's anticorruption interests with respect to a group like the ADC. ................................................................................ 10

    3. The PAC transfer law serves Alabama's interests in promoting transparency. ................................................................. 13

D. The PAC transfer law embodies a reasonable "fit" between its means and its ends. ................................................................. 15

Conclusion ................................................................................ 17

Certificate of Service ................................................................ 18

# REPLY BRIEF

As explained below, the ADC's summary-judgment opposition contains many flaws on many fronts. But one stands out above the rest: the ADC is asking the Court to enjoin Alabama's PAC transfer law on the same evidence and same arguments that resulted in a reversal by the Eleventh Circuit of this Court's previous summary-judgment order. The fact is, the Eleventh Circuit remanded the case for discovery of facts demonstrating the law's capacity to fight actual or apparent corruption, and the State has delivered. The PAC transfer law is thus constitutional—at least in some respect relevant to the ADC—and the State is thus entitled to summary judgment.

In cases such as this, it is important to hew closely to the proper mode of analysis. This reply brief, therefore, begins by reiterating the right way to analyze the PAC transfer law. Consistent with the proper approach, the brief then walks through each step of the analysis: It establishes the importance of Alabama's justifications for the law; it confirms why the law in fact serves those goals; and it demonstrates that the law bears a proper "fit" between means and ends. The upshot is that the PAC transfer law—in the context of Alabama's modest approach to campaign-finance regulation—easily withstands scrutiny. It is constitutional on its face, and especially so as applied to the ADC.

### A. Closely drawn scrutiny is in fact a deferential form of First Amendment review.

In seeking summary judgment, the State noted two aspects of "closely drawn" scrutiny that make its selection by the Eleventh Circuit weigh heavily in the State's favor. First, this approach is a "'relatively complaisant'" form of First Amendment review in that it gives legislatures substantial flexibility under the tailoring analysis. Doc. 45 at 29 (quoting *FEC v. Beaumont*, 539 U.S. 146, 161 (2003)). And second, it stems from the recognition that contribution limits "entail[] only a marginal restriction" on First Amendment rights. *Id.* at 30-31 (quoting *Buckley v. Valeo*, 424 U.S. 1 at 20-21 (1976) (per curiam)). Indeed, because the "'degree of scrutiny turns on the nature of the activity regulated,'" and because the PAC transfer law only bars electioneering entities from transferring money among themselves, this case in fact calls for a posture of less rigor within the already "'less rigorous'" closely drawn framework. *Id.* at 31 (quoting *Beaumont*, 539 U.S. at 162); *id.* at 29 (quoting *FEC v. McConnell*, 540 U.S. 93, 137 (2003), *overruled on other grounds by Citizens United*, 558, U.S. 310, 336-66 (2010)).

On this front, the ADC does not put up much of a fight. It protests that the "[d]efendants are really arguing for an extremely deferential level of review." Doc. 47 at 6. But it fails to answer the numerous Supreme-Court pronouncements establishing the closely drawn standard to in fact be deferential in key respects. *See* doc. 45 at 29-31. The one case the ADC cites on this point is entirely consistent with the

4

State's position and expressly notes that "the closely drawn standard is less demanding than strict scrutiny." *Wagner v. FEC*, 854 F. Supp. 2d 83, 88 (D.D.C. 2012) (citing *Beaumont*, 539 U.S. at 162)). The ADC furthermore simply drops its reliance on *Homans v. City of Albuquerque*, 366 F.3d 900 (10th Cir. 2004)—a case which, as the State observed, applies strict scrutiny, not the "lesser" form of review at issue here. *McCutcheon v. FEC*, 134 S. Ct. 1434, 1445 (2014); *see* doc. 45 at 54-55.

As a result, although the State bears the burden in this case, that burden is a surmountable one. *See McCutcheon*, 134 S. Ct. at 1451. The State must show simply that the PAC transfer law pursues a worthy goal in a "'reasonable'" or "'proportion[ate]'" way. *Id.* at 1456 (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). As further explained below, Alabama's PAC transfer law does just that.

### B. Fighting corruption and promoting transparency are sufficiently "important" state goals.

Just as there is little real dispute about the proper analytical framework, there is also little real dispute about the legitimacy of Alabama's goals. For example, the ADC rightly does not question the importance of fighting *quid pro quo* corruption or its appearance. As the State explained before, the sufficiency of that interest is beyond question. *See* doc. 45 at 32-33.

The ADC does now appear to walk back its prior concessions about the importance of the State's transparency interest. *See* doc. 47 at 22; *cf.* doc. 43 at 33 (conceding that "there is no reason to dispute transparency [as] a legitimate and important governmental concern"). But by block-quoting the portion of the Eleventh Circuit's opinion sidestepping this justification, it does not do so unequivocally. *See* doc. 47 at 22. Moreover, notwithstanding numerous opportunities, the ADC still has not responded to the State's affirmative arguments for treating transparency as sufficiently important. *See* doc. 45 at 33 (citing doc. 39-3 at 59-65 (State's Eleventh Circuit brief)). The Court should thus regard promoting transparency as sufficient in this particular case, just as it must treat fighting corruption as sufficient in general.

### C. The PAC transfer law prevents corruption and promotes transparency in Alabama.

Since the Eleventh Circuit remanded this case, the State has gathered even more evidence that the PAC transfer law prevents corruption and promotes transparency. *Cf. Ala. Democratic Conf.*, 541 F. App'x at 936 (noting that "the State presented ample evidence of possible corruption through PAC-to-PAC transfers to withstand summary judgment."). Indeed, by devoting so much of its response to rebutting this evidence, the ADC effectively acknowledges as much. At the same time, however, it is equally clear that the ADC is not rebutting the State's evidence

with any substantial evidence of its own. The State has thus carried its summary-judgment burden, and the Court should dispose of the case accordingly.

> **1. *The PAC transfer law serves Alabama's anticorruption interests in all of its applications.***

Perhaps most importantly, the PAC transfer law furthers Alabama's anticorruption interests in all of its applications—*i.e.*, even as applied to groups which claim to make only independent expenditures. Prior to the law's passage, the State's news media widely reported on political operatives' use of PAC-to-PAC transfers to secretly deliver campaign contributions to candidates. And indeed, the federal government prosecuted a group of state lobbyists and legislators for committing bribery through this very practice. Similarly, campaign-finance consultant Ashley Newman demonstrated that, on at least one occasion, Alabama political operatives likely used PAC-to-PAC transfers to secretly deliver campaign contributions through coordinated expenditures—without money ever reaching the candidate's bank account. *See* doc. 45 at 9-16, 34-35. Especially when coupled with Alabama's decision not to impose other, more onerous campaign-finance regulations, these facts establish that the law serves its anticorruption goal. *See id.* at 34-40.

Most of the ADC's arguments in opposition to summary judgment are simply nonresponsive to these facts. For example, the ADC extensively quotes the Supreme Court's recent holdings that "[c]orruption means *quid pro quo* corruption"

7

and that "independent expenditures do not create *quid pro quo* corruption. Doc. 47 at 8-9. But the State's evidence and arguments take both of these points as a given. The ADC likewise reiterates that it will not make candidate contributions from its independent-expenditure account. *See id.* at 10. But this misses the entire crux of the State's argument, which is that the PAC transfer law promotes the "detection [and prevention] of 'sham' independent expenditures." Doc. 45 at 36. As the Tenth Circuit has observed, *Citizens United* "did not question the government's authority to enforce restrictions against coordination between candidates and independent expenditure PACs" because "coordination . . . has always been deemed the functional equivalent of a candidate contribution." *Republican Party of N.M. v. King*, 741 F.3d 1089, 1096 n.4 (10th Cir. 2013). At the end of the day, the ADC simply has no response to this point.

More broadly, the ADC contends that Alabama generally "does not prohibit or regulate coordination" and that in the absence of candidate contribution limits such "coordination" is protected associational activity not subject to regulation. *Id.* at 10-12. This line of argument flows from a dubious premise, as Alabama's definition of "contribution" does not specify a recipient, and expressly encompasses an "agreement to make a gift . . . of money or anything of value" as well as the "payment of a third party[] made for the purpose of influencing the result of an election." Ala. Code § 17-5-2(2)(a)(1) & (2). But more importantly, it (again) fails to

respond to the State's evidence that PAC-to-PAC transfers can facilitate bribery. Nothing in the First Amendment obligates States to cap candidate contributions as a prerequisite for abolishing other opportunities for corruption. The "right to participate in democracy through political contributions . . . is not absolute," and if one particular form of contribution has proven capable of concealing bribery, then the State may legitimately act to eliminate it. *McCutcheon*, 134 S. Ct. at 1441.

The ADC finally contends that there is no "proof of corruption via PAC-to-PAC transfers," but this argument is divorced from reality. Doc. 47 at 12. The Supreme Court has admonished lower courts not to require an insurmountable evidentiary showing in circumstances such as these. *See* doc. 45 at 35. But that point aside, the only "evidence" the ADC offers in rebuttal is the supposed ignorance of the Attorney General's Rule 30(b)(6) designee about the corrosive effects of PAC transfers. *See* doc. 47 at 12-13. That is not relevant evidence at all, and it certainly does not create a "genuine" dispute on this issue. Fed. R. Civ. P. 56(a). (Recall that the Court excused counsel for the Attorney General from "educating" the 30(b)(6) designee about this case.) Nor, moreover, does the ADC's characterization of "[t]he Defendants' newspaper evidence" as "inadmissible hearsay" change anything. Doc. 47 at 23 n.12. That evidence is not offered for the truth of every statement contained in it, but instead to show the likelihood of PAC transfers' use in facilitating corruption—as well as the public appearance of corruption that natural-

ly followed. The Supreme Court has previously relied on such "newspaper accounts" in upholding a contribution limit, so this evidence, too, supports the State's entitlement to summary judgment. *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 393 (2000).

### 2. *The PAC transfer law serves Alabama's anticorruption interests with respect to a group like the ADC.*

Beyond the law's general capacity for preventing *quid pro quo* corruption, the State has identified at least three ways in which it especially serves this goal as applied to groups like the ADC. Nothing the ADC has said undercuts any of these points.

*(a.)* First, the same "'entity or people'" will control both ADC's candidate contributions and its purported independent expenditures. Doc. 45 at 41 (citing undisputed fact #133); *see also id.* at 41-43. The ADC quibbles with the State's hypothetical scenario showing how a hybrid group like the ADC might become a conduit for corruption, but that quibble is at the margins. As a preliminary matter, this scenario is not particularly relevant if, as just demonstrated, the PAC transfer law serves the anticorruption goal as a general matter. *See supra* Section C.1. In any event, the ADC even admits that the State's hypothetical would "make sense" with a slight adjustment. Doc. 47 at 14. For that to happen, the ADC argues, one must assume that a corrupt political operative would pay a premium for the ability to

covertly deliver campaign contributions. *See id.* But in light of national experience generally, and Alabama's experience in particular, this assumption is no stretch at all. *See FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 457 (2001) (noting that "candidates, donors, and parties test the limits of the current law").

The ADC also seeks to spin Justice Blackmun's concurrence in *California Medical Association v. FEC*, 453 U.S. 182 (1982), in its favor. It is true, as the ADC observes, that Justice Blackmun would invalidate contribution limits on a "committee that makes only independent expenditures." *Id.* at 203 (opinion of Blackmun, J.). But the fact remains that he voted to uphold the contribution limit at issue in *Cal-Med* precisely because the PAC there, like the ADC, intended to make candidate contributions. *Cal-Med*, of course, is distinguishable in that it evaluated a traditional quantity limit applicable to all donors across the board. But to the extent it is relevant, Justice Blackmun's concurrence there helps the State, not the ADC.

None of the ADC's other relevant arguments are any more persuasive. The group cites *McCutcheon* for the proposition that "transfers vitiate the potential for corruption in any contribution." Doc. 47 at 15 (citing *McCutcheon*, 134 S. Ct. at 1453-54). But that was true only in light of "[v]arious earmarking and antiproliferation rules." 134 S. Ct. at 1453. *McCutcheon*, moreover, at least implic-

itly assumed the validity of those rules. In context, then, it is clear that Alabama's approach to preventing corruption represents a less restrictive means than that imposed by the federal government and other States. *See* doc. 45 at 39-40. Finally, the ADC's internal organization chart is not a relevant consideration. *See* doc. 47 at 16. The ADC, or an organization like it, could at any time help facilitate a bribery scheme regardless of its internal structure.

*(b.)* Next, the ADC is analogous to a political party or a political-party affiliate and thus uniquely capable of facilitating corruption. *See* doc. 45 at 44-47 (citing, among other sources, undisputed facts #72-125). The ADC half-heartedly questions the legal validity of this argument, but its efforts along these lines fall flat. For example, the ADC attempts to distinguish *Republican National Committee v. FEC*, 698 F. Supp. 2d 150 (D.D.C. 2010), and *Farris v. Seabrook*, 677 F. 3d 858 (9th Cir. 2012). Those attempts are unpersuasive, but even if that were not the case, they would take nothing away from the Supreme Court's approval in *McConnell* of soft-money restrictions on national party committees—a holding that the *McCutcheon* Court expressly reaffirmed. *See* 134 S. Ct. at 1451 n.6 ("Our holding about the constitutionality of the aggregate limits clearly does not overrule *McConnell*'s holding about 'soft money.'").

The rest of the ADC's arguments on this point are merely an attempt to chip away at the overwhelming (and undisputed) evidence of the group's resemblance

to a political party or a political-party affiliate. It contends, for example, that it does not endorse every Democratic candidate and that it has sometimes sued the Alabama Democratic Party. *See, e.g.*, doc. 47 at 18-19. As it turns out, the ADC was not actually a named party in any of the cited lawsuits. *See id.* at 19. But that issue aside, these responses fail to overcome the multiple ways in which the ADC is "intertwined" with the party that is its namesake. *Id.* at 18; *see also* doc. 45 at 18-20. What is important is the potential for a donation to the ADC to "create a sense of obligation" on the part of candidates who are aligned with it. *McConnell*, 540 U.S. at 144. In light of the undisputed evidence, that is surely the case—"no less than would a direct contribution." *Id.*

*(c.)* Finally, the ADC openly coordinates its expenditures with candidates. *See* doc. 45 at 21-22, 48-49; *see also id.* at 74-76 (undisputed facts #98-125). Here again, though, the ADC's response—that the ADC "is not in a position to give governmental benefits to [a] candidate"—misses the point. Doc. 47 at 16. The relevant question is whether the ADC can become *a conduit* for corrupt arrangements between donors and the candidates with whom it coordinates. Those candidates are very much "in a position" to give "*quos*" in exchange for donors' "*quids*."

### 3. *The PAC transfer law serves Alabama's interests in promoting transparency.*

The ADC argues throughout its brief, but particularly with respect to the State's transparency interest, that the PAC transfer law does not clarify the source of political contributions. In part, this is supposedly because the State's "searchable online database of campaign contributions" has fixed the problem. Doc. 47 at 22; *see also id.* at 10, 15-16. And in part, it is supposedly because on some level the true source of a contribution routed through a PAC is unknowable. *Id.* at 23-24.

Neither of these points are persuasive. First, enhanced online search capabilities do not in fact fix the problem. The State's summary-judgment brief anticipated this argument. *See* doc. 45 at 49-50, 57. But for present purposes, the Court only need recall Ashley Newman's actual, undisputed testimony. *See id.* at 62-66 (undisputed facts #1-33). The ADC accurately summarizes that testimony when it says she was "unable to track contributions even after two full days of effort in 2010." Doc. 47 at 23. But the ADC ignores that the crux of Newman's "complain[t]" is an *in*ability—not just a *diminished* ability—to determine the source of PAC-laundered funds. Thus, the new online system leaves an investigator like Newman no better off, even if the search that previously took her two days "now can be completed in minutes." *Id.* at 23. Likewise, it is no answer to throw up one's hands on the notion that the source of funds routed through a single PAC is inherently unknowable. *McCutcheon* assumed that a PAC's candidate contributions are attributable to each of the PAC's donors on a pro rata basis. *See, e.g.*, 134 S. Ct. at 1453-54. But on

whatever basis of attribution one selects, there is no denying that traceability is *improved* under the PAC transfer law. And at this step of the analysis, that is all that is required.

### D. The PAC transfer law embodies a reasonable "fit" between its means and its ends.

Because the PAC transfer law furthers Alabama's anticorruption and transparency interests, the question becomes whether it does so in a way that "'is not necessarily perfect, but reasonable'"—*i.e.*, a way "'that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.'" *McCutcheon*, 134 S. Ct. at 1456-57 (quoting *Bd. of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480 (1989)). The State previously explained, at length, why the PAC transfer law clears this relatively complaisant hurdle. *See* doc. 45 at 50-57. And remarkably, the ADC makes essentially no tailoring arguments in response.

The closest the ADC comes to a response on this prong is its citation, in the opening pages of its brief, to the *Wagner* decision, but this citation does not help the ADC's cause. *See* doc. 47 at 7-8. Citing *Beaumont*, that opinion observed that the Legislature's selection of a ban, as opposed to a mere limit, may make it more difficult to survive the tailoring analysis. But the key point here is *Wagner*'s caveat

that its observation applies where a limit "will adequately achieve the government's objectives." 854 F. Supp. 2d at 90. In light of the undisputed record evidence, it easy to see that a mere limit will not eliminate PAC-to-PAC transfers as an avenue for facilitating corruption. Capping PAC-to-PAC transfers at, say, $5,000 per PAC would just result in the proliferation of more PACs. In any event, under a properly deferential analytical approach, the Legislature was entitled to believe that.

For these reasons, the PAC transfer law is "closely drawn to achieve its purposes and is thus fully constitutional—in general, and in particular as applied to the ADC.

CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of the State on the ADC's sole remaining First Amendment claim.

Respectfully submitted,

LUTHER STRANGE (ASB-0036-G42L)
  *Attorney General*

Andrew L. Brasher (ASB-4325-W73B)
  *Solicitor General*

s/William G. Parker, Jr.
Winfield J. Sinclair (ASB-1750-S81W)
James W. Davis (ASB-4063-I58J)
William G. Parker, Jr. (ASB-5142-I72P)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
(334) 353-8440 (fax)
wsinclair@ago.state.al.us
jimdavis@ago.state.al.us
wparker@ago.state.al.us

**Attorneys for Attorney General Strange, District Attorney Broussard, and District Attorney Graham**

# CERTIFICATE OF SERVICE

I certify that on May 19, 2014, I electronically filed the foregoing document using the Court's CM/ECF system which will send notification of such filing to the following persons:

Edward Still
130 Wildwood Parkway
Suite 108 - PMP 304
Birmingham, AL 35209
(205) 320-2882
still@votelaw.com

John K. Tanner
JOHN TANNER LAW OFFICE
3743 Military Road NW
Washington, DC 20015
(202) 503-7696
john.k.tanner@gmail.com

Norman O Grubbs
JOE M. REED & ASSOCIATES LLC
524 South Court Street
Montgomery, AL 36104
(334) 834-2000
ogrubbs@bellsouth.net

            s/William G. Parker, Jr.
            Counsel for the Defendants