FILED
2014 May-27 AM 09:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| THE ALABAMA DEMOCRATIC CONFERENCE, an Alabama political action committee, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> LUTHER STRANGE, in his official capacity as Attorney General of Alabama, *et al.*, <br><br> *Defendants*. | Civil Action No. <br> 5:11-cv-02449-JEO |

**DEFENDANTS' RESPONSE TO**
**PLAINTIFFS' STATEMENT OF FACTS (DOC. 46)**

For the sake of clarity, the defendants respond as follows to the plaintiffs' asserted undisputed facts and also to their alleged "disputes" with the defendants' proposed undisputed facts. The bold statements below are directly quoted from the plaintiffs' statement of facts. *See* doc. 46.

### A. Response to Facts Proposed by the Plaintiffs

**1. The State of Alabama places no limits on the amount of money that an individual, a business, or a political organization can contribute directly to the campaign of a candidate for office.**

<u>Response</u>: This is a legal conclusion, not a fact. Having said that, it is undisputed as a general matter. *Cf.* Ala. Code § 17-5-14(c) (prohibiting utilities regulated by the Public Service Commission from contributing to a PSC candidate).

**2. The State of Alabama does not prohibit coordination by individuals or PACs in their independent expenditures for the benefit of candidates for political office. Transcript of 11-21-2011 oral argument at 26:15 – 25-27:5. (Mr. Parker).**

<u>Response</u>: This is a legal conclusion, not a fact. Having said that, it is undisputed.

**3. The State of Alabama does not have or enforce any requirement that coordinated campaign activities are contributions that must be reported and disclosed. Ed Packard depo at 45:9-18.**

<u>Response</u>: This is a legal conclusion, not a fact. It is also inaccurate. The Alabama Fair Campaign Practices Act defines "contribution" broadly to include the following:

- "[a] gift, subscription, loan, advance, deposit of money or anything of value, a payment, a forgiveness of a loan, or payment of a third party, made for the purpose of influencing the result of an election";

- "[a] contract or agreement to make a gift, subscription, loan, advance, or deposit of money or anything of value for the purpose of influencing the result of an election"; and

- "[a]ny transfer of anything of value received by a political committee from another political committee, political party, or other source."

Ala. Code § 17-5-2(2)(a)(1)-(3). To the extent Secretary of State employee Ed Packard's testimony is relevant on this point, it *confirms* that "[the Secretary's] interpretation of the definition of a contribution would make [coordinated campaign activities] an in-kind contribution." Doc. 43-1 (Packard Depo.) at 33:15-17. As

such, "it's reflected as part of the reporting that's been in place since the FCPA first was implemented." *Id.* at 34:11-13; *see also id.* at 32:4-35:21.

**4. Despite the wording of Alabama Code § 17-5-2-9[1], the State of Alabama does not enforce its ban on conduit payments as contributions in the name of another, § 17-5-15(a), against organizations as do most states and as does the federal government. Lisenby depo at 33:7-18.**

<u>Response</u>: This is a legal conclusion, not a fact. It is also inaccurate. The cited testimony of Assistant Attorney General Bill Lisenby concerns a different subject entirely.

Moreover, the plaintiffs are incorrect to cite the State's initial appellate brief as proof that "the Alabama Attorney General interprets § 17-5-15(a) to only prevent *individuals* from making a contribution in the name of another person." Doc. 43 at 10 (citing doc. 39-3 at 15-16, 52 (internal quotation marks and alterations omitted)). In its reply brief on appeal, the State in fact said that this "law prevents persons *and groups* from giving a contribution under a false name." Doc. 39-4 (State's reply brief on appeal) at 29 (emphasis added).

Along these lines, note that § 17-5-15(a) is a false-name provision. As such, it "has not been interpreted to prevent a donor from earmarking contributions to a

---

[1] This appears to be a typo; the plaintiffs presumably mean to refer to Ala. Code § 17-5-2(10), which defines "person" as "[a]n individual, partnership, committee, association, corporation, labor organization, or any other organization or group of persons."

3

PAC such that they are 'passed through.'" *Id.* (citing Ala. Att'y Gen. Op. No. 91-135 (Jan. 10, 1991)).

**5. Through the 2010 elections the State of Alabama did not restrict PAC to PAC contributions. The restrictions on PAC to PAC contributions enacted in 2010 were enjoined through the 2012 elections.**

<u>Response</u>: The first sentence is a legal conclusion, not a fact. Having said that, it is undisputed.

The second sentence is correct, but only as applied to the Alabama Democratic Conference and other plaintiffs in this lawsuit. Undisputed testimony from Alabama Secretary of State employee Ed Packard suggests that other individuals and groups believed that the law was in effect. He testified that "[a]fter the PAC-to-PAC transfer went into effect," some of the known PAC proliferators "were dissolving PACs and reducing their number of PACs." Doc. 43-1 at 47:3-7; *see also* doc. 45 at 66 (undisputed facts #31-33).

**6. The ADC's campaign finance reports for 2012 are attached as Exhibit EE. A summary of income and expenditures is in Exhibit FF.**

<u>Response</u>: The defendants reserve their right to dispute the accuracy of these reports, but their accuracy is not a material issue; the defendants are entitled to summary judgment even assuming them to be accurate.

**7. There have been no prosecutions in Alabama based on a corrupt quid pro quo effected through PAC to PAC transfers. Lisenby depo at 30:11 – 31:2, 33:7-18. Nor does the Alabama Attorney General know of any cases where bribery was facilitated by a transfer of money through a PAC. Lisenby Depo at 18:9 – 19:8, 26:6-19.**

<u>Response</u>: According to the State's undisputed facts, this is incorrect. In 2010, the federal government indicted a bipartisan group of lobbyists and state legislators for using PAC-to-PAC transfers to commit bribery. Although some of the defendants were acquitted, one defendant pleaded guilty based on this scheme. *See* doc. 45 at 68-69 (undisputed facts #50-53). Moreover, even though the jury acquitted some defendants, the facts in the indictment show PAC transfers' capacity, and at least their apparent capacity, to facilitate bribery.

**8. Prior to the introduction of the new campaign finance reporting system in July 2013, there was no way to search campaign finance reports for a particular contributor. A citizen would have to go to a candidate's or committee's reports, and read each one to find a contributor name. Packard depo 36:18-37:6. Tracking contributions between and among PACs accordingly could be tedious and time-consuming.**

<u>Response</u>: Undisputed.

**9. Under Alabama law, a single campaign operative can control a number of PACs, but even prior to the PAC to PAC ban, Alabama Code § 17-5-6 prevented concealing the source of a campaign contribution "simply by moving credits from one ledger to another" because that section requires separate checking accounts and all payments must be made by check.**

<u>Response</u>: It is undisputed that a single campaign operative can control a number of PACs. But portions of this item are inaccurate based on Alabama state law or the State's undisputed facts. For example, Ala. Code §17-5-6 requires Ala-

5

bama PACs to "maintain a checking account," but it allows expenditures to be made out of a "petty cash fund" (up to $100) in addition to allowing them to be made by check.

More importantly, the State's undisputed facts render untrue the conclusion in this item that "prior to the PAC to PAC ban, Alabama Code §17-5-6 prevented concealing the source of a campaign contribution." *See, e.g.*, doc. 45 at 62-66 (undisputed facts #1-33).

**10. The change to a searchable online database of campaign contributions was completed on 1 July 2013 when the system was open for filing reports. 20 May 2013. MEDIA ADVISORY—Secretary of State Chapman to Introduce New Online Campaign Finance System to Media, http://sos.state.al.us/PR/PR.aspx?ID=7824 (21 May 2013)**.

Response: Undisputed.

**11. The changes in the Code and the introduction of the searchable database have revolutionized the ease of tracking contributions. The tedious review of hard copies no longer is necessary. With the new searchable database now in place, an interested person now can track contributions by individuals and PACs through any transfers with a few strokes on a computer keyboard. See DUF 4.**

Response: Undisputed. Note that this item is most accurate if the phrase "changes in the Code" includes the PAC transfer law at issue in this litigation.

**12. The Secretary of State web site now allows one to obtain campaign contribution data by searching the name or part of the first of last name of the candidate, the name or part of the name of the candidate's PAC, or the name or part of the first or last name of a contributor. Packard Depo 15:18 – 23:4. By clicking on a particular PAC one can to find the names of the chair and the treasurer of that PAC, and then by clicking on the chair and treasurer one**

6

can see all other PACs of which they are chairs or treasurers. Id. at 23:12-24:5.

Response: Undisputed.

13. **It is possible to download all contributions and expenditures by a given PAC in a spreadsheet format. Id at 25:5-28:10. Prior to 2013, all of those searches would have to have been done by scrolling through scanned copies of documents, one at a time.**

Response: Undisputed.

14. **The much greater frequency of reporting of campaign contributions further inhibits the possibility that an individual or PAC can conceal or obscure the source of funds. See DUF 6.**

Response: This conclusion misinterprets Defendants' Undisputed Fact #6. Quoting Ashley Newman's testimony, Undisputed Fact #6 establishes that when PAC-to-PAC transfers were lawful, donors would "stagger the timing of their [contributions]" to further conceal or obscure the source of campaign contributions. Thus, on its own terms, and especially in the context of Ms. Newman's overall testimony, the point is that PAC-to-PAC transfers *inherently* undermine disclosure regimes—however frequent the reporting requirements.

15. **Alabama does not limit the number of PACs one person can create or control. For example, Ashley Newman is an officer of or the designated filing agent of multiple PACs and political groups. Newman depo at 13:22 – 18:10 and Exhibit 1 to the deposition.**

Response: Undisputed.

7

**16. Exhibit GG shows Speaker Mike Hubbard's Storming the State House PAC's registration and its reports over the past 10 months.**

Response: Undisputed.

**17. To some extent it was and remains impossible to achieve perfection in tracking campaign contributions under any regime, regardless of a ban on PAC to PAC transfers. A contribution by an individual to a PAC necessarily becomes intermingled with the contributions of others. Where the PAC contributes to two or more candidates, makes independent expenditures with two or more messages, or makes both candidate and independent expenditures, it is impossible to say what, if any proportion of that individual's expenditure went to a given expenditure. There is no way to effectively trace the contribution from the original contributor to the ultimate recipient. Packard depo 28:11 - 31:17; Lisenby depo 14:19 – 17:5.**

Response: This statement is undisputed if any of the PAC's contributors earmarked their contribution for a particular candidate or expenditure. Otherwise, common sense dictates that one could assume each of the PAC's candidate contributions or expenditures to be attributable to each of the PAC's contributors. (For example, *McCutcheon* assumed that a PAC's candidate contributions are attributable to each of the PAC's donors on a pro rata basis. *See, e.g.*, 134 S. Ct. at 1453-54.)

In any event, nothing in this statement undermines the undisputed facts supporting the conclusion that Alabama's PAC transfer law *improves* traceability. *See* doc. 45 at 62-66 (undisputed facts #1-33).

**18. The ADC was founded in 1960 to promote the Kennedy-Johnson ticket, and has continued to operate as a group advocating the rights of black citizens since then. The ADC currently has approximately 3,000 members. Reed Depo. at 42:8-15.**

Response: Undisputed.

**19. Until 1966 the Alabama Democrats used the slogan, "White Supremacy For the Right," on its ballot symbol. Exhibit HH, Jeff Frederick, Stand Up For Alabama: Governor George C. Wallace, 140-42 (2007).**

Response: Undisputed.

**20. Like many other organizations, the ADC operates within a single political party, in its case the Democratic Party. The ADC endorses and actively supports certain candidates and actively opposes other in Democratic primary elections. And the ADC actively seeks to influence the Democratic Party. [cite]**

Response: Undisputed, except as to the phrase "[l]ike many other organizations." Although a comparison of the ADC to other organizations is not relevant, there is no substantial evidence in the record pertaining to other organizations' relationship to a political party. The undisputed record evidence, however, does demonstrate the ADC's particularly close relationship to the Alabama Democratic Party and to Democratic candidates for public office. *See* doc. 45 at 71-76 (undisputed facts #72-125).

**21. The ADC focuses its activities on the Democratic Party because it, along with the black voters of Alabama generally and black voters across the United States, perceives the Republican Party as hostile to the aspirations of black citizens.**

Response: Undisputed.

9

**22. Overwhelming majorities of black voters in Alabama and, indeed, across the United States, regularly support Democratic candidates. In the case of the ADC, that perception is based on the ongoing actions of Republican elected officials. Reed Depo 41:8-23; Reed declaration ¶ 4. The ADC activities thus are intertwined with the Democratic Party, but it is independent of the Democratic Party. Friction between the two groups is not uncommon. See, e.g., Reed depo 118:16 - 119:11(disputes over reserved seats on SDEC for ADC and other matters).**

Response: The factual components of this item are undisputed. The conclusion that "[the ADC] is independent of the Democratic Party" is not supported by the cited facts, however. *See also* doc. 45 at 71-76 (undisputed facts #72-125). Moreover, even if the ADC is in some sense "independent" of the Alabama Democratic Party, that fact does not render the ADC insufficiently related to the Alabama Democratic Party or Democratic candidates for public office as to exempt it from regulation on the theories adopted by the Supreme Court in *McConnell v. FEC*. *See* 540 U.S. 93, 144-46, 168 (2003).

**23. The ADC refuses to endorse certain Democratic candidates in general elections, and opposes actions and policies of Democratic Party leaders and democratic elected officials. Reed depo 181:19 - 183:5; 183:21 - 184:8.**

Response: Undisputed.

**24. From time to time the ADC has sued the Democratic Party under the Voting Rights Act, 42 U.S.C. §1973, et seq. For example, under Alabama law, county party executive committees play a role in selecting poll officials. The ADC has filed suit to bar racial discrimination in the selection and behavior of poll officials, Harris v. Graddick, 593 F. Supp. 128, 601 F. Supp. 70 (M.D. Ala. 1984), and to obtain racially fair selection of members of the state and county Democratic committees, Hawthorne v. Baker, 750 F. Supp. 1090 (M.D. Ala. 1990), 756 F. Supp. 527 (M.D. Ala. 1990), 762 F. Supp. 1475 (M.D.**

**Ala. 1991), and the ADC continues to promote vigilance as to the activities of the state and county party committees.**

Response: The ADC was not a named party in any of the cited cases.

**25. The relationship between the ADC and the Democratic Party is similar to its relationship with other groups with which it is often aligned. For example, Dr. Reed was a senior official of the AEA; when the groups' goals aligned (both groups support public education), they supported each other, but there were times when they were opposed. 30:10 – 22; 213:1 - 214:18.**

Response: The factual components of this item are undisputed. However, the conclusion that "[t]he relationship between the ADC and the Democratic Party is similar to its relationship with other groups with which it is often aligned" is unsupported by the undisputed facts. For example, there is no evidence that the other groups (1) bear a similar name to the Democratic Party; (2) receive financial support from Democratic candidates; (3) endorse a slate of Democratic candidates; (4) have a mission statement that includes "advocat[ing] and advanc[ing] the cause of the Democratic Party"; (5) require membership in the Democratic party as a prerequisite for membership in the organization; (6) conduct Get-Out-the-Vote activities exclusively on behalf of Democratic candidates, or (7) coordinate those activities with candidates, etc. *See* doc. 45 at 71-76 (undisputed facts #72-125).

**26. The ADC is a statewide organization with chapters in over 60 counties. Doc. 43-4 (Reed Depo.) at 46:11-22.**

Response: Undisputed.

11

**27.** The ADC endorses candidates for many state, district, and local race in both the primary and general elections. Candidates seeking the ADC's endorsement must appear in person to be interviewed in turn. The determination as to which candidates the ADC endorse is made, for county elections, by the county chapters; at the district level by groups of members from the respective districts, with all of the endorsing groups interviewing candidates and deciding on endorsements simultaneously; and at the state office level by the ADC Executive Committee. The various committee endorsements are subject to amendment on the floor of the state convention. Reed depo at 175:1 - 176:1

Response: Undisputed.

**28.** The ADC endorsements are not based on candidates' contributions to ADC: some candidate committees make donations and others do not. Reed depo 191:20 - 192:9.

Response: Undisputed.

**29.** Dr. Joe L. Reed is the Executive Director of the ADC. Dr. Reed does not cast a vote in the various endorsement committees. His role during the endorsement process is to keep things moving and answer questions that may come up within the various decision-making groups. Reed depo 164:20 - 166:11.

Response: Undisputed.

**30.** The ADC distributes a base amount of its available funds to each of its 60+ chapters. Remaining funds are distributed based on an independent determination by Dr. Reed of a variety of factors, including the size of the county's black population and the effectiveness of the local chapter. Reed declaration at ¶¶ 16-17.

Response: Undisputed.

**31.** The ADC has no power to direct government benefits. That is, there is no quo within the gift of the ADC.

Response: Undisputed, strictly speaking. One of the State's theories, however-

er, is that a contribution to the ADC is tantamount to a contribution to the candi-

dates it supports and with whom it coordinates its expenditures because it is a political party or political-party affiliate as *McConnell* used those concepts. Candidates and officeholders, of course, do have the power to direct government benefits.

**32. The ADC has not used PAC to PAC transfers as a way to avoid revealing the true source of a contribution. Reed Depo, 13:8 - 14:13.**

Response: Although the defendants reserve their right to dispute the accuracy of Dr. Reed's testimony on this point, its accuracy is not a material issue; the defendants are entitled to summary judgment even assuming it is accurate.

**33. The ADC'S campaign finance reports are prepared by an independent auditor. Reed Dep. 105:23 - 107:1.**

Response: Undisputed.

**34. The ADC is not aware that it ever has been investigated and the State of Alabama does not allege that the ADC ever has been investigated for possible violation of a campaign statute of the State of Alabama since its inception in 1960.**

Response: Undisputed.

**35. Upon the enactment of the ban on PAC to PAC transfers, the ADC sought to restructure its activities in a manner consistent with those held by the court in Emily's List v. Federal Election Com'n, 581 F.3d 1 (DC Cir 2009). Reed declaration at ¶ 21.**

Response: Undisputed, except the State rejects the analogy of the facts at issue in this case to those present in *Emily's List*.

**36. The Federal Election Commission refers to PACs with separate bank accounts for candidate contributions and independent expenditures as "political committees with non-contribution accounts." There are 81 such committees registered with the FEC. Exhibit II.**

Response: Undisputed.

### B. Response to the Plaintiffs' Allegedly "Disputed" Facts

**37. The statements alleged in paragraphs 1-2, 4-53 of the Defendants' Numbered Statement of Undisputed Facts relate to the period before the development of a searchable database and have no relevance to the operation of the new system and the exponentially greater transparency it has created.**

Response: Nothing in this statement disputes any of the facts proffered in the State's Undisputed Facts #1-2 and 4-53. Regardless of their "relevance" to the "new [online, searchable] reporting system," these facts have great relevance to the capacity of PAC transfers to conceal the true source of a campaign contribution and to facilitate *quid pro quo* corruption.

**38. A jury acquitted all defendants in United States v. McGregor, 879 F. Supp. 2d 1308 (M.D. Ala. 2012), the case referenced in paragraphs 50-53 of the Defendants' Numbered Statement of Undisputed Facts, and Senator Smith and the other acquitted defendants presumptively did not commit the acts alleged.**

Response: This statement ignores Defendants' Undisputed Fact #53, which explains that one of the defendants, gambling promoter Ronald Gilley, pleaded guilty and admitted that he "attempted to conceal the true nature, source, and control of [certain] payments made to members of the Alabama Legislature" by "disguising illicit payments through political action committees." Doc. 45 at 69.

14

Moreover, even though the jury acquitted other defendants, the facts in the indictment show PAC transfers' capacity, and at least their apparent capacity, to facilitate bribery.

Respectfully submitted,

LUTHER STRANGE (ASB-0036-G42L)
  *Attorney General*

Andrew L. Brasher (ASB-4325-W73B)
  *Solicitor General*

s/William G. Parker, Jr.
Winfield J. Sinclair (ASB-1750-S81W)
James W. Davis (ASB-4063-I58J)
William G. Parker, Jr. (ASB-5142-I72P)
  *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
(334) 353-8440 (fax)
wsinclair@ago.state.al.us
jimdavis@ago.state.al.us
wparker@ago.state.al.us

**Attorneys for Attorney General Strange, District Attorney Broussard, and District Attorney Graham**

CERTIFICATE OF SERVICE

I certify that on May 27, 2014, I electronically filed the foregoing document using the Court's CM/ECF system which will send notification of such filing to the following persons:

Edward Still
130 Wildwood Parkway
Suite 108 - PMP 304
Birmingham, AL 35209
(205) 320-2882
still@votelaw.com

John K. Tanner
JOHN TANNER LAW OFFICE
3743 Military Road NW
Washington, DC 20015
(202) 503-7696
john.k.tanner@gmail.com

Norman O Grubbs
JOE M. REED & ASSOCIATES LLC
524 South Court Street
Montgomery, AL 36104
(334) 834-2000
ogrubbs@bellsouth.net

                          s/William G. Parker, Jr.
                          Counsel for the Defendants