# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| THE ALABAMA DEMOCRATIC CONFERENCE, an Alabama political action committee, *et al.*, )<br>)<br>)<br>)<br>*Plaintiffs,* )<br>)<br>v. )<br>)<br>LUTHER STRANGE, in his official capacity as Attorney General of Alabama, *et al.*, )<br>)<br>)<br>)<br>*Defendants.* )<br>) | Civil Action No.<br>5:11-cv-02449-JEO |

### DEFENDANTS' RESPONSE TO
### PLAINTIFFS' ORAL ARGUMENT EXHIBIT

At the oral argument held May 27, 2014, the ADC presented the Court with a document purporting to analyze the newspaper articles the Defendants submitted in support of their initial motion to dismiss. *See* docs. 7-4 & 7-5. Through this document, the ADC seems to be arguing that PAC-to-PAC transfers do not really raise a specter of actual or apparent *quid pro quo* corruption and that prohibiting such transfers therefore does not serve Alabama's compelling anticorruption interests. This argument is unfounded and unpersuasive.

Below, the defendants show why the submitted articles support the State's rationale for the PAC transfer law. But as an initial matter, it is worth reiterating that the State need not wait until its elections are actually corrupt before it can take steps to prevent that result. It certainly need not wait until it has uncovered smok-

ing-gun evidence of corruption regarding each and every activity it intends to regulate. The Supreme Court has never required the government to produce that kind of needle in a haystack. And indeed if it had, decisions such as *FEC v. Beaumont*, 539 U.S. 146 (2003), and *FEC v. National Right to Work Committee*, 459 U.S. 197 (1982)—to name just two examples—would have been decided differently. Neither decision identified such evidence. Yet lower courts have continued to follow *Beaumont* after *Citizens United*. *See, e.g.*, *United States v. Danielczyk*, 683 F.3d 611, 615 (4th Cir. 2012).[1] And *Citizens United* itself distinguished *National Right to Work Committee*, directly indicating that it is still good law. *See Citizens United v. FEC*, 558 U.S. 310, 357, 358-59 (2010).

On the question of evidence of *quid pro quo* corruption, the Supreme Court's decision in *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377 (2000), is particularly instructive. As noted in the State's summary-judgment briefing, this is the decision observing that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Id.* at 391. Relevant here, it also noted that the plaintiffs in that case were "wrong" to advocate for

---

[1] *Danielczyk* relied on the so-called "*Agostini* principle," which dictates that "lower courts should not conclude that the Supreme Court's 'more recent cases have, by implication, overruled [its] earlier precedent.'" 683 F.3d at 616 (quoting *Agostini v. Felton*, 521 U.S. 203, 237 (1997).

2

"a new requirement" that "the recited harms are real, not merely conjectural." *Id.* at 391-92 (quotation marks and citations omitted).

In any event, *Nixon* ultimately concluded, in a holding particularly applicable to this case, that Missouri's proffered evidence did not "present a close call" about the validity of the state's contribution limits as anticorruption measures. *Id.* at 393. The evidence in that case consisted of

(1) the facts underlying *Buckley*'s own recognition that "voters would tend to identify a big donation with a corrupt purpose," *id.* at 391;

(2) an affidavit from a knowledgeable state political actor describing the "real potential" for corruption, *id.* at 393;

(3) "newspaper accounts of large contributions supporting inferences of impropriety," *id.*;

(4) "'overwhelming'" public support for the challenged law, *id.* at 394 (quoting *Carver v. Nixon*, 882 F. Supp. 901, 905 (W.D. Mo. 1995)); and

(5) the failure of the law's challengers to make "any showing of their own to cast doubt on the apparent implications of *Buckley*'s evidence and the record here," *id.*

The evidence of corruption stemming from PAC-to-PAC transfers is just as persuasive, if not more so, than the evidence at issue in *Nixon*. Each of these five evidentiary propositions applies equally in this case. Plus, Alabama experienced a federal indictment, which resulted in one guilty plea, based on corruption through the use of PAC-to-PAC transfers.

3

To be clear, and contrary to the ADC's apparent argument, the State's newspaper articles support the State's position. First, they establish that the public could perceive operatives to use PAC-to-PAC transfers to funnel money to candidates. For example:

- "PACs have become the favored legal route for channeling money to candidates, in part because PACs obscure who gave how much to whom and in part because they circumvent some restrictions on how much money companies can give." Doc. 7-4 at p. 6.

- "In a classic PAC funnel with which many Alabamians have already become familiar, the phalanx of 11 PACs run by Montgomery lobbyists Joe Fine and Bob Geddie channeled $290,071 from dozens of contributors, including some PACs, to dozens of candidates and other PACs." Doc. 7-4 at p. 8.

- "The funnel obscures which contributed money went to which candidate. Lieutenant governor candidate Don Siegelman pulled the most out of the funnel, $62,500 - a significant portion of that during the last few days of his primary runoff battle against Sen. Ryan deGraffenried, whom Siegelman beat." Doc. 7-4 at 9.

- "A study by the American Tort Reform Association, for example, revealed how trial lawyer contributions were juggled through nine transfers among four PACs in just two days. Some of those PACs gave money to candidates for the Alabama Supreme Court, but no one can trace the dollars to their original sources." Doc. 7-4 at pp. 15-16.

- "'The Alabama Education Association's political action committee gives money directly to people running for the Legislature, but it also runs money through other PACs to hide its tracks. AEA passes money through other PACs when candidates want to 'keep a contribution quiet' and not let voters know they got money from AEA, said Paul Hubbert, executive secretary of the teacher's lobby." Doc. 7-4 at p. 21.

- "Consider that it's legal in Alabama for political action committees to launder campaign money through PAC-to-PAC 'transfers' so no one can figure

4

the source of a donation; or that a PAC or individual can give an unlimited amount to a candidate." Doc. 7-4 at p. 24.

- "While it is no secret Siegelman has accepted hundreds of thousands of dollars from trial lawyers, he could legitimately deny the money the party gave him came from trial lawyers. PACs, by their very nature, act as a pass-through for money, blurring its original source." Doc. 7-4 at p. 28.

Second, the articles establish that the public could perceive these PAC transfers to result in *quid pro quo* corruption. For example:

- "PAC-to-PAC transfers must be eliminated, and strict limits on contributions must be set and enforced if there is going to be true campaign finance reform in Alabama. Otherwise, why don't we just auction our candidates off to the highest bidder?" Doc. 7-4 at p. 27.

- "Voters should hear alarm bells going off when candidates (including Riley) claim they don't know the true source of contributions laundered through PACs. Rest assured, no one who funnels $250,000 to a campaign wishes to remain anonymous - not to the candidate. Big political donors are almost always in the business of advancing a cause or protecting their interests. They want candidates to know what's buttering the proverbial bread." Doc. 7-4 at p. 40.

- "Alabamians may not understand the ins and outs of PAC-to-PAC transfers but they know corruption when they smell it." Doc. 7-5 at p. 7.

- "Here's one reason why the state Senate should stop its stalling on reforming transfers between political action committees: $436,950. That's nearly a half million dollars that PACs transferred to other PACs before it reached Larry Langford's successful campaign for mayor of Birmingham. The money began its circuitous route as $50,000 in Tuscaloosa developer Stan Pate's PAC. The mayor announced last week that Mr. Pate would be a partner in a $90 million revitalization plan for Five Points West and at Fair Park." Doc. 7-5 at p. 8.

- "The reason Alabama's campaign finance system is a disgrace is that it allows PACs to hide the money - to keep the public from knowing who's really funding campaigns. State Treasurer Kay Ivey, a GOP candidate for gov-

ernor, compared it to 'slipping hundred dollar bills under the table.'" Doc. 7-5 at p. 19.

- "What s crystal clear at this point is there would be no doubt about whether [former Alabama Attorney General Troy] King got bingo bucks if Alabama prevented PACs from washing away any public trace of where the money originated. That, of course, is the dark beauty of legal money laundering through PACs." Doc. 7-5 at p. 25.

- "It's hard to find a better example than last week's seemingly landmark Senate vote on bingo. Of 21 senators who voted in favor of the bill, at least 17 got campaign money directly or indirectly from bingo baron Ronnie Gilley or his lobbyist Jarrod Massey state campaign finance records show. Massey's lawyers acknowledged Friday he had been singled out for questioning by federal agents, and was pressured to cooperate soon after the Senate voted 21-13 to pass the bingo bill. None of the 13 senators who voted against the bill got money from Gilley, as far as I can tell. None got money from Massey's dozen PACs, or those fed by them." Doc. 7-5 at p. 27.

- "March 30, Gilley committed $500,000 to a particular legislator, who was likely to miss the vote on SB380 due to illness. That legislator showed up and voted in favor of SB380." Doc. 7-5 at p. 37.

- "Funneling cash through a series of PACs makes it virtually untraceable, so the public remains in the dark about any influence that the special interest has on the candidate." Doc. 7-5 at p. 50.

Third, the articles establish that the public could perceive PACs will coordinate their expenditures with candidates—and thereby effectively make candidate contributions—even if they do not directly deliver *funds* to a candidate (as the ADC says it will not do via its "independent expenditure" account). For example:

- "The largest payment - $142,418 went from the Alabama Trial Lawyers Association's TRIAL PAC to New York consulting firm Austin Sheinkopf. The report says nothing more about what the money bought. . . . A review of numerous candidates disclosure statements show the firm performed cam-

6

paign work for more than 20 Alabama Democratic candidates." Doc. 7-4 at p. 8.

- "Two PACs run by the Alabama Farmers Federation and Alfa Insurance Co. paid a total of $54,117 to Creative Consultants Inc. of Montgomery. The two ALFA PACs also transferred a total of $29,813 to the Conservative Coalition PAC, which, in turn, mixed that money with other money and distributed it to conservative candidates, blurring precisely who gave to whom. The Business Council's Progress PAC paid $24,983 to Strategic Message Design of New Jersey to help unidentified candidates." Doc. 7-4 at p. 8.

Taken together, along with Ashley Newman's undisputed testimony, the 2010 federal bingo indictment, the nation's experience as expressed in *Buckley* and *Nixon*, and the PAC transfer law's unanimous passage, these articles establish that PAC-to-PAC transfers create the kind of "'opportunity for abuse'" that the Supreme Court has said may be "'eliminated.'" *McCutcheon v. FEC*, 134 S. Ct. 1434, 1445 (2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 30 (1976) (per curiam)).

Alabama already imposes essentially no substantive impediments to campaign activity. Consistent with the "relatively complaisant" level of scrutiny that governs this case, the Court should uphold Alabama's PAC transfer law, both as a general matter and specifically as applied to the ADC. *Beaumont*, 539 U.S. at 161.

Respectfully submitted,

LUTHER STRANGE (ASB-0036-G42L)
   *Attorney General*

Andrew L. Brasher (ASB-4325-W73B)
   *Solicitor General*

<u>s/William G. Parker, Jr.</u>
Winfield J. Sinclair (ASB-1750-S81W)
James W. Davis (ASB-4063-I58J)
William G. Parker, Jr. (ASB-5142-I72P)
   *Assistant Attorneys General*

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
(334) 242-7300
(334) 353-8440 (fax)
wsinclair@ago.state.al.us
jimdavis@ago.state.al.us
wparker@ago.state.al.us

**Attorneys for Attorney General Strange, District Attorney Broussard, and District Attorney Graham**

## CERTIFICATE OF SERVICE

I certify that on June 4, 2014, I electronically filed the foregoing document using the Court's CM/ECF system which will send notification of such filing to the following persons:

Edward Still
130 Wildwood Parkway
Suite 108 - PMP 304
Birmingham, AL 35209
(205) 320-2882
still@votelaw.com

John K. Tanner
JOHN TANNER LAW OFFICE
3743 Military Road NW
Washington, DC 20015
(202) 503-7696
john.k.tanner@gmail.com

Norman O Grubbs
JOE M. REED & ASSOCIATES LLC
524 South Court Street
Montgomery, AL 36104
(334) 834-2000
ogrubbs@bellsouth.net

                                        s/William G. Parker, Jr.
                                        Counsel for the Defendants