Case 5:11-cv-02449-JEO    Document 68-1    Filed 10/26/16    Page 1 of 30

Case: 15-13920    Date Filed: 09/27/2016    Page: 1 of 29

FILED
2016 Oct-26  PM 02:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 15-13920

————————————————

D.C. Docket No. 5:11-cv-02449-JEO

THE ALABAMA DEMOCRATIC CONFERENCE,
DR. EDDIE GREENE,
JAMES GRIFFIN,
BOB HARRISON,
EMMITT E. JIMMAR,
JIMMIE PAYNE,

Plaintiffs-Appellants,

versus

ATTORNEY GENERAL, STATE OF ALABAMA,
ROBERT L. BROUSSARD,
in his official capacity as District Attorney for the 23rd Judicial Circuit,
BRYCE U. GRAHAM, JR.,
in his official capacity as District Attorney for the 31st Judicial Circuit,

Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Northern District of Alabama

————————————————

(September 27, 2016)

Before WILSON, MARTIN and HIGGINBOTHAM,[*] Circuit Judges.

MARTIN, Circuit Judge:

For over fifty years, the Alabama Democratic Conference ("ADC") has been dedicated to communicating with black voters in Alabama and encouraging them to support candidates for public office that the organization believes would best represent their interests. The ADC has grown to become the largest grassroots political organization in Alabama, and it is active throughout the state. As part of the effort to build support for its endorsed candidates, the ADC is actively involved in elections in Alabama and regularly raises and spends money in connection with state elections.

In 2010, Alabama made changes to its election law that impacted the ADC's ability to raise and spend money in state elections. One of these changes prevented the ADC from continuing to raise money from political action committees ("PACs"), which had been an important source of funding for the ADC's election activity. The organization brought a legal challenge to Alabama Code § 17-5-15(b), which limited the ADC's fundraising abilities. This statute is known as the "PAC-to-PAC transfer ban." The District Court upheld this ban against the ADC's constitutional challenge. In this appeal, the ADC challenges the District Court's final judgment in favor of the State of Alabama ("the State"). The ADC argues

---

[*]Honorable Patrick E. Higginbotham, United States Circuit Judge for the Fifth Circuit, sitting by designation.

that the PAC-to-PAC transfer ban is unconstitutional as applied because the ban

violates the ADC's First Amendment right to make independent expenditures.

After careful review, and with the benefit of oral argument, we affirm the judgment

of the District Court.

## I.

## A.

In Alabama, the Fair Campaign Practices Act ("FCPA") governs campaign

finance requirements for state elections.  See Ala. Code §§ 17-5-1 to -21.  Under

the FCPA, it is "unlawful for any political action committee . . . to make a

contribution, expenditure, or any other transfer of funds to any other political

action committee."  Id. § 17-5-15(b).  A "political action committee" is defined as

"[a]ny committee, club, association, political party, or other group of one or more

persons . . . which receives or anticipates receiving contributions and makes or

anticipates making expenditures to or on behalf of any Alabama state or local

elected official, proposition, candidate, principal campaign committee or other

political action committee."  Id. § 17-5-2(a)(13).

There is an exception to this ban on PAC-to-PAC transfers: a PAC that is

not designated as a "principal campaign committee" may "make contributions,

expenditures, or other transfers of funds to a principal campaign committee."  Id.

§ 17-5-15(b).  Thus, if a PAC is set up to give money to several candidates, that

PAC cannot make a contribution or expenditure to another PAC that is doing the same thing.  It can contribute to or spend for only a specific type of PAC set up by a candidate for the benefit of that particular candidate.  The PAC-to-PAC transfer ban is a major feature of the FCPA.

Unlike many other states, Alabama's campaign finance law does not limit the amount of money that a person, business, or PAC may contribute directly to a candidate's campaign.  See generally id. §§ 17-5-1 to -21.  The FCPA instead relies on a system of disclosure that requires regular reporting of campaign contributions and spending by candidates, corporations, and PACs.  See id. § 17-5-8.  It also creates an electronic searchable database of those reports.  See id. § 17-5-8.1.

## B.

The ADC is an Alabama-based "grassroots political organization" that was founded in 1960.  Its mission is "to communicate with, educate, organize, and unify black voters," which it carries out mostly through its sixty-plus local branches throughout the state.  The organization endorses candidates for office, all Democrats, and attempts to get out the vote for its endorsed candidates in various ways, including a "well-known ADC yellow sample ballot distributed to voters at polling places and other locations across the state."  Its activities are "intertwined with," but the organization is "independent of," the state Democratic Party.

The ADC also routinely spends money in state elections to support its endorsed candidates.  For this reason, the ADC is registered as a PAC with the Alabama Secretary of State.  The ADC gets the money it uses for this spending from contributions, including contributions from the Alabama Democratic Party, other PACs, and candidates.  The ADC's decision about whether to endorse a candidate is not dependent on whether a candidate contributes to the ADC.  Some, but not all, of the candidates the ADC endorses contribute to the ADC through their own candidate committees.

The Alabama legislature adopted the PAC-to-PAC transfer ban during a special session in December 2010.  The ban made it illegal for the ADC's organizational PAC to receive contributions from the Alabama Democratic Party and other PACs.  Before the 2010 enactment of the ban, the ADC raised about half its funds from these sources.  In light of the new law, the ADC restructured its contribution system by establishing separate bank accounts for candidate contributions and independent expenditures.  The idea was that the funds ADC raised from other PACs would go only to the account for independent expenditures.

## C.

In July 2011, the ADC sued the State to stop enforcement of § 17-5-15(b).  It argued that the new law violated its First and Fourteenth Amendment rights.

Specifically, the ADC asserted that because a state could not regulate independent expenditures of PACs after <u>Citizens United v. FEC</u>, 558 U.S. 310, 130 S. Ct. 876 (2010), it followed that neither could a state regulate contributions to PACs used solely for independent expenditures.  <u>Ala. Democratic Conference v. Broussard</u> ("<u>ADC I</u>"), 541 F. App'x 931, 932 (11th Cir. 2013) (per curiam) (unpublished). The ADC challenge thus went to funds it got from other PACs and then placed into a separate bank account that was used only for independent expenditures.  <u>Id.</u>

The District Court granted summary judgment in favor of the ADC.  <u>Id.</u>  The District Court found the PAC-to-PAC transfer ban unconstitutional as it applied to the ADC because the law infringed the organization's First Amendment rights.  <u>Id.</u> It enjoined the State from enforcing the law against contributions that the ADC intended to deposit directly into the separate account used only for independent expenditures.  <u>Id.</u>

The State appealed this ruling, and this Court reversed the District Court, stating that "<u>Citizens United</u> d[id] not render § 17-5-15(b) unconstitutional as applied" to the ADC, at least on the record then before it.  <u>Id.</u> at 935.  This Court's ruling observed that "[i]n prohibiting limits on independent expenditures, <u>Citizens United</u> heavily emphasized the independent, uncoordinated nature of those expenditures, which alleviates concerns about corruption."  <u>Id.</u>  But the independence of an organization like the ADC, which both makes independent

6

expenditures and contributes directly to candidates, "may be called into question and concerns of corruption may reappear." Id.  The concern is about the appearance of corruption.  Even if there is no actual corruption, "the public may believe that corruption continues to exist, despite the use of separate bank accounts, because both accounts are controlled and can be coordinated by the same entity." Id. (emphasis added).

This Court decided that the question of "whether the establishment of separate bank accounts by ADC . . . eliminates all corruption concerns is a question of fact." Id. at 936.  In doing so, we refused to "hold as a matter of law that the State's interest in preventing corruption or the appearance of corruption is insufficient to justify contribution limits on funds used for independent expenditures when the receiving organization also makes campaign contributions." Id. at 935.  Because "the State presented ample evidence of possible corruption" to create a disputed issue of material fact, this Court concluded that summary judgment was inappropriate and remanded the case to the District Court.  Id. at 936.  We instructed the District Court to further develop the facts about "[w]hether the [state's] anti-corruption interest is sufficient in light of the evidence in the record in this case, and whether the transfer ban is a closely drawn means of furthering that interest." Id.

On remand, the ADC and the State each sought summary judgment after discovery.  The District Court denied both motions, but ruled on the merits that § 17-5-15(b) is constitutional as applied to the ADC.  The court observed that under Supreme Court precedent, "the only sufficiently important interest that will support the PAC-to-PAC transfer ban is preventing quid pro quo corruption or the appearance thereof."  It found that the ADC's organizational structure triggered this concern.  Although the ADC operated two bank accounts to keep its candidate contributions separate from its independent expenditures, "these two accounts are controlled by the same entity and people."  Neither was there any "evidence to indicate there is any organizational separation with respect to the two accounts to alleviate any potential appearance of corruption" or "any other internal controls to safeguard against the risk that contributions, even if formally earmarked for independent expenditures, could be funnelled to a candidate."  On this record, the District Court found that the State had a valid corruption concern with respect to the ADC.

The District Court went on to find that the PAC-to-PAC transfer ban was sufficiently closely drawn to further the State's anti-corruption interest.  It found the tailoring sufficient because there was no evidence "that a more narrowly tailored solution, such [as] a limit on the amount another PAC could contribute to [the] ADC, would adequately protect the State's interest" in preventing corruption

"[i]n light of [the] lack of evidence of organizational separation or other safeguards" in the ADC's structure. The District Court also found that "the impact of the PAC-to-PAC transfer ban on the ADC's associational rights is minimal" given that the ADC can still receive unlimited contributions from individuals and make both unlimited contributions to candidates as well as unlimited independent expenditures. It is the ADC's appeal of this decision we consider here.

## II.

We review the District Court's legal rulings de novo, and its findings of fact for clear error. Tartell v. S. Fla. Sinus & Allergy Ctr., Inc., 790 F.3d 1253, 1257 (11th Cir. 2015). We will not disturb findings of fact unless "after viewing all the evidence, we are left with the definite and firm conviction that a mistake has been committed." Id. (quotation omitted). Because we are the second Eleventh Circuit panel to review this case, we are bound by the legal conclusions from the earlier decision under the law of the case doctrine. This That & the Other Gift & Tobacco, Inc. v. Cobb Cty., 439 F.3d 1275, 1283 (11th Cir. 2006) (per curiam).

Political contributions and spending "both fall within the First Amendment's protection of speech and political association." FEC v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 440, 121 S. Ct. 2351, 2358 (2001). Limitations on political expenditures "impose significantly more severe restrictions on protected freedoms of political expression and association than do [] limitations on

financial contributions." <u>Buckley v. Valeo</u>, 424 U.S. 1, 23, 96 S. Ct. 612, 636

(1976) (per curiam).  Compared to restrictions on spending, which receive a higher

level of scrutiny, "restrictions on political contributions have been treated as

merely 'marginal' speech restrictions subject to relatively complaisant review

under the First Amendment, because contributions lie closer to the edges than to

the core of political expression." <u>FEC v. Beaumont</u>, 539 U.S. 146, 161, 123 S. Ct.

2200, 2210 (2003).  This is because "the transformation of contributions into

political debate involves speech by someone other than the contributor." <u>Buckley</u>,

424 U.S. at 21, 96 S. Ct. at 636.  Expenditures by a PAC that are coordinated with

a candidate are treated as contributions to that candidate.  <u>See</u> <u>id.</u> at 46–47, 96 S.

Ct. at 647–48.

    A law limiting contributions is valid "if the State demonstrates a sufficiently

important interest" and the law is "closely drawn" to serve that state interest, even

if there is a "significant interference" with political association.  <u>Id.</u> at 25, 96 S. Ct.

at 638 (quotation omitted).  This standard is a "lesser demand" than strict scrutiny.

<u>Beaumont</u>, 539 U.S. at 162, 123 S. Ct. at 2210; <u>see also</u> <u>McCutcheon v. FEC</u>, ___

U.S. ___, ___, 134 S. Ct. 1434, 1444 (2014) (plurality opinion) (noting that strict

scrutiny would require that the "regulation promote[] a compelling interest and is

the least restrictive means to further the articulated interest").  The goal of this

"less rigorous standard of review" is to give the legislature "sufficient room to

anticipate and respond to concerns about circumvention of regulations designed to protect the integrity of the political process." <u>McConnell v. FEC</u>, 540 U.S. 93, 137, 124 S. Ct. 619, 656–57 (2003), <u>overruled on other grounds by</u> <u>Citizens United</u>, 558 U.S. 310; <u>see also</u> <u>Beaumont</u>, 539 U.S. at 155, 123 S. Ct. at 2207 ("[D]eference to legislative choice is warranted particularly when Congress regulates campaign contributions, carrying as they do a plain threat to political integrity and a plain warrant to counter the appearance and reality of corruption.").

III.

The ADC argues here that the PAC-to-PAC transfer ban is unconstitutional as it applies to the ADC's separate account used only for independent expenditures.  The ADC makes its challenge based on each prong of the test in <u>Buckley</u> for upholding a law that limits contributions.  <u>See</u> 424 U.S. at 25, 96 S. Ct. at 638.  First, the ADC argues that the District Court erred by placing the burden on the ADC to prove that the law was not sufficiently closely drawn to serve an important state interest.  Second, it argues that the State does not have a sufficiently important interest in banning PAC-to-PAC transfers used only for independent expenditures.  Third, it argues that the PAC-to-PAC transfer ban does not actually promote any state interest.  Finally, it argues that the law is not sufficiently closely drawn to protect the State's purported interests.  We will address each argument in turn.

A.

The ADC first argues that the District Court wrongly placed the burden of proof, requiring ADC to prove that the law was not sufficiently closely drawn to serve an important state interest rather than requiring the State to justify its law. We find no merit in this argument.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." McCutcheon, 134 S. Ct. at 1452 (plurality opinion) (quoting United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 816, 120 S. Ct. 1878, 1888 (2000)). A state can meet its burden of proof by showing that its law furthers a sufficient state interest, such as preventing quid pro quo corruption or its appearance. See McCutcheon, 134 S. Ct. at 1444, 1452. To meet this burden, a state must provide evidence that is "enough to show [] the substantiation of the [legislative] concerns" driving its enactment. Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 393, 120 S. Ct. 897, 907 (2000). This substantiation may be made through pieces of evidence such as newspaper accounts, reports, and affidavits. See id.

In upholding § 17-5-15(b), the District Court found that:

> [T]he ADC operates two bank accounts for purposes of keeping its funds for contributions to candidates separate from its funds to be used for independent expenditures. It is undisputed that these two accounts are controlled by the same entity and people. These two facts are all the court knows about how the ADC runs these separate accounts. The ADC did not present any evidence to indicate there is

12

> any organizational separation with respect to the two accounts to alleviate any potential appearance of corruption. Additionally, aside from the creation of two accounts, the <u>ADC has not offered any evidence</u> to indicate that it has implemented any other internal controls to safeguard against the risk that contributions, even if formally earmarked for independent expenditures, could be funneled to a candidate.

This emphasized language does not demonstrate an improper shift of the burden to the ADC.

The District Court found that the State provided newspaper and other evidence that the appearance of corruption was an issue in Alabama before § 17-5-15(b) was enacted. The court specifically referenced two incidents in which there was at least an appearance that PAC-to-PAC transfers were operating to disguise the true source of contributions in just the way the law was intended to prevent. The District Court then engaged in a lengthy analysis of the ADC's organizational structure in an effort to identify any features that might address the State's anti-corruption concern. The District Court properly allocated the burden of proof as between these parties. Although the District Court observed that the ADC presented no evidence to rebut the State's justification for regulating transfers between PACs, we conclude it did not improperly shift the burden of proof to the ADC.

B.

The State advances two interests to justify its decision to regulate contributions through the PAC-to-PAC transfer ban: anti-corruption and transparency.  The ADC argues in turn that these interests are not sufficient to justify the law.

The Supreme Court has recognized that "preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances."  FEC v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 496–97, 105 S. Ct. 1459, 1468 (1985).  In Citizens United, the Supreme Court announced that "independent expenditures . . . do not give rise to corruption or the appearance of corruption" so the state's anti-corruption interest was no longer sufficient to justify certain regulations of independent expenditures.  558 U.S. at 357, 130 S. Ct. at 909.  In contrast, anti-corruption concerns are a well-established justification for a state's decision to regulate political contributions.  See Buckley, 424 U.S. at 26–27, 96 S. Ct. at 638–39.  Citizens United did not alter this longstanding rule.  See 558 U.S. at 357, 130 S. Ct. at 908; see also McCutcheon, 134 S. Ct. at 1441 (stating, after Citizens United, that "Congress may regulate campaign contributions to protect against corruption or the appearance of corruption").  It is a matter of law, therefore, that the State's interest in preventing corruption or its appearance is

14

sufficiently important to justify its decision to regulate political contributions and those transactions, including donations to PACs, that relate to or appear to relate to such contributions.

The first time this case came to our Court, the panel decided that, because the ADC brought an as-applied challenge to the PAC-to-PAC transfer ban, the issue of whether anti-corruption concerns were a sufficient state interest was a question of fact. See ADC I, 541 F. App'x at 936. The panel observed that "the State presented ample evidence of possible corruption through PAC-to-PAC transfers to withstand summary judgment" and remanded to the District Court to decide "[w]hether the anti-corruption interest is sufficient in light of the evidence in the record in this case." Id. On remand, the District Court found sufficient evidence that appearance-of-corruption concerns justified the State's decision to regulate in this area.[1] This finding was not clearly erroneous.

We need not address the issue of whether transparency is alone a sufficient legal justification for a state to regulate campaign contributions, because the

---

[1] The District Court noted a series of newspaper articles and testimony by the State highlighting that, before the PAC-to-PAC transfer ban, "the appearance in Alabama was that donors were attempting to conceal donations to candidates and other groups by laundering said donations through multiple PACs." Donors were able to conceal these donations by making "a contribution to one PAC, which in turn made a contribution to another PAC, which then made a contribution to yet another PAC and so on, such that by the time the money was delivered to a candidate there was no way to effectively trace the contribution from the original donor to the ultimate recipient." Because Alabama does not limit the number of PACs any individual may create, "a single campaign operative could control all of the PACs in a contribution chain and carry out a scheme to conceal the source of a campaign contribution by simply moving money from one PAC to another."

District Court rightly found that "transparency plainly is related to and furthers the State's interest in preventing corruption and the appearance of corruption insofar as one can only assess whether there has been a <u>quid pro quo</u> exchange if one is able to identify the party making the payment."  This finding is in keeping with the Supreme Court's conclusion that "disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity," because "[a] public armed with information about a candidate's most generous supporters is better able to detect any post-election special favors that may be given in return."  <u>Buckley</u>, 424 U.S. at 67, 96 S. Ct. at 657.  The State's proffered interest in transparency thus ties into its interest in preventing corruption to justify regulating transfers between PACs.

## C.

The ADC next argues that the PAC-to-PAC transfer ban does not sufficiently serve the State's interest in preventing <u>quid pro quo</u> corruption or the appearance of <u>quid pro quo</u> corruption.  It reasons that, in the wake of the Supreme Court's decision in <u>Citizens United</u>, the State no longer has a cognizable corruption-based interest in restricting independent expenditures.  Because the ADC has separate bank accounts for candidate contributions and independent expenditures, it argues that the State has no anti-corruption interest in regulating

contributions into the account that the ADC uses only for independent expenditures.

It is true that in Citizens United, the Supreme Court recognized that "independent expenditures do not lead to, or create the appearance of, quid pro quo corruption." 558 U.S. at 360, 130 S. Ct. at 910. The Court said, "[b]y definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate." Id. This means a state's interest in preventing corruption may no longer justify regulating independent expenditures when there is no other form of contribution to or coordination with a candidate involved.

Other Circuits, applying the logic of Citizens United, have uniformly invalidated laws limiting contributions to PACs that made only independent expenditures. See, e.g., Republican Party of N.M. v. King, 741 F.3d 1089, 1097 (10th Cir. 2013); N.Y. Progress & Prot. PAC v. Walsh, 733 F.3d 483, 487 (2d Cir. 2013); Texans for Free Enter. v. Tex. Ethics Comm'n, 732 F.3d 535, 538 (5th Cir. 2013); Wis. Right to Life State Political Action Comm. v. Barland, 664 F.3d 139, 154 (7th Cir. 2011); Thalheimer v. City of San Diego, 645 F.3d 1109, 1121 (9th Cir. 2011); SpeechNow.org v. FEC, 599 F.3d 686, 696 (D.C. Cir. 2010) (en banc). These opinions generally reason as follows: "In light of the Court's holding as a matter of law that independent expenditures do not corrupt or create the appearance of quid pro quo corruption, contributions to groups that make only

17

independent expenditures also cannot corrupt or create the appearance of corruption.  The Court has effectively held that there is no corrupting 'quid' for which a candidate might in exchange offer a corrupt 'quo.'"  SpeechNow.org, 599 F.3d at 694–95; see also, e.g., Republican Party of N.M., 741 F.3d at 1096–97 ("If an entity can fund unlimited political speech on its own without raising the threat of corruption, no threat arises from contributions that create the fund.").

This reasoning does not extend to contributions made to an organization like the ADC that makes both independent expenditures and candidate contributions. Three of our sister Circuits have addressed the question we face here.  That is, how to treat contribution limitations when the contribution will be put into a separate bank account used only for independent expenditures.  They have split in answering the question of whether keeping separate bank accounts for independent expenditures and campaign contributions is sufficient to eliminate the possibility of corruption or its appearance so as to render contribution limits unconstitutional for the independent expenditure-only accounts.

On one side of the debate, the Tenth Circuit concluded that, where an organization makes both candidate contributions and independent expenditures, separate bank accounts are sufficient to alleviate corruption concerns.  See Republican Party of N.M., 741 F.3d at 1097.  In upholding a preliminary injunction, the court examined the facts of the case to conclude that "under the

record we have, [the organization at issue] adheres to contribution limits for

donations to its candidate account." Id.  It determined that "no anti-corruption

interest is furthered as long as the [organization] maintains an account segregated

from its candidate contributions" for the purpose of making independent

expenditures.  Id.  The Tenth Circuit observed that the organization could "not pass

along the donors' funds to candidates or coordinate with candidates in making

expenditures" if it accepted "unlimited contributions for independent expenditures"

into a separate account.  Id. at 1102.  And "[b]ecause [the organization] maintains

such a segregated account," as evidenced by the record before the court, the Tenth

Circuit concluded that the challenged state contribution limits were

unconstitutional as applied to the independent expenditure-only account.  Id. at

1097.

Conversely, the Second and Fifth Circuits both concluded that a state's

interest in preventing corruption and the appearance of corruption was a

permissible justification for regulating hybrid organizations, even where they had

separate bank accounts.  The Second Circuit established that having a separate

bank account intended for independent expenditures was not sufficient to alleviate

a state's corruption concern when the organization also maintained an "otherwise

indistinguishable" candidate contribution account.  Vt. Right to Life Comm., Inc.

v. Sorrell, 758 F.3d 118, 143 (2d Cir. 2014).  Two organizations were at issue in

the Second Circuit's case: a nonprofit entity and a PAC formed by that entity, which purported to exist only to make independent expenditures. Id. at 122. The PAC brought an as-applied challenge to the state's contribution limits, arguing that those limits could not be imposed on it when the PAC made only independent expenditures. Id. at 125.

The Second Circuit concluded that the state contribution limit was properly applied to the PAC. Although the PAC was intended to make only independent expenditures, it was in fact "enmeshed financially and organizationally" with another PAC controlled by the same organization that made direct contributions to candidates. Id. at 141. The court ruled that the creation of separate bank accounts for the two PACs was not by itself sufficient, because—though "[a] separate bank account may be relevant"—the separate account was not "enough to ensure there is a lack of 'prearrangement and coordination'" with candidates standing alone. Id. The court concluded that "[s]ome actual organizational separation between the groups must exist to assure that the expenditures are in fact uncoordinated." Id. It suggested that, in deciding whether the independent expenditure-only entity was "functionally distinct" from an entity that made direct or coordinated contributions, that court would look to factors such as "the overlap of staff and resources, the lack of financial independence, the coordination of activities, and the flow of information between the entities." Id. at 142.

Examining those factors, the Second Circuit observed that the only proof of

separation provided by the organization were the facts that two separate

committees existed within its organizational documents, and that the PAC

maintained a separate bank account intended only for independent expenditures.

Id. at 143.  The court said, "the fact that there are two separate bank accounts does

not mean the funds were actually treated as separate" where there was evidence

that funds had been transferred between the related PACs and that fundraising

efforts were performed jointly between the PACs.  Id.  The court examined "the

organizational structure of the groups," observing that: the same organization

maintained control over both PACs' "structure and finances"; they "share[d] a

substantial overlap in membership"; and they engaged in joint organizational

activities.  Id. at 143–44.  Based on this substantial "overlap of staff and resources,

the fluidity of funds, and the lack of any informational barrier between the

entities," the court found that the independent expenditure-only entity was not

sufficiently distinct from other parts of the hybrid organization, so the state had an

anti-corruption interest in imposing its contribution limits on that entity.  Id. at 145.

The Fifth Circuit also concluded that a state had a valid anti-corruption

interest in ensuring that a contribution was used only for independent expenditure

purposes, when that contribution would have otherwise violated state contribution

limits.  See Catholic Leadership Coal. of Tex. v. Reisman, 764 F.3d 409, 443 (5th

Cir. 2014).  In the Fifth Circuit case, a nonprofit organization formed a separate

general-purpose PAC to engage in direct political advocacy ahead of an election,

and that PAC purported to make only independent expenditures.  Id. at 418–19.

The nonprofit sought to make an in-kind contribution of its email list of supporters

to the PAC so the PAC could use the email list in support of its independent

expenditures.  Id. at 419.  State law prevented this in-kind contribution, however,

because the PAC was not registered as an independent expenditure-only entity.  Id.

The organization and PAC challenged the state law as applied to their attempt to

transfer the email list.  See id. at 442.

    The Fifth Circuit concluded that, while the state "does not have an

anticorruption interest in limiting contributions intended to support independent

expenditures," it "does have an anti-corruption interest in ensuring those donations

facilitate only independent expenditures."  Id. at 443.  Even though the

organizations said the list would be used only for independent expenditures, the

court determined that "the state is permitted to undertake some reasonable

measures to ensure that any contribution limitations are not circumvented."  Id. at

444.  It observed that the organizations "seem[ed] almost willful in not explaining

what safeguards are in place to ensure the donated email mailing list will only be

used in support of independent expenditures other than the [PAC's] own good

intentions."  Id.  The court determined this "failure to so explain any actual

safeguards beyond potentially opening a separate bank account to deposit contributions raised with the email list [wa]s dispositive of their as-applied challenge." Id. While the Fifth Circuit declined to "weigh in on the precise safeguards that must be present," it held that "the state's interest in preventing quid pro quo corruption and its appearance permits the state to insist, at the very least, that there is some safeguard before permitting the contribution[]." Id.

The well-reasoned approach of the Second and Fifth Circuits provides guidance here. The question of whether a state has a sufficient anti-corruption interest in setting contribution limits like Alabama's PAC-to-PAC transfer ban to regulate contributions made to a hybrid organization but intended only for independent expenditures, can be answered by an examination of the facts about the structure and operations of the hybrid organization. An account set up for independent expenditures can pass muster under a state's interest in anti-corruption only when it is truly independent from any coordination with a candidate.

To create the necessary independence, an organization must do more than merely establish separate bank accounts for candidate contributions and independent expenditures. There must be safeguards to be sure that the funds raised for making independent expenditures are really used only for that purpose. There must be adequate account-management procedures to guarantee that no money contributed to the organization for the purpose of independent expenditures

will ever be placed in the wrong account or used to contribute to a candidate.  We will not undertake to make an exhaustive list of necessary safeguards here, but we will join the Second Circuit in considering factors such as "the overlap of staff and resources, the lack of financial independence, the coordination of activities, and the flow of information between the entities" in deciding whether sufficient safeguards exist.  Vt. Right to Life Comm., 758 F.3d at 142.  We also find guidance from the Fifth Circuit admonition that the safeguards must involve more than the organization's "own good intentions."  Catholic Leadership Coal. of Tex., 764 F.3d at 444.

Beyond sufficient structural separations within the organization, it is also necessary that the same people controlling the contributions to candidates are not also dictating how the independent expenditure money is spent.  And there must be more than simply naming different treasurers for different accounts.  Different people must functionally control the spending decisions for the different accounts.  See Vt. Right to Life Comm., 758 F.3d at 143–44.  Having the same person in control of both accounts threatens the perceived "independence" of the independent expenditure-only account.  How could a person simply "forget," for example, everything she knows about coordinated spending efforts or contributions to candidates when turning her focus to the independent expenditure-only account?

We now examine how the District Court applied this framework. The District Court found that the ADC's separate accounts were not sufficient to alleviate the State's valid corruption concern. The court found that "these two accounts are controlled by the same entity and people" and observed that the ADC "did not present any evidence to indicate there is any organizational separation with respect to the two accounts to alleviate any potential appearance of corruption." It also noted that the ADC did not "offer[] any evidence to indicate that it has implemented any other internal controls to safeguard against the risk that contributions, even if formally earmarked for independent expenditures, could be funneled to a candidate." The record supports the findings of the District Court, which were not clearly erroneous. The District Court properly recognized that the PAC-to-PAC transfer ban served the State's anti-corruption interest as applied to the ADC's account for independent expenditures.

D.

The ADC finally argues that the PAC-to-PAC transfer ban is not sufficiently closely drawn to the State's interest in preventing corruption. In deciding whether a law is sufficiently "closely drawn," we "assess the fit between the stated governmental objective and the means selected to achieve that objective." McCutcheon, 134 S. Ct. at 1445 (plurality opinion) (citing Nat'l Conservative Political Action Comm., 470 U.S. at 496–501, 105 S. Ct. at 1468–70). There must

be "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but a means narrowly tailored to achieve the desired objective." Id. at 1456–57 (quoting Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480, 109 S. Ct. 3028, 3035 (1989)) (alterations adopted).  A law can survive this review if it "avoid[s] unnecessary abridgment" of First Amendment rights.  Buckley, 424 U.S. at 25, 96 S. Ct. at 638.

In determining whether a contribution limit is "closely drawn," the Supreme Court has suggested that "the amount, or level, of that limit could make a difference." Randall v. Sorrell, 548 U.S. 230, 247, 126 S. Ct. 2479, 2491 (2006).  A restriction will generally not be overturned when it does not "have a severe impact on political dialogue." Id. (quotation omitted).  Restrictions with such an impact are suspect because they "prevent[] candidates and political committees from amassing the resources necessary for effective advocacy." Id. (quotation omitted).  Courts approach a legislature's decision about the scope of a law, and whether it is precise enough to carry out a state's objectives with deference.  Typically courts exercise independent judgment on the proper fit only "as a statute reaches th[e] outer limits" of reasonable tailoring. Id. at 249, 126 S. Ct. at 2492.

26

In light of the record developed by the District Court, the limit imposed on the ADC by Alabama's PAC-to-PAC transfer ban is "closely drawn" to the State's interest in preventing corruption.  The evidence shows that, as applied to the ADC, the ban serves an important  anti-corruption interest while only marginally impacting political dialogue.

The District Court noted ample evidence that, before the law's passage, PAC-to-PAC transfers were viewed by Alabama citizens as a tool for concealing donor identity, thus creating the appearance that PAC-to-PAC transfers hide corrupt behavior.  The Alabama legislature acted to prevent this specific category of behavior when it enacted the PAC-to-PAC transfer ban.  And, as discussed above, the ban serves this narrow purpose as applied to the ADC.  Because of the ADC's organizational structure, PAC donations to the ADC give rise to concerns about shadowy campaign contribution activity.  Under the PAC-to-PAC transfer ban, contributions to the ADC can no longer pass through PACs in a way that could obscure the true source of the funds.  See Buckley, 424 U.S. at 67, 96 S. Ct. at 657; Sorrell, 548 U.S. at 265, 126 S. Ct. at 2501 (Kennedy, J., concurring) (PACs "can manipulate the system and attract their own elite power brokers, who operate in ways obscure to the ordinary citizen.").

As applied to the ADC, the ban serves this important anti-corruption purpose without "severe[ly] impact[ing] . . . political dialogue."  Sorrell, 548 U.S. at 247,

126 S. Ct. at 2491 (quotation omitted).  Under the ban, the ADC can still "amass[]
the resources necessary for effective advocacy."  Id.  The ban does not limit the
amount of money the ADC can raise; it only limits the ADC's ability to raise
money through a specific type of donation—PAC-to-PAC transfers.  Moreover, the
ban does not directly affect the ADC's campaign contributions or independent
expenditures.  The ADC can continue to make unlimited contributions and
independent expenditures.  While the ban does bar the ADC from contributing to
other PACs, the ADC has offered no evidence that it contributed to other PACs
prior to the ban or that it seeks to now.

For these reasons, we conclude that the PAC-to-PAC transfer ban as applied
to the ADC is sufficiently "closely drawn to avoid unnecessary abridgement of
associational freedoms."  McCutcheon, 134 S. Ct. at 1444 (quotation omitted).  In
light of the ADC's organizational structure, it is difficult to imagine a less
restrictive means of regulation that would still address the corruption concerns
arising from PAC contributions to the ADC.  Of course, the PAC-to-PAC transfer
ban does not even have to be the least restrictive means of furthering Alabama's
anti-corruption interest in order to survive constitutional scrutiny.  Under the less
rigorous "closely drawn" standard, the ban need only be "narrowly tailored to
achieve [Alabama's] desired objective."  Id. at 1456–57 (quotation omitted).  This
standard has been met.

The PAC-to-PAC transfer ban is closely drawn to meet Alabama's interest in preventing quid pro quo corruption (or its appearance) as applied to the ADC here. We affirm the District Court's finding on the merits that § 17-5-15(b) is constitutional as applied to the ADC.

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 27, 2016

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  15-13920-CC
Case Style:  Alabama Democratic Conference, et al v. Attorney General, State of Ala, et al
District Court Docket No:  5:11-cv-02449-JEO

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Joe Caruso, CC at (404) 335-6177.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1 Ntc of Issuance of Opinion